UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DALE S. FISCHER

UNITED STATES DISTRICT JUDGE PRESIDING

- - -

| | |
|---|---|
| CLODOALDO ANTEMATE, ET AL., | ) |
| | ) |
| PLAINTIFFS, | ) |
| | ) |
| VS. | ) CV14-05255-DSF |
| | ) |
| ESTENSON LOGISTICS, LLC, ET AL., | ) |
| | ) |
| DEFENDANTS. | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

**DAY ONE**

LOS ANGELES, CALIFORNIA

TUESDAY, MAY 9, 2017; 8:30 AM

_____

ALEXANDER T. JOKO, CSR NO. 12272
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CA 90012
AJ_CSR@YAHOO.COM

1    **APPEARANCES OF COUNSEL:**

2    FOR PLAINTIFFS:      KITTY SZETO
                          PARRIS LAW FIRM
3                         43364 10TH STREET WEST
                          LANCASTER, CA 93534
4
                          R. REX PARRIS
5                         PARRIS LAW FIRM
                          43364 10TH STREET WEST
6                         LANCASTER, CA 93534

7

8    FOR DEFENDANTS:      ADAM C. SMEDSTAD
                          SCOPELITIS GARVIN LIGHT
9                         HANSON AND FEARY PC
                          30 WEST MONROE STREET
10                        SUITE 600
                          CHICAGO, IL 60603
11
                          JAMES H. HANSON
12                        SCOPELITIS GARVIN LIGHT
                          HANSON AND FEARY PC
13                        10 WEST MARKET STREET
                          SUITE 1500
14                        INDIANAPOLIS, IN 46204

15                        R. JAY TAYLOR, JR.
                          SCOPELITIS GARVIN LIGHT
16                        HANSON AND FEARY PC
                          10 WEST MARKET STREET
17                        SUITE 1500
                          INDIANAPOLIS, IN 46204

18

19

20

21

22

23

24

25

1                          **I N D E X**

2                                                        <u>PAGE</u>

3     <u>**SCOTT HALTERMAN**</u>

4     DIRECT EXAMINATION BY MR. SMEDSTAD................ 4

5     CROSS-EXAMINATION BY MR. PARRIS................... 38

6     REDIRECT EXAMINATION BY MR. SMEDSTAD............. 67

7     RECROSS-EXAMINATION BY MR. PARRIS................ 72

8     REDIRECT EXAMINATION BY MR. SMEDSTAD............. 77

9     RECROSS-EXAMINATION BY MR. PARRIS................ 81

10

11    <u>**MICHELLE ALEXANDER**</u>

      DIRECT EXAMINATION BY MR. HANSON................. 92
12
      CROSS-EXAMINATION BY MR. PARRIS................. 122
13
      REDIRECT EXAMINATION BY MR. HANSON.............. 166
14
      RECROSS-EXAMINATION BY MR. PARRIS............... 177
15
      REDIRECT EXAMINATION BY MR. HANSON.............. 190
16

17    <u>**BRADY ALAN BANKSON**</u>

18    DIRECT EXAMINATION BY MR. SMEDSTAD.............. 196

19    CROSS-EXAMINATION BY MR. PARRIS................ 210

20    REDIRECT EXAMINATION BY MR. SMEDSTAD........... 216

21    REDIRECT EXAMINATION BY MR. PARRIS............. 220

22

23

24

25

| | **EXHIBIT** | **DESCRIPTION** | **MARKED** | **RECEIVED** |
|---|---|---|---|---|
| 1 | | | | |
| 2 | 590 | EMPLOYEE MANUAL | | 67 |
| 3 | 10 | OFFER LETTER | | 67 |
| 4 | 551 | PLAINTIFF'S DRIVER FILE | | 115 |
| 5 | 552, 553, 554, 557 | PLAINTIFF'S FILE | | 116 |
| 6 | | | | |
| 7 | 592 | HUMAN RESOURCE ACTION FORM | 154 | 158 |
| 8 | 1212 | NOT IDENTIFIED | | 192 |

LOS ANGELES, CALIFORNIA; TUESDAY, MAY 9, 2017

8:30 AM

- - - - -

THE CLERK:  CV14-5255, CLODOALDO ANTEMATE VERSUS ESTENSON LOGISTICS LLC.

COUNSEL, STATE YOUR APPEARANCES.

MR. PARRIS:  R. REX PARRIS ON BEHALF OF THE PLAINTIFFS, YOUR HONOR.

THE COURT:  GOOD MORNING.

MS. SZETO:  GOOD MORNING, YOUR HONOR.  KITTY SZETO ON BEHALF OF THE PLAINTIFF.

MR. HANSON:  YOUR HONOR, JAMES HANSON ON BEHALF OF THE DEFENDANT, ESTENSON LOGISTICS.

MR. SMEDSTAD:  GOOD MORNING, YOUR HONOR.  ADAM SMEDSTAD ON BEHALF OF ESTENSON LOGISTICS.

MR. TAYLOR:  GOOD MORNING, YOUR HONOR.  JAY TAYLOR ON BEHALF OF DEFENDANT ESTENSON LOGISTICS.

THE COURT:  GOOD MORNING.

ALL RIGHT.  WE'RE HERE ON AN AFFIRMATIVE DEFENSE.  SO THE DEFENSE MAY PROCEED.

MR. HANSON:  YOUR HONOR, WOULD YOU LIKE OPENING?  WE DO HAVE --

THE COURT:  IT DOESN'T MATTER TO ME.  IT

1   SHOULD BE VERY BRIEF, IF YOU WISH TO GIVE ONE.  I THINK

2   I KNOW WHAT YOUR POINT IS.

3        MR. HANSON:  WE HAD JUST TWO PRELIMINARY

4   HOUSEKEEPING ISSUES ON EXHIBITS, AND ONE ALSO ABOUT --

5   WE HAD LISTED AS -- ONE OF OUR WITNESSES WE WERE GOING

6   TO CALL WAS THE PLAINTIFF.  AND WE HAD INDICATED -- WE

7   HAD TOLD THE PLAINTIFFS YESTERDAY THAT WE WERE GOING TO

8   CALL HIM FIRST.

9        WE FOUND OUT THIS MORNING THAT HE IS NOT

10  COMING.  THEY HAVE DECIDED NOT TO HAVE HIM COME.  AND I

11  DON'T REALLY UNDERSTAND WHY.  HE'S THE PLAINTIFF.

12       MR. PARRIS:  YOUR HONOR, WHEN HE SAYS THEY

13  TOLD US "YESTERDAY," HE MEANS 8:00 O'CLOCK LAST NIGHT.

14       THE COURT:  IS THAT RIGHT?

15       MR. HANSON:  WE TOLD THEM WE WERE GOING TO

16  CALL HIM FIRST.  THEY ASKED FOR AN ORDER OF WITNESSES.

17  WE GAVE THEM THE ORDER LAST NIGHT.  BUT WE HAVE ALWAYS

18  TOLD THEM.  HE'S BEEN ON THEIR WITNESS LIST AND OURS.

19       THE COURT:  WHEN WILL HE BE HERE?

20       MR. PARRIS:  YOUR HONOR, THE RULES ARE, THEY

21  HAVE TO SUBPOENA HIM.

22       THE COURT:  MY QUESTION IS, "WHEN WILL HE BE

23  HERE?"

24       MR. PARRIS:  FORGIVE ME.  I SHOULD HAVE

25  ANSWERED THAT.

```
 1                    THE COURT:  YES.
 2               MR. PARRIS:  I CAN HAVE HIM HERE TOMORROW.
 3                    IS THE COURT ORDERING ME TO HAVE HIM
 4     HERE?
 5               THE COURT:  YES.
 6               MR. PARRIS:  OKAY.  THANK YOU.
 7               MR. HANSON:  THAT'S ALL.
 8                    YOUR HONOR, GIVEN THAT YOU HAVE HAD THIS
 9     CASE FOR A LONG TIME, WE'LL WAIVE OPENING STATEMENT.
10               THE COURT:  THANK YOU.
11               MR. HANSON:  AND PROCEED WITH OUR FIRST
12     WITNESS.
13               THE COURT:  ALL RIGHT.
14               MR. SMEDSTAD:  YOUR HONOR, WE COULD LIKE TO
15     CALL SCOTT HALTERMAN.
16               MR. PARRIS:  I WOULD OBJECT TO MR. SMEDSTAD
17     PROCEEDING IN THIS.  HE WAS NOT DISCLOSED IN RULE
18     26(F).  HE WAS NOT HERE FOR THE SCHEDULING CONFERENCE.
19               THE COURT:  I THINK HE MEANT THE NAME OF YOUR
20     WITNESS, NOT YOUR NAME, SIR.
21               MR. PARRIS:  I DID MEAN HIM.  I'M OBJECTING TO
22     COUNSEL.
23                    THE RULES ARE, I HAD TO BE HERE FOR THE
24     SCHEDULING CONFERENCE.  HE WAS NOT HERE.
25               THE COURT:  OH, SIT DOWN.
```

```
 1                    GO AHEAD.

 2                  PLEASE STEP FORWARD.

 3              THE CLERK:  YOU DO SOLEMNLY SWEAR THAT THE

 4   TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW

 5   PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE

 6   TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

 7              THE WITNESS:  YES.

 8              THE CLERK:  PLEASE STEP FORWARD TO THE WITNESS

 9   STAND AND STATE YOUR FULL NAME AND SPELL IT.

10              MR. HANSON:  YOUR HONOR, WE HAVE WITNESSES IN

11   THE COURTROOM.

12              SHOULD WE ASK THEM TO STEP OUT?

13              MR. PARRIS:  YES, YOUR HONOR.

14              THE COURT:  OKAY.  SURE.

15                  DIRECT EXAMINATION

16   BY MR. SMEDSTAD:

17   Q    WOULD YOU STATE YOUR NAME FOR THE RECORD.

18   A    SCOTT ALLEN HALTERMAN, H-A-L-T-E-R-M-A-N.

19   Q    WHERE ARE YOU EMPLOYED?

20   A    ESTENSON LOGISTICS.

21   Q    AND HOW LONG HAVE YOU BEEN EMPLOYED AT ESTENSON?

22   A    APPROXIMATELY, 12 YEARS.

23   Q    WHAT IS YOUR CURRENT POSITION WITH ESTENSON?

24   A    I AM A SITE MANAGER AT THE TRACY RDC.

25   Q    AND WHAT DOES "RDC" STAND FOR?
```

1    A    THE "RAPID DEPLOYMENT CENTER."

2    Q    HOW LONG HAVE YOU BEEN THE SITE MANAGER FOR THE

3    TRACY RDC?

4    A    APPROXIMATELY, SEVEN YEARS.

5    Q    DOES ESTENSON HAVE OTHER RDC'S IN CALIFORNIA?

6    A    YES, THEY DO.

7    Q    AND WHERE ARE THEY LOCATED?

8    A    WE HAVE ONE IN REDLANDS, CALIFORNIA AND ONTARIO,

9    CALIFORNIA.

10   Q    DO THE REDLANDS AND ONTARIO, CALIFORNIA RDC'S

11   SERVICE THE HOME DEPOT ACCOUNT?

12   A    YES, THEY DO.

13   Q    WHAT WAS YOUR POSITION WITH ESTENSON BEFORE COMING

14   TO TRACY?

15   A    I WAS A SITE MANAGER AT THE LATHROP SDC.

16   Q    AT THE "LATHROP," I'M SORRY?

17   A    SDC.

18   Q    THANK YOU.

19        AND WHAT DOES "SDC" STAND FOR?

20   A    STOCKING DISTRIBUTION CENTER.

21   Q    AND DID LATHROP SDC HAVE A DIFFERENT NAME WHEN YOU

22   FIRST GOT TO LATHROP?

23   A    YES, IT DID.

24   Q    AND WHAT WAS THAT?

25   A    IT WAS "IDC."

```
1    Q    WHAT DOES "IDC" STAND FOR?

2    A    IMPORT DISTRIBUTION CENTER.

3    Q    HOW LONG WERE YOU AT THE LATHROP IDC, SLASH, SDC?

4    A    APPROXIMATELY, FIVE YEARS.

5    Q    AND AT THAT TIME THAT YOU WERE THERE, DID THE

6    LATHROP DISTRIBUTION CENTER SERVICE THE HOME DEPOT

7    ACCOUNT?

8    A    YES, IT DID.

9    Q    WHERE DID THE FREIGHT THAT CAME INTO LATHROP COME

10   FROM?

11   A    IT CAME FROM THE PORTS, THE OAKLAND PORT.

12   Q    AND WHAT KIND OF PRODUCT WAS COMING IN?

13   A    IT WAS SEASONAL PRODUCT.  YOU'D HAVE PATIO

14   FURNITURE, CHRISTMAS DECORATIONS, WINTER STORAGE TOTES,

15   FANS, AC'S.

16   Q    ARE THERE OTHER SDC'S THAT SERVICE THE HOME DEPOT

17   ACCOUNT?

18   A    YES, THERE IS.

19   Q    AND IN CALIFORNIA, I APOLOGIZE?

20   A    YES.

21   Q    AND WHERE ARE THEY LOCATED?

22   A    IN MIRA LOMA, CALIFORNIA.

23   Q    DOES THE TRACY RDC SERVICE THE HOME DEPOT ACCOUNT?

24   A    YES, IT DOES.

25   Q    AND WHERE DOES THE FREIGHT THAT COMES INTO TRACY
```

```
1    COME FROM?

2           MR. PARRIS:  YOUR HONOR, I'M GOING TO OBJECT

3    TO THIS LINE OF QUESTIONING.  THIS WITNESS WAS -- FIRST

4    OF ALL, THE DESIGNATION, THE RULE 26(1) DESIGNATION,

5    SIMPLY HAS HIS NAME.

6           HE WAS THEN -- THEY SUBSEQUENTLY TOLD US

7    THAT HE WAS THE SUPERVISOR FOR THE PLAINTIFF, AND

8    THAT'S HOW HE WOULD BE TESTIFYING.

9           WE TOOK HIS DEPOSITION AS THE SUPERVISOR

10   FOR THE PLAINTIFF.

11           AS TO THE PRACTICES OF WHAT HOME DEPOT

12   DOES, HE WAS NEVER DESIGNATED FOR THAT IN ANY WAY.  AND

13   IT WOULD BE INAPPROPRIATE FOR US TO BE BUSHWHACKED WITH

14   IT AT THIS POINT.

15           MR. SMEDSTAD:  YOUR HONOR, I'M NOT ASKING WHAT

16   HOME DEPOT DOES.  I'M ASKING ABOUT HIS KNOWLEDGE OF THE

17   OPERATIONS OF THE SITES THAT HE HAS MANAGED FOR 12

18   YEARS.

19           THE COURT:  I THINK MR. PARRIS' POINT STILL

20   APPLIES.  APPARENTLY, YOU DESIGNATED HIM FOR A SPECIFIC

21   PURPOSE.  AND AS FAR AS I CAN TELL, HE'S TESTIFYING

22   OUTSIDE THAT SPECIFIC PURPOSE.

23           MR. SMEDSTAD:  IF I MAY HAVE A MOMENT TO

24   CONFER?  THANK YOU.

25           (PAUSE IN THE PROCEEDINGS)
```

```
1              MR. SMEDSTAD:  I APOLOGIZE, YOUR HONOR.

2              I AM ADVISED THAT MR. HALTERMAN WAS

3    DISCLOSED AS A FACT WITNESS WITH KNOWLEDGE OF THE FACTS

4    RELATING TO THE ALLEGATIONS IN THE COMPLAINT AND OUR

5    AFFIRMATIVE DEFENSES, AND WAS NOT SPECIFICALLY OR

6    NARROWLY DESIGNATED AS JUST "PLAINTIFF'S SUPERVISOR."

7              THEY HAD A BROAD-BASED DEPOSITION.  HE

8    WAS NOT A CORPORATE REPRESENTATIVE DESIGNATED TO SPEAK

9    ON A PARTICULAR TOPIC.

10             THIS HAS BEEN AN ISSUE THAT THE

11   PLAINTIFFS HAVE BEEN AWARE OF FOR THE ENTIRE PENDENCY

12   OF THIS CASE, AND CERTAINLY SINCE MR. HALTERMAN HAS

13   BEEN DEPOSED.

14             MR. PARRIS:  YOUR HONOR, I DON'T WANT TO DEAL

15   WITH WHAT HE THINKS I WAS AWARE OF OR NOT AWARE OF.

16             THE RULES ARE VERY CLEAR.  YOU HAVE TO

17   DESIGNATE THE WITNESS, AND YOU HAVE TO DISCLOSE TO US

18   WHAT HE'S GOING TO --

19             THE COURT:  STOP TELLING ME WHAT THE RULES

20   ARE.

21             DO YOU HAVE SOME KIND OF DESIGNATION THAT

22   YOU'RE RELYING ON?

23             MR. PARRIS:  YES, YOUR HONOR, OF COURSE.

24             THE COURT:  YOU CAN CALL A WITNESS TO TESTIFY

25   AS TO WHATEVER YOU WANT, UNLESS THERE'S BEEN SOMETHING
```

```
 1    PREVIOUSLY THAT'S BEEN MISLEADING.

 2              MR. PARRIS:  WHEN -- IN THEIR DISCLOSURE,

 3    WHERE THEY DISCLOSED THEIR WITNESSES, THEY ONLY

 4    DISCLOSED THREE WITNESSES.  HE WAS ONE OF THEM.  AND

 5    ALL HE WAS WAS A NAME.

 6              THE COURT:  OKAY.  SO HERE HE IS.  AND HE'S

 7    GOT THE SAME NAME.

 8                   SO WHAT'S YOUR POINT?  IS THERE --

 9              MR. PARRIS:  MY --

10              THE COURT:  YOU TOLD ME HE WAS DESIGNATED

11    "NARROWLY."  SO WHERE IS THE DESIGNATION THAT'S

12    NARROWED IT?

13              MR. PARRIS:  ONE SECOND, YOUR HONOR.

14               THIS IS WHAT HE'S DESIGNATED FOR ON THE

15    WITNESS LIST IS --

16              THE COURT:  GIVE IT TO MS. PLATO.

17              MR. PARRIS:  HE'S NUMBER FOUR ON THE WITNESS

18    LIST.  AND THIS IS THE DEFENDANT'S INITIAL DISCLOSURE,

19    WHICH WAS NEVER SUPPLEMENTED.

20              THE COURT:  SO YOU INDICATED HE'S GOING TO

21    TESTIFY TO THE OPERATIONS OF THE TRACY RDC?

22              MR. SMEDSTAD:  YES.  THAT'S INDICATED ON OUR

23    WITNESS DISCLOSURE.

24              THE COURT:  OKAY.  WHEN WAS HE DEPOSED?

25              MR. TAYLOR:  NOVEMBER 2014.
```

1          MR. SMEDSTAD:  YES, YOUR HONOR.

2          THE COURT:  OKAY.  YOU MAY CONTINUE, COUNSEL.

3          MR. SMEDSTAD:  THANK YOU, YOUR HONOR.

4   BY MR. SMEDSTAD:

5   Q    WHERE DOES THE FREIGHT THAT COMES INTO TRACY COME

6   FROM?

7          MR. PARRIS:  OBJECTION.  FOUNDATION.

8              NO FOUNDATION FOR HOW HE KNOWS THE

9   FREIGHT GETS TO TRACY.

10          THE COURT:  IF YOU'RE GOING TO OBJECT TO EVERY

11  QUESTION, THIS IS GOING TO BE SEVERAL-MONTHS LONG.

12          MR. PARRIS:  I DO NOT WASTE OBJECTIONS, YOUR

13  HONOR.

14          THE COURT:  SO FAR YOU'RE NOT CONVINCING ME OF

15  THAT.

16          MR. PARRIS:  THEN --

17          THE COURT:  WHAT IS YOUR OBJECTION?

18  FOUNDATION?

19              THANK YOU.  SIT DOWN.

20              LAY A FOUNDATION, COUNSEL.

21              SIT DOWN.  IT'S A BENCH TRIAL.

22  BY MR. SMEDSTAD:

23  Q    DO YOU KNOW WHERE THE FREIGHT COMING INTO THE TRACY

24  RDC COMES FROM?

25  A    YES.

1    Q    HOW DO YOU KNOW THAT?

2    A    OUR DRIVERS PICK UP FREIGHT FROM NEVADA.  OUR -- I

3    SEE BILLS OF LADING THAT ARE FROM OTHER STATES.

4    Q    OKAY.  AND WHAT'S A "BILL OF LADING"?

5    A    IT'S A PIECE OF PAPER THAT WILL DESCRIBE THE

6    SHIPPER, THE CONSIGNEE, QUANTITIES, WEIGHTS, WHAT KIND

7    OF PRODUCT IT IS.

8    Q    AND WHEN YOU SAY "CONSIGNEE," WHAT DO YOU MEAN?

9    A    THE DESTINATION.

10    Q    OKAY.  AND IT INDICATES, YOU SAID, THE SHIPPER.

11          IS THAT THE PERSON OR ENTITY THAT IS SENDING

12    THE FREIGHT?

13    A    YES.

14    Q    OKAY.  AND DOES IT SHOW ANYTHING ABOUT THE ORIGIN

15    OF THE FREIGHT?

16          MR. PARRIS:  YOUR HONOR, NOW WE'RE HEARSAY.

17          IF HE'S GOT A DOCUMENT, WE SHOULD BE ABLE

18    TO SEE IT, AND YOU CAN SEE FOR YOURSELF.  BUT FOR HIM

19    TO SAY WHAT SOMETHING SAYS THAT'S NEVER BEEN AN EXHIBIT

20    IN THIS CASE IS BUSHWHACKING THE PLAINTIFF.

21          IT IS -- IT IS INAPPROPRIATE FOR ME TO

22    HAVE TO DEAL WITH THIS INTERSTATE ISSUE AS TO WHAT

23    COMES FROM CHINA AND WHERE IT'S ADDRESSED --

24          THE COURT:  WHEN I WANT FURTHER DISCUSSION FOR

25    YOUR ONE- OR TWO-WORD OBJECTION, I WILL ASK FOR IT.

```
1    SIT DOWN.

2               MR. PARRIS:  SO THE RECORD IS CLEAR --

3               THE COURT:  SIT DOWN.

4               MR. PARRIS:  -- OBJECTION.  FOUNDATION AND

5    HEARSAY.

6               THE COURT:  THANK YOU.

7               MR. SMEDSTAD:  AND, YOUR HONOR, I'M JUST

8    ESTABLISHING HOW HE KNOWS WHERE THE FREIGHT COMES FROM.

9               THE COURT:  NOT BY ASKING HIM SPECIFICALLY.

10              MR. SMEDSTAD:  NO.  I ASKED HIM ABOUT WHAT A

11   BILL OF LADING WAS AND WHAT WOULD BE SHOWN ON IT.  NOT

12   WHAT ANY PARTICULAR BILL OF LADING --

13              THE COURT:  THAT'S FINE.  THAT'S FINE.

14   BY MR. SMEDSTAD:

15   Q   SO YOU MENTIONED SEEING BILLS OF LADING.

16              YOU MENTIONED THAT ESTENSON BRINGS IN SOME OF

17   THE FREIGHT ITSELF, AND SO YOU KNOW WHERE THAT FREIGHT

18   IS COMING FROM.

19              AND I THINK YOU SAID IT CAME FROM NEVADA; IS

20   THAT RIGHT?

21   A   YES.

22   Q   DOES ANY OF THE FREIGHT COME IN FROM OUTSIDE THE

23   COUNTRY?

24   A   YES.

25   Q   AND HOW DO YOU KNOW THAT?
```

```
 1    A    FROM BILLS OF LADING.

 2    Q    AND WHAT KIND OF FREIGHT COMES FROM OUTSIDE THE

 3    COUNTRY?

 4    A    WATER HEATERS.

 5    Q    AND, I'M SORRY, DO YOU KNOW WHO MANUFACTURES THOSE

 6    WATER HEATERS?

 7    A    RHEEM.

 8    Q    AND DO YOU KNOW WHERE THEY'RE MANUFACTURED?

 9    A    IN MEXICO.

10    Q    YOU'VE TOLD ME ABOUT WHERE THE COUNTRY COMES -- THE

11    PRODUCT COMES FROM.

12              WHAT KIND OF PRODUCTS ARE THEY THAT ARE

13    CONTAINED IN THESE FREIGHT CONTAINERS?

14    A    PRODUCT THAT YOU WOULD SEE IN A HOME DEPOT; TOOLS,

15    WATER HEATERS, TOILETS, LIGHTS, PAINT --

16    Q    OKAY.

17    A    -- GARDEN SUPPLIES, ET CETERA.

18    Q    AND DESCRIBE FOR ME WHAT HAPPENS TO THE FREIGHT AT

19    TRACY ONCE IT ARRIVES AT TRACY?

20    A    IT'LL COME THROUGH OUR GATE.  IT'LL BE STAGED IN

21    THE YARD.  AT THAT TIME, HOME DEPOT WILL REQUEST A MOVE

22    THROUGH OUR YMS SYSTEM TO --

23    Q    LET ME STOP YOU THERE.  I WANT TO MAKE SURE

24    EVERYBODY UNDERSTANDS WHAT IT IS THAT YOU'RE SAYING.

25              YOU SAID "COME INTO OUR GATE," WHAT DO YOU
```

```
 1    MEAN?

 2    A    INTO OUR FACILITY.

 3    Q    IT'S A GATED FACILITY?

 4    A    YES, IT IS.

 5    Q    AND YOU THEN SAID, "IT WILL BE STAGED IN THE YARD."

 6         WHAT DOES THAT MEAN?

 7    A    THE CARRIERS WILL DROP THE TRAILER IN A YARD

 8    LOCATION.

 9    Q    ANY LOCATION?

10    A    THEY'RE ASSIGNED A YARD LOCATION.

11    Q    OKAY.  SO WHEN YOU SAY THE "CARRIERS," TO WHOM ARE

12    YOU REFERRING?

13    A    ESTENSON, JB HUNT, SWIFT, SCHNEIDER, PLEXMAR, MAY.

14    Q    AND THE TRAILERS THAT THESE CARRIERS ARE BRINGING

15    IN, ARE THEY LOADED?

16    A    YES.

17    Q    AND ONCE THEY HAVE PARKED THEM IN THEIR DESIGNATED

18    SPOT, WHICH I BELIEVE YOU REFERRED TO AS "STAGING THE

19    TRAILER," THEN WHAT HAPPENS?

20    A    HOME DEPOT WILL PUT IN A REQUEST TO HAVE THAT

21    TRAILER MOVED FROM THE YARD LOCATION TO A DOCK DOOR.

22    Q    WHEN YOU SAY A "DOCK DOOR," WHAT DO YOU MEAN?

23    A    A DOOR AGAINST THE BUILDING.

24    Q    OKAY.  AND WHAT HAPPENS NEXT?

25    A    ONCE THE TRAILERS HIT THE DOCK DOOR, THE HOME DEPOT
```

15

```
1    RECEIVES THE TRAILER.

2    Q    OKAY.  I DON'T UNDERSTAND WHAT YOU MEAN BY

3    "RECEIVES THE TRAILER."

4    A    THEY WILL CHECK-IN THE PRODUCT.  OFF-LOAD THE

5    TRAILER AND CHECK IT IN.

6              THE COURT:  THE DOCK DOOR IS AT THE HOME

7    DEPOT?

8              THE WITNESS:  YES.

9    BY MR. SMEDSTAD:

10   Q    AS A POINT OF CLARIFICATION, AT THE DISTRIBUTION

11   CENTER?

12   A    YES.

13   Q    OKAY.  AND ONCE THE HOME DEPOT ASSOCIATES HAVE

14   UNLOADED THE PRODUCT OFF OF THE INCOMING TRAILER, THEN

15   WHAT HAPPENS?

16   A    THEY CONFIRM THAT IT'S ALL THERE.  THEN THEY WILL

17   MOVE IT ACROSS THE BUILDING FROM THE INBOUND SIDE.

18              MR. PARRIS:  YOUR HONOR, I'M GOING TO OBJECT

19   TO FOUNDATION.

20   BY MR. SMEDSTAD:

21   Q    HOW DO YOU KNOW THAT THEY MOVE IT ACROSS THE

22   BUILDING?

23   A    I WORK IN THAT BUILDING.

24              THE COURT:  ALL RIGHT.

25
```

16

1    BY MR. SMEDSTAD:

2    Q    SO YOU SAID THEY "MOVE IT ACROSS THE BUILDING."

3         WHY ARE THEY MOVING IT "ACROSS THE BUILDING"?

4    A    IT'S A CROSS-DOCK OPERATION.

5    Q    WHAT DOES "CROSS-DOCK" MEAN?

6    A    COMES IN ON ONE SIDE OF THE BUILDING AND GOES OUT

7    ON THE OTHER SIDE OF THE BUILDING.

8    Q    LITERALLY ON THE OTHER SIDE?

9    A    YES.

10   Q    AND IS IT JUST GOING FROM ONE TRAILER THROUGH THE

11   BUILDING AND INTO ANOTHER TRAILER?

12   A    YOU HAVE A TRAILER ON THE INBOUND SIDE WITH

13   PRODUCTS, SAY, WATER HEATERS.  IT'LL GET RECEIVED BY

14   THE HOME DEPOT.  AND THEN THEY WILL DESIGNATE, SAY, "12

15   HEATERS GO TO THIS DOOR.  FOUR GO TO THIS DOOR."

16        WE DELIVER TO 88 STORES.  SO THAT PRODUCT THAT

17   CAME ON ONE TRAILER COULD GET DISBURSED ONTO 88

18   DIFFERENT TRAILERS.

19   Q    OKAY.  AND WOULD THAT BE ALL THAT WOULD GO INTO

20   THAT TRAILER, IS JUST THE WATER HEATERS?

21   A    NO.

22   Q    WHAT ELSE WOULD GO IN?

23   A    ALL THE OTHER PRODUCT FROM OTHER TRAILERS THAT THEY

24   HAD OFF-LOADED.

25   Q    SO IS IT FAIR TO DESCRIBE THIS AS A CONSOLIDATION

```
1    POINT?

2    A    YES.

3    Q    OKAY.  AND BY CONSOLIDATING, DESCRIBE THAT FOR US

4    IN TERMS OF HOW THE FREIGHT IS GETTING INTO THE VARIOUS

5    TRAILERS THAT ARE GOING TO THE VARIOUS STORES?

6    A    AGAIN, IT'S RECEIVED ON THE INBOUND SIDE.  THEY

7    CONSOLIDATE THE PRODUCT TO FIT INTO ONE TRAILER.  AND

8    THEY TRY TO DO THEIR BEST TO KEEP OUT THAT TRAILER.

9    Q    AND WHO DECIDES WHAT PRODUCT WILL BE PUT INTO THE

10   TRAILER?

11   A    HOME DEPOT DOES.

12   Q    OKAY.  AND HOW LONG DOES THE FREIGHT THAT COMES

13   INTO TRACY STAY AT TRACY FROM THE TIME IT ARRIVES?

14   A    HOME DEPOT'S GOAL IS TO HAVE THE PRODUCT --

15            MR. PARRIS:  OBJECTION, YOUR HONOR.

16   SPECULATION.  FOUNDATION.

17            THE COURT:  HE WASN'T ANSWERING YOUR QUESTION

18   ANYWAY.  SO WHY DON'T YOU ASK A DIFFERENT QUESTION.

19   BY MR. SMEDSTAD:

20   Q    BASED ON YOUR EXPERIENCE, HOW LONG DOES THE FREIGHT

21   STAY AT TRACY FROM THE TIME IT ARRIVES?

22   A    APPROXIMATELY, THREE DAYS.

23   Q    OKAY.  AND THEN ONCE THE FREIGHT IS TAKEN OFF OF

24   THE TRAILER THAT HAS ALL THE WATER HEATERS AND

25   DISTRIBUTED INTO THE VARIETY OF NEW TRAILERS AND THEN
```

```
 1    CONSOLIDATED WITH OTHER FREIGHT, HOW DOES THAT

 2    NEWLY-LOADED TRAILER GET FROM THE DISTRIBUTION CENTERS

 3    TO THE HOME DEPOT STORES?

 4    A    THROUGH OUR DRIVERS.

 5    Q    AND WHEN YOU SAY THAT, "OUR DRIVERS," DO YOU MEAN

 6    ROUTE DRIVER?

 7    A    ROUTE DRIVERS, YES.

 8    Q    I APOLOGIZE.  I SAY "ROUTE."  MY FATHER BEAT IT OUT

 9    OF ME, AND HE WANTS ME TO SAY "ROUTE."

10         THE COURT:  I SAY "ROUTE," SO IT DOESN'T

11    MATTER TO ME.

12         MR. SMEDSTAD:  WELL, I APOLOGIZE IN ADVANCE

13    BECAUSE IT'S A HARD HABIT TO BREAK.

14    BY MR. SMEDSTAD:

15    Q    WHAT ARE "HOSTLERS"?

16    A    THEY'RE DRIVERS THAT MOVE TRAILERS AROUND WITHIN

17    OUR YARD.

18    Q    AND WHAT IS A "CLASS A COMMERCIAL DRIVER'S

19    LICENSE"?

20    A    IT'S A TYPE OF LICENSE THAT ALLOWS A DRIVER TO TAKE

21    A TRACTOR-TRAILER OUT ON THE HIGHWAY.

22    Q    DO ALL OF THE ESTENSON'S ROUTE DRIVERS THAT SERVICE

23    HOME DEPOT HAVE CLASS A CDL'S?

24    A    YES, THEY DO.

25    Q    WHEN I SAY "CDL," I'M INDICATING COMMERCIAL
```

1    DRIVER'S LICENSE.

2              YOU UNDERSTOOD THAT?

3    A    YES.

4    Q    ALL RIGHT.  WHY?

5    A    IT'S A REQUIREMENT BY LAW TO HAVE THAT.

6    Q    DOES ESTENSON REQUIRE ITS HOSTLER DRIVERS TO HAVE

7    CLASS A CDL'S?

8    A    YES, WE DO.

9    Q    WHY?

10   A    AT ANY GIVEN TIME, WE COULD ASK THEM TO TAKE A

11   TRACTOR-TRAILER ON A ROAD TO THE STORE OR BACKHAUL.

12   Q    OR A?

13   A    BACKHAUL.

14   Q    WHAT'S A "BACKHAUL"?

15             MR. PARRIS:  YOUR HONOR, I WOULD OBJECT.

16   MOTION TO STRIKE BASED ON FOUNDATION AS TO THE "WHY."

17   WHO SAYS?  I MEAN, WHERE IS THIS "WHY" COMING FROM?

18             THE COURT:  THAT'S WHY THEY MADE

19   CROSS-EXAMINATION.

20   BY MR. SMEDSTAD:

21   Q    WHAT IS A "BACKHAUL"?

22   A    IT'S A VENDOR THAT WE PICK UP PRODUCT FROM THAT

23   COMES INTO THE DC.

24   Q    OKAY.  SO WHEN YOU SAY A HOSTLER MIGHT BE CALLED

25   UPON TO PERFORM A BACKHAUL, WHAT WOULD THAT INVOLVE?

1    A    HE WOULD TAKE AN EMPTY TRAILER FROM THE DC TO THE

2    VENDOR AND PICK UP A LOADED TRAILER AND BRING IT BACK.

3    Q    WHAT OTHER CIRCUMSTANCES MIGHT OR HAS ESTENSON

4    DISPATCHED HOSTLERS TO HAUL ROUTE LOADS TO HOME DEPOT

5    STORES?

6    A    IF WE HAD A ROUTE DRIVER THAT CALLED OUT SICK, OR

7    HOME DEPOT REQUESTED A HOT SHIPMENT TO A STORE, OR THEY

8    COULD ALSO POSSIBLY VOLUNTEER ON A SATURDAY, FOR

9    EXAMPLE, TO RUN ROUTES.

10   Q    AND WHEN WE SAY "ROUTES," YOU MEAN ON THE HIGHWAYS,

11   THE PUBLIC HIGHWAYS?

12   A    YES.

13   Q    OKAY.  AND YOU SAID A "HOT LOAD."

14        WHAT'S A "HOT LOAD"?

15   A    IT WOULD BE A SHIPMENT THAT HOME DEPOT IS

16   REQUESTING US THAT WE GET IT TO THE STORE ASAP.

17   Q    OKAY.  AND HOW DOES ESTENSON DECIDE WHICH HOSTLER

18   WILL TAKE THE ROUTE LOAD WHEN THEY'RE DISPATCHED?

19   A    AS LONG AS THAT HOSTLER HAD THE HOURS OF SERVICE

20   AVAILABLE TO TAKE THAT RUN, WE WOULD ASK THAT DRIVER.

21   Q    AND YOU SAID "HOURS OF SERVICE," WHAT ARE YOU

22   REFERRING TO?

23   A    THEIR HOURS AVAILABLE TO DRIVE ON THE FREEWAY, THE

24   HIGHWAY.

25   Q    WHEN YOU SAY "HOURS AVAILABLE TO DRIVE ON THE

1    HIGHWAY," WHO SETS THOSE HOURS?

2    A    THE FEDERAL D.O.T.

3    Q    ARE ANY HOSTLERS EXEMPT FROM BEING DISPATCHED TO

4    TAKE A LOAD TO A STORE?

5    A    NO.

6    Q    DOES ESTENSON HAVE ANY RECORDS REFLECTING INSTANCES

7    IN WHICH HOSTLERS PERFORMED ROUTE ACTIVITY ON THE OPEN

8    ROADS?

9    A    YES.

10   Q    WHAT KIND OF RECORDS DO THEY HAVE?

11   A    IT WOULD BE A TRIP SHEET.

12   Q    WHAT'S A "TRIP SHEET"?

13   A    IT'S A FORM THAT THEY -- ALL DRIVERS FILL OUT FOR

14   THEIR ACTIVITY OF THAT DAY.

15   Q    AND WHEN DO THE DRIVERS FILL THAT OUT?

16   A    AT THE START OF THEIR SHIFT, THROUGHOUT THEIR SHIFT

17   AND AT THE END OF THEIR SHIFT.

18   Q    DO YOU INSTRUCT THEM FILL THEM OUT

19   CONTEMPORANEOUSLY WITH THE ACTIVITIES THAT THEY'RE

20   PERFORMING?

21   A    THROUGHOUT THE DAY, YES.

22   Q    AND THEN ARE THEY REQUIRED TO TURN THOSE TRIP

23   SHEETS IN?

24   A    YES, THEY ARE.

25   Q    AND DOES ESTENSON MAINTAIN THOSE TRIP SHEETS?

1   A   YES, THEY DO.

2   Q   DOES EVERY DRIVER FILL OUT A TRIP SHEET WHEN HE

3   PERFORMS ROUTE ACTIVITIES?

4   A   YES.

5   Q   DO HOSTLERS FILL OUT TRIP SHEETS WHEN THEY PERFORM

6   ROUTE ACTIVITIES?

7   A   YES.

8   Q   AND HOW CAN YOU LOOK AT A TRIP SHEET AND TELL THAT

9   IT INVOLVES ROUTE ACTIVITIES?  THAT IS, DRIVING A LOAD

10   ON THE OPEN ROAD.

11   A   IT'LL SHOW THEIR HOME DESTINATION.  TRACY RDC, FOR

12   EXAMPLE.

13          THE NEXT LINE ITEM WOULD BE A STORE, HOME

14   DEPOT STORE.  IT WOULD IDENTIFY THAT BY A STORE NUMBER

15   AND A CITY.

16   Q   HOW MANY TRIP SHEETS HAVE YOU SEEN IN YOUR 12 YEARS

17   SERVICING THE HOME DEPOT DISTRIBUTION CENTERS?

18   A   THOUSANDS OF THEM.

19   Q   ARE YOU ABLE TO RECOGNIZE ESTENSON TRIP SHEETS WHEN

20   YOU SEE THEM?

21   A   YES.

22          MR. SMEDSTAD:  OKAY.  YOUR HONOR, I'D LIKE TO

23   SHOW THE WITNESS A GROUP EXHIBIT, 587, WHICH CONSISTS

24   OF BINDERS 2 THROUGH 8.  THAT'S ONE EXHIBIT.

25          AND I'LL REPRESENT FOR THE RECORD THAT IT

```
1    IS A PAPER PRINTOUT OF ALL OF THE TRIP SHEETS PERFORMED

2    BY OR FILLED OUT BY THE HOSTLERS REFLECTING THEIR ROUTE

3    ACTIVITY DURING THE CLASS PERIOD.

4            THE COURT:  AND WHEN WAS THAT SHOWN TO

5    MR. PARRIS?  I KNOW WE HAD HAD SOME DISPUTES ABOUT

6    THIS.

7            MR. SMEDSTAD:  SO THE VAST MAJORITY OF THE

8    TRIP SHEETS WERE PRODUCED IN THE ORDINARY COURSE.

9            WE THEN PRODUCED A SPREADSHEET THAT

10   IDENTIFIED CERTAIN LOADS THAT COMES FROM A DIFFERENT

11   DATA SOURCE.  AND THERE WERE -- MR. PARRIS' OFFICE

12   IDENTIFIED SOME LINES THAT DID NOT HAVE CORRESPONDING

13   TRIP SHEETS.

14           WE THEN, SUBSEQUENTLY, LOOKED FOR AND

15   FOUND ADDITIONAL TRIP SHEETS REFLECTING SOME OF THE

16   MISSING LINE ITEMS THAT MR. PARRIS HAD IDENTIFIED.  AND

17   I BELIEVE THOSE WERE PRODUCED, APPROXIMATELY, A YEAR

18   AGO.

19           MR. PARRIS:  THEY WERE PRODUCED IN THE -- LAST

20   FALL AND BEGINNING OF THIS YEAR.

21           MR. SMEDSTAD:  SO IN SEPTEMBER AND THEN --

22   WHEN YOU SAY THE "BEGINNING" --

23           MR. TAYLOR:  I THINK JANUARY WAS THE LAST --

24           MR. SMEDSTAD:  JANUARY.

25           THE COURT:  SO THERE'S NOTHING IN THESE
```

1    BINDERS THAT MR. PARRIS HAS NOT YET BEEN PROVIDED?

2           AND THE MOST RECENT DOCUMENT PRODUCTION

3    WAS JANUARY 2017?

4           MR. SMEDSTAD:  CORRECT.

5           THE COURT:  ALL RIGHT.  MR. PARRIS?

6           MR. PARRIS:  THAT MAY OR MAY NOT BE TRUE, YOUR

7    HONOR.  WE HAVEN'T SEEN THOSE BINDERS.

8           NOW, MY CONCERN IS, IF YOU -- IF YOU WHAT

9    WANT ME TO DEAL WITH JUST THIS QUESTION, I CAN OR

10   SHOULD WE JUST DEAL WITH THE ISSUE?

11          THE COURT:  LET'S GO AHEAD AND DEAL WITH THE

12   WHOLE ISSUE.

13          MR. PARRIS:  OKAY.  THE PURPOSE OF WHY THEY

14   BROUGHT IN ALL THESE BINDERS IS BECAUSE THEY -- WE

15   ASKED FOR THE UNDERLYING DOCUMENTS UNDER RULE 1006 TO

16   SUPPORT THAT EXHIBIT THAT MICHELLE ALEXANDER HAD

17   CREATED.  AND THAT IS PRECISELY HOW THEY RESPONDED TO

18   US.

19          THE 1006 REQUIRES YOU TO PULL OUT THE

20   EXHIBITS THAT YOU HAVE SUMMARIZED FOR THIS EXHIBIT.

21          WHAT THEY HAVE DONE IS, THEY HAVE GIVEN

22   US 90,000 DOCUMENTS AND SAID, "OH, IT'S IN THERE."

23   THAT'S INAPPROPRIATE.

24          THE 1006 REQUIRES THAT IF YOU HAVE -- IF

25   YOU HAD SUMMARIZED THESE EXHIBITS, THESE DOCUMENTS THAT

```
 1   ARE BUSINESS RECORDS, YOU HAVE TO GIVE US THE ONES YOU
 2   USED TO MAKE THAT SUMMARY.  NOT ONES THAT YOU -- NOT
 3   THE WHOLE UNIVERSE.
 4             YOU FOLLOW ME?
 5             THE COURT:  I FOLLOW WHAT YOU'RE SAYING.  I
 6   DON'T KNOW THAT THAT'S WHAT 1006 REQUIRES, BUT --
 7             MR. PARRIS:  AND WE'RE GOING TO SEE, YOU KNOW,
 8   AS THIS GOES ON, ANOTHER EXHIBIT SHOWING THE CAPS OF
 9   WHEN THE DRIVERS APPARENTLY DROVE.  GIVE ME THOSE
10   EXHIBITS.  DON'T MAKE ME SEARCH THROUGH 90,000 THAT
11   WERE PIECEMEAL GIVEN TO US AND WHICH THEY HAVE
12   ACKNOWLEDGED THEY DIDN'T HAVE ALL OF THEM.
13                  AND THE COURT SHOULD KEEP IN MIND THAT
14   EVERY TIME THEY GET IN A TRUCK AND GO ON THE ROAD,
15   THERE'S A LOG.  THE TRANSPORTATION --
16             THE COURT:  I JUST HEARD THAT.  I WAS
17   LISTENING.
18             MR. PARRIS:  BUT WE'VE NEVER SEEN A LOG.
19   THEY'VE NEVER PRODUCED A LOG.
20                  THE ACCURATE RECORD OF THE DRIVING HAS
21   NEVER BEEN PRODUCED.
22                  I DON'T UNDERSTAND HOW THE COURT CAN GO
23   THROUGH 90,000 EXHIBITS TO FIGURE OUT IF THIS
24   SUMMARY --
25             THE COURT:  THE COURT ISN'T GOING TO GO
```

1     THROUGH 90,000 EXHIBITS.  IF THEY -- I'M NOT GOING

2     THROUGH ANY EXHIBITS.

3                 IF THEY HAVE A SUMMARY, I'LL LOOK AT THE

4     SUMMARY.  AND THEN YOU CAN CROSS-EXAMINE.  AND THEN

5     WHEN THIS WHOLE THING IS OVER, WHICH IS GOING TO BE TWO

6     DAYS BECAUSE THAT'S WHAT I GAVE YOU, THEN YOU'RE GOING

7     TO ORDER THE TRANSCRIPT AND FIGURE OUT WHAT YOU'RE

8     GOING TO ARGUE TO ME.

9                 AND IF YOU HAVEN'T BEEN PROVIDED WITH ALL

10    THE EXHIBITS, THEN YOU'RE GOING TO HAVE AS MUCH TIME AS

11    YOU WANT TO COME BACK AND MAKE AN ARGUMENT.

12            MR. PARRIS:  GOOD ENOUGH, YOUR HONOR.  THANK

13    YOU.

14            THE COURT:  YOU MAY PROCEED.

15            MR. SMEDSTAD:  THANK YOU, YOUR HONOR.

16                 AND I -- IT'S UP TO THE COURT'S PLEASURE,

17    BUT I THINK THAT THERE IS SOME DISCONNECT HERE BETWEEN

18    THE RELATIONSHIP BETWEEN THESE DOCUMENTS THAT ARE IN

19    BINDERS 2 THROUGH 8 AND THE EXCEL SPREADSHEET, WHICH IS

20    A DIRECT EXPORT OF A SEPARATE BUSINESS RECORD.  AND I

21    CAN ADDRESS THAT NOW, BUT I'M HAPPY TO NOT DO IT IN

22    FRONT OF THE WITNESS.

23            THE COURT:  LET'S FINISH WITH THE WITNESSES.

24            MR. SMEDSTAD:  ALL RIGHT.

25

1   BY MR. SMEDSTAD:

2   Q    I ASKED YOU WHETHER OR NOT YOU WERE ABLE TO

3   RECOGNIZE ESTENSON TRIP SHEETS.  YOU TOLD ME YOU WERE.

4            AND I WANT TO DIRECT YOUR ATTENTION TO GROUP

5   EXHIBIT 587, WHICH I PREVIOUSLY MADE A REPRESENTATION

6   TO THE COURT REFLECTS ALL OF THE TRIP SHEETS THAT WE

7   WERE ABLE TO LOCATE THAT REFLECT ROUTE ACTIVITY BY

8   HOSTLERS ON THE --

9            MR. PARRIS:  THAT'S FOR THE WITNESS TO SAY.

10            THE COURT:  YOU CAN LET HIM FINISH HIS

11   QUESTION, PLEASE, BEFORE YOU OBJECT.

12   BY MR. SMEDSTAD:

13   Q    -- DURING THE CLASS PERIOD.

14            DIRECTING YOUR ATTENTION TO -- LET'S TAKE A

15   LOOK AT VOLUME 4 OF 8.

16            ACTUALLY, LET'S START WITH 5 OF 8.

17            I'VE ORGANIZED THEM IN NUMERICAL ORDER ON THE

18   SHELF IMMEDIATELY TO YOUR RIGHT.

19            MR. PARRIS:  I WOULD OBJECT.  THEY HAVEN'T

20   GIVEN US A COPY.

21            MR. SMEDSTAD:  IT'S MY UNDERSTANDING WE

22   PROVIDED A COPY OF THE EXHIBITS PRIOR TO THE TRIAL.  WE

23   DID NOT -- WE WERE NOT REQUESTED TO PRINT OUT COPIES BY

24   THE PLAINTIFF'S COUNSEL FOR THEM, BUT WE HAVE PROVIDED

25   IT TO THEM.

```
 1              MR. PARRIS:  YOUR HONOR, I WOULD OBJECT.

 2              THE COURT:  HOW IS HE SUPPOSED TO FIND IT?

 3              MR. SMEDSTAD:  I'LL PUBLISH IT TO HIM.

 4              THE COURT:  OKAY.  FINE.

 5              MR. PARRIS:  YOUR HONOR, IF THEY'RE SHOWING

 6    HIM A DOCUMENT --

 7              MR. SMEDSTAD:  I'M HAPPY TO PUBLISH IT TO YOU.

 8              MR. PARRIS:  YOU'LL GIVE IT TO ME NOW?

 9              MR. SMEDSTAD:  SURE.

10              THE COURT:  YOU'RE GOING TO FIGURE OUT HOW TO

11    IDENTIFY WHAT YOU'RE POINTING TO FOR THE RECORD, OR

12    MS. PLATO IS GOING TO GO CRAZY.

13    BY MR. SMEDSTAD:

14    Q    DO YOU HAVE VOLUME 5 OF 8 OF GROUP EXHIBIT 587 IN

15    FRONT OF YOU?

16    A    YES, I DO.

17    Q    AND COULD YOU DESCRIBE THE APPROXIMATE SIZE OF THE

18    BINDER THAT YOU'RE HOLDING?

19    A    FIVE-, SIX-INCH BINDER.

20    Q    OKAY.  LET'S TAKE A LOOK AT THE FIRST PAGE IN THIS

21    BINDER.

22              THERE IS A NUMBER THAT WE REFER TO AS A "BATES

23    NUMBER" IN THE LOWER RIGHT-HAND CORNER OF THIS

24    DOCUMENT.

25              COULD YOU READ THAT INTO THE RECORD?
```

```
 1    A    IT'S "EST006368."

 2    Q    OKAY.  AND HAVE YOU SEEN DOCUMENTS LIKE THE FIRST

 3    PAGE IN BINDER 5 OF 8 BEFORE?

 4    A    YES.

 5    Q    WHAT IS IT?

 6    A    IT'S AN ESTENSON TRIP SHEET.

 7    Q    ALL RIGHT.  DIRECTING YOUR ATTENTION TO THIS PAGE,

 8    WHICH ESTENSON DRIVER FILLED OUT EST6368?

 9    A    THE DRIVER'S NAME WAS "TIM FELLS."

10    Q    AND WHERE DO YOU SEE THAT ON THE PAGE?

11         THE COURT:  OKAY.  WHAT -- THIS IS A BENCH

12    TRIAL.  PUT IT ON THE SCREEN SO I CAN SEE IT.  I'M NOT

13    DEALING WITH THESE EXHIBITS.  I'LL BREAK MY ARMS IF I

14    HAVE TO --

15         MR. SMEDSTAD:  I APOLOGIZE.

16         THE COURT:  THANK YOU.

17    BY MR. SMEDSTAD:

18    Q    ALL RIGHT.  I'M SORRY, CAN YOU SHOW -- POINT TO

19    WHERE THE DRIVER'S NAME APPEARS?  JUST IDENTIFY IN --

20         THE COURT:  IS IT ON YOUR SCREEN, SIR?  IS IT

21    ON THE SCREEN?

22         THE WITNESS:  YES.

23         THE COURT:  TOUCH THE SCREEN.

24              THANK YOU.

25
```

1    BY MR. SMEDSTAD:

2    Q    AND I'D LIKE YOU NOW TO TAKE OUT THE PLAINTIFF'S

3    BINDER, WHICH IS -- IT SAYS "EXHIBITS," I THINK, "1

4    THROUGH 9."  IT'S THE FIRST -- IT'S A WHITE BINDER

5    RIGHT THERE.

6    A    OKAY.

7    Q    I'M GOING TO DIRECT YOUR ATTENTION TO EXHIBIT 1,

8    WHICH I'LL REPRESENT FOR THE RECORD IS A COPY OF THE

9    CLASS LIST OF THE CLASS MEMBERS IDENTIFIED IN THIS

10   CASE.

11               CAN YOU FIND MR. FELLS ON THAT LIST?

12               THE COURT:  I DON'T KNOW IF HE CAN, BUT I CAN.

13   SO MOVE ON.  I SEE IT.

14               MR. SMEDSTAD:  OKAY.  THANK YOU.

15   BY MR. SMEDSTAD:

16   Q    AND WHEN DID MR. FELLS -- WHAT'S THE DATE ON WHICH

17   THIS DOCUMENT WAS CREATED?

18   A    11/29/2012.

19   Q    AND DOES THIS REFLECT ANY ROUTE ACTIVITY PERFORMED

20   BY MR. FELLS ON THIS DATE?

21   A    YES.

22   Q    AND HOW DO YOU SEE THAT?

23   A    BY THE LINE ITEMS THAT HE'S WRITTEN IN ON HIS TRIP

24   SHEET.

25   Q    WELL, YOU SAY "LINE ITEMS," ARE YOU REFERRING TO

1   THE ENTRIES UNDER THE COLUMN THAT SAYS "ORIGIN, SLASH,

2   DESTINATION"?

3   A    YES.

4   Q    OKAY.  COULD YOU EXPLAIN -- COULD YOU INTERPRET

5   THESE FOR US?  EXPLAIN WHAT THOSE SHOW?

6   A    THIS DRIVER IS A NESTLE DRIVER.  HIS HOME

7   DESTINATION IS MANTECA.  SO HE STARTED IN MANTECA, CAME

8   TO THE TRACY RDC, PICKED UP A LOADED TRAILER AND TOOK

9   IT TO A HOME DEPOT IN ROSEVILLE, AND THEN CAME BACK TO

10  THE TRACY RDC, WENT TO THE LATHROP SDC, PICKED UP A

11  LOADED TRAILER.

12         THIS WAS A TWO-STOP TRAILER.  SO HIS FIRST

13  STOP WAS WEST SACRAMENTO.  HIS NEXT STOP WAS WOODLAND,

14  CALIFORNIA.

15         AND THEN HE BROUGHT THE TRAILER BACK TO THE

16  LATHROP SDC, AND THEN HE RETURNED TO HIS HOME BASE IN

17  MANTECA.

18  Q    OKAY.  AND I AM GOING TO -- THOSE ARE ALL TRIPS

19  THAT ARE OUTSIDE OF THE YARD?

20  A    CORRECT.

21  Q    ALL RIGHT.  I'M GOING TO FLIP, AND I'M GOING TO

22  DIRECT YOUR ATTENTION TO EST028173.

23         HAVE YOU -- DO YOU SEE IT ON THE SCREEN?

24  A    YES.

25  Q    AND IS THIS ANOTHER TRIP SHEET?

32

```
1    A    YES.

2    Q    AND WHAT WAS THE DATE OF THIS TRIP SHEET?

3    A    3/27 OF 2015.

4    Q    AND WHO IS THE DRIVER THAT FILLED THIS TRIP SHEET

5    OUT?

6    A    JESSE DOMIER.

7    Q    LET'S TAKE ANOTHER LOOK AT -- THIS IS STILL 587.

8    THE BATES NUMBER IS "EST02871."

9              WE'RE GOING TO PUBLISH THEN, AGAIN, EXHIBIT 1,

10   WHICH IS THE CLASS LIST, AND SEE IF WE CAN FIND

11   MR. DOMIER'S NAME.

12             THE COURT:  I SEE IT.  GO AHEAD.

13   BY MR. SMEDSTAD:

14   Q    OKAY.  AND DOES THIS TRIP SHEET REFLECT ROUTE

15   ACTIVITY?

16   A    YES.

17   Q    AND TELL ME HOW YOU CAN TELL THAT?

18   A    HE STARTED AT THE TRACY RDC, TOOK A LOADED TRAILER

19   TO THE MODESTO STORE, PICKED UP AN EMPTY TRAILER AND

20   CAME BACK TO THE TRACY RDC.

21   Q    I'M JUST GOING TO PICK AND FLIP.

22             NOW, I'M PUBLISHING "EST28681."

23             IS THIS ANOTHER TRIP SHEET?

24   A    YES.

25   Q    AND WHICH DRIVER PREPARED THIS?
```

1   A   TIM FELLS.

2   Q   THAT WAS THE SAME INDIVIDUAL WE HAD THE FIRST TIME;

3   ISN'T THAT RIGHT?

4   A   YES.

5   Q   OKAY.  AND WHAT'S THE DATE OF THIS TRIP SHEET?

6   A   3/18 OF 2015.

7   Q   AND DOES THIS REFLECT ANY ROUTE ACTIVITY?

8   A   YES.

9   Q   AND HOW CAN YOU TELL THAT?

10  A   HE STARTED AT THE TRACY RDC, TOOK A TRAILER LOADED

11  FULL OF PALLETS TO THE LATHROP SDC, DROPPED IT OFF,

12  PICKED UP AN EMPTY TRAILER, CAME BACK TO THE TRACY RDC,

13  PICKED UP ANOTHER PALLET TRAILER, TOOK IT TO THE

14  LATHROP SDC, PICKED UP AN EMPTY AND CAME BACK TO TRACY.

15  Q   AND HOW CAN YOU TELL THAT THOSE ARE LOADED OR

16  EMPTY?

17  A   ON THE RIGHT-HAND SIDE, IT SAYS "P" AND "E."  "P"

18  IS FOR PALLETS AND "E" IS FOR EMPTY.

19  Q   OKAY.  ALL RIGHT.

20          THE COURT:  WHEN YOU SAY A "LOAD OF PALLETS,"

21  A PALLET IS --

22          THE WITNESS:  EMPTY PALLETS.

23          THE COURT:  OKAY.

24          MR. SMEDSTAD:  I'M GOING TO SHOW ON -- IN

25  BINDER 2 OF 8, I WILL -- MY APOLOGIES.

```
 1              I'M GOING TO PUBLISH TO THE WITNESS BATES

 2     STAMP "EST57839."

 3     BY MR. SMEDSTAD:

 4     Q    SIR, IS THIS ANOTHER TRIP SHEET?

 5     A    YES.

 6     Q    AND WHAT DRIVER FILLED OUT THIS TRIP SHEET?

 7     A    CARRIE -- AND I'M NOT SURE ON THE SPELLING OF THAT

 8     LAST NAME.

 9     Q    "P-E-U-R-I-N"?

10     A    THAT LOOKS CORRECT, YES.

11     Q    AND WHAT WAS THE DATE THAT HE FILLED THAT OUT?

12     A    LOOKS LIKE THE MONTH IS 8/31 OF 2015.

13     Q    CAN YOU SIT DOWN SO THAT THE COURT REPORTER CAN

14     HEAR YOU.

15     A    I'M SORRY.  IT'S HARD TO READ BECAUSE OF THE

16     REFLECTION.

17     Q    SO IT'S 8/31/2015?

18     A    YES.

19     Q    AND I HAVE JUST REALIZED THAT THIS IS

20     P-E-L-L-E-R-I-N.

21              AND DOES THIS TRIP SHEET REFLECT THAT

22     MR. PELLERIN PERFORMED ROUTE ACTIVITY ON THIS DATE?

23     A    YES.

24     Q    AND HOW CAN YOU TELL?

25     A    HE WENT TO MULTIPLE LOCATIONS.  HE WENT FROM
```

```
 1    STOCKTON TO A LOCATION IN TRACY, AND THEN WENT TO A

 2    LOCATION IN LATHROP, MODESTO, FAIRFIELD, BACK TO

 3    LATHROP, TO THE PORT WHERE HIS HOME LOCATION, WENT TO

 4    FAIRFIELD AND THEN BACK TO STOCKTON.

 5    Q    OKAY.  AND I'M GOING TO NOW PUBLISH PAGE 2 OF

 6    PLAINTIFF'S EXHIBIT 1.  AND I BELIEVE YOU'LL SEE THAT

 7    MR. PELLERIN IS ON THE CLASS LIST.

 8                    DO YOU SEE THAT?

 9              THE COURT:  I SEE IT.  MOVE ON.

10              MR. SMEDSTAD:  THANK YOU.

11                    I'M GOING TO FLIP HERE, AND I'LL -- I'M

12    GOING TO PUBLISH TO THE WITNESS BATES NUMBER

13    "EST055984."

14    BY MR. SMEDSTAD:

15    Q    SIR, IS THIS ANOTHER TRIP SHEET?

16    A    YES.

17    Q    AND WHICH DRIVER FILLED THIS OUT?

18    A    JUAN LOPEZ.

19    Q    AND WHEN DID HE FILL IT OUT?

20    A    10/30 OF 2013.

21    Q    AND DOES THIS TRIP SHEET REFLECT ANY ROUTE

22    ACTIVITY?

23    A    YES.

24    Q    AND HOW CAN YOU TELL?

25    A    HE STARTED AT FONTANA, WENT TO THE RDC IN ONTARIO,
```

1    WENT TO THE COLTON TRUCK STOP, WENT TO THE HOME DEPOT

2    IN OXNARD, WENT TO A LOCATION -- BACKHAUL LOCATION IN

3    RANCH CUCAMONGA, CAME BACK TO THE ONTARIO RDC, AND THEN

4    FINISHED OUT BACK AT HIS HOME LOCATION IN FONTANA.

5    Q    AND IT SAYS, I BELIEVE, UNDER "INVOICE, SLASH, PO,"

6    THERE'S SOME NOTATIONS, "DEL LOAD."

7            WHAT DOES THAT MEAN?

8    A    DELIVERED LOAD.

9    Q    OKAY.  SO THAT WAS A LOADED TRAILER?

10   A    YES.

11   Q    OKAY.  AND THEN THERE'S A LINE UP ABOVE THAT THAT

12   SAYS "LIVE LOAD."

13           WHAT DOES THAT MEAN?

14   A    THAT'S SOUTH -- SOUTHWIRE.  HE -- THEY HAD LOADED

15   HIS TRAILER THAT HE HAD BROUGHT THERE.

16           MR. PARRIS:  YOUR HONOR, I'M GOING TO OBJECT.

17   IT'S BECOMING CUMULATIVE.  I'VE GOT THE POINT, IF

18   THERE'S A POINT TO BE MADE.

19           MR. SMEDSTAD:  THAT'S FINE, YOUR HONOR.  I

20   JUST WANTED TO CLOSE THE LOOP ON THIS PARTICULAR

21   INDIVIDUAL, JUAN LOPEZ.

22               AND I AM PUBLISHING PAGE 2 OF PLAINTIFF'S

23   EXHIBIT 1.  AND I BELIEVE THAT HIS NAME APPEARS THERE.

24   HE IS THE LAST "LOPEZ" LISTED.

25           THE COURT:  YES, I SEE IT.  OKAY.

```
 1              MR. SMEDSTAD:  NOT WANTING TO WASTE ANY MORE
 2   OF THE COURT OR THE PLAINTIFF'S TIME, I WOULD MOVE
 3   GROUP EXHIBIT 587 INTO EVIDENCE.
 4              MR. PARRIS:  WHOA, WHOA.  AS A GROUP?  ALL OF
 5   THESE ARE GOING TO BE PART OF THE COURT'S RECORD?
 6              THE COURT:  THESE ARE THE BASIS FOR THE
 7   SUMMARY EXHIBIT THAT, I ASSUME, YOU'RE GOING TO BE
 8   PROVIDING.
 9              IS THAT --
10              MR. SMEDSTAD:  THEY CORROBORATE THE SUMMARY,
11   THE OTHER DATA POINT.  THAT WAS THE ISSUE THAT I WAS
12   GOING TO RAISE -- DISCUSS WITH YOU REGARDING THE
13   DISCONNECT BETWEEN THE RELATIONSHIP.
14              BUT, YES, THESE ARE DOCUMENTS THAT
15   CORROBORATE THE INFORMATION CONTAINED ON THE OTHER
16   EXPORTED EXCEL SPREADSHEET.
17              THE COURT:  I'M NOT SURE EXACTLY WHAT THAT
18   MEANS.  SO WE'LL DEAL WITH IT LATER.
19              MR. SMEDSTAD:  OKAY.
20              MR. PARRIS:  YOUR HONOR, I WOULD OBJECT TO
21   THIS VOLUMINOUS DOCUMENT BEING INTRODUCED IN EVIDENCE
22   AS PART OF THIS COURT'S --
23              THE COURT:  I JUST SAID WE'RE GOING TO DEAL
24   WITH IT LATER.
25              MR. PARRIS:  OH, I SEE.  I GOT HEARING
```

```
 1    PROBLEMS.  I'M SORRY.

 2              THE COURT:  OKAY.

 3    BY MR. SMEDSTAD:

 4    Q    DOES ESTENSON HAVE ANY OTHER RECORDS OF THE ROUTE

 5    ACTIVITIES THAT THE HOSTLERS PERFORM?

 6    A    YES.

 7    Q    WHAT ARE THOSE RECORDS?

 8    A    THEY WOULD BE OUR BILLING RECORDS.

 9    Q    OKAY.  AND ARE YOU THE BEST PERSON TO ASK ABOUT

10    THOSE RECORDS?

11    A    NO.

12              MR. SMEDSTAD:  THAT'S ALL I HAVE, YOUR HONOR.

13              THE COURT:  THE PLAINTIFF?

14              MR. PARRIS:  THANK YOU, YOUR HONOR.

15              BEFORE I BEGIN, IN ORDER TO AVOID THE

16    NECESSITY OF RECALLING HIM, WILL I BE ABLE TO EXCEED

17    THE SCOPE?  I'M GOING TO DO IT ALL AT ONCE.

18              ANY OBJECTION TO THAT?

19              MR. SMEDSTAD:  NO OBJECTION.

20              THE COURT:  THAT'S FINE.

21              MR. PARRIS:  THANK YOU.

22                       CROSS-EXAMINATION

23    BY MR. PARRIS:

24    Q    MR. HALTERMAN, I MET YOU EARLIER IN THE HALLWAY;

25    RIGHT?
```

1    A    YES.

2    Q    THANK YOU.

3          NOW, COUNSEL ASKED YOU ABOUT HOW THE

4    DISTRIBUTION CENTER WORKS.

5          STUFF COMES IN, RIGHT, ONE SIDE OF THE

6    BUILDING; IS THAT CORRECT?

7    A    YES.

8    Q    THIS BUILDING IS A MILLION-SQUARE FEET, ISN'T IT?

9    A    IT'S A LITTLE BIT SMALLER THAN THAT.  YES.

10   Q    THE ONE IN TRACY IS A MILLION-SQUARE FEET; ISN'T

11   THAT RIGHT?

12   A    IT'S A LITTLE BIT SMALLER THAN THAT.

13   Q    THEY COME IN ONE SIDE.  THEY'RE BROKEN APART.  AND

14   THEN THEY'RE RECONFIGURED AS TO WHAT INDIVIDUAL STORES

15   NEED FOR THEIR TRAILER; ISN'T THAT CORRECT?

16   A    YES.

17   Q    AND HOW THEY KNOW WHAT THE INDIVIDUAL STORES NEED

18   IS THE INDIVIDUAL STORE CALLS IN AND TELLS THEM WHAT

19   THEY NEED; RIGHT?

20          MR. SMEDSTAD:  FOUNDATION.  MISCHARACTERIZES

21   THE TESTIMONY.

22          THE COURT:  HE DIDN'T -- HE'S NOT

23   CHARACTERIZING TESTIMONY.  HE'S ASKING THE QUESTION.

24          IF YOU KNOW, YOU CAN ANSWER.  IF YOU

25   DON'T KNOW, JUST SAY YOU DON'T KNOW.

```
 1          THE WITNESS:  I DON'T KNOW EXACTLY HOW HOME

 2   DEPOT ORDERS THE PRODUCT.

 3   BY MR. PARRIS:

 4   Q    OKAY.  YOUR UNDERSTANDING OF HOW IT IS IS, THERE'S

 5   SOME METHODOLOGY WHERE THE STORES NOTIFY THE

 6   DISTRIBUTION CENTER OF WHAT THEY NEED; ISN'T THAT

 7   CORRECT?

 8   A    YES.

 9   Q    THANK YOU.

10          NOW, THE ROAD HOSTLER, LET'S TALK ABOUT THAT.

11   EXPLAIN TO THE COURT -- COULD WE PUT UP A PICTURE OF

12   WHATEVER THE EXHIBIT IS OF THE GOAT?

13          EXPLAIN TO THE COURT WHAT A "GOAT" IS?

14   A    WE CALL -- THE GOATS ARE THE YARD TRACTORS.  IT'S A

15   TWO-AXLE TRACTOR WITH A HYDRAULIC FIFTH WHEEL ON THE

16   BACK THAT ALLOWS THE DRIVER TO MANUALLY LIFT UP THAT

17   FIFTH WHEEL.  IT'LL LIFT UP THE TRAILER.  SO HE DOESN'T

18   HAVE TO ROLL UP THE LANDING GEAR.

19   Q    AND THEN MOVE IT AROUND; RIGHT?

20   A    AND THEN MOVE IT AROUND, CORRECT.

21   Q    NOW, IN THE -- YOU'VE BEEN INVOLVED IN THE

22   TRANSPORTATION INDUSTRY OR THE TRUCKING INDUSTRY NOW

23   FOR A LONG TIME; RIGHT?

24   A    YES.

25   Q    ISN'T IT TRUE THAT THE VAST MAJORITY OF ACCIDENTS
```

```
 1    INVOLVE BACKING UP WITH TRAILERS?

 2              MR. SMEDSTAD:  FOUNDATION AND VAGUE.

 3              THE COURT:  WAIT A MINUTE.  ONLY THE PERSON

 4    WHO QUESTIONS GETS TO MAKE OBJECTIONS.

 5              MR. SMEDSTAD:  THAT WAS ME.

 6              MR. HANSON:  IT WAS HIM, YOUR HONOR.  I DID

 7    NOT SAY ANYTHING.

 8              THE COURT:  ALL RIGHT.  IF YOU -- FOR ANY

 9    ANYBODY'S QUESTIONS, IF YOU DON'T KNOW THE ANSWER, JUST

10    SAY YOU DON'T KNOW.

11              THE WITNESS:  I DON'T KNOW.

12    BY MR. PARRIS:

13    Q    OKAY.  DIRECTING YOUR ATTENTION TO -- IT'S A

14    DEMONSTRATIVE.

15              THAT'S WHAT A GOAT LOOKS LIKE; RIGHT?

16    A    YES.

17    Q    IT CAN'T GO ON THE HIGHWAYS.  I MEAN, IT'S NOT

18    SUPPOSED TO; RIGHT?

19    A    IF IT IS LICENSED, IT CAN GO ON THE HIGHWAY.

20    Q    THE GOATS IN ESTENSON'S LOT ARE NOT LICENSED BY

21    D.O.T. TO GO ON THE HIGHWAY; CORRECT?

22    A    THE YARD GOATS AT THE TRACY RDC ARE NOT LICENSED TO

23    GO ON THE HIGHWAY.

24    Q    THANK YOU.

25              AND IT WOULD BE ILLEGAL FOR THEM TO GO ON THE
```

```
 1   HIGHWAY, WOULDN'T IT?

 2   A    IN THAT VEHICLE, YES.

 3   Q    NOW, THESE GOATS, DO THEY HAVE THE COMPUTER ON

 4   BOARD THAT THE TRACTORS HAVE FOR THE DRIVER TO FILL IN

 5   HIS HOURS?

 6   A    NO, THEY DO NOT.

 7   Q    NOW, THE TRACTOR THAT THEY ACTUALLY GO ONTO THE

 8   HIGHWAY WITH, DEPARTMENT OF TRANSPORTATION REQUIRES THE

 9   DRIVER TO FILL IN HIS LOGS; ISN'T THAT RIGHT?

10   A    YES.

11   Q    AND EXPLAIN TO THE COURT WHAT THE RULES ARE ABOUT

12   HOURS OF DRIVING THAT THE SECRETARY OF TRANSPORTATION

13   HAS PROMULGATED?

14   A    YOU HAVE 11 HOURS OF DRIVING, 14 HOURS OF ON-DUTY.

15   Q    AND WHAT ABOUT ANY GIVEN LENGTH OF TIME?

16   A    70 HOURS AND EIGHT DAYS.

17   Q    70 HOURS AND WHAT?

18   A    EIGHT DAYS.

19   Q    AND THEN THERE IS A PERIOD OF TIME THAT THEY HAVE

20   TO TAKE A BREAK?

21   A    THEY HAVE TO TAKE 10 HOURS OFF IN BETWEEN DRIVING.

22   AND WE ALSO HAVE A 34-HOUR RESET.

23   Q    AND WHEN DOES THE 34-HOUR RESET COME INTO PLAY?

24   A    THAT RESETS THEIR HOURS.

25   Q    WHEN?
```

```
1              HOW MANY DAYS CAN THEY DRIVE BEFORE THEY HAVE
2    TO DO THE 34 HOURS?
3    A    THEIR 34 HOURS, THEY CAN TAKE IT WHENEVER THEY CAN
4    ON THE 34 HOURS.
5    Q    COULD THEY DRIVE EVERY DAY 11 HOURS A DAY -- OR 14
6    HOURS A DAY?
7    A    NOT EVERY DAY, NO.  THEY HAVE TO HAVE THEIR TIME
8    OFF.
9    Q    AND WHEN DO THEY HAVE TO HAVE THEIR TIME OFF?
10   A    WHEN THEY REACH THEIR 70 HOURS.
11   Q    OKAY.  NOW, WHEN THESE YARD HOSTLERS GET INTO A
12   TRUCK, A TRACTOR, THAT'S THE FIRST TIME THEY EVER FILL
13   OUT A LOG; ISN'T THAT RIGHT?
14   A    NO.
15   Q    WHEN DO THEY FILL OUT THE LOG?
16   A    AT THE START OF THEIR DAY, THEY SWIPE INTO A KIOSK,
17   AND THAT STARTS THEIR LOG.
18   Q    THAT STARTS THEIR TIME CLOCK; RIGHT?
19   A    AND THEIR LOG.
20   Q    SO HOW DOES THAT GET TO THEIR LOG WITH THE
21   DEPARTMENT OF TRANSPORTATION?
22   A    THAT'S IN OUR SYSTEM.
23              AND THEN WHEN THEY WOULD BE IN THE TRUCK, THEY
24   WOULD LOG INTO THE TRUCK AND THAT SHOWS --
25   Q    SO WHY IS IT THEY LOG INTO THE TRUCK, IF THEY HAVE
```

```
 1    ALREADY LOGGED IN WHEN THEY SWIPED IN?
 2    A    YOU'RE LOGGING INTO THE TRUCK BY THAT SPECIFIC
 3    DRIVER.
 4    Q    WHAT'S THE PURPOSE OF THAT?
 5    A    SO WE CAN MAINTAIN HIS HOURS.
 6    Q    THERE IS NO MERGING OF THOSE TWO DOCUMENTS, IS
 7    THERE?
 8    A    I'M NOT SURE WHAT YOU MEAN.
 9    Q    THERE IS NO WAY TO DETERMINE HOW MANY HOURS HE WAS
10    IN THE GOAT AND ADD THAT TO THE HOURS HE WAS IN THE
11    TRACTOR; ISN'T THAT RIGHT?
12    A    NO.
13    Q    WHEN IS THAT DONE?
14    A    WHEN HE SWIPES INTO THE KIOSK, THAT STARTS HIS LOG
15    FOR THAT DAY.
16    Q    AND IS THAT WHAT'S REPORTED TO THE DEPARTMENT OF
17    TRANSPORTATION WITH THE LOGS?
18    A    YES.
19    Q    YOU KNOW THAT FOR A FACT?
20    A    YES.
21    Q    ALL RIGHT.  THANK YOU.
22         NOW, IS A DRIVER A HOSTLER?
23    A    A DRIVER CAN HOSTLE, YES.
24    Q    IS THE DRIVER IN YOUR COMPANY ALSO A HOSTLER?
25    A    I'M NOT SURE WHAT YOU --
```

```
 1    Q    YOU HAVE EMPLOYEES YOU HAVE DESIGNATED AS

 2    "DRIVERS"; ISN'T THAT RIGHT?

 3    A    WE HAVE DRIVERS, YES.

 4    Q    ARE THEY ALSO YARD HOSTLERS?

 5    A    I HAVE DRIVERS THAT ALSO YARD HOSTEL, YES.

 6    Q    WE WILL DEAL WITH THAT IN A MINUTE.

 7              BUT AS FAR AS THE THOUSAND DRIVERS YOU HAVE,

 8    ARE ALL OF THEM ALSO YARD HOSTLERS?

 9    A    I'M NOT SURE WHAT YOU'RE ASKING.

10    Q    YOU HAVE JOB CLASSIFICATIONS AND JOB DUTIES; ISN'T

11    THAT RIGHT?

12    A    YES.

13    Q    OF THOSE THOUSAND DRIVERS, ARE THEY CLASSIFIED AS

14    "YARD HOSTLERS"?

15    A    YES.

16    Q    WHERE?

17              WHAT DOCUMENT SAYS THEY'RE A YARD HOSTLER?

18    A    WE HAVE OFFER LETTERS THAT SHOW YARD HOSTLERS --

19    THAT THEY ARE YARD HOSTLERS.

20    Q    THAT'S CORRECT, AND WE'LL GET TO THAT.

21              THE COURT:  STOP SAYING "WE'LL GET TO THAT."

22    JUST ASK HIM ANOTHER QUESTION.

23              MR. PARRIS:  YES, YOUR HONOR.

24    BY MR. PARRIS:

25    Q    THERE ARE CLEARLY TWO DISTINCT JOB TITLES IN
```

1    ESTENSON, ONE IS YARD HOSTLER AND ONE IS DRIVER, AMONG

2    OTHERS; ISN'T THAT RIGHT?

3    A    YES.

4    Q    OKAY.  A DRIVER IS NOT A YARD HOSTLER UNLESS HE HAS

5    FILLED OUT THE PAPERWORK MOVING OVER TO A YARD HOSTLER;

6    ISN'T THAT CORRECT?

7    A    NO.

8    Q    WHEN DOES HE BECOME A YARD HOSTLER?

9    A    I HAVE DRIVERS THAT ARE CROSS-TRAINED TO YARD

10   HOSTEL IN THE YARD.

11   Q    SO YOU DO HAVE SOME DRIVERS THAT ARE BOTH; IS THAT

12   RIGHT?

13   A    YES.

14   Q    OKAY.  AND THEN YOU HAVE SOME YARD HOSTLERS THAT

15   NEVER GET ON THE ROAD; RIGHT?

16   A    NO.

17   Q    IS IT YOUR TESTIMONY THAT THERE ARE NO YARD

18   HOSTLERS THAT NEVER GET ON THE HIGHWAY?

19            MR. SMEDSTAD:  VAGUE.

20            THE COURT:  WELL, YOU WERE TALKING ABOUT A

21   THOUSAND DRIVERS.  I DON'T KNOW IF YOU'RE TALKING ABOUT

22   THE WHOLE COMPANY, CALIFORNIA OR WHAT.  AND NOW YOU'RE

23   REFERRING TO HIS YARD HOSTLERS.  SO PLEASE --

24   BY MR. PARRIS:

25   Q    LET'S BACK UP NOW TO JUST THE 103 MEMBERS OF THE

```
 1    CLASS THAT HAVE BEEN DESIGNATED AS "YARD HOSTLERS."
 2            DO YOU KNOW IF ANY OF THEM HAVE NEVER DRIVEN
 3    ON THE HIGHWAY?
 4    A    NO.
 5    Q    AND SOME OF THE ONES AT TRACY, YOU DON'T KNOW IF
 6    THEY HAVE NEVER DRIVEN ON THE HIGHWAY, DO YOU?
 7    A    THEY HAVE DRIVEN -- THE HOSTLERS AT THE TRACY RDC,
 8    YES, HAVE DRIVEN ON THE ROAD.
 9    Q    EVERY SINGLE ONE?
10    A    EVERY SINGLE ONE.
11    Q    OKAY.  THANK YOU.
12            HOW DO YOU KNOW THAT?
13    A    I HAVE WORKED THE TRACY RDC FOR SEVEN YEARS.  I
14    MANAGE THAT SITE.
15    Q    SO DO YOU MAINTAIN SOME TYPE OF RECORD?
16    A    THE TRIP SHEETS.
17    Q    AND THE TRIP SHEETS, IS THAT WHAT YOU'RE BASING IT
18    ON?
19    A    YES.
20    Q    OKAY.  NOW LET'S GO TO THOSE TRIP SHEETS.  ALL OF
21    THESE BINDERS FULL OF TRIP SHEETS, THE VAST MAJORITY OF
22    TRIP SHEETS ARE, THEY NEVER LEFT THE YARD.  THEY'RE
23    YARD HOSTLERS; RIGHT?
24    A    SAY THAT AGAIN?
25    Q    THE VAST MAJORITY OF THE TRIP SHEETS ARE, THEY
```

1    NEVER LEFT THE YARD?

2    A    THE BIG BINDER THAT WE'RE LOOKING AT?

3    Q    YES.

4    A    THOSE EXAMPLES THAT WE SHOWED, THEY ALL LEFT THE

5    YARD.

6    Q    I UNDERSTAND THAT.

7         BUT WHAT ABOUT THE ONES THEY DIDN'T SHOW YOU?

8    A    I DON'T KNOW.

9    Q    SO YOU NEVER ACTUALLY WENT THROUGH THOSE EXHIBITS?

10   A    NOT THE WHOLE BINDER, NO.

11   Q    IS IT JUST THE ONES THAT WERE PULLED OUT OF IT AND

12   SHOWN TO YOU THAT YOU LOOKED AT?

13   A    THOSE ARE THE ONES I JUST LOOKED AT, YES.

14   Q    SO YOU HAVE NO WAY OF KNOWING WHAT THE OTHERS SAY;

15   IS THAT RIGHT?

16   A    THAT ARE CURRENTLY IN THE BINDER?

17   Q    YES.

18   A    NO.

19   Q    YOU HAVEN'T LOOKED AT THEM, SO YOU DON'T KNOW;

20   RIGHT?

21   A    RIGHT.

22   Q    THANK YOU.

23        NOW, I NOTICED THAT WHAT YOU WERE SHOWING US

24   CAME OUT OF PACKETS THAT SEEMED TO BE BY THE YEAR.

25        WERE THEY ALPHABETIZED BY THE YEAR OR WERE

```
 1    THEY ALPHABETIZED ACCORDING TO THE NAME OF THE CLASS

 2    MEMBER?

 3    A    I DON'T KNOW.

 4              MR. SMEDSTAD:  VAGUE.  CONFUSING,

 5    "ALPHABETIZED BY THE YEAR"?

 6              THE COURT:  HE SAYS HE DOESN'T KNOW.

 7              MR. PARRIS:  THAT'S CORRECT.

 8    BY MR. PARRIS:

 9    Q    DO YOU HAVE AN UNDERSTANDING THAT THOSE EXHIBIT

10    BOOKS WERE PUT TOGETHER BY ALPHABETICAL ORDER OF THE

11    YARD HOSTLERS?

12    A    I DO NOT KNOW.

13    Q    OKAY.  AND HAVE YOU EVER SEEN OR HAS ANYBODY EVER

14    TALKED TO YOU ABOUT PERIODS OF TIME THAT THE YARD

15    HOSTLERS MAY HAVE GONE ON THE HIGHWAYS?

16    A    I DON'T HAVE SET DATES.

17    Q    I'M SORRY, WHAT?

18    A    I DON'T HAVE SET DATES FROM THIS SPECIFIC DATE TO

19    THIS SPECIFIC DATE, NO.

20    Q    SO THE EXHIBITS THAT REFLECT SOMEBODY MAY HAVE

21    DROVE ON THE HIGHWAYS ANY TIME IN A SEVEN-YEAR PERIOD,

22    TO YOUR KNOWLEDGE; IS THAT RIGHT?

23    A    I'M SORRY, SAY THAT ONE MORE TIME, PLEASE?

24    Q    YOU DON'T KNOW HOW LONG THE PERIOD OF TIME IS THAT

25    THOSE TRIP SHEETS CAME FROM; RIGHT?
```

```
 1    A    RIGHT.

 2    Q    IT WASN'T BY THE YEAR.  IT WASN'T BY THE MONTH.  IT

 3    WASN'T BY THE WEEK.

 4              RIGHT?

 5    A    RIGHT.

 6    Q    OKAY.  THANK YOU.

 7              DO YOU KNOW WHO COMPILED THE TRIP SHEETS?

 8    A    NO, I DO NOT.

 9    Q    WHO PUT THEM IN THE BINDERS?

10    A    NO, I DO NOT.

11    Q    OKAY.  THANK YOU.

12              AT LEAST AT TRACY, ARE YOU CONFIDENT THAT THE

13    TRIP SHEETS ARE ACCURATE?

14    A    YES.

15    Q    HOW DO YOU KNOW THEY'RE ACCURATE?

16    A    THEY'RE LEGAL DOCUMENTS THAT THE DRIVER STATES THAT

17    THAT WAS HIS DAILY ACTIVITY.

18    Q    THANK YOU.

19              YOU'RE SATISFIED THEY'RE ACCURATE?

20    A    YES.

21    Q    AND SO IF IT'S NOT CHECKED OFF FOR A BREAK, IT

22    MEANS THEY DIDN'T TAKE A BREAK; RIGHT?

23              MR. SMEDSTAD:  OBJECTION.  FOUNDATION.  VAGUE.

24    AND ALSO RELEVANCE GIVEN THIS PROCEEDING, WHICH IS

25    LIMITED TO THE AFFIRMATIVE DEFENSE.
```

```
1            THE COURT:  I'LL LET HIM ANSWER THE QUESTION,

2    BUT WE'RE NOT GOING OUTSIDE OF THE --

3            MR. PARRIS:  I KNOW.  I JUST THOUGHT WHILE HE

4    WAS UP THERE, I WOULD GRAB IT.

5    BY MR. PARRIS:

6    Q    IF THEY DON'T TAKE A BREAK, THEY DON'T CHECK THE

7    BOX; RIGHT?

8    A    I DON'T KNOW THAT.

9    Q    OKAY.  THANK YOU.

10            NOW, I WANT TO TALK TO YOU ABOUT THIS -- DO WE

11   HAVE A PICTURE OF THE YARD OR THE BUILDING?

12            THAT'S THE TRACY BUILDING; RIGHT?

13   A    YES.

14            THE COURT:  I TAKE IT YOU DON'T WANT THESE

15   THINGS IN EVIDENCE BECAUSE YOU'RE NOT --

16            MR. PARRIS:  JUST SO THE COURT GETS AN IDEA OF

17   WHAT HE'S TALKING ABOUT.

18            THE COURT:  OKAY.

19   BY MR. PARRIS:

20   Q    THIS -- LOOK AT THE PICTURE THERE.

21            THAT'S THE YARD HOSTLER'S JOB; RIGHT?

22            THEY GOT TO BACK THAT TRAILER UP AGAINST THAT

23   BUILDING WITH ALMOST NO SPACE IN BETWEEN THEM; ISN'T

24   THAT RIGHT?

25   A    YES, THEY BACK THE TRAILERS AGAINST THE BUILDING.
```

1   Q    AND HOW MANY INCHES BETWEEN THE TRAILERS?

2   A    I DON'T KNOW THE EXACT NUMBER.

3   Q    AND WHAT THEY HAVE TO DO IS, THEY HAVE TO -- LIKE

4   THEY BACK IN ANY TRAILER, YOU HAVE TO DRIVE FORWARD AND

5   THEN BACK IT IN; CORRECT?

6   A    CORRECT.

7            MR. SMEDSTAD:  RELEVANCE.

8            THE COURT:  MOVE ON, MR. PARRIS.

9                ARE YOU GOING TO MOVE ON BECAUSE I DON'T

10  SEE THE POINT?

11           MR. PARRIS:  YOU DON'T?

12           THE COURT:  NO.  I DON'T SEE THE POINT.

13           MR. PARRIS:  OKAY.  I'LL GET THERE.

14  BY MR. PARRIS:

15  Q    IT TAKES AN EXPERIENCED TRUCK DRIVER TO BE ABLE TO

16  DO THAT JOB; ISN'T THAT CORRECT?

17  A    YES.

18  Q    AND THAT'S WHY, WHEN YOU HIRE PEOPLE, YOU WANT TO

19  MAKE CERTAIN THEY HAVE A CLASS A LICENSE; ISN'T THAT

20  RIGHT?

21           MR. SMEDSTAD:  ASKED AND ANSWERED.

22           THE COURT:  OVERRULED.

23           THE WITNESS:  REPEAT THE QUESTION, PLEASE?

24  BY MR. PARRIS:

25  Q    IF THEY HAVE A CLASS A LICENSE, YOU KNOW SOME

1    THINGS.  YOU KNOW THEY HAVE BEEN THROUGH TRUCK DRIVER

2    SCHOOL; RIGHT?

3    A    RIGHT.

4    Q    YOU KNOW THEY KNOW HOW TO DO THE JOB; ISN'T THAT

5    RIGHT?

6    A    YES.

7    Q    YOU DON'T HAVE TO SEND THEM OUT FOR TRAINING, DO

8    YOU?

9    A    NO.  THEY ARE -- THEY HAVE A CLASS A LICENSE.

10   Q    THANK YOU.

11        NOW, WHAT WAS YOUR UNDERSTANDING OF THE EXEMPT

12   OR NON-EXEMPT STATUS OF THE DRIVERS AT ESTENSON?

13        MR. SMEDSTAD:  FOUNDATION.

14        THE WITNESS:  I'M NOT SURE WHAT YOU MEAN.

15   BY MR. PARRIS:

16   Q    YOU KNOW WHETHER A PERSON IS EXEMPT FROM OVERTIME;

17   RIGHT?

18        OR NON-EXEMPT; RIGHT?

19   A    IF THEY DON'T GET PAID OVERTIME OR THEY GET PAID

20   OVERTIME, IS THAT WHAT YOU'RE ASKING?

21   Q    YES.

22        DO YOU KNOW THE DIFFERENCE?

23        MR. SMEDSTAD:  VAGUE.  CALLING FOR A LEGAL

24   CONCLUSION.

25        THE COURT:  HE'S JUST ASKING WHETHER HE KNOWS

```
 1    THE DIFFERENCE.  I'M NOT SURE WHAT RELEVANCE THIS IS
 2    GOING TO HAVE.  I'LL ALLOW A COUPLE OF QUESTIONS.
 3    BY MR. PARRIS:
 4    Q    YOU HIRED HOSTLERS?
 5    A    YES.
 6    Q    YOU MET WITH THEM WHEN YOU HIRED THEM; RIGHT?
 7    A    RIGHT.
 8              MR. PARRIS:  COULD I HAVE THE EMPLOYMENT
 9    LETTER?
10    BY MR. PARRIS:
11    Q    DIRECTING YOUR ATTENTION TO EXHIBIT 10.
12              IS THAT THE EMPLOYMENT LETTER ALL THE DRIVERS
13    WHO WERE GIVEN AN OFFER FOR A ROAD HOSTLER GOT?
14              MR. SMEDSTAD:  FOUNDATION.
15              THE COURT:  IF YOU KNOW.
16    BY MR. PARRIS:
17    Q    DO YOU KNOW?
18    A    THAT'S AN OFFER LETTER, YES.
19    Q    AND THE OFFER LETTER, IT SAYS WHAT THEY'RE EXPECTED
20    TO DO; RIGHT?
21    A    IT TALKS ABOUT THE POSITION.
22    Q    DOES IT ALSO SAY THEY'RE EXEMPT, AND THEY WILL GET
23    OVERTIME?
24              NON-EXEMPT AND THEY'LL GET OVERTIME?
25    A    THIS IS NON-EXEMPT.
```

1    Q    SO WHEN YOU'RE HIRING PEOPLE AND YOU'RE TELLING

2    THEM THEIR POSITION IS NON-EXEMPT, WHAT DID YOU THINK

3    THAT MEANT?

4              MR. SMEDSTAD:  FOUNDATION.  RELEVANCE.  LEGAL

5    CONCLUSION.

6              THE COURT:  HE DOESN'T NEED TO LAY FOUNDATION

7    FOR ASKING THE MAN WHAT HE THINKS.

8                   WHY IS WHAT HE THINKS RELEVANT,

9    MR. PARRIS?

10             MR. PARRIS:  THAT'S A GOOD POINT.

11             THE COURT:  THANK YOU.

12             MR. PARRIS:  I'LL WITHDRAW IT.

13   BY MR. PARRIS:

14   Q    NOW, THIS IS WHAT THEY WERE GIVEN AT THE TIME OF

15   HIRE; IS THAT CORRECT?

16   A    YES.

17   Q    AND THEY SIGNED IT?

18   A    YES.

19   Q    DID YOU EVER TELL ANY OF THEM THAT THEIR POSITION

20   HAD BECOME EXEMPT?

21   A    NO.

22   Q    NOW, WHEN HIRING TRUCK DRIVERS, IT'S HARD TO GET

23   REALLY GOOD TRUCK DRIVERS, ISN'T IT?

24   A    AT TIMES IT IS, YES.

25   Q    TO GET DRIVERS WITH GOOD SAFETY RECORDS, NO PRIOR

1    DRUG AND ALCOHOL PROBLEMS, THAT ARE SAFE TO PUT OUT ON

2    THE HIGHWAYS.

3           THERE ARE TIMES WHEN THEY'RE JUST NOT

4    AVAILABLE; ISN'T THAT RIGHT?

5    A    YES.

6    Q    AND ONE OF THE INDUCEMENTS THAT YOUR COMPANY GIVES

7    TO THE YARD HOSTLERS IS, THEY'RE NOT GOING TO HAVE TO

8    GO ON LONG HAULS AND BE AWAY FROM THEIR FAMILY; ISN'T

9    THAT RIGHT?

10   A    AS FAR AS MY -- OUR DRIVERS?

11   Q    YEAH.

12   A    WE'RE LOCAL.  ALL LOCAL DRIVERS.

13   Q    AND YOU EVEN TELL THEM, THEY'RE LOCAL DELIVERIES;

14   RIGHT?

15   A    YES.

16   Q    WHAT'S A "LOCAL DELIVERY"?

17   A    YOUR DELIVERY, YOU COME BACK HOME.  YOU DON'T --

18   Q    ISN'T -- ARE YOU AWARE THAT THE FEDERAL REGS' HAVE

19   A SPECIFIC DEFINITION OF A "LOCAL DELIVERY"?

20   A    I DON'T KNOW THE COMPLETE VERBIAGE OF IT.

21   Q    OKAY.  AND THAT IS PART OF YOUR PITCH TO THEM WHEN

22   YOU'RE HIRING THEM, ISN'T IT, THAT THEY'RE NOT GOING TO

23   BE SPENDING THE NIGHT ANYWHERE.  IT'S ALL LOCAL

24   DELIVERIES, IF THEY HAVE TO DO IT AT ALL; CORRECT?

25   A    YES.

```
1    Q    WHEN THEY'RE ASSIGNED TO DO THE DELIVERIES, THERE'S

2    NO RANDOM ORDER TO IT, IS THERE?

3    A    I'M SORRY?

4    Q    THEY'RE NOT SELECTED RANDOMLY?

5    A    AS FAR AS PUTTING THEM ON A SCHEDULE?

6    Q    YES.

7              IN FACT, YOU DON'T PUT THEM ON THE SCHEDULE,

8    DO YOU?

9    A    MYSELF?

10   Q    RIGHT.

11   A    NO.

12              MR. SMEDSTAD:  VAGUE.

13   BY MR. PARRIS:

14   Q    SOMEBODY ELSE DOES THAT; RIGHT?

15   A    CORRECT.

16   Q    AND THEY'RE -- THERE ARE SOME HOSTLERS THAT WILL

17   DRIVE A LOT AND SOME THAT DRIVE VERY LITTLE, IF AT ALL?

18              THE COURT:  ARE YOU NOW TALKING ABOUT TRACY,

19   JUST SO WE KNOW?

20              MR. PARRIS:  JUST TRACY.

21              THE COURT:  OKAY.

22              THE WITNESS:  ARE YOU REFERRING TO THE YARD

23   HOSTLERS?

24   BY MR. PARRIS:

25   Q    YES.
```

```
1    A    YES.

2    Q    HOW IS THE DECISION MADE AS TO WHO DRIVES?

3              MR. SMEDSTAD:  ASKED AND ANSWERED.

4              THE COURT:  I DON'T EVEN KNOW WHAT YOU'RE

5    TALKING ABOUT "DRIVING."  THEY ARE ALL DRIVING A GOAT.

6                   ARE YOU TALKING ABOUT DRIVING SOMETHING

7    ELSE?

8              MR. PARRIS:  WHENEVER I SAY "DRIVE," I MEAN

9    OUT OF THE YARD, DRIVE ON THE HIGHWAYS.

10             THE COURT:  DO YOU UNDERSTAND THAT?

11             THE WITNESS:  YES.

12             THE COURT:  NOW YOU CAN ASK THE QUESTION.

13   BY MR. PARRIS:

14   Q    HOW IS THE DECISION MADE AS TO WHICH HOSTLER WILL

15   DRIVE ON THE HIGHWAYS ON ANY GIVEN DAY?

16   A    BASED ON HOURS OF SERVICE, AND THE DRIVER WE TALKED

17   ABOUT EARLIER ABOUT VOLUNTEERING ON, SAY, LIKE A

18   SATURDAY TO TAKE A ROUTE.

19   Q    OKAY.  SOME DRIVERS DON'T LIKE TO DO IT -- SOME

20   HOSTLERS DON'T LIKE TO DO IT; RIGHT?

21   A    CORRECT.

22   Q    AND YOU DON'T MAKE THEM DO IT, DO YOU?

23   A    IF I HAVE TO, I COULD MAKE THEM DO IT, YES.

24   Q    HAVE YOU EVER HAD A SITUATION WHERE YOU HAD TO DO

25   THAT?
```

59

1    A    I'VE HAD TO TELL A DRIVER, YES, YOU HAVE TO TAKE

2    THAT ROUTE.

3    Q    OKAY.  JUST SO I AM CLEAR, THERE'S ABSOLUTELY NO

4    RANDOM ORDER TO HOW THEY'RE SELECTED THOUGH?

5              MR. SMEDSTAD:  ASKED AND ANSWERED.

6              THE COURT:  OVERRULED.

7              THE WITNESS:  IT'S BASED OFF OF HOURS OF

8    SERVICE AND, IF I HAVE A LOAD AND I CAN ASK A HOSTLER,

9    "ARE YOU WILLING TO TAKE IT?"

10   BY MR. PARRIS:

11   Q    OKAY.  NOW, GOING BACK TO THOSE EXHIBITS, HOW DO

12   YOU KNOW SOME OF THOSE WEREN'T DRIVERS THAT THEN

13   TRANSFERRED OVER TO HOSTLERS, CHANGED JOB

14   CLASSIFICATIONS?

15   A    HOW DO I KNOW THAT?

16   Q    YEAH.

17   A    AT THE TRACY --

18   Q    RIGHT.

19   A    -- FACILITY?

20        I KNOW THAT THOSE DRIVERS HAVE TRANSFERRED

21   FROM DRIVERS TO HOSTLERS, YES.

22   Q    DO YOU HAVE THE LIST OF THOSE?

23   A    I DON'T HAVE A LIST IN FRONT OF ME, NO.

24   Q    OKAY.  THANK YOU.

25        AND -- OKAY.  THAT'S FINE.

1          AND WHAT IS THE SHIFT OF THE YARD HOSTLERS,

2     HOW MANY HOURS?

3     A     APPROXIMATELY, 10 HOURS.

4     Q     AND HOW MANY DAYS A WEEK DO THEY WORK?

5     A     FIVE TO SIX.

6     Q     AND WERE THEY PAID OVERTIME ON THE SIXTH DAY?

7               MR. SMEDSTAD:  FOUNDATION.  RELEVANCE.

8               THE COURT:  WE'RE STICKING TO THE EXEMPTION?

9               MR. PARRIS:  YES.

10    BY MR. PARRIS:

11    Q     WAS THERE EVER A DISCUSSION WITH THEM THAT SAID

12    YOU'RE NOT GOING TO GET PAID OVERTIME ON THE SIXTH DAY,

13    ANYBODY THAT YOU EVER TALKED TO?

14              MR. SMEDSTAD:  RELEVANCE.

15              THE COURT:  I'LL ALLOW IT.

16              THE WITNESS:  THAT THEY WEREN'T GETTING PAID

17    OVERTIME?

18    BY MR. PARRIS:

19    Q     RIGHT.

20    A     NOT TO MY KNOWLEDGE.

21    Q     THANK YOU.

22              NOW, THESE YARDS ARE BUSY; RIGHT?

23    A     YES.

24              MR. SMEDSTAD:  VAGUE AS TO "BUSY."

25    Q     WHEN YOU PULL --

```
1              THE COURT:  STOP, PLEASE.  I'M TELLING HIM TO
2    STOP WITH THE VAGUE OBJECTIONS.
3              MR. PARRIS:  THANK YOU.
4    BY MR. PARRIS:
5    Q    WHEN YOU PULL A HOSTLER OUT AND ASK HIM TO DRIVE A
6    LOCAL DELIVERY, THE WORKLOAD GOES UP FOR THE HOSTLERS;
7    ISN'T THAT RIGHT?
8    A    POTENTIALLY, YES.
9    Q    SOME DAYS THOSE GUYS ARE MOVING A HUNDRED TRAILERS
10   A DAY; ISN'T THAT RIGHT?
11   A    THAT'S A PRETTY HIGH NUMBER.  AS FAR AS A SINGLE
12   HOSTLER, THAT'S A PRETTY HIGH NUMBER.
13   Q    IS THERE A MAXIMUM THAT THEY DO IN A DAY?
14   A    THERE ISN'T A SET NUMBER THAT'S -- THEY --
15   Q    YOU HAVE -- ESTENSON HAS A CONTRACT WITH HOME DEPOT
16   TO MOVE THOSE TRAILERS IN AND OUT --
17             THE COURT:  MR. PARRIS, WE'RE LIMITING IT TO
18   THE EXEMPTION ISSUE.
19             MR. PARRIS:  FAIR ENOUGH.  THANK YOU, YOUR
20   HONOR.
21   BY MR. PARRIS:
22   Q    DID YOU SAY YOU REVIEWED THE TRIP SHEETS?
23   A    I DON'T PERSONALLY REVIEW THEM.  I SEE THEM
24   EVERYDAY, YES.
25   Q    BUT IT IS SOMEBODY ELSE'S JOB TO REVIEW THEM;
```

1    RIGHT?

2    A    CORRECT.

3    Q    YOU MIGHT JUST SEE SOMETHING AND RECOGNIZE IT AS A

4    TRIP SHEET, BUT YOU'RE NOT THE PERSON THAT REVIEWS

5    THEM; RIGHT?

6    A    NO, I DO NOT REVIEW THEM FOR BILLING PURPOSES.

7    Q    IT WAS NEVER PART OF YOUR JOB TO REVIEW TRIP

8    SHEETS, WAS IT?

9    A    IT'S NOT -- THAT'S NOT MY POSITION TO DO THAT ALL

10   THE TIME, NO.

11   Q    THAT'S KELLY'S JOB?

12   A    SHE'S ONE OF MY FLEET MANAGERS THAT DOES THE

13   BILLING, YES.

14   Q    THANK YOU.

15         THE PURPOSE OF THESE TRIP SHEETS, JUST SO

16   WE'RE CLEAR, IS FOR BILLING HOME DEPOT, CLOROX, WHOEVER

17   THE CUSTOMER IS AT ANY PARTICULAR FACILITY; ISN'T THAT

18   RIGHT?

19   A    AND THAT'S THE DAILY TRIP SHEET THAT THE DRIVER

20   FILLS OUT FOR HIS DOCUMENTATION TOO.

21   Q    WHERE DOES IT -- IS THERE SOMETHING THAT TELLS HIM

22   IT'S FOR HIS DOCUMENTATION?

23   A    HE GETS A COPY OF THAT ALSO.

24   Q    DO YOU REMEMBER TELLING US THAT THE TRIP SHEETS

25   WERE FOR BILLING PURPOSES?

1    A    I -- I DON'T RECALL THE EXACT VERBIAGE OF WHAT I

2    SAID.

3    Q    SO IS THERE A PRINTOUT SOMEPLACE FOR EACH EMPLOYEE

4    EACH WEEK SHOWING THE HOURS OF SERVICE AVAILABLE FOR

5    THEM?

6    A    THEY COULD -- WE CAN PULL UP THEIR LOG AND SHOW THE

7    HOURS, OR THROUGH BILLING WE CAN SHOW THEIR HOURS ALSO.

8    Q    OKAY.  SO YOU HAVE TO LOOK AT TWO SEPARATE THINGS?

9    A    YOU CAN LOOK AT EITHER/OR.

10   Q    SO WHAT I'M ASKING YOU IS, IS THERE ANY

11   DOCUMENTATION THAT IS GENERATED IN THE COURSE OF

12   BUSINESS THAT SHOWS THE HOURS HE WAS IN THE YARD AS A

13   YARD HOSTLER AND THE HOURS HE WAS IN A TRUCK DRIVING ON

14   THE HIGHWAYS IN ANY GIVEN WEEK?

15   A    IT WOULD BE IN OUR SYSTEM, YES.

16   Q    AND DOES IT PRINT OUT AS A SEPARATE DOCUMENT?

17   A    YOU COULD RUN A REPORT AND GET THAT INFORMATION.

18   Q    THOSE REPORTS ARE NOT RUN IN THE NORMAL COURSE OF

19   BUSINESS, ARE THEY?

20            MR. SMEDSTAD:  FOUNDATION.

21            THE WITNESS:  I DON'T KNOW THAT ANSWER.

22   BY MR. PARRIS:

23   Q    YOU HAVE NEVER SEEN A DOCUMENT SHOWING OR EVEN A

24   SCREEN ON THE COMPUTER SHOWING SOMEBODY'S HOURS IN THE

25   YARD AND HOURS DRIVING A TRUCK ON THE HIGHWAYS, HAVE

1    YOU?

2              MR. SMEDSTAD:  RELEVANCE.

3              THE COURT:  OVERRULED.

4                   HAVE YOU SEEN THAT?

5              THE WITNESS:  AS BROKEN DOWN PIECE BY PIECE?

6    BY MR. PARRIS:

7    Q    YOU HAVE NEVER SEEN ANY PRINTOUT, ANY SCREEN

8    SHOWING THESE ARE THE HOURS THE DRIVER WAS IN THE YARD

9    AS A YARD HOSTLER, AND THESE ARE THE HOURS HE WAS IN A

10   TRUCK DRIVING A TRUCK FOR ANY GIVEN WEEK; ISN'T THAT

11   CORRECT?

12   A    NOT TO MY KNOWLEDGE.

13   Q    OKAY.  AND, TO YOUR KNOWLEDGE, SUCH A PRINTOUT DOES

14   NOT EXIST?

15   A    I DO NOT KNOW.

16   Q    THANK YOU.

17             THE COURT:  REDIRECT?

18             MR. PARRIS:  I HAVE ONE MORE.  I'M SORRY.

19             THE COURT:  OKAY.

20   BY MR. PARRIS:

21   Q    COULD YOU LOOK AT 590 UP THERE, PLEASE?

22             MR. SMEDSTAD:  IT WOULD BE IN BINDER 1 OF 9.

23   BY MR. PARRIS:

24   Q    DID YOU FIND THE EMPLOYEE MANUAL THERE IN THE

25   EXHIBIT BOOK?

```
1    A    WHAT WAS THE EXHIBIT NUMBER, PLEASE?

2              THE COURT:  590.

3              THE WITNESS:  EMPLOYEE HANDBOOK IS WHAT I'M

4    LOOKING AT RIGHT NOW.

5    BY MR. PARRIS:

6    Q    AND ARE YOU FAMILIAR WITH THE EMPLOYEE'S HANDBOOK?

7    A    YES.

8    Q    AND WHEN YOU TALKED TO THE YARD HOSTLERS THAT WORK

9    FOR YOU, THAT YOU SUPERVISE AND HIRE THEM, DO YOU

10   DISCUSS THE EMPLOYEE MANUAL WITH THEM?

11   A    WE DON'T GO THROUGH THE WHOLE THING, NO.

12   Q    DO YOU DISCUSS, AT ANY TIME, PAGE 31 WHERE IT SAYS,

13   "DRIVER NOTE, THE NON-EXEMPT STATUS OF OUR DRIVERS IS

14   INTENDED TO BE AN ADDITIONAL BENEFIT TO THE TOTAL

15   REWARDS PACKAGE OFFERED THROUGH EMPLOYMENT WITH ELC"?

16             "ELC" IS ESTENSON; RIGHT?

17   A    YES.

18   Q    OKAY.  "OVERTIME, GENERALLY SPEAKING, IS NOT AN

19   ENTITLEMENT OF THE TRANSPORTATION INDUSTRY AS MOST

20   DRIVERS ARE EXEMPT FROM THE OVERTIME PAY RULES AND

21   REGULATIONS."

22             AND IT EVEN CITES THE CODE OF FEDERAL

23   REGULATIONS FOR THAT EXEMPTION; RIGHT?

24   A    RIGHT.

25   Q    WHAT DID THAT MEAN TO YOU?
```

```
 1              MR. SMEDSTAD:  RELEVANCE.

 2              THE COURT:  I DON'T THINK IT'S RELEVANT WHAT

 3    IT MEANS TO HIM, UNLESS HE WAS EXPLAINING HIS INTENT

 4    TO --

 5    BY MR. PARRIS:

 6    Q    DID YOU EVER EXPLAIN THAT TO ANY OF THE EMPLOYEES?

 7    A    NO, I HAVE NOT.

 8    Q    YOU NEVER TOLD THEM --

 9    A    THAT SPECIFIC VERBIAGE RIGHT THERE?  NO, I HAVE

10    NOT.

11    Q    BUT AT ESTENSON, ACROSS THE BOARD, WHETHER A YARD

12    HOSTLER OR WHETHER YOU'RE ACTUALLY DESIGNATED AS A

13    DRIVER, THAT'S HOW IT WORKS, RIGHT, THEY'RE EXEMPT --

14    THEY'RE NON-EXEMPT?

15    A    NON-EXEMPT.

16    Q    RIGHT.

17    A    CORRECT.  THEY WERE PAID OVERTIME.

18    Q    RIGHT.

19              THEY'RE NON-EXEMPT; RIGHT?

20    A    CORRECT.

21    Q    THEY ARE TOLD THEY ARE NON-EXEMPT; RIGHT?

22    A    YES.

23    Q    HAS THAT EVER, IN ANY WAY, BEEN REVOKED WHERE THEY

24    WANTED TO RELY ON THE EXEMPTION WITH ANY OF THE

25    EMPLOYEES?
```

```
1    A     NOT TO MY KNOWLEDGE.

2    Q     AND EVEN TODAY, YOU'RE TELLING EMPLOYEES THAT,

3    UNDER THE FEDERAL LABOR STANDARDS ACT AND CALIFORNIA

4    LAW, THEY ARE NON-EXEMPT AS AN ADDED BENEFIT, ISN'T

5    THAT RIGHT?

6              MR. SMEDSTAD:  CALLS FOR A LEGAL CONCLUSION.

7              THE COURT:  HE'S JUST ASKING WHAT HE TELLS

8    PEOPLE.

9              THE WITNESS:  I DO NOT TELL THEM THAT EXACT

10   VERBIAGE, NO.

11   BY MR. PARRIS:

12   Q     YOU GIVE THEM THE MANUAL WHERE THAT EXACT VERBIAGE

13   EXISTS; CORRECT?

14   A     THAT'S CORRECT.  THEY GET A COPY OF THE HANDBOOK.

15             MR. PARRIS:  THANK YOU.  THAT'S ALL I HAVE.

16                  I MOVE TO ADMIT THE HANDBOOK AND THE

17   OFFER LETTER.

18             THE COURT:  OKAY.

19             MR. PARRIS:  THANK YOU.

20             MR. SMEDSTAD:  NO OBJECTION.

21             (EXHIBITS 590 AND 10 RECEIVED INTO

22             EVIDENCE)

23                     REDIRECT EXAMINATION

24   BY MR. SMEDSTAD:

25   Q     GOOD MORNING.  I PROMISE THAT I'LL BE BRIEF.
```

```
1              I WANT TO TALK TO YOU ABOUT A COUPLE OF POINTS
2     THAT MR. PARRIS COVERED WITH YOU WHEN MR. PARRIS WAS
3     DESCRIBING THE UNLOADING OF THE PRODUCT AT THE
4     CROSS-DOCK AND RELOADING INTO NEW TRAILERS.  HE USED
5     THE WORD ADJECTIVE "RECONDITION."
6              DO YOU REMEMBER THAT?
7     A    I DON'T REMEMBER EXACTLY THAT, NO.
8     Q    ARE THE PRODUCTS THAT ARE TAKEN OFF OF THE LOADED
9     TRAILER THAT COME INTO TRACY AND UNPACKED AND SEPARATED
10    INTO THE VARIOUS TRAILERS THAT WILL GO TO THE 88 STORES
11    ALTERED IN ANY WAY?
12    A    NO, THEY ARE NOT.
13    Q    MR. PARRIS TALKED TO YOU ABOUT SOME OF THE FMCSA
14    SERVICE REGULATIONS.  AND YOU TALKED ABOUT DRIVERS
15    NEEDING TO TAKE 10-HOUR BREAKS BEFORE DRIVING AGAIN.
16              DO YOU REMEMBER TELLING US THAT?
17    A    YES.
18    Q    DO HOSTLERS HAVE TO TAKE 10-HOUR BREAKS?
19    A    YES.
20    Q    AND DO HOSTLERS FILL OUT HOURS OF SERVICE LOGS
21    EVERYDAY?
22    A    YES.
23    Q    AND YOU INDICATED THAT THEY START THEIR LOG BY
24    SWIPING A KIOSK; IS THAT RIGHT?
25    A    YES.
```

1    Q    AND DOES THAT SWIPE COMMUNICATE WITH PEOPLENET?

2    A    YES, IT DOES.

3    Q    AND WHAT IS "PEOPLENET"?

4    A    PEOPLENET IS AN ON-BOARD COMPUTER THAT WE HAVE IN

5    OUR TRACTORS.

6    Q    AND THERE WAS SOME CONFUSION ABOUT WHEN A HOSTLER

7    IS A DRIVER OR A DRIVER IS A HOSTLER.

8            IS IT FAIR TO SAY THAT ESTENSON HIRES DRIVERS?

9    A    YES.

10   Q    AND SOME OF THEM HOSTLE?

11   A    YES.

12   Q    AND THEN SOME OF THE ONES THAT HOSTLE ALSO DRIVE,

13   ROUTE DRIVERS; CORRECT?

14   A    YES.

15   Q    YOU MENTIONED THAT THE EXHIBITS THAT I SHOWED YOU,

16   THAT I PUBLISHED TO YOU, WERE THE ONES THAT -- THE ONLY

17   ONES THAT YOU HAD SEEN.

18            DID YOU MEAN TODAY?

19   A    YES.

20   Q    OKAY.  HAVE I EVER SHOWN YOU THOSE PRECISE EXHIBITS

21   BEFORE?

22   A    THOSE PRECISE ONES, NO.

23   Q    OKAY.  YOU ALSO INDICATED THAT THERE WAS NO WAY FOR

24   YOU TO DETERMINE WHETHER OR NOT EACH OF THOSE TRIP

25   SHEETS IN FACT REFLECTED ROUTE ACTIVITY.

```
 1              DO YOU REMEMBER SAYING THAT?

 2    A    YES.

 3    Q    YOU COULD GO THROUGH THEM, COULDN'T YOU, AND

 4    DETERMINE THAT?

 5    A    YES.

 6    Q    ALL RIGHT.  AND YOU ALSO INDICATED THAT YOU WERE

 7    NOT AWARE AS TO HOW THE TRIP SHEETS WERE ORGANIZED;

 8    ISN'T THAT CORRECT?

 9    A    WITHIN THE BINDER?

10    Q    YES.

11    A    YES.

12    Q    IF YOU WOULD TAKE A LOOK AT BINDER 2 OF 8.

13              DO YOU SEE TABS THERE?

14    A    YES.

15    Q    AND WHAT DOES THE FIRST TAB SAY?

16    A    "CLOROX FAIRFIELD."

17    Q    WHAT DOES THE NEXT TAB SAY?

18    A    CLOROX L.A.

19         MR. SMEDSTAD:  ALL RIGHT.  I'LL REPRESENT FOR

20    THE RECORD THAT THE BINDERS ARE ORGANIZED BY LOCATION.

21         THE COURT:  ALL RIGHT.

22         MR. SMEDSTAD:  AND I'LL ALSO REPRESENT FOR THE

23    RECORD - AND I'M HAPPY TO SPEND THE TIME TO DO IT -

24    THAT EACH ONE OF THE DAILY TRIP SHEETS THAT IS IN ALL

25    OF THOSE BINDERS REFLECTS ROAD ACTIVITY BY A HOSTLER
```

1    DURING THE CLASS PERIOD.

2    BY MR. SMEDSTAD:

3    Q    YOU MENTIONED, WHEN WE WERE TALKING ABOUT HOW YOU

4    SELECT WHICH HOSTLER WILL BE DISPATCHED TO TAKE A ROUTE

5    LOAD, THAT YOU LOOKED TO THE HOURS OF SERVICE?

6    A    CORRECT.

7    Q    AND WHEN SAY "LOOKED TO THE HOURS OF SERVICE," YOU

8    MEAN DETERMINE WHETHER THEY HAVE ENOUGH HOURS TO

9    LEGALLY TAKE THAT LOAD?

10   A    CORRECT.

11   Q    AND HOW DO YOU GO ABOUT DOING THAT?

12   A    THROUGH PEOPLENET.

13   Q    SO YOU'LL LOOK AT PEOPLENET AND DETERMINE WHICH

14   HOSTLER HAS ENOUGH HOURS OF SERVICE TO TAKE THE

15   PARTICULAR LOAD THAT YOU NEED TO DISPATCH?

16   A    YES.

17   Q    ALL RIGHT.  AND DOES IT VARY DAY-TO-DAY AS TO WHICH

18   HOSTLER WILL HAVE HOURS OF SERVICE AVAILABLE?

19   A    YES.

20   Q    SO IT'S NOT ONE PARTICULAR HOSTLER ALWAYS HAS HOURS

21   OF SERVICE; RIGHT?

22   A    CORRECT.

23        MR. SMEDSTAD:  ALL RIGHT.  THAT'S ALL I HAVE,

24   YOUR HONOR.

25             APPARENTLY, I HAVE ONE MORE.

```
1     BY MR. SMEDSTAD:

2     Q    CAN ANY OF THE YARD HOSTLERS BE ASSIGNED A ROUTE TO

3     A HOME DEPOT STORE?

4     A    ONE MORE TIME?

5     Q    CAN ANY OF THE YARD HOSTLERS BE DISPATCHED ON A

6     ROUTE TO TAKE A LOAD TO A HOME DEPOT STORE?

7     A    YES.

8     Q    AND DO YOU DECIDE THAT BASED ON WHO HAS THE

9     AVAILABLE HOURS?

10    A    YES.

11    Q    OKAY.  AND I BELIEVE THAT YOU TOLD US EARLIER THAT

12    YOU KNOW THAT ALL OF THE YARD HOSTLERS AT TRACY HAVE IN

13    FACT TAKEN ROUTES; IS THAT RIGHT?

14    A    YES.

15              MR. SMEDSTAD:  ALL RIGHT.  THANK YOU.

16    NOTHING.

17              THE COURT:  MR. PARRIS?

18              MR. PARRIS:  YES.

19                        RECROSS-EXAMINATION

20    BY MR. PARRIS:

21    Q    YOU JUST TESTIFIED THAT ALL OF THOSE EXHIBITS

22    REFLECT TRIP SHEETS WHERE THE YARD HOSTLER WAS ON THE

23    HIGHWAY.

24              DIDN'T YOU JUST SAY THAT?

25    A    YES.
```

```
 1    Q    THAT'S NOT TRUE, IS IT?

 2    A    THE ONES THAT I LOOKED AT, YES.

 3    Q    THE ONES THAT YOU LOOKED AT.

 4              BUT IN REGARDS TO ALL OF THOSE VOLUMES OF

 5    BOOKS, THAT WOULD NOT BE ACCURATE, WOULD IT?

 6    A    I DON'T KNOW THAT ANSWER.

 7    Q    WELL, LET'S SEE IF I CAN HELP YOU OUT HERE.  GO TO

 8    90545, THAT LAST FOUR NUMBERS.  I'LL PUT IT ON.

 9              WHAT DOES THAT REFLECT?

10    A    THAT IS A TRIP SHEET FROM A DRIVER.

11    Q    NEVER WENT ANYWHERE; RIGHT?

12    A    I'M SORRY?

13    Q    NEVER WENT ANYWHERE, DID HE?

14    A    NOT ON THAT TRIP SHEET, NO.

15    Q    AND IT'S NOT A DRIVER.  IT'S A ROAD HOSTLER; RIGHT?

16    IT'S THE ONE YOU WERE TELLING US ABOUT, MR. FELLS.

17              ISN'T THAT RIGHT?

18    A    YES.

19    Q    TRIP SHEETS ARE FILLED OUT BOTH FOR WHEN THEY'RE IN

20    THE YARD AND THEN ANOTHER TRIP SHEET GETS FILLED OUT IF

21    THEY GO ONTO THE HIGHWAY; ISN'T THAT RIGHT?

22    A    YES.

23              IT'S PAGE 1 OF 2.  SO I'M NOT SURE WHAT THE

24    OTHER PAGE LOOKED LIKE.

25    Q    HERE IT IS.
```

```
1              NEVER LEFT THE TRACY YARD; RIGHT?

2              THE COURT:  IT STILL SAYS "1 OF 2."

3    BY MR. PARRIS:

4    Q    YOU ALSO INDICATED THAT THERE'S A 10-HOUR LIMIT FOR

5    ROAD HOSTLERS.

6              IS THAT WHAT YOUR TESTIMONY WAS?

7    A    TO HAVE 10 HOURS OFF.

8    Q    THEY HAVE TO HAVE 10 HOURS OFF.

9              THERE IS NO LIMIT TO HOW MANY HOURS THEY WORK;

10   RIGHT?  IT'S OVERTIME.

11   A    IF THEY STAY IN THE YARD.

12   Q    SOME DAYS THEY WORK 12 HOURS.  SOME DAYS THEY EVEN

13   WORK 14; CORRECT?

14   A    CORRECT.

15              MR. SMEDSTAD:  RELEVANCE.

16              THE COURT:  OVERRULED.

17   BY MR. PARRIS:

18   Q    NOW, IS YOUR DEPOSITION UP THERE?

19              CAN YOU HELP HIM -- LET ME JUST PUT IT UP HERE

20   FOR YOU.

21              YOUR DEPOSITION WAS TAKEN; RIGHT?

22   A    YES.

23   Q    DO YOU SEE WHERE IT'S MARKED OVER HERE, PAGES "45

24   THROUGH 46"?

25   A    THE ONES THAT ARE MARKED ON MY SIDE ARE "17 THROUGH
```

```
 1    25."  IT LOOKS LIKE "1 THROUGH 8."

 2    Q    PAGE 45, LINE 17 THROUGH PAGE 46, LINE 8.

 3              DO YOU WANT TO READ THAT?

 4    A    YES, I SEE THAT.

 5    Q    AND YOU WERE ASKED ABOUT THIS 10-HOUR RULE; RIGHT?

 6    A    YES.

 7    Q    AND YOU SEE ON LINE 5 ON PAGE 46 WHERE, "SO YARD

 8    HOSTLERS ARE THE ONLY EMPLOYEES THAT WILL BE SCHEDULED

 9    TO WORK TO COME BACK TO WORK BEFORE THEIR 10-HOUR REST

10    TIME IS UP?  ANSWER:  YES."

11              THAT'S WHAT YOU TESTIFIED TO IN YOUR

12    DEPOSITION; RIGHT?

13    A    YES.

14    Q    WHAT CHANGED?

15    A    IF A DRIVER CAME BACK WITHIN EIGHT -- A YARD

16    HOSTLER CAME BACK WITH EIGHT HOURS, HE COULD NOT GO OUT

17    ON THE ROAD.

18    Q    THANK YOU.

19              BUT AS FAR AS THE LIMITS FOR YARD HOSTLERS,

20    THERE IS NONE; RIGHT?

21              THE COURT:  WHAT LIMITS?

22    BY MR. PARRIS:

23    Q    AS FAR AS THE REQUIREMENT THAT THEY TAKE A 10-HOUR

24    BREAK, IF THEY'RE JUST YARD HOSTLING, THERE IS NO RULE,

25    IS THERE?
```

```
 1    A    IF THEY ARE ONLY YARD HOSTLING.

 2    Q    THERE'S NO RULE, IS THERE?

 3    A    THEY CANNOT GO BACK OUT ON THE ROAD IF THEY DIDN'T

 4    HAVE 10 HOURS OFF.

 5    Q    IF THEY'RE ONLY GOING TO YARD HOSTLE THAT DAY, THEY

 6    COULD COME BACK AFTER SIX HOURS AND JUST YARD HOSTLE;

 7    RIGHT?

 8    A    TECHNICALLY, YES.

 9    Q    THANK YOU.

10          NOW, WHEN A DRIVER BECOMES A YARD HOSTLER OR A

11    YARD HOSTLER BECOMES A DRIVER FULL-TIME, NOT MIXING THE

12    TWO UP, THEY FILL OUT A FORM; RIGHT?

13              THERE'S A TRANSFER?

14          MR. SMEDSTAD:  BEYOND THE SCOPE.

15          THE COURT:  IT IS, MR. PARRIS.

16          MR. PARRIS:  IT'S TWO QUESTIONS.  MOVE TO

17    REOPEN?

18          THE COURT:  ALL RIGHT.

19          MR. PARRIS:  THANK YOU.

20    BY MR. PARRIS:

21    Q    THAT'S THE TRANSFER; RIGHT?

22    A    I'M SORRY?

23    Q    THAT'S WHEN THEY TRANSFER FROM DRIVER TO YARD

24    HOSTLER OR VICE VERSA.

25              THERE'S A FORM LIKE THAT?
```

1    A    YES.

2    Q    DID YOU MAKE ANY EFFORT TO LOOK AND SEE IF ANY OF

3    THE PEOPLE THAT ARE LISTED AS DRIVING A GREAT DEAL OF

4    TIME, THEIR PERSONNEL FILES REFLECT A CHANGE IN JOBS?

5    A    DID I LOOK IT UP?

6    Q    YES.  DID YOU?

7    A    SAY THE QUESTION AGAIN?

8    Q    DID YOU MAKE ANY ATTEMPT TO LOOK AT THE PERSONNEL

9    FILES OF THE PEOPLE YOU TESTIFIED ABOUT HERE TODAY AND

10   THE AMOUNT OF TIMES THEY DROVE TO FIND OUT IF THEY HAD

11   BEEN A DRIVER AND THEN BECAME A YARD HOSTLER?

12   A    NO, I DID NOT.

13            MR. PARRIS:  THANK YOU.  THAT'S ALL I HAVE.

14                **FURTHER REDIRECT EXAMINATION**

15   BY MR. SMEDSTAD:

16   Q    BRIEFLY.  AND I'M ONLY GOING TO ADDRESS THE TWO

17   INCOMPLETE TRIP SHEETS THAT MR. PARRIS PUBLISHED TO

18   YOU.

19            DO YOU REMEMBER BEING SHOWN TWO TRIP SHEETS

20   THAT INDICATED "PAGE 1 OF 2"?

21   A    YES.

22   Q    ALL RIGHT.  AND IF A DRIVER -- IF A DRIVER PERFORMS

23   YARD HOSTLING ACTIVITY AT THE START OF THE DAY AND THEN

24   SUBSEQUENTLY TAKES A ROUTE LOAD, MIGHT HE START A

25   SECOND TRIP SHEET?

1    A    YES.

2    Q    AND WOULD THAT BE AN EXPLANATION AS TO WHY THERE

3    WOULD BE A SECOND PAGE WHEN THERE WAS ALL THAT BLANK

4    SPACE LEFT OPEN ON PAGE 1 OF 2?

5    A    YES.

6              MR. SMEDSTAD:  ALL RIGHT.  I TRIED TO LOCATE

7    THE SECOND PAGE OF MR. PARRIS' TRIP SHEETS.  BUT WE

8    WEREN'T PROVIDED THAT, SO I WASN'T ABLE TO DO THAT.

9              THE COURT:  I THOUGHT THEY CAME FROM YOUR

10   BINDERS?

11             MR. PARRIS:  IT'S YOUR EXHIBIT.

12             MR. SMEDSTAD:  DO YOU HAVE PAGE 2?

13             MR. PARRIS:  IT'S YOUR EXHIBIT WITH THE BATES

14   NUMBER --

15             MR. SMEDSTAD:  WHICH VOLUME?

16             MR. PARRIS:  THE ONE YOU GAVE ME.

17             MR. SMEDSTAD:  IS THAT 5 OF 8?

18             MR. PARRIS:  LET ME HAND YOU THREE OF THEM.

19             OKAY.  IT'S EXHIBIT 9003 -- BATES NUMBER

20   9003.  AND THEN YOUR EXHIBITS JUMP TO 9008.  AND IT'S

21   STILL JUST TRACY.  AND THEN IT JUMPS TO 90013.

22             WOULD YOU LIKE TO SEE THEM?

23             MR. SMEDSTAD:  NO.  THOSE AREN'T THE PAGES.

24   BY MR. SMEDSTAD:

25   Q    I'M GOING TO SHOW YOU AN EXAMPLE.  I'M GOING TO

```
1    PUBLISH A THREE-PAGE TRIP SHEET, THE FIRST PAGE OF
2    WHICH IS EST039595, AND IT GOES THROUGH EST039597.
3    LET'S TAKE A LOOK AT THE FIRST PAGE.
4            MR. PARRIS:  BEYOND THE SCOPE, YOUR HONOR.
5    OBJECTION.
6            THE COURT:  I THINK HE'S TRYING TO ADDRESS THE
7    ISSUE YOU RAISED.
8                 OVERRULED.
9    BY MR. SMEDSTAD:
10   Q    SIR, PAGE EST39595, IS THAT A FIRST PAGE OF A TRIP
11   SHEET?
12   A    YES.
13   Q    AND HOW MANY PAGES DOES THIS TRIP SHEET INDICATE
14   THAT IT HAS?
15   A    ACCORDING TO THIS, IT LOOKS LIKE THERE'S THREE
16   PAGES.
17   Q    AND WHO IS THE DRIVER?
18   A    RON RICE.
19   Q    AND WHAT'S THE DATE?
20   A    5/21 OF 2014.
21   Q    OKAY.  AND DOES THE FIRST PAGE REFLECT ANY ROUTE
22   ACTIVITY?
23   A    YES.
24   Q    OKAY.  AND HOW CAN YOU TELL THAT?
25   A    HE'S TAKING TRAILERS FROM THE TRACY RDC TO MCKINNEY
```

```
 1   TRAILER IN STOCKTON.

 2   Q    LET'S TAKE A LOOK AT PAGE 2, WHICH IS EST39596.

 3        DOES THIS APPEAR TO BE THE SECOND PAGE OF THE

 4   SAME TRIP SHEET?

 5   A    YES.

 6   Q    AND WHAT'S THE DATE?

 7   A    5/21 OF 2014.

 8   Q    DOES THIS REFLECT ROUTE ACTIVITY?

 9   A    NO, IT DOES NOT.

10   Q    SO THIS IS THE SAME DAY, AND THE DRIVER WAS

11   PERFORMING ROUTE ACTIVITY IN THE MORNING; CORRECT?

12   A    YES.

13   Q    AND THEN PERFORMING YARD HOSTLING AFTER THAT?

14   A    YES.

15   Q    AND THEN LET'S TAKE A LOOK AT PAGE 3, WHICH IS

16   EST039597.

17        DOES THAT APPEAR TO BE THE THIRD PAGE OF THIS

18   TRIP SHEET?

19   A    YES.

20   Q    AND WHAT'S THE DATE?

21   A    5/21 OF 2014.

22   Q    SO IT'S THE SAME DATE?

23   A    YES.

24   Q    AND WHAT DOES THIS THIRD PAGE SHOW?

25   A    THAT WAS BASICALLY HIS POST-TRIP.
```

1    Q    OKAY.  AND WHEN YOU SAY "POST-TRIP," WHAT DO YOU

2    MEAN?

3    A    THE END OF HIS DAY.

4    Q    OKAY.  WHEN HE INSPECTED THE TRACTOR?

5    A    YES.

6           MR. SMEDSTAD:  ALL RIGHT.  NOTHING FURTHER.

7           MR. PARRIS:  JUST ON THAT ISSUE, YOUR HONOR?

8                    **FURTHER RECROSS-EXAMINATION**

9    BY MR. PARRIS:

10   Q    CAN YOU LOOK AT THE EXHIBIT BOOK THAT YOU INITIALLY

11   STARTED YOUR TESTIMONY WITH REGARDING MR. FELLS?  CAN

12   YOU PULL THAT OUT?  I THINK IT'S VOLUME 5.

13          WE HAVE ONE DATED JULY 15TH, 2014.

14          WHAT'S THE ARRIVAL TIME?

15   A    1400.

16   Q    WHAT'S THE DEPARTURE TIME?

17   A    0100.

18   Q    AND WHAT DOES REFLECT TO YOU?  WHAT DOES THAT MEAN

19   TO YOU?

20   A    I'M NOT --

21   Q    DOES THAT MEAN HE WORKED 11 HOURS?

22          MR. SMEDSTAD:  SCOPE.  RELEVANCE.

23          THE COURT:  HOW IS THIS TIED TO WHAT

24   MR. SMEDSTAD WAS DOING?

25          MR. PARRIS:  HE WAS INDICATING THAT, IF THERE

```
1    WAS 1, THEN PAGE 2 IS SHOWING THAT HE WAS DRIVING ON

2    THE HIGHWAYS.  THAT WAS THE CLEAR IMPLICATION OF HIS

3    QUESTIONING.

4              THE COURT:  SO SHOW ME PAGE 2.

5    BY MR. PARRIS:

6    Q    WELL, THE PROBLEM I HAVE, IF YOU GO TO 9003, IS

7    THERE A 9004?

8    A    I DO NOT KNOW.

9    Q    LOOK AND SEE.

10   A    I'M NOT SURE WHERE YOU'RE TELLING ME TO LOOK.

11             THE COURT:  LOOK, THERE EITHER IS OR THERE

12   ISN'T.  LOOK FOR IT LATER.  IF IT'S NOT THERE, IT'S NOT

13   THERE.  WE ARE JUST WASTING TIME HERE.

14   BY MR. PARRIS:

15   Q    THE POINT OF IT BEING, THERE'S ALL KINDS OF PAGES

16   SKIPPED IN THE BATES NUMBERING IN THOSE VOLUMES.  AND

17   YOU DON'T KNOW IF THAT'S THE CASE OR NOT; RIGHT?

18   A    CORRECT.

19   Q    BUT YOU DO KNOW THAT THIS PERSON WORKED 11 HOURS

20   BASED UPON THE ARRIVAL AND DEPARTURE TIMES; ISN'T THAT

21   RIGHT?

22             MR. SMEDSTAD:  SCOPE.  RELEVANCE.

23             THE COURT:  OVERRULED.

24             THE WITNESS:  THE DRIVER ON THIS TRIP SHEET

25   WORKED FROM 1400 TO 0100.
```

```
1   BY MR. PARRIS:

2   Q    AND HOW MANY HOURS IS THAT?

3   A    ELEVEN HOURS.

4   Q    AND SO IF PAGE 2 SHOWS HIM GETTING ON THE HIGHWAYS,

5   THAT WOULD BE A VIOLATION OF THE LAW; ISN'T THAT RIGHT?

6   A    I DON'T KNOW WHAT PAGE 2 SAYS.

7   Q    IF PAGE 2 -- HYPOTHETICALLY, IF IT WERE THERE AND

8   IT SHOWS A TRIP ON THE HIGHWAYS, THAT WOULD BE A

9   VIOLATION OF THE LAW, WOULDN'T IT?

10  A    IF HE STAYED WITHIN CALIFORNIA, HE CAN DRIVE UP TO

11  12 HOURS.

12  Q    THANK YOU.

13        NOW, THAT'S TRUE WITH 9008.  THAT'S THE NEXT

14  EXHIBIT AFTER 9003 IN THAT BOOK.

15        SAME THING; RIGHT?

16  A    YES.

17  Q    AND THERE IS NO 9009 IN THAT BOOK.  WELL, YOU DON'T

18  KNOW.

19        AND THE SAME THING WITH 13 -- 90013.

20        AGAIN, IT SEEMS LIKE THEY ARE CONSISTENTLY

21  WORKING 11 HOURS; ISN'T THAT RIGHT?

22        MR. SMEDSTAD:  SCOPE AND RELEVANCE.

23        THE COURT:  AND WASTING MY TIME.  YOU CAN MAKE

24  THESE ARGUMENTS IN YOUR CLOSING BRIEF.  YOU'LL HAVE ALL

25  THE EXHIBITS.  THIS WITNESS DOESN'T KNOW ANYTHING ABOUT
```

```
1    THIS.
2              MR. PARRIS:  THANK YOU, YOUR HONOR.
3              MR. SMEDSTAD:  NOTHING FURTHER.
4              THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU
5    ARE EXCUSED.
6                   WE'LL TAKE A 15-MINUTE BREAK.
7                   (RECESS)
8              THE COURT:  YOU MAY BE SEATED.
9                   DOES THE DEFENSE HAVE ANOTHER WITNESS?
10             MR. HANSON:  YES, YOUR HONOR.  WE WOULD CALL
11   CHRIST LICHT.
12             MR. PARRIS:  YOUR HONOR, I HAVE TO OBJECT.  HE
13   HAS NOT BEEN DISCLOSED IN THE DISCLOSURE.  HE WASN'T
14   DISCLOSED IN INTERROGATORIES.  THEY CAN'T PULL UP
15   WITNESSES AFTER DISCOVERY CLOSES AND EXPECT THEM TO
16   TESTIFY.
17             MR. HANSON:  YOUR HONOR, HIS NAME HAS COME UP
18   THROUGHOUT.  HE IS THE DIRECTOR OF SAFETY.  THEY HAVE A
19   PICTURE OF HIM IN SOME OF THE THINGS THEY GAVE US.
20             THE COURT:  THE FACT THAT SOMEONE'S NAME HAS,
21   QUOTE, "COME UP" DOES NOT INDICATE THAT THEY'RE GOING
22   TO BE A WITNESS IN THE CASE THAT SHOULD BE DEPOSED.
23             MR. HANSON:  YOUR HONOR, THEY DID SERVE A
24   DEPOSITION NOTICE FOR HIM AND THEN DECIDED NOT TO TAKE
25   HIS DEPOSITION.
```

```
 1              THE COURT:  OKAY.  HE CAN TAKE THE STAND.

 2              MR. PARRIS:  YOUR HONOR, THEY'RE MISLEADING

 3    YOU.  IF YOU RECALL, THE LAST TIME WE WERE HERE --

 4              THE COURT:  I DON'T RECALL.  I TRY TO PUT IT

 5    OUT MY MIND, MR. PARRIS.

 6              MR. PARRIS:  I CAN SEE WHY YOU DID, YOUR

 7    HONOR.

 8                   IN REFERENCE TO THE SUMMARY AND THE 1006

 9    OBJECTION, YOU OFFERED ME THE OPPORTUNITY TO DEPOSE THE

10    PERSON WHO COMPILED IT.  AND WE TALKED ABOUT, THIS IS

11    NOT GOING TO REOPEN DISCOVERY IN ANY WAY.  THEY SAID,

12    THEY DID NOT WANT TO REOPEN DISCOVERY.  I SAID IT.

13                   OUR INTENT WAS TO TAKE MICHELLE

14    ALEXANDER'S DEPOSITION WHO IS THE ONE WHO PREPARED THE

15    SUMMARY.  THEY REFUSED TO LET US TAKE HER.  THEN THEY

16    ADDED THESE TWO NAMES AND SAID, THOSE ARE THE PEOPLE.

17    THEN THEY SAID, NO, THEY DIDN'T PREPARE THE SUMMARY.  A

18    THIRD GUY DID.  AND AT THAT POINT, WE SAID, "NO, THIS

19    SEEMS TO BE AN ATTEMPT TO REOPEN DISCOVERY."

20                   AND IF THIS GUY IS NOT GOING TO TESTIFY

21    AS TO THE COMPILATION OF THOSE EXHIBITS, HE -- HE WAS

22    NOT DISCLOSED DURING THE COURSE OF DISCOVERY.  AND THIS

23    COURT DID NOT ALLOW US TO REOPEN DISCOVERY.

24              MR. HANSON:  MAY I RESPOND, YOUR HONOR?

25              THE COURT:  YES.
```

```
 1              MR. HANSON:  DURING THE DEPOSITION OF OUR
 2    30(B)(6) WITNESS, MICHELLE ALEXANDER, CHRIST LICHT WAS
 3    IDENTIFIED.  AND THE PLAINTIFF THEN NOTICED A
 4    DEPOSITION AND THEN DECIDED NOT TO TAKE HIS DEPOSITION.
 5              MR. PARRIS:  WELL, THAT IS TECHNICALLY TRUE,
 6    BUT WITHIN THE CONFINES OF WHAT I JUST TOLD YOU.
 7                   WE DID NOT -- IT HAD NOTHING TO DO WITH
 8    THE DEPOSITION WHEN WE ASKED HIM ABOUT THE ORGANIZATION
 9    OF THE COMPANY.
10                   THEY LISTED THE PRESIDENT.  THEY TALKED
11    ABOUT ALL THE VARIOUS DIFFERENT POSITIONS.  BUT NOTHING
12    WAS SAID ABOUT, THAT THEY HAD ANYTHING TO SAY THAT WAS
13    DIRECTLY RELEVANT TO THE CASE.
14                   AND I WOULD SUBMIT THAT, EVEN IF THEY
15    DID, IT WOULDN'T MATTER.  IT'S THEIR JOB.  THEY COULD
16    HAVE --
17              THE COURT:  WHEN DID YOU INDICATE THIS PERSON
18    WAS GOING TO BE A WITNESS?
19              MR. HANSON:  WE IDENTIFIED THE WITNESS IN
20    OUR -- THE JOINT SUBMISSION WHERE WE PUT THE SUMMARY.
21    HE HAS SUBMITTED DECLARATIONS IN THIS CASE.  IT'S NOT
22    SOMEBODY THAT WE HAVE HIDDEN FROM THE PLAINTIFFS.  THEY
23    HAVE HAD THE OPPORTUNITY TO TAKE HIM --
24              THE COURT:  YOU'RE SUPPOSED TO SUPPLEMENT
25    WITNESS LISTS AS THINGS GO ALONG.
```

```
 1              MR. HANSON:  AND WE DID THAT, YOUR HONOR.

 2              THE COURT:  WHEN WAS HE IDENTIFIED ON A

 3   WITNESS LIST?

 4              MR. HANSON:  YOUR HONOR, HE WAS IDENTIFIED ON

 5   THE FIRST WITNESS LIST FILED LAST YEAR WHEN THIS CASE

 6   WAS SET FOR A JURY TRIAL.

 7              MR. PARRIS:  AFTER DISCOVERY CLOSED.

 8              MR. TAYLOR:  HE WAS IDENTIFIED -- MICHELLE

 9   ALEXANDER IDENTIFIED HIM AS THE DIRECTOR OF SAFETY IN

10   HER 30(B)(6) DEPOSITION.  AND MR. LICHT SUBMITTED A

11   DECLARATION IN SUPPORT OF --

12              THE COURT:  HOW DOES THAT TELL HIM HE'S GOING

13   TO BE A WITNESS?

14              MR. TAYLOR:  IT WAS MADE KNOWN HE WOULD BE A

15   WITNESS AT TRIAL SINCE THE WITNESS LIST WAS FILED WITH

16   THE COURT.

17              THE COURT:  AFTER DISCOVERY?

18              MR. TAYLOR:  I'M NOT SURE IT WAS AFTER THE

19   CLOSE OF DISCOVERY, YOUR HONOR.  BUT I WOULD HAVE TO

20   CHECK THE -- THE DEADLINES.

21              THE COURT:  THE WITNESS LIST IS FOR THE

22   PRETRIAL, WHICH IS --

23              MR. TAYLOR:  THERE'S A DEPOSITION NOTICE TO

24   MR. LICHT TO TAKE HIS DEPOSITION.  IT WAS NEVER TAKEN.

25   SO THEY COULD HAVE DEPOSED HIM AND DIDN'T.
```

```
 1              AND HIS DEPOSITION WASN'T ABOUT THIS
 2    COMPILATION OF DATA.  THE PERSON TO BE DEPOSED WAS A
 3    30(B)(6) DESIGNEE ABOUT THE DATA.  AND WE ALLOWED THEM
 4    TO TAKE MR. LICHT'S DEPOSITION AND MR. BANKSON, BOTH OF
 5    WHOM HAD NOT BEEN DEPOSED BECAUSE THEY HAD PREVIOUSLY
 6    OBJECTED TO LISTING THEM ON THE WITNESS LIST WHEN IT
 7    WAS FILED LAST SUMMER.
 8              SO THEY WERE GIVEN THE CHANCE TO TAKE THE
 9    DEPOSITIONS EVEN THOUGH DISCOVERY HAD CLOSED AT THAT
10    POINT.
11         MR. PARRIS:  YOUR HONOR, MAY I RESPECTFULLY
12    SUBMIT?  ONE DOES NOT REOPEN DISCOVERY BY TELLING ME I
13    CAN TAKE SOMEBODY'S DEPOSITION WITHOUT ANY DESIGNATION
14    OF -- ANY SUPPLEMENTAL DESIGNATION OR ANYTHING ELSE.
15              ONE REOPENS DISCOVERY BY EITHER GETTING
16    AN AGREEMENT THAT IS THEN SUBMITTED TO THE COURT OR BY
17    DOING A MOTION.  THEY DIDN'T DO ANY OF THOSE THINGS.
18    THEY NEVER TOLD US WHY THIS GUY -- WHEN THEY TOLD US WE
19    COULD DEPOSE HIM, I THOUGHT IT WAS FOR THE SINGULAR
20    PURPOSE OF THOSE EXHIBITS AND THE SUMMARY UNDER 1006.
21         THE COURT:  WHAT IS HE GOING TO TESTIFY TO?
22         MR. TAYLOR:  LET ME JUST SAY, MR. LICHT
23    SUBMITTED A DECLARATION IN SUPPORT OF MOTIONS THAT WERE
24    FILED WELL BEFORE THE END OF DISCOVERY OFFERING
25    EVIDENCE TO THE COURT.  SO, YOU KNOW, IF -- IF THAT
```

```
 1    DIDN'T NOTIFY THE PLAINTIFF THAT MR. LICHT WOULD BE A
 2    WITNESS OFFERING TESTIMONY --
 3              THE COURT:  THIS IS NOT A GAME, PEOPLE, WHERE
 4    WE JUST SIT THERE AND FIGURE OUT HOW FAR WE CAN GO
 5    WITHOUT ACTUALLY TELLING PEOPLE WHO THE WITNESSES ARE
 6    GOING TO BE AND STILL BE ALLOWED TO CALL THEM.
 7              MR. TAYLOR:  YOUR HONOR, HE WAS OFFERED AS A
 8    WITNESS IN SUPPORT OF THE SUMMARY JUDGMENT BY VIRTUE OF
 9    HIS DECLARATION.  AND HE WAS LISTED AS A WITNESS ON THE
10    WITNESS LIST FOR TRIAL.  AND --
11              THE COURT:  AFTER THE END OF DISCOVERY.
12              I CAN'T BELIEVE WE TURNED IN THE WITNESS
13    LIST FOR TRIAL WHILE DISCOVERY WAS STILL GOING ON.
14    THAT'S NEVER HOW IT WORKS.
15              IF FOR SOME REASON IT DID IN THIS CASE,
16    THEN YOU CAN SHOW ME THE DOCUMENTS.
17              MR. HANSON:  YOUR HONOR, WHAT HAPPENS IN
18    DISCOVERY IS THAT PEOPLE'S NAMES --
19              THE COURT:  I DID DISCOVERY FOR 17 YEARS.
20    DON'T TELL ME WHAT HAPPENS IN DISCOVERY.
21              MR. HANSON:  SO HE WAS MADE KNOWN --
22              THE COURT:  YOU DON'T JUST GET TO SIT THERE
23    AND NAME NAMES --
24              MR. HANSON:  CORRECT.
25              THE COURT:  -- AND SAY, "WE NAMED 20 NAMES.
```

```
 1    WE DIDN'T INDICATE THEY WERE GOING TO BE WITNESSES AT

 2    TRIAL, BUT HE ASKED TO IDENTIFY THEM."

 3            MR. HANSON:  BECAUSE YOU DESIGNATE WITNESSES

 4    AFTER DISCOVERY CLOSES, BUT YOU MAKE AVAILABLE WHO HAS

 5    INFORMATION DURING THE COURSE OF DISCOVERY.  THAT WAS

 6    DONE WITH MR. LICHT.

 7            THE COURT:  WHAT IS HE GOING TO TESTIFY TO?

 8            MR. HANSON:  HE IS GOING TO TESTIFY -- YOUR

 9    HONOR, HE'S THE DIRECTOR OF SAFETY.  AND HE'S GOING TO

10    TESTIFY AS TO THE QUALIFICATIONS OF THE DRIVERS THAT

11    ESTENSON HIRES, BOTH THOSE THAT PERFORM ROUTE WORK, AS

12    WELL AS THOSE WHO PERFORM HOSTLING WORK.

13            THE COURT:  IS THAT WHAT WAS IN HIS

14    DECLARATIONS?

15            MR. HANSON:  YES, YOUR HONOR.

16            THE COURT:  YOU CAN PUT HIM ON THE STAND TO

17    TESTIFY ONLY TO WHAT'S IN THE DECLARATIONS.

18            MR. PARRIS:  I THINK THAT WOULD BE A WASTE OF

19    TIME.  HE CAN SUBMIT THE DECLARATION TO THE COURT.  I

20    DON'T NEED TO CROSS-EXAMINE HIM ABOUT THIS.

21            MR. HANSON:  MAY WE HAVE A MOMENT, YOUR HONOR?

22            THE COURT:  YES.

23            MR. HANSON:  WE WANT TO LOOK AT THE

24    DECLARATION.  WE DON'T HAVE A COPY OF IT WITH US IN

25    COURT, YOUR HONOR.
```

```
 1              (PAUSE IN THE PROCEEDINGS)

 2              MR. HANSON:  YOUR HONOR, WE WILL ACCEPT THEIR

 3    OFFER TO ADMIT THE DECLARATION OF MR. LICHT IN LIEU OF

 4    HIS TESTIMONY.

 5              THE COURT:  OKAY.  THANK YOU.

 6              MR. PARRIS:  ALTHOUGH I WANT TO BE CLEAR, I'M

 7    OBJECTING TO ANY TESTIMONY FROM HIM.  BUT IF HE'S GOING

 8    TO TESTIFY, YOU CAN HAVE THE DECLARATION.  IT SPEEDS IT

 9    UP.  I HAVE NO NEED TO CROSS-EXAMINE HIM ABOUT ANY OF

10    THIS.

11              THE COURT:  OKAY.  SO THE DECLARATION IS HIS

12    TESTIMONY.

13              YOU DON'T WANT TO CROSS-EXAMINE HIM?

14              MR. PARRIS:  I AM WAIVING CROSS-EXAMINATION,

15    BUT I AM OBJECTING TO THE LATE DESIGNATION OF THE

16    WITNESS.  I DON'T WANT TO WAIVE MY OBJECTION, IS ALL.

17              THE COURT:  THAT'S FINE.  OKAY.

18              MR. HANSON:  AT THIS TIME, YOUR HONOR, I'LL

19    CALL MICHELLE ALEXANDER.

20              HIS DECLARATION WILL NEED TO BE MOVED IN

21    AS AN EXHIBIT.  AND WE'LL HAVE TO MAKE IT -- OUR LAST

22    ONE IS 590.  IT'LL BECOME 591.  WE'LL HAVE TO PROVIDE A

23    COPY TO THE COURT OF IT.

24              THE COURT:  OKAY.  THANK YOU.

25              STEP FORWARD, PLEASE.
```

```
1               THE CLERK:  PLEASE STEP FORWARD.

2                    YOU DO SOLEMNLY SWEAR THAT THE TESTIMONY

3      YOU ARE ABOUT TO GIVE IN THE CAUSE NOW PENDING BEFORE

4      THIS COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND

5      NOTHING BUT THE TRUTH, SO HELP YOU GOD?

6               THE WITNESS:  YES, I DO.

7               THE CLERK:  PLEASE STEP FORWARD TO THE WITNESS

8      STAND AND STATE YOUR FULL NAME FOR THE RECORD AND SPELL

9      IT.

10              THE WITNESS:  MICHELLE ALEXANDER.

11              THE COURT:  YOU CAN HAVE A SEAT.

12                   PLEASE SPELL YOUR FIRST AND LAST NAME.

13              THE WITNESS:  M-I-C-H-E-L-L-E,

14     A-L-E-X-A-N-D-E-R.

15              THE COURT:  YOU MAY PROCEED.

16              MR. HANSON:  THANK YOU, YOUR HONOR.

17                        DIRECT EXAMINATION

18     BY MR. HANSON:

19     Q    MS. ALEXANDER, WHERE ARE YOU EMPLOYED?

20     A    ESTENSON LOGISTICS.

21     Q    HOW LONG HAVE YOU BEEN AT ESTENSON LOGISTICS?

22     A    THIRTEEN YEARS.

23     Q    WHAT'S YOUR POSITION AT ESTENSON?

24     A    VP OF CORPORATE SERVICES.

25     Q    AS A VP OF CORPORATE SERVICES, WHAT ARE YOUR JOB
```

```
 1    DUTIES AND RESPONSIBILITIES?

 2    A    OVERALL RESPONSIBLE FOR THE HUMAN RESOURCE

 3    DEPARTMENT, THE CORPORATE TRAVEL AND EXPENSE

 4    DEPARTMENT.  AND THEN, MOST RECENTLY, THE RECRUITING

 5    DEPARTMENT.

 6    Q    HAVE YOU HAD OTHER POSITIONS WITH ESTENSON BEFORE

 7    BECOMING THE VICE PRESIDENT OF CORPORATE SERVICES?

 8    A    YES, I HAVE.

 9    Q    WHAT ARE THE OTHER POSITIONS YOU HAVE HELD?

10    A    OFFICE MANAGER AND DIRECTOR OF CORPORATE SERVICES.

11    Q    AS A DIRECTOR OF CORPORATE SERVICES, WHEN DID YOU

12    BEGIN IN THAT POSITION?

13    A    THAT WAS 2008.

14    Q    DID YOUR JOB RESPONSIBILITIES CHANGE WHEN YOU MOVED

15    FROM BEING THE DIRECTOR OF CORPORATE SERVICES TO BEING

16    THE VICE PRESIDENT OF CORPORATE SERVICES?

17    A    NOT IMMEDIATELY UPON THAT TITLE.

18    Q    SO WHAT CHANGED AFTER YOU BECAME VICE PRESIDENT?

19    A    PREVIOUSLY, ALSO MANAGED PART OF THE ACCOUNTING,

20    ACCOUNTS RECEIVABLE, AS WELL AS THE PAYROLL DEPARTMENT.

21    Q    AND WHAT HAPPENED -- DO YOU STILL HAVE THOSE

22    RESPONSIBILITIES?

23    A    I DO NOT.

24    Q    WHO HANDLES THOSE NOW?

25    A    THOSE NOW ARE ACCOUNTING FUNCTIONS.
```

1    Q    WHAT TYPE OF BUSINESS DOES ESTENSON DO IN THE STATE

2    OF CALIFORNIA?

3    A    ESTENSON PROVIDES LOGISTIC TRANSPORTATION SERVICES

4    FOR OUR CUSTOMERS, LIKE HOME DEPOT, TRANSPORTING

5    MERCHANDISE FROM THEIR DC'S TO THEIR STORES.

6    Q    AND BY A "DC," WHAT'S A DC?

7    A    A DISTRIBUTION CENTER.

8    Q    DOES ESTENSON HIRE DRIVERS TO PERFORM THESE

9    TRANSPORT AND DELIVERY SERVICES?

10   A    YES.

11   Q    WHAT TYPES OF DRIVERS DOES ESTENSON USE TO SERVICE

12   CUSTOMERS LIKE HOME DEPOT?

13   A    WE HIRE D.O.T. QUALIFIED DRIVERS.

14   Q    IS THERE ANY DISTINCTION -- DO SOME OF THE DRIVERS

15   HAVE DIFFERENT JOB DUTIES THAT THEY DO ON A REGULAR

16   BASIS VERSUS OTHER DRIVERS?

17   A    YES.

18   Q    WHAT TYPES OF DRIVERS DO YOU HAVE THEN?

19   A    SO WE HAVE DRIVERS THAT PERFORM ROUTES, WHICH IS

20   TAKING MERCHANDISE FROM THE DISTRIBUTION CENTER TO THE

21   STORES.  WE HAVE OTHER DRIVERS THAT PERFORM YARDWORK,

22   YARD HOSTLING WORK.

23   Q    WHAT DOES A YARD HOSTLER DO?

24   A    A YARD HOSTLER MOVES TRAILERS WITHIN A LARGE DC.

25   SO MOVING EMPTY TRAILERS TO A LOADING DOCK, MOVING FULL

```
 1    TRAILERS TO A STAGING AREA.
 2    Q    IS THE STAGING AREA ON THE -- IN THE SAME SITE OR A
 3    DIFFERENT SITE?
 4    A    IT DEPENDS ON THE LOCATION.
 5    Q    DO SOME OF THE LOCATIONS HAVE STAGING AREAS THAT
 6    ARE OFF THE DC SITE?
 7    A    YES.
 8    Q    ARE THE YARD HOSTLERS -- WHEN THE DRIVERS ARE
 9    PERFORMING THE YARD HOSTLING SERVICES, DO THEY HAVE TO
10    GO ON THE PUBLIC HIGHWAYS TO GET TO THOSE STAGING
11    AREAS?
12    A    SOME LOCATIONS.
13    Q    WHEN YOU DO THAT, DOES ESTENSON, IN ANY WAY,
14    QUALIFY THEIR -- DO THEY STILL USE THE YARD TRACTORS TO
15    MOVE -- MAKE THOSE MOVES TO THE STAGING AREAS?
16    A    YES.
17    Q    DOES ESTENSON DO ANYTHING IN ORDER FOR THOSE
18    TRACTORS TO BE OUT ON THE ROAD ON A PUBLIC HIGHWAY?
19    A    DO ANYTHING IN TERMS?
20    Q    YEAH, DO THEY HAVE TO HAVE A LICENSE -- A PHYSICAL
21    LICENSE ON THE TRUCK IN ORDER TO BE OUTSIDE OF THE
22    PRIVATE PROPERTY OF THE DC?
23    A    YES.
24    Q    AND THEN YOU SAID YOU HAD ROUTE DRIVERS.
25         IN TERMS OF THE QUALIFICATIONS, IS THERE ANY
```

```
 1    DISTINCTION BETWEEN THE QUALIFICATIONS OF A DRIVER
 2    PERFORMING YARD HOSTLER SERVICES AND A DRIVER
 3    PERFORMING A DELIVERY -- ROUTE DELIVERY SERVICES?
 4    A    NO.
 5    Q    I'M GOING TO SHOW YOU PART OF EXHIBIT NUMBER 590,
 6    AND IT IS BEEN ADMITTED AS THE DRIVER HANDBOOK.
 7              AND THIS, FOR THE RECORD, IS PAGE 19 OF THAT
 8    EXHIBIT.  IT IS BATES STAMPED "EST000154."
 9              ON THE DRIVER HANDBOOK, WHAT DUTY AND
10    RESPONSIBILITIES DO YOU HAVE IN -- WITH RESPECT TO THE
11    DRIVER HANDBOOK -- THE COMPILATION OF THE DRIVER
12    HANDBOOK?
13    A    SO MY DIRECT RESPONSIBILITY IS, OBVIOUSLY, THE HR
14    PORTIONS, TIME AWAY FROM WORK, FMLA, THOSE TYPE OF
15    THINGS.  THERE'S INPUT FROM SAFETY AND MAINTENANCE ON
16    THE PORTIONS OF THE HANDBOOK THAT ARE DIRECTLY RELATED
17    TO THOSE TOPICS.
18    Q    AND I'M GOING TO SHOW YOU THIS PAGE THAT WE'VE GOT
19    UP ON THE SCREEN.
20              WHAT DOES THIS PAGE REPRESENT IN THE HANDBOOK?
21    A    THIS PAGE REPRESENTS THE ESTENSON GENERAL
22    QUALIFICATIONS FOR OUR DRIVERS.
23    Q    AS YOU LOOK, DO ALL OF ESTENSON'S DRIVERS MEET THE
24    QUALIFICATIONS THAT ARE SET FORTH IN THAT MIDDLE
25    SECTION OF THAT EXHIBIT?
```

1    A    YES, THEY DO.

2    Q    AND IT DOESN'T MATTER WHETHER IT'S A ROUTE DRIVER

3    OR YARD HOSTLER DRIVER?

4    A    CORRECT.

5    Q    AS PART OF THE QUALIFICATION PROCESS, DOES ESTENSON

6    FOLLOW ANY TYPE OF REGULATIONS RELATED TO WHAT DRIVERS

7    THEY CAN USE ON THE HIGHWAYS?

8    A    I DON'T THINK I UNDERSTAND EXACTLY WHAT YOU'RE

9    ASKING.

10   Q    ARE THERE ANY TYPES OF STATE OR FEDERAL REGULATIONS

11   THAT GOVERN THE QUALIFICATIONS OF DRIVERS THAT ESTENSON

12   USES?

13   A    YES, FEDERAL D.O.T. REGULATIONS.

14   Q    THAT'S THE DEPARTMENT OF TRANSPORTATION?

15   A    CORRECT.

16   Q    WHEN YOU SAY "D.O.T.," DO THE DRIVERS THAT ESTENSON

17   HAS, ARE ALL OF THEM QUALIFIED UNDER THE D.O.T.

18   REGULATIONS?

19   A    YES.

20   Q    DOES THAT INCLUDE BOTH DRIVERS WHO PERFORM YARD

21   HOSTLING SERVICE, AS WELL AS THOSE THAT DO ROUTE

22   DELIVERIES?

23   A    IT DOES.

24   Q    AS PART OF IT, DO YOU DO BACKGROUND CHECKS AS PART

25   OF THE D.O.T. QUALIFICATION PROCESS?

```
 1    A    YES, WE DO.

 2    Q    IS THAT SET FORTH IN THAT NEXT SECTION OF THE -- ON

 3    THAT PAGE 19 OF EXHIBIT NUMBER 590?

 4    A    YES, IT IS.

 5    Q    NOW, PAGE 20 OF THAT SAME EXHIBIT UP AT THE TOP, IT

 6    CONTINUES ON WITH A FURTHER EXPLANATION ABOUT THE

 7    BACKGROUND CHECKS.

 8         ARE YOU REQUIRED TO DO BACKGROUND CHECKS OF

 9    DRIVERS AS PART OF THE HIRING PROCESS UNDER THE D.O.T.

10    REGULATIONS?

11    A    THAT, I DON'T KNOW.

12    Q    ALL RIGHT.  THERE IS A PRE-EMPLOYMENT DRUG AND

13    ALCOHOL POLICY.

14         ARE THE DRIVERS DRUG TESTED AS PART OF THE

15    HIRING PROCESS?

16    A    YES, THEY ARE.

17    Q    IS THAT REQUIRED, IN YOUR UNDERSTANDING, UNDER THE

18    D.O.T. REGULATIONS?

19    A    YES.

20    Q    DOES THAT DRUG TESTING POLICY APPLY TO BOTH THE

21    ROUTE DRIVERS, AS WELL AS THE DRIVERS WHO DO YARD

22    HOSTLER SERVICES?

23    A    YES, IT DOES.

24    Q    NOW, AFTER A DRIVER IS EMPLOYED, DOES THE DRIVER --

25    ARE DRIVERS SUBJECT TO HAVING DRUG AND ALCOHOL
```

```
1    TESTING --

2    A    YES.

3    Q    -- AS PART OF FEDERAL REGULATIONS?

4    A    YES, THEY ARE.

5    Q    ARE THERE ANY -- ARE ALL OF THE ROUTE DRIVERS, LIKE

6    THE HOME DEPOT ROUTE DRIVERS AND THE HOME DEPOT YARD

7    HOSTLERS, ARE THEY SUBJECT TO BEING TESTED DURING THEIR

8    EMPLOYMENT WITH ESTENSON?

9    A    YES.

10   Q    IS THERE A PARTICULAR TYPE OF PROGRAM THAT THEY

11   PARTICIPATE IN IN DRUG TESTING WHILE EMPLOYED?

12   A    IT'S A FEDERAL REGULATED RANDOM DRUG TESTING.  SO

13   ANY EMPLOYEE THAT HOLDS A CDL IS PART OF THAT RANDOM.

14   Q    IS THAT SOMEONE WHO COULD BE CALLED UPON TO BE ON

15   THE PUBLIC ROADS?

16   A    CORRECT.

17   Q    WITH A CDL?

18   A    CORRECT.

19   Q    DOES THE RANDOM POOL THAT ESTENSON HAS, WHAT

20   DRIVERS ARE INCLUDED IN THAT POOL FOR TESTING -- THE

21   RANDOM TESTING PURPOSES?

22   A    ALL DRIVERS, INCLUDING YARD HOSTLERS.

23              MR. PARRIS:  I WOULD OBJECT AS TO FOUNDATION

24   AS TO "RANDOM."

25              THE COURT:  I DON'T KNOW WHAT YOU MEAN BY
```

1    "FOUNDATION."  YOU USED IT.  I DON'T KNOW WHAT YOU

2    MEANT.  HE'S USING IT NOW.

3            MR. PARRIS:  I DON'T --

4            THE COURT:  IF YOU GUYS WANT TO EXPLAIN IT,

5    THAT'S FINE.

6            MR. PARRIS:  HOW DOES SHE KNOW IT'S RANDOM?  I

7    DON'T THINK SHE HAS ANY PERSONAL KNOWLEDGE.

8            THE COURT:  THEN YOU CAN CROSS-EXAMINE.

9    BY MR. HANSON:

10   Q    NOW, PAGE 21 OF THE DRIVER HANDBOOK, YOU HAVE SEEN

11   THIS PAGE BEFORE, HAVEN'T YOU?

12   A    YES.

13   Q    IT TALKS ABOUT MEDICAL EXAMINATIONS.

14            ARE -- THE DRIVERS THAT ESTENSON HAS, ARE THEY

15   SUBJECT TO ANY TYPE OF MEDICAL EXAMINATIONS AS PART OF

16   THE QUALIFICATION UNDER THE D.O.T. REGULATIONS?

17   A    YES, THEY ARE.

18   Q    WHAT TYPE OF A MEDICAL EXAMINATION DO THEY HAVE TO

19   HAVE?

20   A    I'M NOT THE EXPERT ON THE MEDICAL EXAMINATION.  I

21   JUST KNOW THAT IT'S REQUIRED BY D.O.T.

22   Q    DO THEY HAVE TO HAVE SOME TYPE OF A VERIFICATION

23   THAT THEY HAVE A MEDICAL EXAM?

24   A    YES.

25   Q    WHAT IS THAT?

```
 1   A    IT'S A MEDICAL D.O.T. MEDICAL CARD THAT THEY HAVE

 2   BEEN EXAMINED AND HAVE PASSED THAT PHYSICAL.

 3   Q    DOES THAT BECOME PART OF THEIR FILES --

 4   A    YES.

 5   Q    -- AT ESTENSON?

 6              ARE ALL OF THE DRIVERS THAT ESTENSON HAS

 7   SUBJECT TO THESE REQUIREMENTS ON THE D.O.T. PHYSICAL?

 8   A    YES, THEY ARE.

 9   Q    DOES THAT INCLUDE THE YARD HOSTLERS?

10   A    IT DOES.

11   Q    WHY ARE YARD HOSTLERS INCLUDED IN THAT REQUIREMENT?

12   A    UPON HIRE, ALL DRIVERS, INCLUDING YARD HOSTLERS, GO

13   THROUGH THE SAME DRIVER QUALIFICATIONS.  THAT FILE IS

14   CREATED BECAUSE, AT ANY TIME, THEY COULD BE DISPATCHED

15   TO TAKE A --

16              MR. PARRIS:  I'M GOING TO OBJECT AND MOVE TO

17   STRIKE AS TO "WHY."  THERE'S NO FOUNDATION FOR THAT.

18              THE COURT:  THAT LAST PART WILL BE STRICKEN.

19   BY MR. HANSON:

20   Q    DOES ESTENSON HAVE A REASON WHY THEY FOLLOW THE

21   D.O.T. REQUIREMENTS FOR ALL DRIVERS?

22              MR. PARRIS:  SAME OBJECTION, YOUR HONOR.

23              MR. HANSON:  I'M JUST ASKING "YES" OR "NO" OF

24   WHY --

25              THE COURT:  DOES ESTENSON HAVE A REASON?
```

```
 1              MR. HANSON:  YEAH.

 2              THE COURT:  I'M NOT SURE THAT'S A GOOD REASON.

 3                  BUT IF YOU KNOW WHETHER ESTENSON HAS A

 4    REASON, YOU CAN SAY "YES" OR "NO" OR "I DON'T KNOW."

 5              THE WITNESS:  YES.

 6    BY MR. HANSON:

 7    Q    WHAT IS THE REASON THAT ESTENSON REQUIRES ALL

 8    DRIVERS TO BE D.O.T. QUALIFIED?

 9              MR. PARRIS:  OBJECTION.  SPECULATION.

10    FOUNDATION.  HEARSAY.

11              MR. HANSON:  YOUR HONOR, SHE'S A CORPORATE

12    REPRESENTATIVE --

13              THE COURT:  I KNOW, BUT IT HAS TO BE SOMETHING

14    THAT SHE KNOWS WITHIN HER JOB DUTIES.  IF YOU CAN

15    EXPLAIN THAT, THAT'S FINE.

16    BY MR. HANSON:

17    Q    IS -- KNOWING THE QUALIFICATIONS OF THE DRIVERS, IS

18    THAT SOMETHING THAT YOU ARE INVOLVED IN WITH THE

19    RECORDKEEPING FOR THE COMPANY AND WITH WHAT THE COMPANY

20    DOES AND THE QUALIFICATION OF DRIVERS?

21    A    THAT IS REALLY SAFETY THAT HOLDS THAT FILE.  I'M

22    RESPONSIBLE FOR THE PERSONNEL FILE.

23    Q    RIGHT.

24              AND ARE YOU AWARE OF WHAT THOSE QUALIFICATIONS

25    ARE FOR DRIVERS?
```

```
1    A    YES.

2    Q    AND ARE YOU AWARE OF WHY ESTENSON HAS ALL DRIVERS

3    BE D.O.T. QUALIFIED?

4              MR. PARRIS:  SAME OBJECTION, YOUR HONOR.

5              THE COURT:  OVERRULED.

6                   "YES" OR "NO."  EITHER YOU'RE AWARE OR

7    YOU'RE NOT.

8              THE WITNESS:  YES.

9    BY MR. HANSON:

10   Q    HOW ARE YOU AWARE OF THE REASON WHY ESTENSON D.O.T.

11   QUALIFIES ALL DRIVERS?

12   A    I'M AWARE BECAUSE PART OF THEIR JOB DESCRIPTION IS

13   TO HAVE THE ABILITY TO TAKE PRODUCTS TO DELIVERY SITES.

14   Q    AND ARE DRIVERS TOLD THAT UPON HIRE?

15   A    THEY ARE.

16   Q    AS PART OF THE QUALIFICATION PROCESS, ARE THEIR

17   DRIVING RECORDS EXAMINED ALSO?

18   A    YES.

19   Q    WHAT IS THAT CALLED, THAT PROCESS CALLED?

20   A    THAT'S CALLED THEIR "MVR."

21   Q    MOTOR VEHICLE RECORD?

22   A    CORRECT.

23   Q    IS THAT DESCRIBED IN THE DRIVER HANDBOOK?

24   A    YES.

25   Q    NOW, PAGE 22 OF THAT DRIVER HANDBOOK, IT TALKS
```

```
1    ABOUT LOSS OR SUSPENSION ON PAGE 22, RESTRICTION OF

2    DRIVER'S LICENSE POLICY.

3              DOES ESTENSON HAVE A POLICY IN ITS MANUAL

4    ABOUT WHAT HAPPENS IF A DRIVER IS UNABLE TO KEEP HIS

5    CDL?

6    A    YES.

7    Q    WHAT IS THE POLICY OF ESTENSON IF A DRIVER DOES NOT

8    HAVE A CDL?

9    A    THEY HAVE TO IMMEDIATELY STOP GETTING IN THE TRUCK,

10   AND THEY HAVE A TIME PERIOD IN WHICH TO RENEW OR

11   REPLACE THAT CDL.

12   Q    IF THEY ARE UNABLE TO DO SO, CAN THEY CONTINUE TO

13   HOLD A JOB AS A DRIVER FOR ESTENSON?

14   A    NO, THEY CANNOT.

15   Q    IF A DRIVER OBTAINS A CITATION FOR SOME TYPE OF A

16   VIOLATION OUT ON THE ROAD, WHAT ARE THEY REQUIRED TO DO

17   UNDER ESTENSON POLICIES?

18   A    THAT, I'M NOT FAMILIAR WITH IT.

19   Q    ALL RIGHT.  NOW, HOW ARE -- THE DRIVERS WHO ARE

20   REGULARLY PERFORMING THE ROUTE DELIVERY SERVICES, HOW

21   ARE THEY PAID?

22   A    THEY ARE PAID PIECEWORK THROUGH THE CLASS PERIOD,

23   ACTIVITY-BASED PAY.

24   Q    AN "ACTIVITY-BASED PAY"?

25   A    CORRECT.
```

1    Q    AND CAN YOU DESCRIBE FOR THE COURT WHAT YOU MEAN BY

2    "ACTIVITY-BASED PAY"?

3    A    THEY'RE PAID FOR EVERY ACTIVITY THEY PERFORM.

4    THERE'S A MILEAGE RATE, A STOP RATE.  SOME LOCATIONS, A

5    DETENTION IF THEY'RE DETAINED FOR THEIR DELIVERIES,

6    THEIR APPOINTMENT TIMES.

7    Q    AND IF A ROUTE DRIVER THEN PERFORMS YARD HOSTLING

8    SERVICES, IS THAT POSSIBLE?

9    A    YES.

10   Q    HOW ARE THEY PAID WHEN THEY DO THE YARD HOSTLING

11   SERVICES?

12   A    THEY'RE STILL PAID ON THE PIECEWORK OR

13   ACTIVITY-BASED RATE UNDER WHAT WE CALL AN "INCREMENTAL

14   PAY."

15   Q    AND WHAT'S AN "INCREMENTAL PAY"?

16   A    "INCREMENTAL" IS ACTIVITY OUTSIDE OF SOME OF THOSE

17   OTHER BUCKETS.  SO IT CAN BE FOR YARDWORK.  IT COULD BE

18   FOR DELAY, IF THEY HAD A FLAT TIRE.  THOSE TYPE OF

19   INCIDENTS WOULD BE PAID UNDER "INCREMENTAL PAY."

20   Q    AND IS INCREMENTAL PAY AN HOURLY TYPE PAY?

21   A    NO.

22   Q    HOW IS IT PAID THEN?

23   A    IT'S PAID BY THE INCREMENT, WHICH IS SET IN

24   15-MINUTE INCREMENTS.  BUT THERE'S A RATE FOR EACH

25   INCREMENT PERFORMED.

1    Q    SO A ROAD DRIVER DOING YARD HOSTLING SERVICES WOULD

2    BE -- RECEIVE SOMETHING IN INCREMENTS OF 15 MINUTES?

3    A    CORRECT.

4    Q    AND SO THAT ENDS UP BEING, THEY GET PAID SOME

5    AMOUNT FOR AN HOUR'S WORTH OF WORK -- FOR EACH HOUR

6    THAT THEY WORK?

7    A    CORRECT.

8    Q    ALL RIGHT.  NOW, IF YOU ARE A YARD HOSTLER DOING

9    YOUR NORMAL DUTIES -- YOUR'RE HIRED AS A YARD HOSTLER

10   TO DO THAT AS YOUR PRIMARY DUTIES, HOW ARE THEY PAID?

11   A    HOURLY.

12   Q    THE YARD HOSTLERS, IF THEY END UP TAKING -- IF THEY

13   GET ASSIGNED TO TAKE A LOAD AND DELIVER A LOAD TO A

14   HOME DEPOT STORE, HOW ARE THEY PAID?

15   A    STILL HOURLY.

16   Q    DOES ESTENSON PAY OVERTIME FOR THE WORK THAT IS

17   PERFORMED BY THE YARD HOSTLER?

18   A    YES.

19   Q    WHAT OVERTIME DO YOU PAY?

20   A    IT'S PAID AT A RATE OF TIME-AND-A-HALF OVER EIGHT

21   PER DAY.

22   Q    IS THAT TRUE FOR ANY DAY THAT THEY WORK?

23   A    YES.

24   Q    I WANT TO SHOW YOU PAGE 31 OF THE DRIVER HANDBOOK.

25        ARE THE YARD -- THE PEOPLE WHO -- THE DRIVERS

```
 1   WHO PERFORM YARD HOSTLING SERVICES AS KIND OF THE

 2   REGULAR COURSE OF THEIR WORK, UNDER YOUR UNDERSTANDING,

 3   ARE THEY TECHNICALLY EXEMPT UNDER THE PAYMENT OF

 4   OVERTIME UNDER THE LAW?

 5   A    THE YARD HOSTLER?

 6   Q    YES.

 7           MR. PARRIS:  I'M GOING TO OBJECT.

 8           MR. HANSON:  I'LL REPHRASE THE QUESTION.

 9   BY MR. HANSON:

10   Q    I'M SHOWING YOU PAGE 31 OF THE -- IF YOU SEE,

11   THERE'S A BOX THERE THAT TALKS ABOUT "DRIVER NOTE."

12           DO YOU SEE THAT?

13   A    YES.

14   Q    WERE YOU A PART OF HELPING PREPARE THIS SECTION OF

15   THE DRIVER HANDBOOK?

16   A    YES.

17   Q    AND ARE YOU FAMILIAR WITH WHAT IT SAYS?

18   A    YES.

19   Q    ALL RIGHT.  THERE IS -- WHY DOES ESTENSON PAY

20   OVERTIME TO ITS YARD HOSTLERS IF THEY HAVE TO BE D.O.T.

21   QUALIFIED AND THEY DRIVE ON THE PUBLIC ROADS?

22           MR. PARRIS:  OBJECTION.  FOUNDATION.

23   SPECULATION AS TO WHY ESTENSON DOES IT.  THERE WAS NO

24   FOUNDATION THAT IT WAS HER DECISION.

25           THE COURT:  FOUNDATION IS SUFFICIENT.
```

1    SUSTAINED.

2    BY MR. HANSON:

3    Q    WHAT -- HOW LONG HAS ESTENSON PAID OVERTIME TO THE

4    YARD HOSTLER?

5    A    ESTENSON HAS PAID OVERTIME AT EIGHT HOURS A DAY FOR

6    ANY GIVEN DAY TO ALL DRIVERS FOR AS LONG AS I HAVE BEEN

7    EMPLOYED.

8    Q    TO THE YARD HOSTLER DRIVERS?

9    A    YES.

10   Q    AND, AGAIN, THE ROUTE DELIVERY DRIVERS, THEY'RE

11   PAID ON AN ACTIVITY-BASED OR A PIECE-RATE SYSTEM;

12   CORRECT?

13   A    CORRECT.

14   Q    NOW, WHEN A -- DO ANY OF THE ROUTE DRIVERS

15   TRANSITION FROM DOING PRIMARY ROUTE DRIVING SERVICES TO

16   THEN DOING YARD HOSTLING SERVICES?

17   A    YES.

18   Q    WHAT ARE DRIVERS TOLD IN THOSE SITUATIONS, WHEN

19   THEY'RE BEING TRANSITIONED FROM THEIR PRIMARY DUTY

20   BEING ROUTE DELIVERIES VERSUS THEIR PRIMARY DUTY BEING

21   HOSTLING, ABOUT THEIR PAY?

22   A    WELL, THE PAY OBVIOUSLY CHANGES FROM THAT PIECEWORK

23   TO THE HOURLY.  AND THEY ARE TOLD THAT THEY WILL BE

24   PAID OVERTIME AFTER EIGHT PER DAY.

25   Q    THOSE DRIVERS -- THOSE YARD HOSTLERS, THEY CAN

```
1    STILL BE CALLED TO DELIVER LOADS THOUGH?

2    A    YES.

3    Q    AND THAT'S TRUE WHETHER THEY START OUT AS A YARD

4    HOSTLER AND WORK AS A YARD HOSTLER PRIMARILY OR

5    TRANSITION FROM BEING A ROUTE DRIVER TO BEING A YARD

6    HOSTLER?

7    A    CORRECT.

8    Q    NOW, THIS SAYS THAT -- AND, AGAIN -- WELL, FIRST OF

9    ALL, ARE YOUR ROUTE DRIVERS PAID OVERTIME?

10   A    I'M SORRY?

11   Q    ARE THE ROUTE DRIVERS PAID OVERTIME?

12   A    YES.

13         OH, NO.  THE ROUTE DRIVERS?  NO.

14   Q    OKAY.  IN HERE IT SAYS, "OVERTIME, GENERALLY

15   SPEAKING, IS NOT AN ENTITLEMENT IN THE TRANSPORTATION

16   INDUSTRY AS MOST DRIVERS ARE EXEMPT FROM THE OVERTIME

17   RULES AND REGULATIONS."

18         HAS ESTENSON MODIFIED HOW IT PAY ITS DRIVERS

19   EVEN THOUGH THEY MIGHT BE EXEMPT FROM THE PAYMENT OF

20   OVERTIME?

21   A    IN TERMS OF OVERTIME?

22   Q    YES.

23   A    NO.  WE STILL PAY THE OVERTIME.

24   Q    YOU PAY THEM OVERTIME EVEN THOUGH THEY'RE NOT

25   OTHERWISE ENTITLED TO IT ON THE HOURLY?
```

```
 1    A    YES.
 2            MR. PARRIS:  OBJECTION.  IT'S COMPOUND AND
 3    LEGAL CONCLUSION AS TO WHAT THEY'RE ENTITLED TO.
 4            THE COURT:  I'LL ACCEPT IT.  YOU CAN FIGURE IT
 5    OUT LATER.
 6    BY MR. HANSON:
 7    Q    NOW, THERE IS -- I'M GOING TO ASK YOU TO LOOK AT
 8    EXHIBIT NUMBER 586.  IT'S IN THE NOTEBOOK.
 9            MR. HANSON:  I'M NOT GOING TO PUT IT ON THE
10    ELMO, YOUR HONOR, BECAUSE IT'S A LONG --
11            THE COURT:  WELL, TELL HER HOW TO FIND IT
12    BECAUSE SHE'S SITTING HERE WAITING.
13    BY MR. HANSON:
14    Q    IT'S IN BINDER NUMBER 1.  IT SHOULD SAY "TRIAL
15    EXHIBITS, VOLUME 1 OF 9."
16            DO YOU HAVE THAT EXHIBIT IN FRONT OF YOU NOW?
17    A    I DO.
18    Q    DOES ESTENSON MAINTAIN RECORDS OF THE LOADS THAT
19    ARE DELIVERED BY ANY DRIVER, LIKE WORKING FOR HOME
20    DEPOT?
21    A    YES.
22    Q    WHAT TYPES OF RECORDS ARE MAINTAINED?
23    A    SO THE TRIP SHEET -- THE DAILY TRIP SHEET THAT THE
24    DRIVER COMPLETES SHOWS THE ACTIVITY THAT HE PERFORMED
25    FOR THE DAY.
```

1    Q    DO THE DRIVERS -- IS THERE ALSO SOME TYPE OF AN

2    ELECTRONIC RECORD THAT IS MAINTAINED OR THAT IS CREATED

3    FOR THE WORK THAT IS DONE BY THE DRIVERS MAKING

4    DELIVERIES?

5    A    YES.

6    Q    EXPLAIN TO THE COURT HOW THOSE ELECTRONIC

7    RECORDS -- YOU KNOW, KIND OF A BROAD OVERVIEW OF HOW

8    THOSE ELECTRONIC RECORDS, WHERE THEY'RE MAINTAINED AND

9    HOW THEY'RE CREATED IN THE SYSTEM AT ESTENSON?

10   A    THEY'RE CREATED BY EITHER EDI, WHICH IS AN

11   ELECTRONIC -- AT LOCATIONS WHERE THEY HAVE THAT, OR

12   THEY'RE ENTERED BY THE DISPATCH OR BILLING DEPARTMENT

13   INTO THE BILLING SYSTEM.

14   Q    HOW IS -- DID YOU PLAY A PART IN HAVING EXHIBIT 586

15   CREATED?

16   A    YES.

17   Q    WHAT DID YOU ASK TO HAVE DONE?

18   A    SO I ASKED I.T. -- OUR I.T. DEPARTMENT IF THEY

19   COULD PULL A REPORT THAT SHOWED TYPES OF ACTIVITY --

20   DAILY ACTIVITY.  I PROVIDED THEM THE CLASS LIST.  AND I

21   PROVIDED THEM THE TIME FRAME FOR THE CLASS PERIOD.

22   Q    SO WHAT DOES 586 REPRESENT THEN?

23   A    SO 586 IS THE FILTERED VERSION OF THE CLASS LIST,

24   CLASS PERIOD OF THE IDENTIFIED YARD HOSTLERS IN THE

25   CLASS THAT PERFORMED ROUTE WORK, ON-THE-ROAD

```
 1    DELIVERIES.
 2              MR. PARRIS:  YOUR HONOR, I WOULD OBJECT --
 3    WELL, NO, HE HASN'T -- HE HASN'T ASKED ANY QUESTIONS
 4    ABOUT IT YET.  OKAY.
 5    BY MR. HANSON:
 6    Q   I WANT TO SHOW YOU ON PLAINTIFF'S EXHIBITS.  IT'S
 7    IN THE WHITE BINDER TO YOUR LEFT.
 8    A   OKAY.
 9    Q   I'D LIKE YOU TO LOOK AT EXHIBIT NUMBER 1.
10              I'LL REPRESENT THAT THIS IS THE CLASS LIST
11    THAT PLAINTIFFS HAVE CREATED OF THESE.
12              DID YOU USE THESE NAMES IN THE CREATION OF
13    EXHIBIT NUMBER 586?
14    A   IF THESE ARE THE NAMES THAT I WAS -- THAT I
15    PROVIDED THEM, THEN, YES.
16    Q   THEY WERE THE CLASS LIST NAMES?
17    A   CORRECT.
18              MR. PARRIS:  I WOULD OBJECT.  SHE DOESN'T
19    KNOW.  SHE SAID, "IF IT IS."  EITHER --
20              THE COURT:  THERE'S NOT AN OBJECTION FOR THE
21    WITNESS' ANSWER.  THAT'S HER ANSWER.  YOU WANT TO
22    CROSS-EXAMINE, YOU CAN CROSS-EXAMINE.
23    BY MR. HANSON:
24    Q   NOW, HOW WAS -- WHEN PULLING THIS REPORT, HOW WERE
25    YOU ABLE TO DETERMINE WHETHER THE WORK BEING PERFORMED
```

```
1    BY THE CLASS MEMBER LIST, WHETHER THOSE DRIVERS WERE

2    PERFORMING WORK AS YARD HOSTLERS OR WORK AS ROUTE

3    DRIVERS?

4    A   SO IT WAS FILTERED BY A SERVICE LEVEL IN THE

5    BILLING SYSTEM.  SERVICE LEVELS ARE SET --

6              MR. PARRIS:  NOW I HAVE TO OBJECT.  SHE

7    DOESN'T -- THAT'S HEARSAY.  SHE DIDN'T DO IT.  THERE'S

8    NO -- WELL, IT'S HEARSAY.

9              THE COURT:  FOUNDATION FOR HER KNOWLEDGE?

10   BY MR. HANSON:

11   Q   HOW DO YOU KNOW ABOUT THE SERVICE LEVELS BETWEEN

12   DRIVERS?

13   A   IT WAS EXPLAINED TO ME BY THE I.T. DEPARTMENT OF

14   HOW THEY WERE GOING TO PULL THE INFORMATION.

15   Q   ARE YOU FAMILIAR WITH THE CUSTOMER BEING BILLED

16   DIFFERENT RATES FOR THE WORK THAT'S BEING DONE?

17   A   YES.

18   Q   AND HOW WAS THAT DIFFERENCE SHOWN WITHIN THE

19   RECORDS OF ESTENSON?

20             IN OTHER WORDS, HOW CAN WE TELL IT'S DIFFERENT

21   WORK?

22   A   BY THAT SERVICE LEVEL THAT WAS EXPLAINED TO ME.

23   Q   IS THERE A SERVICE -- PARTICULAR SERVICE LEVEL WHEN

24   A DRIVER IS DOING YARD HOSTLING WORK?

25   A   YES.
```

1    Q    IS THERE ALSO A SERVICE LEVEL WHEN A DRIVER IS

2    PERFORMING DELIVERIES TO STORES?

3    A    YES.

4    Q    IS THAT WITHIN THE COMPUTER SYSTEM FOR BILLING

5    PURPOSES TO THE HOME DEPOT CUSTOMER?

6    A    CORRECT.

7    Q    SO WHAT DOES EXHIBIT NUMBER 586 REPRESENT THEN?

8    A    THIS IS THE -- 586 IS THE FILTERED REPORT OF

9    IDENTIFIED CLASS MEMBERS THAT PERFORMED A SERVICE LEVEL

10   OTHER THAN YARD HOSTLING WORK DURING THE TIME PERIOD

11   GIVEN.

12   Q    DOES IT COVER A PARTICULAR TIME PERIOD?

13   A    IT DOES.

14   Q    WHAT TIME PERIOD IS THAT?

15   A    MAY 2010 TO WHEN THIS WAS RUN.  SO FEBRUARY 2016.

16   Q    IS THAT PART OF THE CLASS PERIOD THEN FOR THESE

17   DRIVERS?

18   A    CORRECT.

19   Q    I'M GOING TO ASK YOU A FEW OTHER QUESTIONS ABOUT

20   THE EXHIBITS THAT YOU HAVE IN THE BLACK BINDER THAT'S

21   IN FRONT OF YOU.

22   A    OKAY.

23   Q    I'D LIKE YOU TO LOOK AT EXHIBIT NUMBER 551.

24   A    IS THAT IN A DIFFERENT BOOK?

25   Q    IT'S RIGHT BEHIND THE WORD INDEX.

```
 1    A     YUP.

 2    Q     DO YOU SEE IT?

 3    A     YES.

 4    Q     I DID THE SAME THING JUST A MINUTE AGO.

 5    A     OKAY.

 6              MR. HANSON:  I GUESS WE HAD STIPULATED TO THE

 7    AUTHENTICITY OF IT.  IT'S THE PLAINTIFF'S DRIVER FILE.

 8    I CAN JUST MOVE TO ADMIT IT.  THAT'LL SAVE SOME TIME.

 9    I WAS GOING TO HAVE HER IDENTIFY IT, BUT WE HAVE

10    STIPULATED TO AUTHENTICITY ON THESE DOCUMENTS.  I'LL

11    MOVE TO ADMIT HIS DRIVER QUALIFICATION FILE, WHICH IS

12    551.

13              THE COURT:  ANY OBJECTION?

14              MR. PARRIS:  NO OBJECTION.

15              THE COURT:  THAT'S ADMITTED.  THANK YOU.

16              (EXHIBIT 551 WAS RECEIVED IN EVIDENCE)

17    BY MR. HANSON:

18    Q     AND WHAT IS EXHIBIT NUMBER 552?

19              MR. HANSON:  AGAIN, WE'VE STIPULATED TO THE

20    AUTHENTICITY OF IT.

21              THE COURT:  THAT'S FINE.

22    BY MR. HANSON:

23    Q     THAT'S PLAINTIFF'S PERSONNEL FILE?

24    A     YES.

25    Q     553 IS PLAINTIFF'S MEDICAL FILE, AND 554 IS HIS
```

1    SAFETY TRAINING FILE AS A DRIVER?

2    A    YES.

3    Q    AND I'D LIKE YOU TO ALSO LOOK AT 556.

4    A    OKAY.

5    Q    AND WHAT IS 556?

6    A    556 IS THE JOB DESCRIPTION FOR THE YARD HOSTLER.

7    Q    AND AS A GENERAL RULE, ARE THEY PERFORMING THE

8    HOSTLING SERVICES WITHIN THE CONFINES OF THE

9    DISTRIBUTION CENTER FACILITY?

10   A    YES.

11            MR. HANSON:  I WOULD MOVE ADMISSION OF 556.

12            MR. PARRIS:  NO OBJECTION.

13            THE COURT:  SO YOU WANT 552, 553, 554 AND 556?

14            MR. HANSON:  AT THIS TIME, YOUR HONOR, I WOULD

15   LIKE TO MOVE FOR ADMISSION THE ONES WE IDENTIFIED.  I

16   THINK I ALREADY MOVED IN 551.  BUT I'D LIKE TO DO 552,

17   -53, -54, -56 AND ALSO 586, THE SPREADSHEET SHE

18   IDENTIFIED.

19            MR. PARRIS:  THAT'S A WHOLE DIFFERENT ISSUE.

20   556, WE OBJECT TO.  586, WE OBJECT TO.

21            THE COURT:  SO -52, -53, -54 AND -56 ARE

22   ADMITTED.

23            **(EXHIBITS 552, 553, 554 AND 557 WERE**

24            **RECEIVED IN EVIDENCE)**

25            MR. HANSON:  MOVE FOR ADMISSION OF 586.

```
1          THE COURT:  AND HE OBJECTS.

2               WHAT'S THE OBJECTION?

3          MR. PARRIS:  1006 TO BEGIN WITH.  THERE WAS NO

4   ATTEMPT -- HAS BEEN NO ATTEMPT TO TAKE THESE ENTRIES

5   AND MATCH THEM UP WITH THE UNDERLYING DOCUMENTS AND

6   GIVE THAT SET OF DOCUMENTS TO US.

7               WHAT THEY HAVE SAID IS, THEY HAVE SOME OF

8   THE DOCUMENTS.  THEN HE HAD MORE DOCUMENTS.  BUT AT THE

9   END OF THE DAY, YOUR HONOR, IT WAS 90,000, IF NOT MORE,

10  DOCUMENTS ON A -- A DISC WITHOUT ANY ATTEMPT TO

11  DELINEATE WHAT THEY WERE RELYING ON.

12              AND SO LIKE WHEN THEY HAVE THREE TIMES A

13  PERSON DROVE, THOSE TRIP SHEETS -- THOSE THREE TRIP

14  SHEETS SHOULD HAVE BEEN SEGREGATED OUT.

15              WHAT THEY HAVE DONE IS CHERRY-PICKED

16  SOME, AND THEY DIDN'T GIVE YOU ALL OF THEM.  AT NO TIME

17  DID WE GET ALL OF THE TRIP SHEETS.  I THINK SOMEBODY

18  TESTIFIED THAT THEY DON'T HAVE ALL THE TRIP SHEETS.

19              THE UNDERLYING DOCUMENTS SIMPLY AREN'T

20  THERE.

21              HER TESTIMONY ABOUT HOW IT WAS PREPARED

22  IS TOTAL HEARSAY.  SHE PICKED UP THE PHONE AND TOLD

23  I.T., "GIVE ME A SPREADSHEET SHOWING WHEN THEY DROVE."

24              THERE'S NO TESTIMONY -- CREDIBLE

25  TESTIMONY AS TO HOW THAT -- THEY WENT ABOUT -- WHAT
```

1    INFORMATION THEY USED TO ASCERTAIN IT, WHAT INFORMATION

2    THEY DIDN'T USE TO ASCERTAIN IT.  IT'S NOT CREDIBLE.

3    IT'S NOT RELIABLE.

4              AND WE GO BACK TO WHERE WE WERE AT THE

5    LAST HEARING.  THEY WERE TO PROVIDE HER.  SHE HAD IT

6    PREPARED.  THEY WERE SUPPOSED TO LET ME REDEPOSE HER SO

7    WE COULD GO THROUGH ALL OF THE THINGS I JUST TOLD YOU.

8    AND THEY EXPRESSLY REFUSED TO LET ME TAKE HER

9    DEPOSITION AGAIN.

10             THEY SAID --

11         THE COURT:  I DON'T UNDERSTAND HOW THAT

12   HAPPENED.

13             WHY DID YOU NOT LET ME KNOW THAT?

14         MR. PARRIS:  IF THEY WANT TO PLAY THAT GAME,

15   THEY LIVE WITH THE CONSEQUENCE OF NOT BEING ABLE TO

16   CALL HER.

17         THE COURT:  AND YOU LIVE WITH THE CONSEQUENCE

18   OF WHAT I DECIDE TO DO IN RESPONSE TO YOUR FAILURE TO

19   BRING IT TO MY ATTENTION.

20             SO WHAT DO YOU WANT TO DO?  JUST SIT HERE

21   FLIPPING COINS?

22         MR. PARRIS:  NO, YOUR HONOR.

23             I THINK THAT YOUR TIME IS THE MOST FINITE

24   RESOURCE.  WE HAVE VERY FEW FEDERAL JUDGES.  AND I'M

25   VERY PARTICULAR AS TO WHEN I BRING MOTIONS.  I ASSESS

1   WHAT IS THE VALUE OF THE MOTION, WHAT IS THE

2   CONSEQUENCE IF I DON'T, WHAT IS THE CONSEQUENCE TO THEM

3   IF THEY DON'T PRODUCE THEM.

4            IT IS NOT MY OBLIGATION TO ENFORCE THE

5   OTHER SIDE TO DO THE RULES.

6            I COULD LIVE WITH THE RESULT.  I COULD

7   LIVE WITH IT.  BUT WHAT THEY HAVEN'T DONE IS SHOWN YOU

8   THE CREDIBILITY FOR THIS.

9            THE COURT:  ALL RIGHT.  STOP.

10            I HAVE 586.  I HAVE MORE DOCUMENTS THAN I

11   AM EVER GOING TO LOOK AT.  I'M NOT LOOKING AT THEM AT

12   ALL.

13            SO YOU CAN CONTINUE WITH YOUR TESTIMONY.

14   YOU CAN BOTH BRIEF WHETHER 586 IS IN OR OUT.  AT THE

15   MOMENT, IT DOESN'T SOUND TO ME LIKE YOU HAVE REALLY

16   CONVINCED ME THIS IS AN ADMISSIBLE SUMMARY.  SO I'LL

17   JUST TELL YOU THAT.  AND THEN IF YOU DON'T, YOU'RE

18   DONE.

19            MR. HANSON:  WE DO HAVE THE TRIP SHEETS, YOUR

20   HONOR.

21            IT'S NOT A 1006 SUMMARY.  IT'S AN EXPORT

22   OF INFORMATION IN THE SYSTEM OF ALL THE WORK THAT WAS

23   DONE.  IT IS CROSS-VERIFIED WITH THE TRIP SHEETS THAT

24   HAVE BEEN PROVIDED.

25            IF YOU RECALL, YOUR HONOR, YOU ASKED US.

```
1    WE PROVIDED THIS.  AND WE MADE THE PERSON WHO

2    ACTUALLY -- FOR MS. ALEXANDER WHO ACTUALLY PROGRAMMED

3    THE --

4              THE COURT:  SO YOU'RE TELLING ME THIS IS AN

5    INDEPENDENT DOCUMENT?  IT'S NOT A SUMMARY?

6              MR. HANSON:  THAT'S CORRECT.

7                   AND IT IS VERIFIED BY THE TRIP SHEETS

8    THAT ARE PART OF ALL THOSE VOLUMES.

9              THE COURT:  WHAT DOES THAT MEAN?

10             MR. HANSON:  THAT MEANS THAT YOU CAN LOOK AT A

11   LINE ITEM ON 586, AND YOU WILL FIND A TRIP SHEET THAT

12   MATCHES THAT SO THAT YOU CAN CROSS-VERIFY THAT THE

13   EXPORT IS ACCURATE.

14             THE COURT:  BUT THAT'S NOT HOW IT WAS CREATED.

15             MR. HANSON:  IT WAS NOT CREATED FROM THE TRIP

16   SHEETS.  IT WAS CREATED BY WHAT IS IN THE BILLING

17   SYSTEM OF WHAT GETS BILLED TO THE CUSTOMER.

18             THE COURT:  YOU CAN BOTH DEAL WITH THAT LATER.

19   IF I FIND IT'S NOT SUFFICIENT, THEN IT'S NOT

20   SUFFICIENT.

21   BY MR. HANSON:

22   Q   MS. ALEXANDER, WOULD YOU LOOK AT 589 IN THAT

23   BINDER?

24             NOW, I SEE, IN 589, A THUMB DRIVE.

25             WHAT IS 589?
```

1  A    SO MY UNDERSTANDING WAS, THAT ONCE WE CREATED THE

2  FILTERED LIST, THERE WAS A REQUEST THAT WE PULL ALL OF

3  THE INFORMATION, ALL OF THE ACTIVITY FOR THE CLASS

4  MEMBERS FOR THAT TIME PERIOD.

5  Q    THAT INCLUDED -- THAT WAS A REQUEST FROM THE COURT?

6  A    YES.

7  Q    AND DID YOU ASK TO HAVE THAT DONE FROM ESTENSON'S

8  RECORDS?

9  A    YES.

10  Q    IS WHAT'S ON THE FLASH DRIVE THAT INFORMATION?

11  A    YES.

12          MR. HANSON:  YOUR HONOR, WE -- AT YOUR

13  DIRECTION, WE MADE THAT AVAILABLE TO THE PLAINTIFFS.

14  WE GAVE THAT TO THE PLAINTIFFS.

15          MR. PARRIS:  YES, YOUR HONOR.  THAT'S

16  ACCURATE.  LONG AFTER DISCOVERY CLOSES, THEY DECIDED TO

17  PRODUCE ANOTHER SUMMARY.  NOT THE SUMMARY THAT WE'VE

18  BEEN TALKING ABOUT AND THAT WAS AT THE LAST HEARING

19  DATE.  AFTER IT WAS -- CLEARLY BOTH SIDES SAY --

20          THE COURT:  WHY ARE WE TALKING ABOUT THIS?

21          MR. PARRIS:  BECAUSE THEY WANT TO PUT IT INTO

22  EVIDENCE, AND IT'S TOTALLY NEW.

23          THE COURT:  I DON'T WANT A FLASH DRIVE OF

24  SOMETHING YOU GAVE TO HIM.  WHAT'S THAT GOT TO DO WITH

25  IT?

1          MR. HANSON:  IT WAS -- THE 586 IS THE FILTER

2     TO GET WHAT'S RELEVANT TO WHAT WE'RE HERE FOR TODAY.

3     586 CONTAINED ALL THE INFORMATION YOU HAD DIRECTED US

4     TO -- TO PRODUCE THAT TO THE PLAINTIFFS, AND WE DID

5     THAT.  AND THAT'S -- WE'RE JUST HERE TO SHOW THAT

6     THAT'S IN FACT WHAT WE DID.

7          THE COURT:  OKAY.  I DON'T CARE.  I DON'T WANT

8     IT.  I WANT YOU TO GIVE IT TO HIM.

9              YOU GAVE IT TO HIM; CORRECT?

10          MR. HANSON:  WE GAVE IT TO THE PLAINTIFF,

11    THAT'S CORRECT.

12          THE COURT:  I DON'T NEED IT.

13          MR. HANSON:  MAY I HAVE JUST A MOMENT, YOUR

14    HONOR?

15          THE COURT:  YES.

16          MR. HANSON:  I'LL PASS THE WITNESS, YOUR

17    HONOR.

18          THE COURT:  MR. PARRIS?

19                    **CROSS-EXAMINATION**

20    BY MR. PARRIS:

21    Q    GOOD AFTERNOON.

22          YOU WERE DESIGNATED BY THE COMPANY AS THE

23    36(B) (SIC) WITNESS FOR ALL OF THE COMPANY'S

24    OPERATIONS, HOW THEY DO BUSINESS, HOW -- THE WHOLE

25    SLOUGH OF THINGS.  YOU WERE THE ONLY WITNESS THAT WAS

```
 1   DESIGNATED AS A 36(B); RIGHT?

 2           MR. HANSON:  IT'S "30(B)(6)," YOUR HONOR.

 3           MR. PARRIS:  YOUR HONOR, SO THE COURT IS

 4   CLEAR, BECAUSE IT MAY MESS UP THE RECORD, IN JANUARY, I

 5   HAD BRAIN SURGERY.  IT WAS RIGHT ON MY WORD-FINDING

 6   ABILITY, AND I MIX MY WORDS UP.  AND I CERTAINLY CAN

 7   UNDERSTAND THE WORDS PERFECTLY, BUT I HAVE WORD-FINDING

 8   PROBLEMS.  AND SO IF THAT OCCURS, I WOULD ASK THE COURT

 9   TO BEAR WITH ME.  OKAY?

10           THE COURT:  WELL, IN THE FIRST PLACE, I

11   HAVEN'T NOTICED ANY PROBLEM AT ALL.  SO YOU'RE DOING

12   WELL.

13               IN THE SECOND PLACE, I KNEW IT WAS

14   30(B)(6).  SO THERE WASN'T ANY PARTICULAR REASON TO SAY

15   THAT.  AND NOW THAT YOU HAVE SHARED THAT, I'M SURE

16   WE'LL ALL UNDERSTAND.  THANK YOU.

17   BY MR. PARRIS:

18   Q    YOU WERE THAT WITNESS; RIGHT?

19   A    YES.

20   Q    AND THEY EXPLAINED TO YOU WHAT THAT MEANT?

21   A    WHO IS "THEY"?

22   Q    WHEN THEY DESIGNATED YOU, THEY TOLD YOU WHAT THEY

23   WERE DOING, WHAT THAT MEANT?

24           MR. HANSON:  I'M GOING TO OBJECT, YOUR HONOR.

25   INVADES ATTORNEY/CLIENT PRIVILEGE.
```

124

```
 1              THE COURT:  SUSTAINED.

 2    BY MR. PARRIS:

 3    Q    NOW, ONE OF THE THINGS WE ASKED YOU ABOUT IN YOUR

 4    DEPOSITION WAS, HOW THE PRODUCTS GOT TO HOME DEPOTS;

 5    RIGHT?

 6              DO YOU REMEMBER THAT?

 7    A    I DON'T REMEMBER.

 8    Q    LET'S PUT UP PAGE 23 OF YOUR DEPOSITION, LINE 13

 9    THROUGH 23.

10              DOES THAT REFRESH YOUR RECOLLECTION?

11    A    YES.

12    Q    OKAY.  AND WHAT ESTENSON'S UNDERSTANDING IS, AND

13    WHAT YOU TESTIFIED TO AS THE 36(B) WITNESS, IS THAT THE

14    PRODUCTS COME INTO THE CENTERS.  THEY'RE BROKE DOWN.

15    WHEN A STORE NEEDS SOMETHING, THEY CALL THE -- WHAT ARE

16    THEY CALLED, "REDISTRIBUTION CENTERS" -- REDISTRIBUTION

17    CENTER AND ORDER IT; RIGHT?

18              OR THEY NOTIFY THEM THAT THEY NEED A PRODUCT.

19    THEY NOTIFY THE REDISTRIBUTION CENTER; ISN'T THAT

20    RIGHT?

21    A    I'M NOT EXACTLY SURE HOW IT WORKS.

22    Q    WELL, WHEN WE ASKED YOU, WHAT YOU SAID IS, "AND

23    THEN WHEN THE STORES ORDER PRODUCT, HOME DEPOT FULFILLS

24    THOSE ORDERS, LOADS AND LOOKS (SIC) -- IT LOOKS (SIC)

25    THOSE TRAILERS THAT BELONG TO CARRIERS, AND THEN THOSE
```

1    CARRIERS PULL THOSE TRAILERS WITH THEIR OWN EQUIPMENT";

2    RIGHT?

3    A    YES.

4    Q    DO YOU HAVE ANY UNDERSTANDING OF HOW IT HAPPENS

5    INSIDE THAT BUILDING?

6            MR. HANSON:  I'M GOING TO OBJECT TO THE

7    QUESTIONS REGARDING HOME DEPOT CAUSE SHE WAS NOT

8    DESIGNATED AS A WITNESS REGARDING THE HOME DEPOT

9    ACCOUNT, HOW THE OPERATIONS OF --

10           THE COURT:  WAS THERE SOMEONE ELSE DESIGNATED

11   FOR HOME DEPOT?

12           MR. HANSON:  THERE WAS NOT A DESIGNATION FOR

13   THAT.  WE DESIGNATED HER FOR THE TOPICS THAT WERE IN

14   THE 30(B)(6) NOTICE.

15           THE COURT:  OKAY.  SHE DOESN'T KNOW.

16   BY MR. PARRIS:

17   Q    OKAY.  WERE YOU GUESSING IN YOUR DEPOSITION AT HOW

18   IT WAS DONE?

19   A    THAT WAS A GENERALIZATION --

20           MR. HANSON:  I'M GOING TO OBJECT.  BEYOND THE

21   SCOPE OF WHAT HER 30(B)(6) WAS.

22           THE COURT:  HE'S ASKING HER NOW.

23   BY MR. PARRIS:

24   Q    DO YOU KNOW NOW HOW THAT HAPPENS, HOW THE PRODUCTS

25   GET FROM ONE SIDE OF THE BUILDING TO THE NEXT SIDE OF

```
 1    THE BUILDING?
 2    A    I THINK IT'S STILL THE SAME.  THEY COME IN ONE
 3    SIDE, PUT ON SHELVES, REPACKAGED, PUT IN TRAILERS.  AND
 4    THEY'RE OUT THE OTHER DOOR.
 5    Q    WHEN THE STORES NEED THEM; IS THAT CORRECT?
 6    A    CORRECT.  AS A CONTINUAL PRODUCT, YES.
 7    Q    ONE OF THE REASONS ESTENSON IS AWARE OF HOW THAT
 8    PROCESS WORKS IS BECAUSE YOU'RE GUARANTEEING ON-TIME
 9    DELIVERY, AREN'T YOU?
10    A    WE ARE.
11    Q    YOU'RE GUARANTEEING 98.5 PERCENT OF TIME, IT'LL BE
12    ON TIME; CORRECT?
13    A    I'M NOT THE PERSON TO SAY THAT.  I DON'T KNOW THE
14    ON-TIME DELIVERY RATE.
15    Q    THANK YOU.
16          NOW, YOU ALSO SIGNED THE INTERROGATORIES;
17    RIGHT?
18    A    YES.
19    Q    AND I ASSUME THAT'S BECAUSE YOU WERE THE PERSON
20    ANSWERING THEM; IS THAT FAIR?
21    A    CORRECT.
22    Q    AND WHEN WE ASKED YOU ABOUT EACH TIME THE DRIVER --
23    THE CLASS MEMBERS WHO DROVE ON THE HIGHWAYS IN
24    INTERROGATORY 24, YOU REMEMBER TELLING US THAT THE TRIP
25    SHEET DOCUMENTS PRODUCED BY ESTENSON SHOW -- HOLD ON --
```

1    DO YOU REMEMBER TELLING US, "ESTENSON DOES NOT HAVE

2    RECORDS SHOWING EACH INSTANCE OF SUCH DRIVING"?

3            WHAT DID YOU BASE THAT ON?

4    A    I'D HAVE TO LOOK AT THAT.

5            MR. HANSON:  OBJECTION, YOUR HONOR.  COMPOUND.

6            MR. PARRIS:  CAN I APPROACH, YOUR HONOR?

7            THE COURT:  YES.

8    BY MR. PARRIS:

9    Q    DO YOU SEE WHERE MY FINGER IS, THE SENTENCE?

10   A    YES.

11   Q    YOU SAID, "ESTENSON DOES NOT HAVE RECORDS SHOWING

12   EACH INSTANCES OF SUCH DRIVING"; IS THAT RIGHT?

13   A    YES.

14   Q    YOU HAD A PARTIAL GROUPING OF WHEN THEY DROVE;

15   ISN'T THAT RIGHT?

16   A    I'M SORRY?

17   Q    YOU DIDN'T HAVE THEM ALL.  YOU JUST HAD SOME OF

18   THEM; IS THAT CORRECT?

19   A    ARE WE REFERRING TO TRIP SHEETS?

20   Q    RECORDS OF WHEN THEY DROVE.

21   A    YEAH.  YES, WE HAVE THEM.  I GUESS I'M CONFUSED BY

22   YOUR QUESTION HERE.

23   Q    I GET THAT WAY, I'M SORRY.

24           "ESTENSON DOES NOT HAVE RECORDS SHOWING EACH

25   INSTANCE OF SUCH DRIVING."

```
 1              YOU DIDN'T SAY "TRIP SHEETS."  YOU DIDN'T SAY
 2    ANYTHING.  YOU SAID YOU "DO NOT HAVE RECORDS."
 3              ISN'T THAT CORRECT?
 4    A    THAT'S WHAT THAT SAYS, YES.
 5    Q    WHY DID YOU SAY THAT?
 6    A    I DON'T KNOW.
 7    Q    THANK YOU.
 8              NOW, YOU NEVER SUPPLEMENTED THIS INTERROGATORY
 9    ANSWER, DID YOU?
10              DO YOU REMEMBER SIGNING SOMETHING SAYING
11    "SUPPLEMENTAL ANSWERS"?
12    A    I DON'T REMEMBER.
13    Q    OKAY.  YOU HAVE NO RECOLLECTION OF HAVING EVER DONE
14    THAT, DO YOU?
15    A    CORRECT.
16    Q    THANK YOU.
17              NOW, DURING THE COURSE OF THIS LITIGATION --
18    IT'S BEEN GOING ON ABOUT SEVERAL YEARS; RIGHT?
19    A    CORRECT.
20    Q    AND THE CLASS PERIOD, YOU UNDERSTAND, IS SEVEN
21    YEARS.  MEANING, THE TIME THE LAWSUIT SAID FROM THIS
22    DATE ON WAS SEVEN YEARS; RIGHT?
23    A    YES.
24    Q    HAVE YOU MADE ANY EFFORT TO DETERMINE HOW MANY
25    TIMES A PERSON WHO WAS LISTED AS A YARD HOSTLER DROVE
```

```
1    ON THE HIGHWAYS IN ANY GIVEN MONTH?

2    A    I MYSELF PERSONALLY, NO.

3    Q    OKAY.  ARE YOU AWARE OF THAT EVER BEING DONE?

4    A    I AM AWARE OF THE INFORMATION BEING PULLED FROM

5    BILLING.

6    Q    WHO TOLD YOU THAT?

7    A    BECAUSE I WAS ASKED FOR IT.  IT WAS A REQUEST.

8    Q    SO YOU'RE TELLING US THAT THERE IS A WAY, AND THERE

9    ARE RECORDS, FOR EACH MONTH OR EVEN EACH WEEK A DRIVER

10   DROVE ON THE HIGHWAYS?

11   A    THERE IS.

12   Q    AND DO YOU HAVE IT WITH YOU?

13   A    I'M SORRY?

14   Q    DO YOU HAVE IT WITH YOU?

15        WHEN DID YOU LAST SEE IT?

16   A    SEE THE RECORD?

17   Q    YEAH.

18   A    JUST A FEW MINUTES AGO, THAT REPORT.

19   Q    THE REPORT WE HAVE?

20   A    YES.

21   Q    THAT'S BROKEN DOWN INTO MONTHS?

22   A    I'D HAVE TO LOOK AT IT AGAIN, BUT I THINK IT'S

23   DAILY.

24   Q    OKAY.  AND I WANTED ASK YOU A FEW QUESTIONS ABOUT

25   THAT.
```

1          LET'S GO TO THE LAST COUPLE PAGES OF IT.

2          SEE WHERE IT'S "A-2"?

3     A    CAN YOU TELL ME WHAT PAGE YOU'RE ON?

4     Q    YEAH, A-2.

5     A    I DON'T SEE "A-2."

6     Q    THAT'S NOT PART OF YOUR EXHIBIT, I'M SORRY.

7          IN THE EXHIBIT -- DO YOU REMEMBER GIVING A

8     DECLARATION FOR THIS EXHIBIT SEVERAL MONTHS AGO?

9     A    IS THAT THE ONE, FEBRUARY 2016?

10    Q    YOU HAVE A GOOD MEMORY.

11    A    YEAH, BECAUSE THIS REPORT WENT WITH THAT.

12    Q    YEAH.  RIGHT.

13    A    YEAH.  YES.

14    Q    THAT'S THE ONE.

15         ON THAT EXHIBIT, THERE WAS AN "A-2," WASN'T

16    THERE?  NOT THE ONE IN FRONT OF YOU.

17         THE COURT:  IF ANYBODY CARES IF I KNOW WHAT'S

18    GOING ON, THE ANSWER TO THAT QUESTION WOULD BE, "NO."

19              WHAT ARE WE TALKING ABOUT?

20         MR. PARRIS:  I'M GOING TO CLARIFY IT, YOUR

21    HONOR.

22    BY MR. PARRIS:

23    Q    IN THE EXHIBIT THAT WAS PRODUCED FOR THE COURT BACK

24    IN FEBRUARY, YOU HAD A SUMMARY OF YOUR SUMMARY; RIGHT?

25    A    I HAD A FILTERED REPORT.

1    Q    YOU HAD A WHAT?

2    A    FILTERED REPORT.

3    Q    WHAT IS THAT ON THE SCREEN THERE?

4    A    THIS IS A CALCULATION OF THE FILTERED REPORT OF

5    ROAD DRIVING, AS I UNDERSTAND IT, COMPARED TO DAYS

6    WORKED.

7    Q    OKAY.  AND SOME OF THESE PEOPLE IN THE ENTIRE SEVEN

8    YEARS NEVER DROVE; RIGHT?

9    A    "NEVER DROVE"?

10   Q    NEVER DROVE ON THE HIGHWAYS.

11   A    I WOULD HAVE TO LOOK AT THAT.

12   Q    LOOK AT IT AND SEE.

13   A    YES.

14   Q    RIGHT?

15   A    UH-HUH.

16   Q    AND SOME OF THEM, IT WOULD BE -- LIKE THE FIRST ONE

17   IS .06 PERCENT; RIGHT?

18   A    I SEE "2.26" ON THE FIRST LINE.

19   Q    MARK JONES?

20   A    I'M ON THE WRONG ONE THEN.

21   Q    OKAY.  THE FIRST ONE IS 2.26 PERCENT OF THE TIME?

22   A    CORRECT.

23   Q    BUT WE DON'T KNOW IF THAT WAS IN 2011, 2012, 2015,

24   2014.  WE DON'T KNOW WHEN THAT 2.26 PERCENT OCCURRED,

25   DO WE?

1    A    NO.

2    Q    AND IF WE WERE TO DO IT BY THE YEAR, IT WOULD

3    OBVIOUSLY BE MUCH, MUCH LESS, WOULDN'T IT?

4    A    I DON'T KNOW THAT.

5    Q    WOULD IT BE MORE?

6    A    I DON'T KNOW THAT EITHER.

7    Q    WELL, WE'RE RELYING ON YOU IN PREPARING THIS THING.

8    A    RIGHT.

9    Q    IF 2.26 PERCENT IS WHAT THEY DROVE IN SEVEN YEARS,

10   IT COULD BE MUCH DIFFERENT ACCORDING TO THE YEAR, IF

11   YOU BROKE IT DOWN BY THE YEAR, COULDN'T IT?

12   A    I WOULD HAVE TO LOOK AT IT YEAR BY YEAR TO ANSWER

13   THAT.

14   Q    YOU CAN'T ANSWER THE QUESTION --

15   A    NO.

16   Q    -- THAT IT WOULD BE DIFFERENT?

17   A    NO.

18   Q    THE VERY NEXT TWO PEOPLE, THEY NEVER DROVE?

19   A    CORRECT.

20   Q    IN THE ENTIRE SEVEN YEARS?

21         MR. HANSON:  I'M GOING TO OBJECT, YOUR HONOR.

22   THAT'S A MISCHARACTERIZATION OF WHAT THE EXHIBIT SHOWS.

23   IT HAS THE DATES OF WHEN THEY WORKED.  SO IT'S A MUCH

24   SHORTER PERIOD.  YOU CAN'T --

25         THE COURT:  WELL, THE WITNESS SHOULD BE

```
1    TESTIFYING TO WHAT IT IS.
2              MR. HANSON:  I OBJECT TO THE FORM OF THE
3    QUESTION BECAUSE IT MISCHARACTERIZES THE EXHIBIT.
4    BY MR. PARRIS:
5    Q    YOU TOLD ME IT WAS A COMPILATION OF SEVEN YEARS;
6    RIGHT?
7    A    I TOLD YOU IT WAS FOR THE CLASS PERIOD, YES.
8    Q    AND IF THE CLASS PERIOD WAS SEVEN YEARS, IT'S FOR
9    SEVEN YEARS; RIGHT?
10   A    IT WAS FROM, I THINK, MAY 2010 TO EARLY 2016.  NOT
11   QUITE SEVEN YEARS.
12   Q    SO SIX YEARS; RIGHT?
13             WE DON'T HAVE THE LAST YEAR?
14   A    I DON'T.  NOT HERE.
15   Q    HAS ANYTHING CHANGED IN THE LAST YEAR?
16             THE COURT:  MANY THINGS HAVE CHANGED IN THE
17   LAST YEAR, MR. PARRIS.
18             MR. PARRIS:  INCOMPLETE, I'M SORRY.
19   BY MR. PARRIS:
20   Q    HAS ANYTHING CHANGED IN HOW YOU PAY EMPLOYEES, BOTH
21   DRIVERS AND YARD HOSTLERS, IN THE --
22   A    YES.
23   Q    WHAT'S CHANGED?
24   A    SO OUR ROUTE DRIVERS ARE PAID HOURLY NOW.
25   Q    I'M SORRY, WHAT?
```

```
1    A    ROUTE DRIVERS ARE PAID HOURLY.

2    Q    SO NOW THE TRUCK DRIVERS ARE PAID HOURLY?

3    A    CORRECT.

4    Q    WHEN DID THAT CHANGE TAKE PLACE?

5    A    JANUARY 2016.

6    Q    OKAY.  AND ARE THEY PAID OVERTIME FOR OVER 40

7    HOURS?

8    A    NO.

9    Q    OKAY.  YOU'RE HEAD OF HUMAN RELATIONS; RIGHT?

10   A    YES.

11   Q    HUMAN RESOURCES?

12   A    YES.

13   Q    YOU ACTUALLY PREPARED SOME OF THAT EMPLOYEE MANUAL;

14   RIGHT?

15   A    CORRECT.

16   Q    IN FACT, YOU PREPARED THE PART THAT SAYS, YOU ARE

17   NON-EXEMPT, AND YOU'LL BE PAID OVERTIME; RIGHT?

18   A    CORRECT.

19   Q    AND YOU EVEN LISTED THE TWO CODE OF FEDERAL

20   REGULATIONS THAT TALK ABOUT THE TRANSPORTATION

21   EXEMPTION; RIGHT?

22   A    YES.

23   Q    AND YOU SAID, EVEN THOUGH THAT COULD APPLY -- I

24   MEAN, WHAT YOU INTENDED TO CONVEY TO THEM, IT DOESN'T;

25   RIGHT?  WE'RE NOT HOLDING YOU TO THAT?
```

```
 1    A    TO BE EXEMPT FROM OVERTIME?

 2    Q    LET ME ASK YOU.  LET'S LOOK AT WHAT IT SAYS, "THE

 3    NON-EXEMPT STATUS OF OUR DRIVERS IS INTENDED TO BE AN

 4    ADDITIONAL BENEFIT TO THE TOTAL REWARDS PACKAGE OFFERED

 5    THROUGH EMPLOYMENT WITH ELC."

 6              IS THAT WHAT IT SAYS?

 7    A    THAT'S WHAT IT SAYS.

 8    Q    DOES IT MEAN WHAT IT SAYS?

 9    A    YES.

10    Q    IT SAYS THEY'RE NON-EXEMPT; RIGHT?

11    A    IT SAYS THAT THEY ARE NON-EXEMPT STATUS, AND THAT

12    WE WILL PAY THEM OVERTIME.

13    Q    OKAY.  SO -- AND THAT HASN'T CHANGED, HAS IT?

14    A    NO.

15    Q    YOU STILL TELL THEM, THEY ARE NON-EXEMPT; RIGHT?

16    A    YES.

17    Q    NOW, I WANT TO TALK TO YOU A LITTLE BIT ABOUT WHEN

18    THAT PROVISION CAME ABOUT.

19              YOU TESTIFIED YOU WERE DIRECTLY INVOLVED IN

20    ITS CREATION.

21              WHAT DID YOU THINK "EXEMPT" MEANT?

22    A    WELL, "EXEMPT" IS EXEMPT FROM OVERTIME.  THAT YOU

23    WILL NOT BE PAID THE OVERTIME.

24    Q    AND YOU INTENDED TO TELL THE EMPLOYEES THEY WOULD

25    BE NON-EXEMPT; RIGHT?
```

```
1    A    CORRECT.

2    Q    AND IF YOU GO TO PAGE 23 OF THE HANDBOOK, YOU SEE

3    WHERE IT SAYS, "NON-EXEMPT EMPLOYEES WHOSE POSITIONS DO

4    NOT MEET FLSA AND STATE EXEMPTION TESTS AND WHO ARE

5    PAID AN OVERTIME RATE BASED ON THE STATE LOCATION"?

6    RIGHT?

7    A    YES.

8    Q    YOU INTENDED TO TELL THE EMPLOYEES, BOTH THE

9    DRIVERS AND THE YARD HOSTLERS, THAT DEPENDING ON WHAT

10   STATE THEY WERE IN, YOU WOULD PAY THEM ACCORDING TO THE

11   OVERTIME LAWS?

12             MR. HANSON:  OBJECTION.  THAT'S A

13   MISCHARACTERIZATION.

14             THE COURT:  HE'S ASKING HER WHAT SHE INTENDED.

15   IS THAT -- YOU DON'T HAVE TO AGREE WITH HIM JUST

16   BECAUSE HE'S ASKING YOU.

17             THE WITNESS:  THAT IS -- THE INTENTION IS,

18   EXEMPT -- IS TO IDENTIFY WHAT "NON-EXEMPT" IS.  BUT AS

19   A DRIVER, ESTENSON DOES NOT HAVE TO PAY THAT OVERTIME.

20   AND WE PAY IT AS AN OVERALL BENEFIT TO THE DRIVERS.

21   BY MR. PARRIS:

22   Q    RIGHT.

23             YOU KNEW, WHEN YOU TOLD THEM THAT THEY WERE

24   GOING TO BE HIRED AS NON-EXEMPT, THAT IF YOU WANTED TO,

25   YOU COULD MAKE SOME OF THEM EXEMPT; RIGHT?
```

1    A    NO.

2    Q    YOU DIDN'T KNOW THAT?

3    A    I GUESS I DON'T UNDERSTAND --

4    Q    IT WAS A CONSCIOUS DECISION BY YOU AS HEAD OF HUMAN

5    RESOURCES AND YOUR SUPERIORS THAT, AS AN ADDED BENEFIT

6    TO THE DRIVERS AND YARD HOSTLERS WHEN THEY'RE DRIVING,

7    THAT THEY WOULD BE NON-EXEMPT; ISN'T THAT TRUE?

8    A    YES.

9    Q    THANK YOU.

10          AND ISN'T IT ALSO TRUE THAT YOU TOLD THEM, ON

11   PAGE 23, THAT BEING NON-EXEMPT MEANT THEY WOULD BE PAID

12   ACCORDING TO THE STATE LAW OF NON-EXEMPTION?

13          MR. HANSON:  OBJECTION.  MISCHARACTERIZATION

14   OF THE DOCUMENT.

15          THE COURT:  HE'S ASKING WHAT SHE TOLD THEM.

16          THE WITNESS:  I DID NOT TELL THEM ANYTHING.  I

17   THINK THIS IS A GENERAL OVERVIEW OF ALL NON-EXEMPT

18   POSITIONS.

19   BY MR. PARRIS:

20   Q    DO YOU DISAGREE WITH ANYTHING I SAID?

21   A    YOU'LL HAVE TO SAY IT AGAIN.

22   Q    WAS IT THE INTENTION OF ESTENSON, THE DEFENDANT IN

23   THIS CASE, TO PAY THE EMPLOYEES AS NON-EXEMPT EMPLOYEES

24   PURSUANT TO THE STATE LAWS OF WHERE THEY WERE WORKING?

25   A    I GUESS DEPENDING ON THE POSITION, YES.

1    Q    THANK YOU.

2           IF IT WAS A DRIVER OR A YARD HOSTLER, THAT WAS

3    THE INTENTION; ISN'T THAT TRUE?

4    A    YES.

5    Q    THANK YOU.

6           NOW, AS TO WHO ACTUALLY WOULD DRIVE ON THE

7    HIGHWAYS, THERE WAS NO SYSTEM IN PLACE TO DO THAT

8    RANDOMLY, WAS THERE?

9           MR. HANSON:  I'M GOING TO OBJECT.  FOUNDATION.

10   EXCEEDS THE SCOPE OF DIRECT.

11          THE COURT:  DO YOU KNOW THE ANSWER TO THAT?

12          THE WITNESS:  I'M SORRY?

13          THE COURT:  IS THAT WITHIN YOUR DUTIES?

14   BY MR. PARRIS:

15   Q    DO YOU HAVE ANY IDEA AS TO HOW THE DRIVERS ARE

16   SELECTED AS YARD HOSTLERS TO WORK AS A DRIVER THAT

17   PARTICULAR DAY OR THAT PARTICULAR PART OF THE DAY?

18   A    NO.

19   Q    OKAY.  WAS THERE A COMPANY POLICY THAT, AS THE

20   36(B) DESIGNATED WITNESS, THAT YOU WERE AWARE OF TO

21   MAKE CERTAIN THAT THESE DRIVERS WERE SELECTED RANDOMLY?

22   A    NO.

23   Q    OKAY.  IT WAS -- DO YOU KNOW WHO MAKES THE

24   SELECTION?

25   A    I DO NOT.

1    Q    OKAY.  DID YOU ATTEMPT TO COUNT UP THE NUMBER OF

2    PEOPLE, ACCORDING TO THE SUMMARY THAT YOU WERE GIVEN,

3    OF HOW MANY PEOPLE IN THE SEVEN-YEAR CLASS PERIOD NEVER

4    DROVE ON THE HIGHWAYS?

5    A    I DID NOT.

6    Q    OKAY.  AND YOU DON'T KNOW WHAT PERCENTAGE OF THE

7    YARD HOSTLERS NEVER DROVE ON THE HIGHWAYS, DO YOU?

8    A    NO.

9    Q    THANK YOU.

10         AT SOME POINT, DID YOU LEARN THAT CALIFORNIA,

11   AND EVEN THE FLSA, REQUIRED OVERTIME FOR HOURS OVER 40

12   HOURS A WEEK?

13   A    YES.

14         MR. HANSON:  I'M GOING TO OBJECT.  CALLS FOR A

15   LEGAL CONCLUSION.  AND IRRELEVANT TO THIS --

16         THE COURT:  OVERRULED.

17   BY MR. PARRIS:

18   Q    WHEN DID YOU LEARN THAT?

19   A    I DON'T KNOW THE EXACT DATE.  BUT, YES, I KNOW

20   THAT.

21   Q    HAS IT BEEN SEVEN YEARS, FIVE YEARS?

22   A    TEN YEARS.

23   Q    I'M SORRY, WHAT?

24   A    TEN YEARS, MAYBE.

25   Q    TEN YEARS?

1    A    YEAH.   SURE.

2    Q    OKAY.   SO FOR 10 YEARS -- AT LEAST 10 YEARS, YOU

3    HAVE KNOWN THAT WHEN AN EMPLOYEE WHO IS NON-EXEMPT

4    WORKS OVER 40 HOURS, YOU HAVE TO PAY HIM OVERTIME; IS

5    THAT RIGHT?

6    A    YES.

7    Q    OKAY.   SO NOT PAYING THESE EMPLOYEES OVERTIME AFTER

8    40 HOURS A WEEK WAS A DELIBERATE DECISION THAT THE

9    COMPANY MADE IN SPITE OF KNOWING THAT FLSA AND FEDERAL

10   LAWS REQUIRED IT?

11             MR. HANSON:  OBJECTION.  ARGUMENTATIVE.

12             THE COURT:  SUSTAINED.

13   BY MR. PARRIS:

14   Q    HOW WAS THE DECISION MADE NOT TO PAY THEM IF YOU

15   KNEW THAT YOU WERE SUPPOSED TO?

16             MR. HANSON:  I'M GOING TO OBJECT.  ASSUMES A

17   FACT NOT IN EVIDENCE.

18             THE COURT:  REPHRASE YOUR QUESTION,

19   MR. PARRIS.

20   BY MR. PARRIS:

21   Q    FOR 10 YEARS, YOU HAVE SAID YOU HAVE KNOWN THE FLSA

22   AND SOME STATE LAWS REQUIRE OVERTIME TO BE PAID FOR

23   OVER 40 HOURS IF THE POSITION IS NON-EXEMPT.

24             HOW WAS THE DECISION MADE TO IGNORE THAT?

25   A    I DON'T THINK A DECISION WAS MADE TO IGNORE IT.  A

1   DECISION WAS MADE TO PAY THE OVERTIME AFTER EIGHT AS A

2   BENEFIT BECAUSE THE DRIVERS HOLDING THE CDL DRIVING

3   PUBLIC STREETS ARE EXEMPT BY FEDERAL D.O.T. TO THE

4   OVERTIME RULES.

5   Q    WHEN WAS THAT DECISION MADE?

6   A    VERY EARLY.

7   Q    WHO MADE IT?

8   A    I DON'T KNOW.

9   Q    WAS IT DISCUSSED?

10  A    I DON'T KNOW.

11  Q    ARE YOU GUESSING THAT THAT DECISION WAS MADE?

12  A    IT'S BEEN A DECISION WITH THE COMPANY SINCE I

13  STARTED.

14  Q    SO DID YOU EVER HAVE A DISCUSSION WITH ANYONE ABOUT

15  HOW THE FLSA REQUIRES YOU TO PAY OVER 40 HOURS

16  OVERTIME, BUT WERE NOT GOING TO PAY IT BECAUSE IT'S A

17  BENEFIT?

18        MR. HANSON:  OBJECTION, YOUR HONOR, TO THE

19  FORM OF THE QUESTION.

20             FIRST OF ALL, IT'S ARGUMENTATIVE.  AND,

21  ALSO, IT MISSTATES THE LAW.  DRIVERS ARE EXEMPT FROM

22  THE PAYMENT OF OVERTIME.  TO SAY THAT THE --

23        THE COURT:  THIS IS A BENCH TRIAL.  I KNOW ALL

24  THAT.  I WILL DISREGARD ANYTHING THAT'S NOT RELEVANT.

25             HE'S ASKING FOR HER UNDERSTANDING OF

1    THINGS.  SHE MAY BE LEGALLY INCORRECT.  HE'S ENTITLED

2    TO ASK.

3              THE WITNESS:  I'M SORRY, CAN YOU ASK AGAIN?

4    BY MR. PARRIS:

5    Q    WELL, HELP US UNDERSTAND THIS.  YOU PUT IN YOUR

6    EMPLOYEE MANUAL, AND YOU EVEN PUT IT IN THE JOB OFFER

7    AND -- RIGHT -- AND EMPLOYMENT AGREEMENT THAT THEY WILL

8    BE NON-EXEMPT AND GET OVERTIME ACCORDING TO THE STATE

9    LAW THAT THEY'RE -- OF WHERE THEY'RE AT.  AND YOU KNEW

10   THAT THAT MEANT ANYTHING OVER 40 HOURS WAS OVERTIME

11   ACCORDING TO THE LAW.

12             JUST TELL ME WHY YOU DIDN'T PAY IT?

13             MR. HANSON:  OBJECTION.  COMPOUND QUESTION.

14             THE COURT:  HOW ABOUT JUST ONE QUESTION.  WHY

15   DIDN'T YOU PAY IT?

16             THE WITNESS:  WE HAD DISCUSSIONS.  D.O.T. IS

17   CLEAR ABOUT DRIVERS THAT HIT PUBLIC HIGHWAYS AND PUBLIC

18   ROADS ARE EXEMPT FROM OVERTIME, AND THAT WE WERE NOT

19   OBLIGATED TO DO THAT.  BUT WE HAVE CONTINUED TO DO IT

20   AS A REWARD OR AS A PERK TO THE DRIVERS.

21   BY MR. PARRIS:

22   Q    IS THERE ANYTHING WRITTEN THAT YOU GIVE THE

23   EMPLOYEES THAT THEY'RE GOING TO BE TREATED AS PARTIALLY

24   EXEMPT?

25   A    NO.

1    Q    THANK YOU.

2         IS THERE ANYTHING THAT HAS EVER BEEN GIVEN TO

3    THE EMPLOYEES THAT THIS DOES NOT APPLY TO THE 40 HOURS

4    A WEEK WHEN YOU SAY THEY WILL BE PAID OVERTIME AND THAT

5    THEY WILL BE NON-EXEMPT?

6    A    NO.

7    Q    OKAY.  ISN'T IT TRUE THAT WHEN THIS DECISION WAS

8    MADE TO MAKE THEM NON-EXEMPT, IT WAS RECOGNIZED THAT

9    THAT IS A HUGE BENEFIT FOR A TRUCK DRIVER TO NOT HAVE

10   TO BE ON THE ROAD SO MANY HOURS WITHOUT BEING PAID?

11   YOU KNEW THAT; RIGHT?

12   A    WELL, I CAN'T SAY THAT.

13   Q    WASN'T IT AN EFFORT TO ATTRACT DRIVERS OF A HIGHER

14   CALIBER?

15   A    THE OVERTIME, EVEN THOUGH IT'S EXEMPT FROM

16   OVERTIME, IS A BENEFIT TO ATTRACTING TALENT AND

17   RETAINING TALENT, YES.

18   Q    WHEN DID YOU FIRST DECIDE THAT IT DIDN'T INCLUDE

19   OVER 40 HOURS A WEEK?

20        MR. HANSON:  I'M GOING TO OBJECT TO THE FORM

21   OF THE QUESTION.  HIS QUESTION WAS UNCLEAR ABOUT WHEN

22   SHE --

23        THE COURT:  YOU'RE ASKING WHETHER HE'S ASKING

24   HER INDIVIDUALLY OR AS A REPRESENTATIVE OF ESTENSON?

25        PLEASE CLARIFY YOUR QUESTION, MR. PARRIS.

1    BY MR. PARRIS:

2    Q    YOU'RE HEAD OF HUMAN RESOURCES.  THESE ISSUES LAND

3    ON YOUR DESK.  YOU'RE THE PERSON WHO MAKES THE

4    DECISION.

5              IS THAT TRUE?

6    A    YES.

7    Q    WHEN DID YOU DECIDE THAT THE OVER-40-HOURS --

8    OVERTIME FOR ANYTHING OVER 40 HOURS WAS NOT GOING TO BE

9    GIVEN TO ESTENSON'S DRIVERS?

10   A    THAT DECISION WAS MADE BEFORE I GOT THERE.  AND WE

11   HAD DISCUSSIONS.  AND IT'S BEEN NOT JUST MY DECISION,

12   BUT IT'S BEEN A COMPANY DECISION.

13   Q    HOW DO YOU KNOW IT WAS A COMPANY DECISION --

14   A    BECAUSE --

15   Q    -- IF IT HAPPENED BEFORE YOU GOT THERE?

16   A    BECAUSE IT WAS THERE WHEN WE GOT THERE.  AND WE'VE

17   HAD DISCUSSIONS OF IT SINCE WITH EXECUTIVE MANAGEMENT,

18   I GUESS.  AND THE -- AND IT HASN'T CHANGED.

19   Q    WHO IN EXECUTIVE MANAGEMENT DID YOU HAVE THAT

20   DISCUSSION WITH AND WHEN?

21   A    IT WOULD BE A COMBINATION OF THE SAFETY DEPARTMENT

22   THAT KNOWS THE D.O.T. REGULATIONS.  IT WOULD BE A

23   COMBINATION OF HUMAN RESOURCES OPERATIONS, HEAD OF

24   OPERATIONS.

25   Q    BUT THERE'S NO DOUBT IN YOUR MIND IT WAS A

1    DELIBERATE DECISION?

2    A    YES.

3    Q    OKAY.  WAS THERE EVER AN EFFORT MADE TO CONVEY TO

4    THE EMPLOYEES THAT THE OVERTIME PROVISIONS REGARDING

5    40-HOURS -- OVERTIME OVER 40 HOURS WAS NOT PART OF

6    THEIR NON-EXEMPT STATUS?

7    A    FROM OUR OFFICE OR JUST IN GENERAL?

8    Q    FROM THE COMPANY.

9    A    SO IT IS DISCUSSED WITH THEM AT THE SITE LEVEL,

10   YES.

11   Q    IT'S DISCUSSED AT THE SITE LEVEL NOW?

12   A    IT ALWAYS HAS BEEN AT TIME OF HIRE.

13   Q    IT IS DISCUSSED AT THE TIME OF HIRE?

14   A    YES.

15   Q    YOU WORK IN ARIZONA; RIGHT?

16   A    YES.

17   Q    YOU'RE NEVER THERE WHEN THEY HIRE PEOPLE?

18   A    I AM WHEN THEY HIRE PEOPLE IN ARIZONA.  NOT IN

19   CALIFORNIA, CORRECT.

20   Q    YOU'RE NOT THERE WHEN THEY HIRE YARD HOSTLERS, ARE

21   YOU?

22   A    I'M NOT.

23   Q    SO FOR YOU TO SAY THAT, THERE MUST BE SOME WRITTEN

24   DOCUMENTATION THAT GOES OUT TO THESE YARDS INSTRUCTING

25   PEOPLE TO DO THAT; RIGHT?

```
1    A    NO.

2    Q    THIS IS A REALLY BIG COMPANY, ISN'T IT?

3              MR. HANSON:  I'M GOING TO OBJECT TO --

4              MR. PARRIS:  I'LL WITHDRAW IT.

5    BY MR. PARRIS:

6    Q    JUST SO THE COURT IS CLEAR, THERE IS NO E-MAIL, NO

7    PIECE OF PAPER, NO PODCAST, NOTHING THAT WOULD DOCUMENT

8    THAT, WHEN PEOPLE ARE HIRED, THEY SHOULD BE TOLD THAT

9    THE 40-HOURS -- OVERTIME FOR 40 HOURS DOESN'T APPLY TO

10   THE EXEMPTION; IS THAT RIGHT?

11   A    CORRECT.

12   Q    THANK YOU.

13              WHERE IS THE YARD HOSTLER TOLD THAT HE MIGHT

14   HAVE TO DRIVE ON THE HIGHWAYS?

15   A    I DON'T KNOW THAT.

16   Q    IT'S NOT PART OF HIS JOB DESCRIPTION, IS IT?

17   A    IT'S THE LAST BULLET ON HIS JOB DESCRIPTION.  IT

18   WAS THE LAST BULLET POINT ON THE JOB DESCRIPTION.

19   Q    OKAY.  YEAH.  I'M SORRY, I DON'T MEAN "JOB

20   DESCRIPTION."

21              IT'S NOT IN THE EMPLOYMENT AGREEMENT LETTER,

22   IS IT?

23   A    NO.

24   Q    AND THE ONLY THING ON THE JOB DESCRIPTION IS "LOCAL

25   DELIVERIES"; RIGHT?
```

```
1   A    YES.

2   Q    THE WORD "INTERSTATE" NEVER APPEARS ANYWHERE, DOES

3   IT?

4   A    IT DOES NOT.

5   Q    AND, IN FACT, LOCAL DELIVERIES -- AND YOU KNOW THIS

6   CAUSE YOU'RE HEAD OF HR AND ESTENSON HAS A POLICY.

7            YOU KNOW THAT LOCAL DELIVERIES ARE AN EXEMPT

8   CLASSIFICATION UNLESS YOU PETITION THE DEPARTMENT OF

9   TRANSPORTATION; ISN'T THAT RIGHT?

10           MR. HANSON:  THAT IS AN INCORRECT STATEMENT OF

11  THE LAW, A REPRESENTATION OF THE LAW.  LOCAL

12  DELIVERIES --

13           THE COURT:  DON'T TELL ME WHAT "LOCAL

14  DELIVERIES" ARE.  WE HAVE A WITNESS ON THE STAND.  HE'S

15  ASKED A QUESTION.  THE ANSWER IS WHATEVER HER ANSWER

16  IS.

17  BY MR. PARRIS:

18  Q    WHAT IS A "LOCAL DELIVERY"?

19  A    I'M SORRY, I CAN'T IDENTIFY -- I CAN'T DEFINE THAT

20  FOR YOU.

21  Q    THANK YOU.

22           IS THERE ANY DOCUMENT THAT YOU'RE AWARE OF

23  TELLING THE YARD HOSTLERS THAT THEY MIGHT HAVE TO DRIVE

24  IN INTERSTATE TRANSPORTATION?

25  A    NO.
```

1    Q    HAVE YOU EVER BEEN AT A MEETING WHERE THEY WERE

2    TOLD THAT, ANY OF THEM WERE TOLD THAT?

3    A    NO.

4    Q    AND YOU'RE DIRECTOR OF HUMAN RELATIONS.

5         YOU HAVE NEVER SENT AN E-MAIL OUT INSTRUCTING

6    PEOPLE TO DO THAT, HAVE YOU?

7    A    NO.

8    Q    THANK YOU.

9         YOU ALSO RESPONDED TO INTERROGATORY SET ONE.

10        DO YOU REMEMBER RESPONDING TO THOSE

11   INTERROGATORIES?

12   A    NO.

13   Q    LET ME ASK YOU, YOU DO KNOW -- YOU SIGNED THE

14   INTERROGATORIES UNDER PENALTY OF PERJURY THAT THEY WERE

15   TRUE; RIGHT?

16   A    YES.

17   Q    DID YOU SIT DOWN WITH SOMEBODY TO PREPARE THOSE

18   ANSWERS?

19   A    I WORKED WITH COUNSEL ON THEM, BUT I'VE SIGNED

20   MANY.  AND WE'RE TALKING TWO-AND-A-HALF YEARS.  SO I

21   HAVE TO LOOK AT THE DOCUMENTS TO --

22   Q    I JUST WANT TO BE CLEAR.  IT WAS SOMETHING YOU

23   THOUGHT ABOUT, SOMETHING YOU DISCUSSED.  AND YOU WERE

24   CLEAR ABOUT WHAT YOU WERE DOING BEFORE YOU DID IT;

25   RIGHT?

```
 1    A    YES.

 2    Q    THANK YOU.

 3              AND WHEN WE ASKED YOU TO DESCRIBE A

 4    COMPREHENSIVE, FULL, FAIR, COMPLETE, ACCURATE AND

 5    DETAILED IDENTIFICATION OF THE MATTER INQUIRED, AND

 6    THEN IT SAYS, "THE JOB DUTIES PERFORMED BY ESTENSON'S

 7    HOURLY PAID OR NON-EXEMPT EMPLOYEES IN THE STATE OF

 8    CALIFORNIA DURING THE CLASS PERIOD," YOU SAID, STARTING

 9    AFTER THE OBJECTIONS, "THE JOB DUTIES OF PLAINTIFF, AND

10    OF THE INDIVIDUALS EMPLOYED LIKE PLAINTIFF AS YARD

11    HOSTLERS AT THE LOCATIONS PLAINTIFF WAS EMPLOYED,

12    INCLUDE MOVING LOADED AND EMPTY TRAILERS, HOOKING AND

13    UNHOOKING TRAILERS AND SEMI-TRACTORS, LOADING AND

14    UNLOADING TRAILERS, TRANSPORTING TRAILERS BETWEEN

15    ESTENSON LOGISTICS FACILITIES IN TRACY, CALIFORNIA,

16    LATHROP, CALIFORNIA AND TRANSPORTING FREIGHT FROM

17    ESTENSON'S LOGISTICS FACILITIES IN TRACY, CALIFORNIA

18    AND LATHROP, CALIFORNIA TO LOCATIONS IN INTERSTATE, IN

19    CALIFORNIA IN INTERSTATE"; RIGHT?

20              THAT'S WHAT YOU SAID, "IN CALIFORNIA"?

21    A    YES.

22    Q    THIS HAS NEVER BEEN SUPPLEMENTED BY YOU, TO YOUR

23    KNOWLEDGE; RIGHT?

24    A    NO.

25    Q    OKAY.  WHAT MAKES YOU THINK IT'S INTERSTATE IF ALL
```

 1   OF THE DELIVERIES ARE IN CALIFORNIA?

 2             MR. HANSON:  OBJECTION.  THAT'S A LEGAL

 3   CONCLUSION.

 4             THE COURT:  WHAT MAKES HER THINK THAT IS

 5   IRRELEVANT.  IT'S NOT RELEVANT.

 6             MR. PARRIS:  OKAY.  THANK YOU.

 7   BY MR. PARRIS:

 8   Q    IS THERE ANYTHING INCORRECT ABOUT THAT ANSWER?

 9   A    I DON'T KNOW.

10   Q    THANK YOU.

11             WHEN WE ASKED YOU IN YOUR DEPOSITION ABOUT

12   WHAT THE YARD HOSTLERS' JOBS WERE, YOU MADE IT VERY

13   CLEAR THAT IT WAS IN THE YARD JUST MOVING TRAILERS

14   ABOUT; RIGHT?

15   A    YES.

16   Q    WHEN DID YOU FIRST START SAYING PART OF THEIR JOB

17   WAS TO DRIVE ON THE HIGHWAYS?

18   A    I DON'T RECALL.

19   Q    OKAY.  IN YOUR MIND AND IN THE DEPARTMENT OF THE

20   HUMAN RELATIONS' MIND, THERE IS A CLEAR DISTINCTION

21   WHEN A PERSON IS DOING A YARD HOSTLER'S JOB AND WHEN A

22   PERSON IS DRIVING; ISN'T THAT RIGHT?

23             MR. HANSON:  ARGUMENTATIVE, YOUR HONOR.  AND

24   NOT RELEVANT.

25             THE COURT:  OVERRULED.

```
 1              THE WITNESS:  YES.
 2    BY MR. PARRIS:
 3    Q    OKAY.  AND WHAT WILL HAPPEN IS, THEY WILL PULL YARD
 4    HOSTLERS OUT AND PUT THEM IN THE DRIVER'S JOB WHEN THEY
 5    DON'T HAVE A DRIVER SHOW UP OR CAN'T PERFORM; ISN'T
 6    THAT RIGHT?
 7    A    THAT'S MY UNDERSTANDING, YES.
 8    Q    OKAY.  SO IN THOSE SITUATIONS, THE YARD HOSTLER
 9    BECOMES A DRIVER; RIGHT?
10    A    WELL, HE IS A DRIVER.  HE'S JUST DRIVING ON A
11    DIFFERENT ROAD.
12    Q    THANK YOU.  NOW, I LOST MY THOUGHT.
13              THE COURT:  IT'S ABOUT TIME FOR A BREAK,
14    MR. PARRIS, IF YOU WOULD LIKE ONE.
15              MR. PARRIS:  I WOULD LOVE ONE.
16              THE COURT:  ALL RIGHT.  ABOUT AN HOUR.
17              MR. PARRIS:  THAT WOULD BE GREAT.
18              THE COURT:  ALL RIGHT.  WE'LL BE BREAKING
19    UNTIL 1:10.
20              MR. HANSON:  I THOUGHT WE WERE GOING UNTIL
21    2:00 O'CLOCK AND THEN QUITTING FOR THE DAY?
22              THE COURT:  THAT'S WHAT I DO IN JURY TRIALS.
23    NOT WHAT I DO IN BENCH TRIALS.
24              MR. HANSON:  I'M SORRY, I WAS PUTTING IT INTO
25    A BENCH TRIAL TOO.
```

```
1              THE COURT:  YOU HAVE WITNESSES AND THINGS?

2              MR. HANSON:  YES, WE DO.

3              THE COURT:  OKAY.

4                  (RECESS)

5              THE COURT:  ALL RIGHT.  WE'RE BACK.

6                  WHERE IS OUR WITNESS?

7              MR. PARRIS:  SHE'S STILL ON THE STAND, YOUR

8      HONOR?

9              THE COURT:  MS. ALEXANDER, YOU ARE STILL UNDER

10     OATH.

11     BY MR. PARRIS:

12     Q    GOOD AFTERNOON.

13     A    GOOD AFTERNOON.

14     Q    I WANT TO TALK TO YOU ABOUT THIS EXHIBIT WITH THE

15     SUMMARY, 586.  OKAY?

16             THE COURT:  OKAY.  YOU'RE CALLING IT A

17     "SUMMARY."  THE COUNSEL SAYS IT'S NOT A SUMMARY.

18     BY MR. PARRIS:

19     Q    586, WHERE YOU HAVE ALL THESE PEOPLE LISTED.

20     A    YES.

21     Q    NOW, IF I UNDERSTOOD YOU CORRECTLY, YOU ORDERED

22     THIS FROM I.T.  AND YOU GAVE THEM THE MEMBERS OF THE

23     CLASS, THE NAMES; IS THAT RIGHT?

24     A    YES.

25     Q    AND YOU GAVE THEM THE PERIOD OF TIME THAT YOU
```

```
 1    WANTED IT?

 2    A    CORRECT.

 3    Q    RIGHT?

 4             AND IT WAS THE SAME FOR EVERYBODY?

 5    A    CORRECT.

 6    Q    THERE WASN'T ANY ATTEMPT TO DIFFERENTIATE WHEN A

 7    PERSON MIGHT HAVE BEEN A TRUCK DRIVER VERSUS A YARD

 8    HOSTLER; RIGHT?

 9    A    CORRECT.

10    Q    OKAY.  NOW, WHENEVER A CHANGE OCCURS IN A PERSON'S

11    EMPLOYMENT, LIKE THEY GET A RAISE OR THEY CHANGE JOB

12    CLASSIFICATION, THERE'S A FORM -- A HUMAN RESOURCE

13    ACTION FORM; RIGHT?

14    A    YES.

15    Q    YOU'RE FAMILIAR WITH THAT FORM?

16    A    I AM.

17    Q    OKAY.  NOW, WHEN I LOOK AT THIS LIST OF PEOPLE WITH

18    THE -- THAT DROVE, THE ONE WHO DROVE THE MOST WAS A

19    MR. SOTO; IS THAT RIGHT?

20    A    I'M SORRY, MISTER "WHO"?

21    Q    MR. SOTO.

22    A    I WOULD HAVE TO LOOK AT THE LIST AND THE RECORDS.

23    Q    LET ME PULL IT UP FOR YOU.

24             SEE WHERE IT SAYS "MARIO SOTO"?

25    A    I DO.
```

1   Q    YOU SEE WHERE YOU HAVE HIM DRIVING 79 PERCENT OF

2   THE TIME?

3   A    CORRECT.

4   Q    THAT'S A LOT OF DRIVING VERSUS YARD HOSTLING;

5   RIGHT?

6   A    YES.

7   Q    NOW, COULD YOU TELL ME -- DIRECTING YOUR ATTENTION

8   TO EXHIBIT-- LET'S MARK THIS AS 592, IF WE COULD.

9          MR. HANSON:  I'M SORRY, WHAT IS IT?

10         MR. PARRIS:  IT'S A HUMAN RESOURCE ACTION

11   FORM.

12        **(EXHIBIT 592 WAS MARKED FOR IDENTIFICATION)**

13   BY MR. PARRIS:

14   Q    COULD YOU TELL THE COURT WHAT THAT IS?

15   A    YES.  THAT'S A HUMAN RESOURCE ACTION FORM.

16   Q    AND IT HAS A -- THAT'S FOR -- ANYTHING THAT HAPPENS

17   WITH THE EMPLOYEE, YOU CHECK WHAT'S GOING DOWN; RIGHT?

18   A    CORRECT.

19   Q    WHAT'S GOING ON?

20         AND THE CHECK HERE IS "EMPLOYEE PERFORMANCE

21   REVIEW"; IS THAT RIGHT?

22   A    CORRECT.

23   Q    WHY IS THERE A CHECK BOX THERE?  WHAT DOES THAT

24   SIGNIFY TO YOU?

25   A    IT SIGNIFIES IT'S THE EMPLOYEE'S ANNUAL PERFORMANCE

1    REVIEW.

2    Q    AND IF YOU GO DOWN THE PAGE -- WHEN WE GO DOWN THE

3    PAGE -- CAN WE BLOW THAT UP A MINUTE?

4            WHAT DOES IT SAY ABOUT "OLD POSITION"?

5    A    IT SAYS "LOCAL DRIVER."

6    Q    HE'S NOT A YARD HOSTLER AT THAT POINT; RIGHT?

7    A    THIS HAS HIM TITLED AS A "LOCAL DRIVER."

8    Q    AND THEN HIS NEW POSITION IS WHAT?

9    A    LOOKS LIKE "LOCAL DRIVER."

10   Q    AND THIS IS HIS PERFORMANCE REVIEW, AND IT'S DATED

11   4/26/12.

12           IS THAT WHEN IT WAS SIGNED?

13   A    YES.

14   Q    AND WHEN YOU LOOK AT HIS DRIVING, YOU HAVE HIM AS A

15   "ROAD HOSTLER" THEN, DON'T YOU?

16   A    I BELIEVE HE WAS ON THERE, YES.

17   Q    SO SOME OF THE PEOPLE THAT ARE ON THIS LIST, AT

18   LEAST APART OF THE TIME, WERE NOT YARD HOSTLERS.  THEY

19   WERE DRIVERS; ISN'T THAT TRUE?

20   A    YES.  THOSE TIME PERIODS WERE IDENTIFIED THOUGH.

21   Q    OKAY.  IN ORDER TO KNOW HOW MUCH OF THEIR TIME WAS

22   ON THE ROAD AS A YARD HOSTLER, YOU WOULD HAVE HAD TO

23   HAVE ASKED FOR JUST THAT PORTION OF TIME WHERE THEY

24   WERE CLASSIFIED AS A "YARD HOSTLER"; ISN'T THAT TRUE?

25   A    YES.

1   Q    FOR WHATEVER REASON, NOBODY TOLD YOU TO DO THAT,

2   DID THEY?

3   A    I WAS TOLD TO PRODUCE THE CLASS LIST FOR THE CLASS

4   PERIOD.

5   Q    OKAY.  THANK YOU.

6           ANY DOUBT IN YOUR MIND THAT THIS IS

7   INACCURATE?

8   A    THIS FORM THAT WE'RE LOOKING AT?

9   Q    THIS EXHIBIT.

10  A    2012?  ONLY BECAUSE I KNOW MANY TIMES YARD HOSTLERS

11  ON DOCUMENTS LIKE THIS ARE ALSO REFERRED TO AS

12  "DRIVERS" BY THE SITE MANAGER JUST FILLING THAT OUT,

13  CAUSE I HAVE SEEN IT.

14  Q    OKAY.  WELL, LET ME SHOW YOU ANOTHER ONE.

15          HOW DO YOU KNOW THAT?

16  A    BECAUSE I HAVE SEEN WHERE THEY ARE YARD HOSTLERS.

17  THEY HAVE AN OFFER OF EMPLOYMENT FOR A YARD HOSTLER.

18  THEY'RE IDENTIFIED IN THE PAYROLL SYSTEM AS A "YARD

19  HOSTLER."  BUT A REVIEW OR A CHANGE IN EMERGENCY

20  CONTACT, ANY OF THOSE TYPE OF ACTIVITIES, AND THEY JUST

21  LIST THEM AS "DRIVER" IN THE TITLE.

22  Q    THEY LIST THEM ON HUMAN RESOURCE ACTION FORMS AS

23  "DRIVERS"?

24  A    THEY CAN SOMETIMES, YES.

25  Q    AND IS THAT AN ERROR?

1   A   YES.

2   Q   YOU'RE NOT SAYING THAT MARIO SOTO, AT THE TIME YOU

3   HAVE HIM DRIVING 76 PERCENT OF THE TIME DURING THE

4   SEVEN-YEAR SPAN, WAS A YARD HOSTLER THE ENTIRE TIME,

5   ARE YOU?

6   A   I WOULD HAVE TO LOOK AT THE LIST THAT I PREPARED OF

7   THE START DATES AND END DATES OF YARD HOSTLERS.  NOT

8   JUST EMPLOYMENT WITH ESTENSON, BUT THEIR TIME IN THAT

9   CAPACITY.

10   Q   BUT THAT'S NOT ON YOUR EXHIBIT, IS IT?

11   A   WHICH EXHIBIT?

12   Q   THAT INFORMATION.

13   A   WHICH EXHIBIT?  THIS ONE?

14   Q   586.

15   A   NO.

16   Q   THANK YOU.

17          NOW, I'D LIKE YOU -- LET'S MOVE THAT INTO

18   EVIDENCE, 592.

19          I'D LIKE YOU TO LOOK AT PLAINTIFF'S 12 --

20          THE COURT:  DID YOU WANT ME TO RULE?

21          MR. PARRIS:  I'M SORRY, YES.

22          THE COURT:  ANY OBJECTION?

23          MR. HANSON:  I'D LIKE TO SEE THE EXHIBIT.  WE

24   HAVE NOT SEEN IT.

25          MR. PARRIS:  SURE.

1          MR. HANSON:  NO OBJECTION, YOUR HONOR.

2          THE COURT:  THAT'S ADMITTED.

3          **(EXHIBIT 592 WAS RECEIVED IN EVIDENCE)**

4          MR. PARRIS:  THANK YOU, YOUR HONOR.

5   BY MR. PARRIS:

6   Q    NOW, DIRECTING YOUR ATTENTION TO PLAINTIFF'S 12,

7   PAGE 12.

8          THIS IS FOR OSCAR RODRIGUEZ; RIGHT?

9   A    CORRECT.

10  Q    AND YOU SEE WHERE IT SAYS "TRANSFER"?

11  A    YES.

12  Q    WHAT DOES THAT MEAN?

13  A    THAT MEANS A TRANSFER IN -- TYPICALLY IN A POSITION

14  CHANGE.

15  Q    AND, THERE, WE HAVE HIM TRANSFERRING ON 4/1/10

16  FROM -- WHAT DOES THE OLD POSITION SAY?

17  A    THAT'S -- IT LOOKS "DRIVER."  IT'S HARD TO SEE.

18  Q    IS THE NEW POSITION A YARD HOSTLER?

19  A    YES.

20  Q    SO THESE ARE VERY MUCH TWO DIFFERENT POSITIONS,

21  AREN'T THEY?

22  A    YES.

23  Q    THANK YOU.

24          NOW, YOU WERE THE ONE WHO PROVIDED US WITH THE

25  CLASS LIST; ISN'T THAT TRUE?

1    A    YES.

2    Q    HOW DID YOU SELECT THE CLASS LIST?

3    A    THE CLASS LIST WAS PROVIDED BY COMBINATION OF

4    RECORDS KEPT IN OUR TIME-KEEPING SYSTEM, AS WELL AS OUR

5    PAYROLL SYSTEM.

6    Q    SO WHAT RECORDS IN THE PAYROLL SYSTEM DID YOU

7    ACCESS?

8    A    THEIR PROFILE, THE EMPLOYEE'S PROFILE THAT LIST THE

9    POSITION TYPE IN THEIR PROFILE.

10   Q    OKAY.  SO THE PROFILE IN THE PAYROLL, IF IT SAID

11   "YARD HOSTLER," YOU INCLUDED THAT?

12   A    CORRECT.

13   Q    AND THEN WHAT OTHER RECORDS DID YOU LOOK AT?

14   A    PAYROLL.  BECAUSE OUR ROUTE DRIVERS WERE PAID

15   PIECEWORK.  OUR YARD HOSTLERS DURING THAT TIME PERIOD

16   WAS HOURLY.  SO THAT ALSO WAS ANOTHER FILTER.

17   Q    SO YOU LOOKED AT EVERYBODY WITH A COMMERCIAL

18   DRIVERS LICENSE THAT WAS PAID HOURLY?

19   A    YES.  IF THEY SHOWED YARD HOSTLER AND HOURLY, YES.

20   Q    OKAY.  WHAT DID YOU DO TO CORRECT FOR THE PEOPLE

21   LISTED AS A "DRIVER" WHO WERE ACTUALLY YARD HOSTLERS?

22   A    WELL, IF THEY WERE A DRIVER, THEY WOULD HAVE BEEN

23   ON PIECEWORK.

24   Q    SO THE CROSS-CHECK WAS THE PIECEWORK; IS THAT

25   RIGHT?

1    A    CORRECT.

2    Q    OKAY.  THANK YOU.

3         NOW, IN ORDER FOR YOUR EXHIBIT 586 TO BE

4    ACCURATE OR CLOSE TO ACCURATE, YOU WOULD HAVE NEEDED TO

5    TAKE THE PERSONNEL FILES FOR EVERY ONE OF THOSE PEOPLE

6    TO FIND OUT WHEN THEY WERE OR IF EVER THEY WERE A

7    DRIVER VERSUS A YARD HOSTLER; CORRECT?

8    A    CORRECT.

9    Q    AND YOU DID NOT DO THAT?

10   A    I DID NOT, NO.

11   Q    OKAY.  THANK YOU.

12        EARLIER WE WERE TALKING ABOUT THAT YOU KNEW

13   THE LAW FOR AN EXEMPT EMPLOYEE REQUIRED OVERTIME OVER

14   40 HOURS, AND THAT YOU HAD DISCUSSIONS WITH PEOPLE IN

15   MANAGEMENT ABOUT IT.

16        DID YOU EVER TALK TO PAUL TRUMAN ABOUT IT?

17   A    I DON'T RECALL.

18   Q    DID YOU EVER ALERT ANYONE THAT YOU THOUGHT THIS WAS

19   A VIOLATION OF THE LAW?

20   A    NO.

21   Q    THANK YOU.

22        DID YOU EVER ALERT ANYONE THAT THE FLSA

23   REQUIRED OVERTIME OVER 40 HOURS, AND YOU WEREN'T PAYING

24   IT?

25   A    NO.

```
 1              MR. HANSON:  I'M GOING TO OBJECT TO THE FORM
 2    OF THE QUESTION AS TO "WHO" BECAUSE IT'S TALKING ABOUT
 3    FLSA REQUIREMENTS.  IT MAKES A DIFFERENCE.
 4              THE COURT:  OVERRULED.
 5    BY MR. PARRIS:
 6    Q    NOW, ARE THERE OTHER POSITIONS IN ESTENSON WHERE A
 7    PERSON MIGHT BE PERFORMING ONE JOB FUNCTION THIS WEEK
 8    AND ANOTHER JOB FUNCTION THE NEXT WEEK, ANOTHER JOB
 9    DESCRIPTION?
10              MR. HANSON:  OBJECTION.  RELEVANCE AS TO --
11    AND VAGUE.
12              THE COURT:  OVERRULED.
13              THE WITNESS:  IN TERMS OF RESPONSIBILITY?
14    BY MR. PARRIS:
15    Q    YES.
16    A    THEY WOULD BE PERFORMING DIFFERENT RESPONSIBILITIES
17    WITHIN THEIR JOB DESCRIPTION DIFFERENT DAYS, IF THAT'S
18    THE QUESTION I'M THINKING YOU'RE ASKING.
19    Q    NO.
20              WHAT I'M SAYING IS, DO YOU SOMETIMES, MAYBE,
21    HAVE SOMEBODY WHO IS DOING ADMINISTRATIVE WORK.  YOU
22    NEED A DRIVER, AND HE HAS A LICENSE, AND THEN HE
23    DRIVES?
24    A    NO.
25    Q    NOTHING LIKE THAT HAS EVER HAPPENED?
```

1    A    NO.

2    Q    OKAY.  DO YOU HAVE A POLICY ABOUT WHAT TO DO IF A

3    PERSON DOES CHANGE JOBS MIDSTREAM FOR A SHORT PERIOD OF

4    TIME AND THEN GOES BACK?

5    A    YES.

6    Q    THAT POLICY IS BY THE WEEK; ISN'T THAT RIGHT?

7    A    CORRECT.

8    Q    YOU PAY THEM BY THE WEEK FOR WHATEVER JOB THEY ARE

9    DOING; ISN'T THAT CORRECT?

10   A    YES.

11   Q    SO IF THEY SHIFT JOBS INTO ANOTHER JOB DESCRIPTION,

12   THE POLICY OF THE COMPANY IS, FOR WHATEVER PERIOD OF

13   TIME IN THAT WEEK THEY WORKED IN THAT JOB, THAT'S HOW

14   YOU PAID THEM; RIGHT?

15   A    WELL --

16   Q    THAT'S A TERRIBLE QUESTION.  I SCREWED IT UP.  I

17   WAS DOING SO GOOD.

18            THE REASON YOU HAVE THAT POLICY IS BECAUSE THE

19   RULES THAT YOU FOLLOW AND THE RULES THAT YOU TELL THE

20   COMPANY TO FOLLOW AS THE HR PERSON, THE HR DIRECTOR, IS

21   THAT WITHIN THE -- YOU JUST COUNT THEM BY THE WEEK, AND

22   YOU PAY THEM BY THE WEEK; RIGHT?

23   A    YES.

24   Q    THE REASON THERE WASN'T ANY NEED TO DO THAT WITH

25   YARD HOSTLERS AND DRIVERS IS BECAUSE THEY MADE THE

1   SAME; RIGHT?

2   A    THEY MADE THE SAME?  I'M SORRY --

3   Q    THEY WERE BOTH TREATED AS NON-EXEMPT.  AND ANYTHING

4   AS TO WHEN THE YARD HOSTLERS DID THAT JOB, THEY WERE

5   PAID IN CHANGE; RIGHT?

6            MR. HANSON:  I OBJECT TO THE QUESTION AS

7   CONFUSING.

8            THE COURT:  SUSTAINED.

9                REPHRASE THAT, MR. PARRIS, PLEASE.

10  BY MR. PARRIS:

11  Q    OKAY.  THERE WAS NO ATTEMPT TO DISTINGUISH WHAT

12  WEEKS THEY MAY HAVE WORKED DRIVING VERSUS YARD HOSTLING

13  BECAUSE THERE WAS NO PRACTICAL DIFFERENCE IN WHAT THEY

14  WERE PAID; ISN'T THAT TRUE?

15  A    IF IT WAS A -- I GUESS IF THEY'RE PERFORMING OTHER

16  RESPONSIBILITIES ON A DAILY BASIS, THEIR PAY STRUCTURE

17  WOULD STAY THE SAME.  ONLY IF THEY'RE PERMANENTLY

18  TRANSFERRED OR ON WHAT WE CALL A "TEMPORARY TRANSFER"

19  FOR A LONG PERIOD OF TIME WOULD THAT CHANGE.

20  Q    THANK YOU.

21           AND JUST SO THERE ISN'T ANY -- I THINK THE

22  COURT HAS IT, BUT I WANT TO BE SURE.

23           TO YOUR KNOWLEDGE, THERE HAS NEVER BEEN AN

24  ATTEMPT TO FIGURE OUT ANY GIVEN WEEK OR ANY GIVEN

25  MONTH -- ANY GIVEN WEEK THAT THE YARD HOSTLERS

1    PERFORMED THE FUNCTIONS OF A DRIVER; IS THAT CORRECT?

2    A    LIKE A FORMAL ATTEMPT?  LIKE RUNNING A REPORT?

3    Q    YES.

4              THERE'S NO REPORT TO GIVE TO THE COURT AND

5    SAY, MR. SOTO WAS A YARD HOSTLER ON THESE WEEKS, BUT ON

6    THESE WEEKS ON -- DURING THE WEEK, HE WOULD PERFORM A

7    JOB AS A DRIVER.  YOU DON'T HAVE THAT INFORMATION, DO

8    YOU?

9    A    I DO NOT.  THAT'S SITE-LEVEL INFORMATION.

10   Q    OKAY.  IT'S INFORMATION YOU COULD OBTAIN; RIGHT?

11   A    BY THEIR ACTIVITY, YES.

12   Q    IT JUST WASN'T DONE; IS THAT CORRECT?

13   A    CORRECT.

14   Q    THANK YOU.

15             WHAT ABOUT BY THE YEAR?  THAT HE DROVE THIS

16   MANY TIMES IN THE YEAR OF 2010, DROVE THIS MANY TIMES

17   2011, DROVE THIS MANY TIMES 2012, ALL THE WAY TO NOW.

18   THERE HASN'T BEEN AN ATTEMPT TO DO THAT EITHER, HAS

19   THERE?

20   A    I GUESS I DON'T UNDERSTAND YOUR ATTEMPT TO --

21   Q    YOU GENERATE A REPORT THAT SAYS, MR. SOTO DROVE

22   THIS PERCENTAGE OF THE TIME IN 2010.

23             NOTHING LIKE THAT HAS BEEN DONE; IS THAT

24   RIGHT?

25   A    THAT'S RIGHT.

1    Q    THANK YOU.

2              SO THE ONLY INFORMATION YOU HAVE TO GIVE THE

3    COURT IS THAT, DURING THE ENTIRE SEVEN YEARS, THIS IS

4    HOW MANY TIMES SOMEBODY MIGHT HAVE DROVE; RIGHT?

5    A    CORRECT.

6    Q    THANK YOU.

7              AND WE KNOW FOR A FACT THAT SOME OF THOSE

8    PEOPLE THAT YOU SAID WERE DRIVING WERE DRIVING BECAUSE

9    THEY WERE DRIVERS; ISN'T THAT RIGHT?

10             MR. SOTO WAS A DRIVER?

11   A    IF HE WAS IDENTIFIED HERE WITH DATES FOR YARD

12   HOSTLER, THEN OUR PAYROLL SYSTEM AND HR RECORDS SHOW

13   HIM AS A YARD HOSTLER FOR THAT TIME.

14   Q    I THOUGHT YOU DIDN'T ASK FOR THEM TO SEGREGATE IT

15   ACCORDING TO ANY TIME OTHER THAN THE CLASS PERIOD.

16   A    RIGHT.  SO YOU'RE STILL TALKING ABOUT THIS REPORT?

17   Q    YES.

18   A    I MISUNDERSTOOD THEN.

19             YES.

20   Q    YOU COULD HAVE PROVIDED THAT, BUT NO ONE ASKED YOU

21   TO; CORRECT?

22   A    CORRECT.

23   Q    THANK YOU.

24             BASED UPON YOUR EXHIBIT, IS THERE ANY WAY TO

25   TELL IF MARIO SOTO'S DRIVING, AS AN EXAMPLE, OCCURRED

1    ALL IN ONE YEAR?

2    A    NO.

3    Q    THANK YOU.

4          AND WE DON'T KNOW WHEN MARIO SOTO, OR IF HE

5    EVER, TRANSFERRED INTO BEING A YARD HOSTLER, DO WE?

6    A    WE WOULD HAVE IF I HAD IDENTIFIED IT.  I DON'T HAVE

7    THAT IN FRONT OF ME.

8    Q    THANK YOU.

9          MR. PARRIS:  THANK YOU.

10         THE COURT:  REDIRECT?

11         MR. HANSON:  YES, YOUR HONOR.  THANK YOU.

12                    **REDIRECT EXAMINATION**

13   BY MR. HANSON:

14   Q    MS. ALEXANDER, A FEW QUESTIONS, HOPEFULLY NOT AS

15   LONG AS THE FIRST TIME AROUND.

16         FOR A COMPANY LIKE HOME DEPOT, YOU HAVE

17   TESTIFIED THAT THERE ARE TWO DIFFERENT DRIVING

18   POSITIONS, YARD HOSTLERS AND ROAD DRIVERS; CORRECT?

19   A    YES.

20   Q    AND YARD HOSTLERS, DID THE JOB DESCRIPTION SAY

21   ANYTHING ABOUT WHETHER THEY COULD BE REQUIRED TO DRIVE,

22   MAKING ROUTE DELIVERIES?

23   A    YES.

24   Q    AND DID YOU FIND THAT YARD HOSTLERS MADE ROUTE

25   DELIVERIES?

```
 1   A    YES.

 2   Q    WHEN YOU LOOK AT THE -- BY THE WAY, HOW CAN YOU

 3   TELL THE DIFFERENCE BETWEEN WHETHER A DRIVER, AT THE

 4   TIME HE TAKES A ROUTE DELIVERY, IS WORKING IN THE

 5   CATEGORY OF A YARD HOSTLER VERSUS A ROUTE DRIVER?

 6   A    BECAUSE HE'S PAID HOURLY FOR THAT TIME.

 7   Q    DO YOU HAVE EXHIBIT 592 THAT YOU JUST ADMITTED?

 8            MR. PARRIS:  DID WE MOVE THAT IN?

 9            THE COURT:  YES.

10            MR. HANSON:  WE DIDN'T OBJECT.

11            THE COURT:  IT'S IN.

12   BY MR. HANSON:

13   Q    NOW, MR. PARRIS WAS ASKING YOU TO LOOK AT THE PART

14   THAT SAID THE TITLE "OLD POSITION, NEW POSITION."

15            HOW WAS MR. SOTO BEING PAID AT THE TIME THAT

16   THIS FORM WAS BEING FILLED OUT?

17   A    HOURLY.

18   Q    WHAT DOES THAT TELL YOU ABOUT WHAT MR. SOTO WAS

19   DOING AT THE TIME?

20   A    HE WAS CLASSIFIED AS A YARD HOSTLER BEING PAID

21   HOURLY.

22   Q    IF HE HAD BEEN DOING ROUTE DELIVERY WORK AS PART OF

23   HIS REGULAR ASSIGNMENT, HOW WOULD HE HAVE BEEN PAID?

24   A    HE WOULD HAVE BEEN PAID ACTIVITY BASED.

25   Q    HOW WOULD IT HAVE BEEN REFERRED TO AS HIS RATE OF
```

1    PAY?

2    A    IT WOULD HAVE BEEN LABELED AS "PIECEWORK."

3    Q    I'D LIKE YOU TO LOOK AT EXHIBIT NUMBER 586, IF YOU

4    WOULD.

5           DO YOU HAVE THAT IN YOUR -- IN FRONT OF YOU?

6    A    YES.

7    Q    IF YOU'LL TURN BACK TO PAGE 92 OF 117.

8           DO YOU FIND MR. SOTO'S NAME ON THAT PAGE?

9    A    YES.

10   Q    ALL RIGHT.  FIRST OF ALL, BEFORE I TAKE OFF EXHIBIT

11   592, DO YOU SEE THE DATE OF THAT HUMAN RESOURCES ACTION

12   FORM?

13          IT'S GOT THE DATE OF HIRE OF "4/13/11."  AND

14   THEN IT HAS -- THE DATE OF THE FORM ITSELF IS "APRIL

15   24TH OF 2012."

16          DO YOU SEE THAT DATE?

17   A    I DO.

18   Q    ALL RIGHT.  WHEN WE LOOK AT THIS LIST -- AND LET ME

19   BACK THIS UP A LITTLE BIT.

20          DO YOU SEE WHERE MR. SOTO STARTS THERE IN

21   APRIL OF 2011?

22   A    I DO.

23   Q    AND THAT CORRESPONDS TO HIS DATE OF HIRE ON THAT

24   TRANSFER FORM; CORRECT?

25   A    YES.

```
 1    Q    NOW, THE DATE OF THE TRANSFER -- BY "THIS FORM,"
 2    THIS WOULD BE YARD HOSTLERS PERFORMING ROUTE DELIVERY
 3    SERVICES; CORRECT?
 4    A    CORRECT.
 5    Q    ON PAGE 97 OF THAT EXHIBIT, DO YOU SEE MR. SOTO
 6    LISTED AS PERFORMING ROUTE DELIVERY SERVICES?
 7    A    I DO.
 8    Q    IS THIS A LIST OF YARD HOSTLERS?
 9    A    YES.
10    Q    AND AS YOU LOOK AT THE EXHIBIT, MR. SOTO'S MOVES GO
11    ALL THE WAY TO PAGE 101.  IT STARTS ON 92 AND GOES TO
12    101 OF ROUTE DELIVERY SERVICES HE PERFORMED WHILE HE
13    WAS BEING PAID HOURLY; CORRECT?
14    A    CORRECT.
15    Q    AND BEING PAID HOURLY, AGAIN, MEANS WHAT?
16    A    IT MEANS THAT THEY ARE A YARD HOSTLER.
17    Q    NOW, WHEN EXHIBIT 586 WAS CREATED, HOW WERE THE --
18    HOW WERE -- HOW WAS IT DETERMINED WHETHER THEY WERE
19    WORKING AS YARD HOSTLERS VERSUS ROAD DRIVERS IF IN FACT
20    THEY HAD BEEN IN ONE POSITION AND TRANSFERRED TO
21    ANOTHER?
22    A    IT WAS IDENTIFIED BY THEIR PAY RECORDS.
23    Q    HOW DO THEIR PAY RECORDS IDENTIFY WHETHER THEY ARE
24    YARD HOSTLERS OR ROUTE DRIVERS?
25    A    ROUTE DRIVERS WERE PAID PIECEWORK-ACTIVITY BASED
```

```
 1   AND YARD HOSTLER ARE PAID HOURLY.

 2   Q    AND THE FILTERING DISPLAYED THAT?

 3   A    YES.

 4   Q    SO INCLUDED ON THIS 586 WOULD BE PEOPLE THAT WOULD

 5   BE PAID JUST HOURLY?

 6   A    YES.

 7   Q    WHEN YOU WERE DESCRIBING SOME OF THE WORK THAT

 8   THE -- THAT WAS DONE AT THE HOME DEPOT DISTRIBUTION

 9   CENTER, YOU USED THE WORD "REPACKAGING" OR

10   "REPACKAGED."

11            WHAT DO YOU MEAN BY THAT?

12   A    I MEAN PRODUCT COMING IN, MAYBE SHRINK-WRAPPED ON A

13   PALLET, UNPACKAGED, PUT ON A SHELF, TAKEN OFF THAT

14   SHELF, REPACKAGED ON A PALLET, PUT ON A TRUCK OR A

15   TRAILER AND SENT TO A STORE.

16   Q    DOES THE PRODUCT ITSELF BECOME SOMETHING DIFFERENT

17   IN TAKING IT OFF OF ONE PALLET AND PUTTING IT ONTO

18   ANOTHER?

19   A    NOT AT ALL.

20   Q    IF THERE ARE A PALLET OF LAWN MOWERS, FOR EXAMPLE,

21   AT A HOME DEPOT STORE THAT YOU WOULD FIND, AND THEY'RE

22   SHRINK-WRAPPED ON ONE PALLET COMING IN, COULD THAT BE

23   PUT ONTO A DIFFERENT PALLET WITH OTHER ITEMS FOR

24   DELIVERY TO A STORE?

25   A    ABSOLUTELY.
```

1    Q    BUT THEY STILL REMAIN LAWN MOWERS EVEN THOUGH

2    THEY'RE MOVING FROM -- CHANGING WHAT PALLET THEY'RE ON?

3    A    CORRECT.

4    Q    NOW, THERE WAS A QUESTION ASKED OF YOU ABOUT THE

5    INTERROGATORY RESPONSE.

6         DO YOU REMEMBER THAT, ABOUT THE RECORDS OF

7    YARD HOSTLER WORK?

8    A    YES.

9    Q    ARE THERE ANY OTHER PHYSICAL RECORDS OF YARD

10   HOSTLER WORK OTHER THAN THE TRIP SHEETS THAT YOU TALKED

11   ABOUT IN THE INTERROGATORY RESPONSE?

12   A    NO.

13   Q    WHAT OTHER TYPE OF INFORMATION DOES ESTENSON HAVE

14   REGARDING WORK THAT'S DONE BY YARD HOSTLERS OTHER THAN

15   TRIP SHEETS?

16   A    NONE.

17   Q    DOES IT HAVE ANY TYPE OF ELECTRONIC RECORDS THAT

18   WOULD SHOW THAT?

19   A    NO.  JUST THEIR CLOCK-IN AND CLOCK-OUT TIME, BUT

20   NOT THE ACTIVITY.

21   Q    OKAY.  NOW, YOU PULLED THE REPORT, HOWEVER, THAT

22   SHOWED WHEN THEY WERE DOING DIFFERENT WORK; CORRECT?

23   A    CORRECT.

24   Q    AND ARE THERE ELECTRONIC RECORDS THAT WOULD SHOW US

25   WHEN A DRIVER IS WORKING AS A ROUTE DRIVER VERSUS A

```
1    YARD HOSTLER?

2    A    WELL, ONLY THROUGH THE BILLING SYSTEM.  YES.

3    Q    AND THAT'S -- IS THAT WHAT YOU USED TO CREATE 586?

4    A    THAT'S WHAT -- CORRECT.  THAT'S WHAT WE USED.

5    Q    BUT THERE'S NO OTHER PHYSICAL DOCUMENTS?

6    A    NO.

7    Q    NOW, THERE'S A LOT OF QUESTIONS ASKED OF YOU ABOUT

8    THIS EXEMPT VERSUS NON-EXEMPT.

9              WHAT DO YOU UNDERSTAND DRIVERS -- IS ESTENSON

10   REQUIRED BY LAW TO PAY OVERTIME TO ITS DRIVERS?

11   A    NO.

12   Q    BUT YOU DO PAY OVERTIME TO SOME OF THE DRIVERS?

13   A    WE DO.

14   Q    WHY IS IT THAT ESTENSON PAYS THEM OVERTIME?

15   A    WE PAY OVERTIME AS AN ADDED BENEFIT OF THEIR

16   OVERALL COMPENSATION PACKAGE.

17   Q    DOES THAT CHANGE WHETHER THEY ARE -- WHETHER YOU

18   PAY THEM OVERTIME OR NOT, DOES THAT CHANGE HOW THE LAW

19   MIGHT VIEW THEM AS EXEMPT OR NON-EXEMPT?

20              MR. PARRIS:  OBJECTION.  LEGAL CONCLUSION.

21              THE COURT:  THAT'S FOR ME TO DECIDE.

22   BY MR. HANSON:

23   Q    I WANT TO SHOW YOU PAGE 31 OF THE DRIVER HANDBOOK,

24   WHICH IS PART OF EXHIBIT NUMBER 590.

25              MR. PARRIS CALLED YOUR ATTENTION TO THE LITTLE
```

1    BOX THAT HAS THE DRIVER NOTE.

2              DO YOU SEE THAT?

3    A    YES.

4    Q    DOES THAT SAY ANYTHING AT ALL ABOUT STATE

5    REQUIREMENTS?

6    A    NO.

7    Q    HAVE YOU EVER CONSIDERED STATE REQUIREMENTS FOR THE

8    PAYMENT OF OVERTIME WHEN YOU SET THE -- WHEN THE

9    OVERTIME POLICY WAS SET AT ESTENSON?

10   A    FOR DRIVERS?

11   Q    FOR DRIVERS, I'M SORRY.

12   A    NO.

13   Q    WHEN DRIVERS ARE BEING RECRUITED, HAVE YOU GIVEN

14   ANY INSTRUCTIONS TO THE SITE MANAGERS AS TO WHAT

15   THEY'RE TO TELL THE -- THE DRIVERS PERFORMING YARD

16   HOSTLER SERVICES AS TO HOW THEY'RE TO BE PAID?

17   A    YES.

18   Q    WHAT ARE THEY INSTRUCTED TO DO?

19   A    THAT'S THROUGH THE ORIENTATION AND ON-BOARDING

20   PROCESS WITH THE HIRING MANAGER, THAT THEY EXPLAIN HOW

21   OVERTIME IS PAID.  MUCH LIKE THEY EXPLAIN CLOCKING IN

22   AND OUT OF THE SYSTEM, HOW THE PEOPLENET UNIT WORKS.

23   ALL OF THAT IS THROUGH ORIENTATION.

24   Q    AND WHAT ARE THE SITE MANAGERS INSTRUCTED TO TELL

25   THEM ABOUT HOW OVERTIME IS PAID?

1    A    THEY'RE INSTRUCTED TO TELL THEM THAT THEY'RE PAID

2    OVERTIME AFTER EIGHT HOURS PER DAY.

3    Q    IS ANYTHING EVER TOLD TO THE DRIVERS THAT THEY ARE

4    TO RECEIVE OVERTIME AFTER 40 HOURS?

5    A    NO.

6    Q    AND UNDER YOUR UNDERSTANDING, ARE YOU LEGALLY

7    REQUIRED TO PAY OVERTIME AFTER 40 HOURS?

8    A    I UNDERSTAND WE ARE NOT.

9    Q    AND WHY IS THAT?

10   A    BECAUSE OUR DRIVERS ARE MOVING INTERSTATE PRODUCTS

11   ON THE ROAD -- PUBLIC ROADS AND ARE EXEMPT.

12   Q    UNDER THE LAW?

13   A    UNDER THE D.O.T., YES.

14           MR. PARRIS:  OBJECTION.  LEGAL CONCLUSION, THE

15   LAST PART.

16           THE COURT:  THAT'S HER UNDERSTANDING.  IT MAY

17   NOT BE THE LAW.

18           MR. HANSON:  MAY I HAVE JUST A MOMENT, YOUR

19   HONOR?  I MAY BE DONE

20           THE COURT:  SURE.

21   BY MR. HANSON:

22   Q    MS. ALEXANDER, I WOULD LIKE YOU TO GO BACK TO

23   EXHIBIT NUMBER 586.  PAGE 84 OF EXHIBIT NUMBER 586.

24           DO YOU SEE A DRIVER LISTED ON THAT PAGE OF

25   "OSCAR RODRIGUEZ"?

1    A    I DO.

2    Q    AND THEN I WOULD ALSO LIKE YOU TO OPEN UP THE WHITE

3    BINDER TO YOUR LEFT.

4    A    UH-HUH.

5    Q    AND I'D LIKE YOU TO TURN TO EXHIBIT NUMBER 12, PAGE

6    12.

7    A    YES.

8    Q    MAYBE A LITTLE EASIER TO READ IT THERE THEN ON THE

9    SCREEN HERE.

10        BUT THIS HUMAN RESOURCE ACTION FORM, WHICH

11   EMPLOYEE IS THIS FOR?

12   A    OSCAR RODRIGUEZ.

13   Q    HOW WAS HE -- HOW WAS HE CLASSIFIED?

14   A    THIS SHOWS A TRANSFER FROM DRIVER TO YARD HOSTLER.

15   Q    ALL RIGHT.  IF YOU WOULD LOOK AT PAGE 84, THE

16   SPREADSHEET -- I'M SORRY, PAGE 86 -- I'M SORRY, IT'S

17   EXHIBIT 586, BUT IT'S PAGE 84 OF 117.

18   A    YES.

19   Q    ON THAT TRANSFER FORM FOR OSCAR RODRIGUEZ ON MARCH

20   31ST OF 2010, HOW WAS HE SHOWN ON THE SPREADSHEET?

21   A    WELL, I SEE THE FIRST RECORD ON 9/22/2010.

22   Q    THAT'S HIS FIRST MOVE AS A YARD HOSTLER DOING ROUTE

23   WORK?

24   A    YES.

25   Q    AND WHEN DID HE MOVE INTO THE YARD HOSTLING

```
1    POSITION?

2    A    3/29/2010.

3    Q    IS THERE ANY INCONSISTENCY BETWEEN THESE RECORDS?

4    A    YOU MEAN THE HR ACTION FORM?

5    Q    THE ACTUAL SPREADSHEET AND THE HUMAN RESOURCES

6    ACTION FORM, ARE THEY CONSISTENT OR INCONSISTENT?

7    A    WELL, THEY APPEAR CONSISTENT.

8    Q    IS ANY OF HIS ROAD DRIVING WORK FOR THAT TIME

9    PERIOD PRIOR TO MARCH 31ST OF 2010 -- HE MUST HAVE BEEN

10   EMPLOYED BY ESTENSON; CORRECT?

11   A    YES.

12   Q    PRIOR TO THAT DATE?

13        IS ANY OF HIS ROAD DRIVING WORK ON THE REPORT

14   THAT YOU HAVE IN 586?

15   A    I'M SORRY, SAY THAT AGAIN?

16   Q    586, YOU SAID, IS THE YARD HOSTLER WORK DOING

17   ROAD -- DOING ROUTE DELIVERIES; CORRECT?

18   A    YES.

19   Q    IS THERE ANY ROUTE DELIVERY WORK -- FROM THE TIME

20   PERIOD THAT MR. RODRIGUEZ WAS A ROUTE DRIVER PRIOR TO

21   MARCH 31ST OF 2010, IS THERE ANY WORK SHOWN ON THERE

22   FOR DELIVERIES WHILE HE WAS A ROUTE DRIVER?

23   A    THERE IS NOT.

24        MR. HANSON:  I HAVE NO FURTHER QUESTIONS, YOUR

25   HONOR.  WE PASS.
```

```
 1              THE COURT:  MR. PARRIS?

 2              MR. PARRIS:  YES, YOUR HONOR.  THANK YOU.

 3                   RECROSS-EXAMINATION

 4    BY MR. PARRIS:

 5    Q    I'M CONFUSED.  I THOUGHT YOU SAID A COUPLE TIMES

 6    THAT THE LIST FOR THIS EXHIBIT - THAT IS NOT IN

 7    EVIDENCE YET, BUT THAT WHATEVER YOU COMPILED THERE IN

 8    586 - WAS SIMPLY OFF A LIST OF NAMES OF THE CLASS

 9    MEMBERS.

10              WAS I WRONG ABOUT THAT?

11    A    NO.  THAT'S CORRECT.

12    Q    OKAY.  THERE WAS NO ATTEMPT TO MATCH IT UP TO

13    PAYROLL RECORDS, THIS LIST, THIS DOCUMENT HERE.  YOU

14    DIDN'T TELL ANYBODY TO DO THAT?

15              MR. HANSON:  WHICH DOCUMENT ARE WE REFERRING

16    TO, YOUR HONOR?

17              MR. PARRIS:  586.

18              THE WITNESS:  THIS DOCUMENT WAS PULLED BY

19    I.T., THE CLASS MEMBERS FOR THE CLASS PERIOD.  THAT

20    ALSO WAS FOR TIME FRAMES THAT ARE ON THE ORIGINAL CLASS

21    LIST OF THE TIME THAT THEY DROVE AS AN HOURLY YARD

22    HOSTLER IDENTIFIED.

23    BY MR. PARRIS:

24    Q    OKAY.  I MEAN, ARE YOU ADDING SOMETHING HERE, OR IS

25    IT -- I THOUGHT WHAT YOU SAID WAS YOU HAD A LIST OF
```

 1   NAMES, AND YOU ASKED THEM TO PULL FROM THAT LIST OF

 2   NAMES DURING THE CLASS PERIOD?

 3   A    CORRECT.

 4   Q    WAS THERE SOME OTHER PARAMETER ADDED TO IT, THE

 5   INSTRUCTIONS YOU GAVE I.T.?

 6   A    NOT TO I.T., NO.

 7   Q    OKAY.  GREAT.  THANK YOU.  I JUST WANT TO MAKE

 8   CERTAIN OF THAT.

 9        NOW, THE DEPARTMENT OF TRANSPORTATION REQUIRES

10   TRUCK DRIVERS TO INPUT THEIR LOG INFORMATION INTO THE

11   COMPUTER IN THE TRUCK; ISN'T THAT RIGHT?

12   A    YES.

13   Q    AND THAT'S WHAT THE DEPARTMENT OF TRANSPORTATION

14   REQUIRES YOU TO KEEP IN CASE THEY EVER WANT TO AUDIT

15   WHETHER OR NOT THE DRIVER IS DRIVING OVER THE ALLOTTED

16   HOURS; RIGHT?

17   A    CORRECT.

18   Q    AND THAT'S TO KEEP DRIVERS FROM BECOMING SLEEP

19   DEPRIVED; RIGHT?

20   A    YES.

21   Q    OKAY.  NOW, WHY DIDN'T ANYBODY PULL THOSE RECORDS

22   TO TELL THE COURT EXACTLY WHEN PEOPLE DROVE AND FOR HOW

23   LONG, ON WHAT DAY?

24        I MEAN, ALL OF THAT INFORMATION IS IN THE LOG;

25   RIGHT?

```
 1              AND THERE'S A COMPUTERIZED VERSION OF IT THAT
 2     IS ACCURATE.
 3              ISN'T THAT TRUE?
 4              MR. HANSON:  OBJECTION, YOUR HONOR.  COMPOUND.
 5              THE COURT:  AMONG OTHER THINGS.
 6                   SUSTAINED.
 7     BY MR. PARRIS:
 8     Q    DID ANYBODY ASK YOU TO PULL THE INFORMATION FROM
 9     THE E-LOGS THAT COME OUT OF THAT TRUCK?
10     A    NO.
11     Q    OKAY.  AM I WRONG THAT THAT WOULD BE MORE ACCURATE
12     AS TO WHEN THE DRIVERS DROVE AND WHERE?
13     A    I'M NOT AN EXPERT ON E-LOGS.  I KNOW IT LOGS
14     STATUSES OF ON-DUTY DRIVING, ON-DUTY NOT DRIVING.  NOT
15     SURE E-LOGS CAPTURE WHAT THEY'RE DOING, THEIR ACTIVITY.
16     Q    OKAY.  THANK YOU.
17              BUT IT WOULD CERTAINLY TELL US WHEN THEY WERE
18     DRIVING?
19     A    YES.
20     Q    NOW, WE HEARD ABOUT THE PIECE-PAY MILEAGE FLAT
21     RATE; RIGHT?
22     A    YES.
23     Q    THAT'S WHAT YOU'RE SAYING ALL THE DRIVERS GOT PAID?
24     A    YES.
25     Q    ARE YOU SURE ABOUT THAT, "ALL THE DRIVERS"?
```

1    A    ALL -- WELL, YARD HOSTLERS, NO.

2    Q    EVERYBODY THAT DRIVES ON THE HIGHWAY, IS THAT WHAT

3    YOU'RE SAYING?

4    A    NO, NOT EVERYONE.

5    Q    WHO ELSE DOESN'T GET -- WHO DRIVES ON THE HIGHWAY

6    THAT DOES NOT GET PAID ACCORDING TO THAT RATE?

7    A    WE HAVE LOCATIONS THAT DON'T PAY -- WE DON'T PAY

8    PIECEWORK ACROSS THE COUNTRY, NO.

9    Q    EXPLAIN THAT.

10   A    DEPENDS ON THE ACCOUNT.  SOME ACCOUNTS ARE HOURLY.

11   SOME ARE PIECEWORK.  CALIFORNIA, MORE PIECEWORK.  HOME

12   DEPOTS WERE PIECEWORK.

13   Q    MORE PIECEWORK THAN NOT?

14   A    CORRECT.

15   Q    IS THAT WHAT YOU JUST SAID?

16   A    IN CALIFORNIA, YES.

17   Q    THANK YOU.

18        AND, IN FACT, ON THAT SAME DOCUMENT OF THE

19   EMPLOYEE AGREEMENT WHERE YOU TELL THE DRIVERS THAT ANY

20   CLAIM OF THEM BEING EXEMPT DOESN'T APPLY TO THEM, YOU

21   ALSO SAY, "IN CERTAIN SELECT MARKETS, DRIVERS OF ELC

22   ARE PAID BY THE MILE PER LOAD AND/OR FLAT RATE"; ISN'T

23   THAT WHAT YOU SAID?

24   A    CORRECT.

25   Q    YOU HELPED PREPARE THAT DOCUMENT; RIGHT?

```
1    A    YES.

2    Q    SO DO YOU HAVE ANY TYPE OF SUPPORTING DOCUMENTS

3    THAT WOULD TELL THIS COURT THAT ALL OF THE HOME DEPOT

4    DELIVERIES WERE BY PIECE RATE?

5    A    YES.

6    Q    WHERE IS IT?

7    A    THAT WOULD BE PAYROLL RECORDS.

8    Q    I'M SORRY, WHAT?

9    A    PAYROLL RECORDS.

10   Q    THAT WOULD TELL THE COURT THAT ALL HOME DEPOT

11   DELIVERIES ARE PIECE RATE?

12   A    DURING THE CLASS PERIOD, YES.

13   Q    THANK YOU.

14        DID YOU BRING THAT WITH YOU?

15   A    NO.

16   Q    THANK YOU.

17        NOW, ISN'T PIECE RATE SOMETHING YOU ACTUALLY

18   PETITION THE SECRETARY OF TRANSPORTATION TO APPLY TO

19   LOCAL DRIVERS IF YOU WANT TO MAKE THEM NON-EXEMPT?

20   A    I DON'T KNOW THE ANSWER TO THAT.

21   Q    ALL RIGHT.  SO THERE ARE SOME TRUCK DRIVERS THAT

22   ARE BEING PAID JUST HOURLY BY ESTENSON IN CALIFORNIA;

23   RIGHT?

24   A    CORRECT.

25   Q    SO THE IDEA THAT ONLY THE PIECE-RATE EMPLOYEES ARE
```

```
1   THE ONES WHO TELL YOU WHO THE DRIVERS ARE IS, AGAIN,

2   INACCURATE, ISN'T IT?

3   A    AT THE LOCATIONS WHERE WE HAVE YARD HOSTLERS, I

4   THINK THAT'S THE IDENTIFIER.

5   Q    SO THE LOCATIONS WHERE YOU HAVE YARD HOSTLERS, YOU

6   THINK THAT'S THE CASE?

7   A    AT THE HOME DEPOTS WHERE WE HAVE YARD HOSTLERS

8   DURING THE CLASS PERIOD, ROUTE DRIVERS WERE PAID

9   PIECEWORK.  YARD HOSTLERS WERE PAID HOURLY.

10  Q    WHO TOLD YOU THAT?  NOT THE YARD HOSTLERS BEING

11  PAID HOURLY.  I'M TALKING ABOUT HOW THE PIECE RATE WAS

12  PAID.

13  A    WHO --

14  Q    WHEN THEY PAID PIECE RATE AS OPPOSED TO WHEN THEY

15  PAID JUST A STRAIGHT HOURLY, WHO TOLD YOU WHEN THAT IS

16  DONE?

17       YOU DON'T HAVE FIRSTHAND KNOWLEDGE OF THAT;

18  RIGHT?

19  A    I'M NOT SURE I UNDERSTAND THE QUESTION.

20  Q    WELL, INITIALLY, YOU SAID THAT ALL THE TRUCK

21  DRIVERS GOT PAID THE PIECE RATE.

22       THEN YOU SAID, NO, ONLY SOME OF THEM, MOST OF

23  THEM IN CALIFORNIA.

24       DO ALL OF THEM THAT DELIVER FOR HOME DEPOT GET

25  PAID PIECE RATE OR JUST SOME OF THEM?
```

```
 1   A    IN CALIFORNIA DURING THE CLASS PERIOD WHERE WE HAD

 2   YARD HOSTLERS, THEY GOT PAID PIECEWORK.

 3            I THOUGHT WE WERE TALKING ABOUT THE CLASS

 4   PERIOD AND THE -- WITHIN THE STATES OF CALIFORNIA --

 5   WITHIN THE BOUNDARIES OF CALIFORNIA.

 6   Q   SO IS IT YOUR TESTIMONY THAT IF THEY WERE YARD

 7   HOSTLERS AND ALSO DRIVERS, THAT DRIVERS GOT PAID

 8   PIECEWORK?  THAT'S HOW YOU KNOW?

 9            THERE WAS SOME KIND OF RULE.

10            IS THAT WHAT YOU'RE SAYING?

11   A    AT THE HOME DEPOT LOCATIONS IN CALIFORNIA, YES.

12   Q    AND THAT'S WHAT YOU MEANT BY CERTAIN SELECT DRIVERS

13   OF ELC ARE PAID BY THE MILE PER LOAD?

14   A    CORRECT.

15   Q    DO YOU HAVE ONE -- JUST ONE OF THOSE PAY RECORDS

16   THAT WE CAN PUT AS AN EXHIBIT AND SHOW TO THE COURT

17   THAT THAT'S THE CASE?

18   A    I DO NOT.

19   Q    THANK YOU.

20            NOW, YOU ACTUALLY HAVE THREE CLASSES -- OR

21   THREE CLASSES OF DRIVER, DON'T YOU?

22            YOU HAVE LOCAL DRIVERS.  YOU HAVE DRIVERS.

23   AND THEN YOU HAVE THE DRIVERS WHO SPECIFICALLY ARE

24   LISTED AS ON PIECEWORK.

25            ISN'T THAT TRUE?
```

```
 1   A    NO.

 2   Q    OKAY.

 3   A    WE HAVE --

 4   Q    I'M SORRY?

 5   A    I'M SORRY.

 6   Q    MAYBE YOU CAN HELP ME UNDERSTAND THIS.  GOING BACK

 7   TO OSCAR RODRIGUEZ'S FORM, OLD POSITION, IT SAYS,

 8   "DRIVER"; IS THAT CORRECT?

 9   A    YES.

10   Q    AND IT HAS -- WHAT IS THAT IN THE "PAID BY HOUR"

11   SECTION?

12   A    I CAN'T EVEN READ IT.

13   Q    THAT'S THE PIECEWORK?

14   A    IT LOOKS -- OH, YEAH.  IF IT SAYS "SUPPLEMENTAL"

15   OVER HERE ON THE RIGHT, THEN, HERE, IT PROBABLY SAYS --

16   I DON'T KNOW.  IT LOOKS LIKE "INCREMENTS."  BUT IT

17   LOOKS LIKE "PIECEWORK," YES.

18          IT IS PIECEWORK, BUT I DON'T KNOW WHAT THAT

19   SAYS EXACTLY.

20   Q    THAT'S THE PIECEWORK STUFF YOU WERE TALKING ABOUT?

21   A    CORRECT.

22   Q    AND THEN WITH OSCAR, HE TRANSFERRED TO YARD HOSTLER

23   AND HOURLY; RIGHT?

24   A    YES.

25   Q    NOW, WITH MR. SOTO, WHICH IS EXHIBIT 592, IT SAYS
```

1   "LOCAL DRIVER."  AND THE RATE IS $15 AN HOUR; ISN'T

2   THAT RIGHT?

3   A    THAT'S WHAT IT SAYS.

4   Q    AND THEN HE GOT A RAISE TO 15.50 AN HOUR?

5   A    YES.

6   Q    SO YOU DO MAKE A DISTINCTION, AT LEAST IN YOUR

7   RECORDS, AS TO THE DRIVERS THAT ARE PAID HOURLY VERSUS

8   THE DRIVERS THAT ARE PAID PIECEWORK; ISN'T THAT RIGHT?

9   A    ON THESE FORMS, IT APPEARS THAT THAT WAS DONE IN

10  ERROR.

11  Q    SO YOU THINK THAT'S AN ERROR?

12  A    YES.

13  Q    EVEN THOUGH IT'S TOTALLY CONSISTENT WITH YOUR

14  EMPLOYEE MANUAL THAT SAYS, IN CERTAIN SELECT MARKETS,

15  IT IS PIECEWORK; RIGHT?

16            MR. HANSON:  ARGUMENTATIVE, YOUR HONOR.

17            PLUS, THE DOCUMENT DOESN'T SAY THAT.

18            THE COURT:  I DON'T EVEN KNOW WHAT WE'RE GOING

19  FOR NOW, MR. PARRIS.

20            COULD YOU START AGAIN?

21            MR. PARRIS:  OKAY.  LET ME LOOK AT THE -- GIVE

22  ME THE EMPLOYEE MANUAL AGAIN.

23  BY MR. PARRIS:

24  Q    IN YOUR EMPLOYEE MANUAL WHEN YOU TALK ABOUT

25  PIECE-PAY MILEAGE FLAT RATE, IT SAYS, "IN CERTAIN

1    SELECT MARKETS, DRIVERS OF ELC ARE PAID BY THE MILE";

2    RIGHT?

3    A    CORRECT.

4    Q    AND ABOVE THAT -- DOESN'T THAT MEAN, IN OTHER

5    MARKETS, THEY'RE PAID BY THE HOUR?

6    A    IT CAN.

7    Q    OKAY.  THANK YOU.

8         AND YOU WERE THE ONE WHO WAS THE 30(B)(6)

9    WITNESS FOR EVERYTHING WE ASKED ABOUT THE COMPANY.

10   THEY CHOSE JUST YOU.  AND YOU WERE THE ONE WHO SIGNED

11   THE INTERROGATORIES.

12        AND ISN'T IT TRUE THAT THIS IS THE VERY FIRST

13   TIME THIS PIECE RATE CAME UP?

14        MR. HANSON:  I'M GOING TO OBJECT AS

15   ARGUMENTATIVE.

16        THE COURT:  I DON'T KNOW WHAT THIS "PIECEWORK

17   CAME UP" MEANS.

18   BY MR. PARRIS:

19   Q    THIS IS THE FIRST TIME YOU TOLD ANYBODY IN THIS

20   CASE, IN THIS LITIGATION - MEANING US - THAT THE

21   DRIVERS CAN BE DISTINGUISHED FROM THE YARD HOSTLERS

22   BECAUSE THEY'RE PAID BY PIECEWORK; RIGHT?

23        THAT'S NEW INFORMATION TO US?

24   A    I DON'T RECALL IF I'VE SAID IT IN THE PAST.

25   Q    THANK YOU.

1          HOW MANY YARD HOSTLERS, DURING THE CLASS

2     PERIOD, NEVER DROVE A TRUCK ON THE HIGHWAY?

3     A    I DON'T KNOW WITHOUT LOOKING AT REPORTS.

4     Q    DID YOU MAKE ANY EFFORT AT ALL TO EXTRAPOLATE THAT

5     INFORMATION?

6     A    WELL, THAT WAS DONE IN FEBRUARY 2016.

7     Q    HOW MANY DROVE LESS THAN 1 PERCENT OF THEIR TOTAL

8     WORK TIME?

9     A    AGAIN, I DON'T KNOW.  I THINK THAT'S REPORTED HERE.

10    Q    OKAY.  THANK YOU.

11         AND EXPLAIN TO THE COURT HOW YOU WENT ABOUT

12    FIGURING THAT OUT ON EXHIBIT A-2 THAT'S ATTACHED TO

13    EXHIBIT -- THAT WAS INITIALLY ATTACHED TO EXHIBIT 586?

14         IT'S EXHIBIT A-2 OF EXHIBIT 586, BUT IT HAD

15    BEEN REMOVED.

16         HOW MANY PEOPLE DIDN'T DRIVE ON THAT LIST?

17    A    I DON'T KNOW.

18    Q    HOW MANY LESS THAN 1 PERCENT OR LESS THAN 2

19    PERCENT?

20         YOU COULD TELL THE COURT THAT IF SOMEBODY

21    ASKED YOU TO MAKE THAT CALCULATION; RIGHT?

22    A    IF I -- YES.  IF SOMEONE HAD ASKED ME TO SAY THAT,

23    YES.

24    Q    AND THERE WAS ABSOLUTELY NO EFFORT TO MAKE A

25    CALCULATION AS TO WHAT PERCENTAGE OF TIME ANY OF THE

1    DRIVERS DROVE TO ANY SPECIFIC LOCATION; RIGHT?

2            MR. HANSON:  OBJECTION.  ARGUMENTATIVE.

3            THE COURT:  OVERRULED.

4            THE WITNESS:  TO ANY SPECIFIC LOCATION, NO.

5    BY MR. PARRIS:

6    Q    THANK YOU.

7            NOW, WHEN YOU WERE TALKING ABOUT HOW THE

8    PRODUCTS COME IN ONE DOOR AND THEY'RE ON THOSE WOODEN

9    PALLETS -- THEY STILL MAKE THEM OUT OF WOOD?

10   A    I THINK SO.

11           NO.  I THINK SOME OF THEM ARE PLASTIC NOW.

12   Q    AND SO IF THERE'S A CONTAINER -- A CONTAINER --

13   THOSE CONTAINERS COME RIGHT OFF THE BOAT; RIGHT?

14   A    SOME DO.

15   Q    RIGHT OFF THE SHIP?

16   A    YES.

17   Q    NOW, IF THE CONTAINER THAT COMES IN HAS 50 SHOWERS

18   IN THEM OR SHOWER HEADS OR WATER HEATERS, RIGHT, THEY

19   BREAK THEM UP.  THEY TAKE THEM OFF THOSE PALLETS.  AND

20   THEN AS THE VARIOUS STORES NEED WATER HEATERS, THERE'S

21   ON-TIME DELIVERY.

22           IS THAT RIGHT?  THEY GET IT RIGHT AWAY?

23   A    THEY GET IT WITHIN THEIR DELIVERY TIMES, YES.

24   Q    RIGHT.

25           SO THEY CALL THE REGIONAL DISTRIBUTION CENTER,

```
 1   SAY, WE NEED THESE PRODUCTS.  SOMEBODY IN THE REGIONAL

 2   DISTRIBUTION CENTER PACKAGES THEM UP AND FILLS THE

 3   CONTAINER THAT WILL GO TO THAT STORE OF EVERYTHING THEY

 4   NEED THAT DAY.

 5                  ISN'T THAT RIGHT?

 6                  MR. HANSON:  OBJECTION, YOUR HONOR.  ASKED AND

 7   ANSWERED AND BEYOND THE SCOPE.

 8                  THE COURT:  OVERRULED.

 9                  THE WITNESS:  CORRECT.

10   BY MR. PARRIS:

11   Q    THAT'S CORRECT; RIGHT?

12   A    YES.

13   Q    OKAY.  TO YOUR KNOWLEDGE, THERE IS NOTHING TO

14   INDICATE THAT CHINA IS SHIPPING SPECIFICALLY TO ONE

15   STORE ANY PRODUCT; IS THAT CORRECT?

16   A    THAT'S CORRECT.

17   Q    OKAY.  OR WHOEVER THE VENDOR IS OR THE MANUFACTURER

18   IS, THERE'S NOTHING THAT YOU KNOW OF THAT WOULD

19   INDICATE THAT THEY'RE SHIPPING IT DIRECTLY TO A

20   SPECIFIC INDIVIDUAL STORE?

21   A    I DON'T HAVE THAT INFORMATION.

22   Q    AND YOU HAVE NEVER SEEN THAT INFORMATION; RIGHT?

23   A    I DON'T SEE THAT INFORMATION.

24   Q    THANK YOU.

25                  THE WHOLE POINT OF WHAT ESTENSON DOES
```

```
 1    WITH THESE BIG-BOX STORES IS TO BYPASS THAT; RIGHT?

 2              YOU DO BIG ORDERS.  ONE WAREHOUSE.  SPLIT

 3    THEM UP, DISTRIBUTE THEM TO THE STORES.

 4              THAT'S THE PURPOSE OF THE CENTER; RIGHT?

 5         MR. HANSON:  OBJECTION.  COMPOUND AND

 6    FOUNDATION.

 7         MR. PARRIS:  NO MORE QUESTIONS, YOUR HONOR.

 8         THE COURT:  ALL RIGHT.  REDIRECT?

 9                   REDIRECT EXAMINATION

10    BY MR. HANSON:

11    Q    MS. ALEXANDER, DO YOU REMEMBER GIVING A

12    DECLARATION -- A SECOND DECLARATION IN MARCH 25TH OF

13    2016?

14    A    YES.

15    Q    IN THIS CASE?

16    A    YES.

17         MR. PARRIS:  OBJECTION, YOUR HONOR.

18    DECLARATION IS HEARSAY.

19         THE COURT:  I HAVEN'T DONE ANYTHING WITH IT

20    YET.

21         MR. PARRIS:  HE'S SHOWING IT TO HER.

22         THE COURT:  YES, HE IS.

23    BY MR. HANSON:

24    Q    MS. ALEXANDER, THERE WAS A QUESTION ASKED OF YOU

25    ABOUT THIS BEING THE FIRST TIME TODAY WHERE YOU -- I
```

```
 1    THINK THE WORD WAS USED "DISCLOSED" THAT ROAD DRIVERS

 2    WERE PAID ON AN ACTIVITY-BASED PAY SYSTEM AND YARD

 3    DRIVERS WERE PAID HOURLY.

 4              DO YOU RECALL GIVING A DECLARATION IN WHICH

 5    YOU SAID THAT VERY THING 14, 15 MONTHS AGO?

 6              IF YOU LOOK AT LINE 23 AND 24 ON THAT PAGE.

 7    A    YES.  THEN WE DID DISCLOSE IT.

 8    Q    IS THAT WHAT YOU SAID TODAY?

 9    A    YES.

10    Q    YOU WERE ASKED SOME QUESTIONS ABOUT THE LOGS AND

11    WHAT THEY MIGHT SHOW.

12              DO THE TRIP SHEETS SHOW THE WORK THAT THE YARD

13    HOSTLERS DO WHEN THEY'RE DOING ROUTE DELIVERIES?

14    A    THEY DO.

15    Q    AND DO THE ELECTRONIC BILLING RECORDS, ALSO WHICH

16    ARE SHOWN IN EXHIBIT 586, ALSO SHOW THE SAME THING?

17    A    THEY DO.

18    Q    WHEN A YARD HOSTLER IS PERFORMING ROUTE WORK, GETS

19    CALLED OUT, HAS TO MAKE A DELIVERY, HOW IS THAT YARD

20    HOSTLER PAID?

21    A    PAID HOURLY.

22    Q    HIS PAY DOES NOT CHANGE JUST BECAUSE HE'S DOING

23    ROUTE WORK?

24    A    NO.

25    Q    ARE ROUTE DELIVERY DRIVERS - THE ONES THAT HAVE
```

1   THEIR PRIMARY DUTY AS MAKING THE DELIVERIES TO THE

2   RETAIL STORES FOR HOME DEPOT - IN CALIFORNIA, HOW ARE

3   THOSE HOME DEPOT ROUTE DELIVERY DRIVERS PAID?

4        WHAT'S THE COMPENSATION SYSTEM USED FOR THEM?

5   A   PIECEWORK.

6        MR. HANSON:  I HAVE NO OTHER QUESTIONS, YOUR

7   HONOR.

8        THE COURT:  MR. PARRIS?

9        MR. PARRIS:  REAL QUICKLY, YOUR HONOR, WE

10  WOULD LIKE TO MOVE IN EXHIBIT 1212 AND PLAINTIFF'S

11  EXHIBIT 10.

12       MR. HANSON:  WE AGREE WITH THAT.  NO

13  OBJECTION.

14       THE COURT:  THEY'RE ADMITTED.

15       **(EXHIBITS 1212 AND 10 WERE RECEIVED IN**

16       **EVIDENCE)**

17       MR. HANSON:  I WOULD MOVE FOR ADMISSION

18  EXHIBIT 586.

19            THE PLAINTIFF HAS WAIVED ANY OBJECTION TO

20  THAT EXHIBIT BECAUSE HE HAS ASKED SUBSTANTIVE QUESTIONS

21  ABOUT THE EXHIBIT OF THIS WITNESS AND HAS, THEREFORE,

22  PUT THE INFORMATION INTO THE RECORD.

23            WE WOULD MOVE ADMISSION BECAUSE HIS

24  OBJECTION HAS BEEN WAIVED.

25            THE COURT:  AS I SAID, YOU CAN BRIEF THIS

1    ISSUE.

2              MR. PARRIS:  THANK YOU, YOUR HONOR.

3              WE WOULD ALSO CONDITIONALLY SUBMIT

4    EXHIBIT A-2 OF 586.  THE EXHIBIT IN HER DECLARATION WAS

5    INITIALLY WITH THE APPENDIX, A-2.  AND WHEN IT MADE IT

6    TO THE STAND, THAT HAD BEEN REMOVED.

7              IF THE COURT DECIDES TO ACCEPT THAT

8    EXHIBIT AS EVIDENCE, WE WOULD REQUEST THAT YOU ALSO

9    ACCEPT THE ATTACHMENT TO IT.

10             THE COURT:  ALL RIGHT.  I'LL CONSIDER THAT

11   WHEN I FIGURE OUT WHAT TO DO WITH 586.

12             YOU CAN STEP DOWN, MS. ALEXANDER.  THANK

13   YOU.

14             DOES THE DEFENSE HAVE ANOTHER WITNESS?

15             MR. HANSON:  WE DO, YOUR HONOR.  WE'RE GOING

16   TO CALL BRADY BANKSON, YOUR HONOR.

17             MR. PARRIS:  THAT WITNESS WAS NEVER DISCLOSED.

18   WHAT THEY DID, HE WAS LISTED AS A WITNESS IN REGARDS TO

19   WHAT HIS JOB TITLE WAS WHEN WE TOOK MS. ALEXANDER'S

20   DEPOSITION.  NO INFORMATION ABOUT IT.  NOTHING.

21             IT WASN'T UNTIL AFTER -- WELL, THEN WE

22   GET A DECLARATION FROM HIM FOR THE SUMMARY JUDGMENT

23   RIGHT ON THE EVE OF DISCOVERY CLOSING.  THEN DISCOVERY

24   CLOSES.  BUT AT NO TIME HAS THEIR DESIGNATIONS CHANGED,

25   HAS THEIR DISCLOSURE CHANGED, HAS THEIR INTERROGATORIES

1    CHANGED.  THEY DIDN'T DO ANY OF THE SUPPLEMENTS THAT

2    ARE REQUIRED.

3              I SHOULDN'T HAVE TO GUESS WHAT THIS

4    WITNESS IS GOING TO TESTIFY TO.  AND I SHOULDN'T HAVE

5    TO BE MOVING THE COURT TO DO SOMETHING AFTER IT'S

6    CLOSED.  IT'S THEIR OBLIGATION.  IF THEY WANT TO PULL

7    IN A NEW WITNESS, THEY DO THE MOTION, IF I WON'T AGREE

8    TO IT.  THEY NEVER EVEN ASKED ME TO AGREE TO IT.

9              THE COURT:  WHAT IS MR. BANKSON GOING TO

10   TESTIFY ABOUT?

11             MR. SMEDSTAD:  HE'S THE VICE PRESIDENT OF

12   OPERATIONS.  HE'S GOING TO TESTIFY ABOUT ISSUES

13   RELATING TO ESTENSON'S EXEMPTION DEFENSE.  AND I WOULD

14   LIKE TO DIRECT --

15             THE COURT:  WELL, I HOPE SO SINCE THAT'S THE

16   ONLY THING WE'RE HERE FOR.  THAT'S NOT VERY HELPFUL.

17             MR. SMEDSTAD:  YOUR HONOR, IN ECF 107, WHICH

18   IS THE PLAINTIFF'S WITNESS LIST FILED ON SEPTEMBER

19   28TH, 2015, PLAINTIFF INDICATED THAT THEY WOULD BE

20   CALLING BRADY BANKSON FOR ONE-AND-A-HALF HOURS TO

21   TESTIFY REGARDING THE DEFENSE EXEMPTION DEFENSE.  THEY

22   KNEW EXACTLY WHAT HIS ROLE WAS.

23             THE COURT:  THEN CALL HIM.

24             MR. SMEDSTAD:  THANK YOU, YOUR HONOR.

25             MR. PARRIS:  WAIT A MINUTE, YOUR HONOR.

1            THE COURT:  NO, I'M NOT WAITING A MINUTE.

2                 YOU CAN CALL HIM.

3                 YOU DON'T TELL ME WHAT TO DO, MR. PARRIS.

4            MR. PARRIS:  YOU'RE ABSOLUTELY RIGHT.  I

5 APOLOGIZE IF THAT'S HOW IT WAS INTERPRETED.  THAT'S NOT

6 WHAT I WANTED TO DO.

7                 IF THEY LIST HIM AS A WITNESS, AND WE

8 NEED A JOINT WITNESS LIST, AND I WANT TO CALL HIM FIRST

9 TO TAKE IT OUT OF THE -- TO TAKE THE STING OUT OF IT --

10 I KNOW THAT I'M GOING TO OBJECT.  BUT IF THE COURT

11 OVERRULES ME, I WANT TO BE ABLE TO CALL HIM.  I DON'T

12 WANT THE JURY TO HEAR HIM FOR THE FIRST TIME WHEN THEY

13 CALL HIM.  THAT'S A DEFENSIVE MEASURE THAT LAWYERS

14 ALWAYS DO.  AND THAT WAS THE -- THAT WAS WHEN IT WAS

15 INTENDED TO BE A JURY.  AND IT WAS ALSO FOR THE TRIAL

16 OF THE ENTIRE CASE.  IT HAD NOTHING TO DO WITH THIS

17 HEARING.

18            THE COURT:  I HAVE NO IDEA WHAT YOU'RE TALKING

19 ABOUT, FRANKLY, SIR.

20                YOU MAY CALL YOUR WITNESS.

21            MR. SMEDSTAD:  THANK YOU, YOUR HONOR.

22            THE CLERK:  YOU DO SOLEMNLY SWEAR THAT THE

23 TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW

24 PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE

25 TRUTH, AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

```
 1              THE WITNESS:  I DO.
 2              THE CLERK:  PLEASE STEP FORWARD TO THE WITNESS
 3    STAND AND STATE YOUR FULL NAME FOR THE RECORD AND SPELL
 4    IT.
 5              THE WITNESS:  FULL NAME, BRADY ALAN BANKSON,
 6    B-R-A-D-Y, A-L-A-N, B-A-N-K-S-O-N.
 7              THE COURT:  YOU MAY PROCEED.
 8              MR. SMEDSTAD:  THANK YOU, YOUR HONOR.
 9                     DIRECT EXAMINATION
10    BY MR. SMEDSTAD:
11    Q    MR. BANKSON, WHERE ARE YOU EMPLOYED?
12    A    I WORK FOR ESTENSON LOGISTICS.
13    Q    AND WHAT IS YOUR POSITION AT ESTENSON?
14    A    MY POSITION IS VICE PRESIDENT OF OPERATIONS.
15    Q    AND HOW LONG HAVE YOU HAD THAT POSITION?
16    A    SINCE MARCH OF 2013.
17    Q    AND ARE YOU FAMILIAR WITH THE SERVICES THAT
18    ESTENSON PROVIDES ITS CUSTOMERS IN CALIFORNIA?
19    A    YES.
20    Q    DESCRIBE FOR ME THE SERVICES THAT ESTENSON PROVIDES
21    HOME DEPOT IN CALIFORNIA?
22    A    ESTENSON PROVIDES DEDICATED CONTRACT CARRIAGE,
23    WHICH IS A FORM OF TRUCK TRANSPORTATION.  WE PICK UP
24    PRODUCT FROM VENDORS THAT SUPPLY HOME DEPOT, DELIVER
25    THAT PRODUCT TO THEIR DISTRIBUTION CENTERS.  AND THEN
```

```
 1    WE DELIVER IT FROM THEIR DISTRIBUTION CENTERS TO THE

 2    RETAIL STORES.

 3          WE ALSO PROVIDE YARD HOSTLER SERVICES, WHICH

 4    IS A SERVICE AT THEIR DISTRIBUTION CENTERS THAT

 5    SHUTTLES TRAILERS WITHIN THE CONFINE OF THE

 6    DISTRIBUTION CENTER FROM PARKING SPACES TO DISTRIBUTION

 7    CENTER DOORS.

 8    Q    OKAY.  AND ARE YOU FAMILIAR WITH THE DIFFERENT

 9    TYPES OF DISTRIBUTION CENTERS THAT ESTENSON WORKS AT

10    FOR HOME DEPOT?

11    A    YES.

12    Q    AND WHAT ARE THOSE TYPES?

13    A    RDC, WHICH IS A RAPID DEPLOYMENT CENTER, AND SDC,

14    WHICH IS A STOCKING DISTRIBUTION CENTER.

15    Q    HOW MANY RAPID DEPLOYMENT CENTERS ARE THERE IN

16    CALIFORNIA?

17    A    THREE.

18    Q    WHERE ARE THEY LOCATED?

19    A    TRACY, CALIFORNIA, ONTARIO, CALIFORNIA AND

20    REDLANDS, CALIFORNIA.

21    Q    AND HOW MANY STOCKING DISTRIBUTION CENTERS ARE

22    LOCATED IN CALIFORNIA?

23    A    THERE ARE TWO, LATHROP, CALIFORNIA AND MIRA LOMA,

24    CALIFORNIA.

25    Q    WHAT KIND OF PRODUCTS COME INTO THE SDC?
```

```
 1   A    I WOULD CLASSIFY THOSE AS SEASONAL PRODUCTS, PATIO

 2   FURNITURE, CHRISTMAS DECORATIONS, STORAGE BINS AND

 3   CONTAINERS.

 4   Q    AND WHAT KIND OF PRODUCTS --

 5        MR. PARRIS:  YOUR HONOR, THERE'S NO FOUNDATION

 6   FOR THIS AS TO HOW HE KNOWS THIS.

 7        THE COURT:  SUSTAINED.

 8   BY MR. SMEDSTAD:

 9   Q    ARE YOU FAMILIAR WITH THE TYPES OF PRODUCTS THAT

10   COME INTO THE SDC?

11   A    IN MY ROLE, I SPEND A LOT OF TIME IN THE FIELD

12   WORKING WITH THE DIFFERENT OPERATION TEAMS.  AND DURING

13   THAT TIME, YOU ACQUIRE KNOWLEDGE ABOUT YOUR CUSTOMER'S

14   BUSINESS, THE TYPES OF PRODUCTS THEY SHIP AND HOW WE

15   COMPLETE THE JOB EVERY DAY.

16        THE COURT:  DON'T ASK -- GO AHEAD.

17        MR. SMEDSTAD:  IT LOOKED LIKE MR. PARRIS --

18        MR. PARRIS:  IF I WANT TO OBJECT, I HAVE TO

19   WAIT FOR A QUESTION.

20        THE COURT:  YES, IT WOULD BE BETTER FOR YOU TO

21   WAIT FOR A QUESTION BEFORE YOU OBJECTED.

22   BY MR. SMEDSTAD:

23   Q    IN THE COURSE OF YOUR FIELD WORK, HAVE YOU OBSERVED

24   THE TYPES OF PRODUCTS THAT COME INTO THE SDC?

25   A    YES.
```

```
1    Q    AND WHAT TYPES OF PRODUCTS ARE THEY?

2              MR. PARRIS:  IT LACKS FOUNDATION AS TO TIME,

3    WHERE HE WAS, WHAT CENTER.  I MEAN, IT'S JUST A BROAD,

4    GENERAL -- I'M SORRY.

5                   FOUNDATION.

6              THE COURT:  WELL, CERTAINLY AS TO TIME WOULD

7    BE MORE HELPFUL.

8    BY MR. SMEDSTAD:

9    Q    SINCE YOU BECAME VICE PRESIDENT OF OPERATIONS IN

10   2013, HAVE YOU HAD THE OPPORTUNITY TO VISIT THE TWO

11   SDC'S THAT ARE LOCATED IN CALIFORNIA THAT SERVICE HOME

12   DEPOT?

13   A    YES.

14   Q    ALL RIGHT.  AND HAVE YOU HAD THE OPPORTUNITY,

15   DURING THAT TIME, TO VIEW THE TYPES OF PRODUCTS THAT

16   COME INTO THE SDC'S?

17   A    NO.

18   Q    OKAY.  DID YOU HAVE THE OPPORTUNITY TO VIEW THE

19   TYPES OF PRODUCTS THAT CAME INTO THE SDC'S PRIOR TO

20   BECOMING VICE PRESIDENT OF OPERATIONS?

21   A    NO.

22   Q    SO I'M A LITTLE CONFUSED AS YOU TOLD ME THAT YOU

23   WENT OUT IN THE FIELD, AND YOU GAINED KNOWLEDGE ABOUT

24   THE KINDS OF PRODUCTS THAT ARE COMING IN.

25              TELL ME HOW I CAN RECONCILE YOUR TWO ANSWERS?
```

```
 1    A    SO VISUALLY SEEING THE PRODUCT UP CLOSE AND

 2    INSPECTING IT, THAT WOULD NOT BE PART OF MY NORMAL JOB

 3    ROLE.  BUT I HAVE SEEN PAPERWORK, BILL OF LADINGS, HAD

 4    DISCUSSIONS WITH MY OPERATIONS TEAMS REGARDING THE

 5    PRODUCTS OR THE VENDORS THAT WE WERE PICKING UP FROM.

 6    Q    SO HAVE YOU HAD THE OPPORTUNITY TO VIEW BILLS OF

 7    LADING REFLECTING THE PRODUCT THAT'S COMING INTO THE

 8    TWO SDC'S IN CALIFORNIA THAT SERVICE HOME DEPOT?

 9    A    I HAVE SEEN BILLS OF LADING, YES.

10    Q    AND DO THOSE BILLS OF LADING REFLECT THE TYPES OF

11    PRODUCTS THAT ARE BEING SHIPPED?

12    A    YES.

13              MR. PARRIS:  I OBJECT.  THAT WOULD BE HEARSAY.

14              THE COURT:  OVERRULED.

15    BY MR. SMEDSTAD:

16    Q    DID YOU ANSWER MY QUESTION?

17    A    I SAID, "YES."

18    Q    OKAY.  AND BASED ON YOUR REVIEW OF THOSE BILLS OF

19    LADING, DID YOU COME TO AN UNDERSTANDING OF THE TYPES

20    OF PRODUCTS THAT WERE COMING INTO THE TWO SDC

21    DISTRIBUTION CENTERS FOR -- THAT SERVICE HOME DEPOT?

22    A    YES.

23    Q    AND IT WAS YOUR ASSESSMENT IT WAS SEASONAL PRODUCT?

24    A    YES.

25    Q    ALL RIGHT.  CAN YOU DESCRIBE FOR ME THE ROLE THAT
```

```
 1    THE DISTRIBUTION CENTERS PLAY IN THE SERVICES THAT

 2    ESTENSON PROVIDES HOME DEPOT?

 3    A     I WOULD SAY THAT DISTRIBUTION CENTERS ACT --

 4              MR. PARRIS:  I WOULD OBJECT.  IT'S COMPOUND.

 5              ONE, HE WOULD NOT HAVE -- HAS NOT LAID

 6    FOUNDATION FOR WHAT GOES ON WITH HOME DEPOT.  THE

 7    ESTENSON PART OF IT IS DIFFERENT.

 8              THE COURT:  SUSTAINED.

 9    BY MR. SMEDSTAD:

10    Q    SIR, SINCE YOU BECAME VICE PRESIDENT OF OPERATIONS,

11    HAVE YOU HAD THE OPPORTUNITY TO GAIN AN UNDERSTANDING

12    OF THE ROLE IN WHICH THE DISTRIBUTION -- THAT THE

13    DISTRIBUTION CENTERS PLAY AND THE SERVICES THAT

14    ESTENSON PROVIDES TO HOME DEPOT?

15    A    YES.

16    Q    AND HOW HAVE YOU GAINED THAT UNDERSTANDING?

17    A    THROUGH ESTENSON'S OWN OPERATION, BEING FAMILIAR

18    AND WITNESSING THE DIFFERENT CHALLENGES THAT HOME DEPOT

19    HAS WITH BUILDING CONSTRAINTS AND THE AMOUNT OF INBOUND

20    PRODUCT THAT COMES IN.

21              THE DISTRIBUTION CENTERS RECEIVE PRODUCT FROM

22    ALL OVER THE WORLD.  PRODUCTS FROM ALL OVER THE NATION

23    COME IN FROM THE PORTS.  THEY COME IN FROM MEXICO.

24    THEY'LL ARRIVE AT THE DISTRIBUTION CENTERS.  IT'S

25    CONSOLIDATED IN THOSE DISTRIBUTION CENTERS AND THEN
```

1    REDISTRIBUTED OUT TO THEIR STORES.

2    Q    IS PART OF YOUR ROLE, AS VICE PRESIDENT OF

3    OPERATIONS, ASSISTING IN FINDING SOLUTIONS TO THE

4    PROBLEMS THAT HOME DEPOT ENCOUNTERS?

5    A    YES.

6    Q    ALL RIGHT.  IN CONNECTION WITH YOUR ROLE AS VICE

7    PRESIDENT OF OPERATIONS AND THE DESCRIPTION YOU JUST

8    PROVIDED US REGARDING LOOKING INTO THE SPACE

9    CONSTRAINTS THAT HOME DEPOT ENCOUNTERS, HAVE YOU GAINED

10   AN UNDERSTANDING OF HOW EMPTY TRAILERS AT DISTRIBUTION

11   CENTERS ARE LOADED?

12   A    YES.

13   Q    OKAY.  AND HOW DID YOU GAIN THAT UNDERSTANDING?

14   A    BY WITNESSING DC OPERATIONS AND HAVING YARD

15   HOSTLERS THAT REPORT THROUGH TO ME THAT ARE ASSIGNED TO

16   POSITION EMPTY TRAILERS FOR LOADING.

17   Q    AND HOW ARE THE EMPTY TRAILERS LOADED AT THE

18   DISTRIBUTION CENTERS THAT SERVICE HOME DEPOT?

19   A    PRODUCT -- INBOUND PRODUCT IS POSITIONED AT A

20   DISTRIBUTION CENTER DOOR.  IT'S HANDLED BY THE HOME

21   DEPOT ASSOCIATES IN THE BUILDING.  THEY PUT IT TOGETHER

22   AND RELOAD IT ONTO AN OUTBOUND TRAILER.

23   Q    WHAT DO YOU MEAN BY "PUT IT TOGETHER"?

24   A    THEY -- STORES HAVE ORDERS.  THEY TAKE MULTIPLE

25   INBOUND TRAILERS.  TAKE THE PRODUCT DESTINED FOR ONE

1  PARTICULAR STORE OFF OF ALL THOSE TRAILERS AND

2  CONSOLIDATE IT ONTO ONE TRAILER.

3          MR. PARRIS:  I WOULD OBJECT.  THEY PRODUCED A

4  WITNESS.  THAT WITNESS WAS DESIGNATED AS THEIR

5  30(B)(6).  YOU HEARD HIM TESTIFY AS TO HOW THE HOME

6  DEPOT OPERATION WORKS.

7          IF THEY DIDN'T LIKE THAT TESTIMONY, THEY

8  SHOULD HAVE SUPPLEMENTED.

9          FOR ME TO HEAR THAT THEY'RE DOING

10 SOMETHING DIFFERENT FOR THE FIRST TIME, I'M SORRY, YOUR

11 HONOR, THERE'S NO WAY I COULD HAVE PREPARED FOR THAT.

12 IT'S TOTALLY CONTRARY TO WHAT THEY HAVE SAID BEFORE.

13          AND THERE'S NO FOUNDATION AS TO HOW HE

14 KNOWS IT.

15          THE COURT:  OVERRULED.

16          GO AHEAD.

17 BY MR. SMEDSTAD:

18 Q    IN CONNECTION WITH OBSERVING THE OPERATIONS AT THE

19 DISTRIBUTION CENTERS, AND YOU SAID THAT THE YARD

20 HOSTLERS REPORT ULTIMATELY UP THROUGH TO YOU, DID YOU

21 GAIN AN UNDERSTANDING OF WHO DECIDES WHAT PRODUCTS WILL

22 BE PLACED INTO THE EMPTY TRAILERS THAT ARE GOING TO

23 LEAVE THE DISTRIBUTION CENTERS THAT SERVICE HOME DEPOT?

24 A    YES.

25 Q    AND WHO DECIDES THAT?

1    A    THAT'S OUR CUSTOMER, HOME DEPOT.

2    Q    OKAY.  ROUGHLY, HOW MANY TRUCKS DOES ESTENSON

3    OPERATE?

4    A    APPROXIMATELY 1200.

5    Q    THAT'S THROUGHOUT THE COUNTRY?

6    A    YES.

7    Q    AND DOES ESTENSON OWN ALL OF THOSE TRUCKS?

8    A    THE MAJORITY OF THEM.

9    Q    AND FOR THE TRUCKS THAT ESTENSON OWNS, WHO IS -- DO

10   YOU KNOW WHO IS LISTED ON THE TITLE?

11   A    ESTENSON LOGISTICS.

12   Q    I WAS GOING TO ASK YOU IF YOU'RE FAMILIAR WITH

13   DRIVERS THAT ESTENSON EMPLOYS AS YARD HOSTLERS, BUT YOU

14   HAD ALREADY TOLD ME THAT THOSE INDIVIDUALS REPORT TO

15   YOU.  SO I TAKE IT YOU'RE FAMILIAR WITH YARD HOSTLERS?

16   A    YES.

17   Q    DOES ESTENSON REQUIRE ITS HOSTLERS TO HAVE A CLASS

18   "A" CDL?

19   A    YES.

20   Q    WHY?

21   A    WE NEED EVERY DRIVER THAT WORKS FOR ESTENSON

22   LOGISTICS TO BE ABLE TO PERFORM ANY TASK THAT A

23   PROFESSIONAL DRIVER MIGHT HAVE TO PERFORM.

24   Q    DOES ESTENSON HAVE RECORDS THAT REFLECT THE

25   INSTANCES IN WHICH HOSTLERS ACTUALLY HAULED FREIGHT

1   OVER THE ROAD?

2   A    YES.

3   Q    WHERE?

4   A    THEY HAVE IT IN TWO FORMS.  ONE IS A WRITTEN TRIP

5   SHEET, WHICH ALL DRIVERS ARE REQUIRED TO PRODUCE

6   THROUGHOUT THEIR WORKDAY.  THE OTHER FORM WOULD BE

7   ELECTRONIC WITHIN OUR DISPATCH BILLING SYSTEM, TMW.

8   Q    OKAY.  AND I'M GOING TO DIRECT YOUR ATTENTION TO

9   EXHIBIT 586, WHICH IS IN DEFENDANT'S BINDER 1 OF 8.

10            FOR EASE OF REFERENCE, I'M GOING TO PUBLISH

11  THE FIRST PAGE OF THAT EXHIBIT ON THE ELMO.

12            HAVE YOU SEEN EXHIBIT 586 BEFORE?

13  A    YES.

14  Q    DO YOU KNOW WHERE IT CAME FROM?

15  A    YES.

16  Q    AND WHERE DID IT COME FROM?

17  A    THIS IS AN EXPORT FROM THE DISPATCH SYSTEM, TMW.

18  Q    AND WHAT DOES IT REFLECT?

19  A    EACH LINE OF DATA HERE REPRESENTS --

20            MR. PARRIS:  OBJECTION.  THERE'S INSUFFICIENT

21  FOUNDATION AS TO HOW HE KNOWS.  HE HAD NOTHING TO DO

22  WITH ITS PREPARATION.

23            THE COURT:  FOUNDATION, COUNSEL.

24  BY MR. SMEDSTAD:

25  Q    ARE YOU FAMILIAR WITH THE INFORMATION IN THE FIELDS

1    THAT ARE CONTAINED IN THE TMW?

2    A    YES.

3    Q    ALL RIGHT.  AND IS THE INFORMATION THAT'S REFLECTED

4    IN EXHIBIT 586 CONSISTENT WITH THE INFORMATION THAT

5    COULD BE EXPORTED FROM TMW?

6    A    YES.

7    Q    ALL RIGHT.  AND YOU HAVE SEEN EXHIBIT 586 BEFORE;

8    CORRECT?

9    A    THAT'S CORRECT.

10   Q    ALL RIGHT.  AND YOU INDICATED THAT IT CAME FROM

11   YOUR BILLING SYSTEM; IS THAT RIGHT?

12   A    THAT'S CORRECT.

13   Q    ALL RIGHT.  AND THAT'S THE TMW SYSTEM THAT YOU

14   REFERENCED BEFORE?

15   A    YES.

16   Q    ALL RIGHT.  YOU MENTIONED EARLIER THAT THERE WERE

17   TWO FORMS OF RECORDS THAT REFLECT INSTANCES IN WHICH

18   YARD HOSTLERS PERFORMED ROUTE WORK; IS THAT RIGHT?

19   A    YES.

20   Q    COULD SOMEONE USE THIS IMPORTED SHEET FROM THE

21   BILLING SYSTEM AND USE THE TRIP SHEETS THAT YOU

22   REFERENCED AS A RECONCILIATION TOOL TO CHECK THE DATA

23   POINTS THAT ARE SHOWN ON 586?

24   A    YES.

25   Q    TO YOUR KNOWLEDGE, ARE THERE ANY HOSTLERS WHOM

```
1    ESTENSON EMPLOYS WHO ARE DESIGNATED AS BEING EXEMPT

2    FROM HAULING FREIGHT OVER THE ROAD?

3    A    NO.

4    Q    DOES ESTENSON ALTER THE FREIGHT THAT IT TRANSPORTS

5    FOR HOME DEPOT IN ANY WAY DURING THE TRANSPORTATION

6    PROCESS?

7    A    NO.  WE PICK UP SEALED TRAILERS AND DELIVER SEALED

8    TRAILERS.

9    Q    WHEN YOU WERE DESCRIBING THE OPERATIONS AT THE

10   DISTRIBUTION CENTERS A LITTLE BIT AGO, YOU MENTIONED

11   THAT THEY WOULD BE TAKEN OFF A VARIETY OF INCOMING

12   TRAILERS, UNPACKED, UNSEALED AND THEN MOVED OVER TO THE

13   EMPTY TRAILERS.

14            IS THAT A FAIR DESCRIPTION?

15   A    YES.

16   Q    OKAY.  AND IF IT'S NOT, YOU TELL ME.  YOU'RE THE

17   ONE --

18   A    YES, FOR THE MOST PART, THEY UNLOAD THE EMPTIES.

19   AND THEY PREPARE IT FOR THE -- OR UNLOAD THE LOADED

20   TRAILERS, PREPARE IT TO BE PUT ONTO THE EMPTY TRAILERS.

21   Q    AND BASED ON YOUR UNDERSTANDING OF THE OPERATIONS

22   FROM YOUR VIEW OF IT HAPPENING, IS THE PRODUCT THAT THE

23   HOME DEPOT ASSOCIATES MOVE FROM THE LOADED TRAILERS TO

24   THE EMPTY TRAILERS THAT ARE GOING TO GO TO THE STORES,

25   DOES THAT REMAIN IN THE ORIGINAL PACKAGING FROM THE
```

```
 1    MANUFACTURER?

 2    A    YES.

 3              MR. PARRIS:  OBJECTION.  IT LACKS FOUNDATION

 4    AS TO WHAT YOU'RE DESCRIBING.  IS IT THE BOX?  IS IT

 5    THE PALLET?

 6              THE COURT:  SUSTAINED.

 7    BY MR. SMEDSTAD:

 8    Q    SO DESCRIBE FOR ME HOW THE -- YOU CALLED IT

 9    "CONSOLIDATION" EARLIER -- HOW IT IS THAT THE PRODUCTS

10    FROM THE INCOMING TRAILERS ARE OFF-LOADED FROM THOSE

11    TRAILERS, AND THEN WHETHER ANYTHING HAPPENS TO THE

12    CONTAINERS IN WHICH THEY ARE MAINTAINED WHEN -- THE

13    CONTAINERS THEY CAME IN, WHEN THEY GOT ON -- CAME ON

14    THE INCOMING TRAILER AS THEY GET LOADED ONTO THE EMPTY?

15    A    SO THE MAJORITY OF THE PRODUCT THAT WE PICK UP AS

16    INBOUND FREIGHT TO THE DISTRIBUTION CENTER IS ON

17    PALLETS.  HOME DEPOT FLOOR-LOADS THE OUTBOUND TRAILERS.

18    SO THEY WILL UNLOAD THE TRAILER WITH THE INBOUND

19    PRODUCT.  THEY'LL REMOVE THE PACKAGING FOR TRANSPORT

20    SHRINK-WRAP PALLET.  AND THEN THEY WILL SORT THOSE

21    PRODUCTS TO GO TO THE DIFFERENT TRAILERS FOR THE

22    OUTBOUND STORES.  THAT'S WHAT I MEAN BY THE "REMOVING

23    PACKAGING."

24    Q    YOU MEAN SHRINK WRAP?

25    A    YES, SHRINK WRAP, PALLETS, STUFF THAT WOULD PROTECT
```

1    THE PRODUCT IN TRANSIT.

2    Q    ONCE THE FREIGHT LEAVES THE HOME DEPOT'S

3    DISTRIBUTION CENTER, DOES ESTENSON TRACK THE PROGRESS

4    OF THE FREIGHT DURING THE TRANSPORTATION?

5    A    YES.

6    Q    HOW?

7    A    SEVERAL WAYS.  OUR TRUCKS ARE EQUIPPED WITH

8    ON-BOARD COMPUTERS.  THEY HAVE GPS.  SO WE CAN SEE WHAT

9    THE PROGRESS IS.  WE ARE ABLE TO TWO-WAY MESSAGE OUR

10   TRUCKS VIA THE ON-BOARD COMPUTERS.  WE'RE ALSO IN

11   CONTACT WITH OUR DRIVERS VIA CELL PHONE.

12   Q    WHO DIRECTS ESTENSON WHERE TO DELIVER THE FREIGHT?

13   A    OUR CUSTOMERS DO.

14   Q    IS THERE ANY DIFFERENCE BETWEEN THE FREIGHT THAT

15   HOSTLERS MIGHT BE DISPATCHED TO HAUL TO COMPLETE A

16   ROUTE FROM THE TYPES OF FREIGHT THAT REGULAR ROUTE

17   DRIVERS HAUL FOR ESTENSON?

18   A    NO.

19   Q    WHO PAYS ESTENSON FOR THE FREIGHT THAT IT DELIVERS

20   FOR HOME DEPOT?

21   A    HOME DEPOT.

22            MR. SMEDSTAD:  NO FURTHER QUESTIONS.

23            THE COURT:  MR. PARRIS?

24

25

**CROSS-EXAMINATION**

BY MR. PARRIS:

Q    IN REGARDS TO HOW HOME DEPOT DEALS WITH ITS

PRODUCTS INSIDE THAT WAREHOUSE, ESTENSON IS NOT PART OF

THAT PROCESS AT ALL, ARE THEY?

A    YOU MEAN INSIDE THE DISTRIBUTION CENTER?

Q    YES.

A    NO.

Q    HOW THEY DECIDE -- WHAT PRODUCTS THEY DECIDE TO

SEND TO WHAT STORES IS NOT SOMETHING YOU KNOW ABOUT?

A    I'M NOT INVOLVED AND MY TEAM IS NOT INVOLVED IN THE

ORDER-CREATION PROCESS.  SO WHAT A HOME DEPOT STORE

ORDERS TO REPLENISH ITS SHELVES, NO, WE'RE NOT INVOLVED

IN THE PROCESS.

Q    YOU DON'T KNOW IF IT'S AN ALGORITHM THAT IS

ADJUSTED EVERYDAY AND THEN THERE'S A PREDICTION OF WHAT

THEY'RE GOING TO NEED BY THE TIME THE PRODUCT GETS TO

THE DISTRIBUTION CENTER, OR IF IT'S ACTUALLY, "WE NEED

THESE PRODUCTS BECAUSE WE JUST RAN OUT," OR A

COMBINATION OF BOTH, DO YOU?

A    NO.

Q    WHAT YOU DO KNOW IS THAT ALL THE WATER HEATERS COME

IN ON ONE CONTAINER OFF THE SHIP.  THEY UNLOAD THEM AND

TAKE THEM INTO THE DISTRIBUTION CENTER.  AND THEN

WHENEVER THE STORES NEED THEM OR IF THE STORES NEED

```
 1    THEM, IT'S DIVIDED UP BETWEEN THE STORES AND PUT ON A

 2    TRUCK THAT'S GOING TO THAT STORE; RIGHT?

 3    A    I DO KNOW THAT THE WATER HEATERS ARE PRODUCED IN

 4    MEXICALI, MEXICO.  AND WE PICK THEM UP ON FULLY-LOADED

 5    TRAILERS IN CALEXICO, CALIFORNIA.  AND THEN THOSE ARE

 6    BROUGHT TO THE DISTRIBUTION CENTERS TO BE UNLOADED.

 7    Q    WHEN YOU PICK THEM UP IN CALEXICO AND THE DRIVER IS

 8    DRIVING THEM, THE DESTINATION IS THE DISTRIBUTION

 9    CENTER; RIGHT?

10    A    I DON'T KNOW FOR SURE.

11    Q    THANK YOU.

12              WHEN YOU PICK UP THAT WATER HEATER, YOU HAVE

13    NO IDEA WHAT ITS FINAL DESTINATION IS, DO YOU, OTHER

14    THAN IT'S GOING TO BE A HOME DEPOT STORE?

15    A    YES.

16    Q    OKAY.  GOOD.  THANK YOU.

17              YOU'RE FAMILIAR THAT THEY TELL THE YARD

18    HOSTLERS AND SOME OF THE DRIVERS THAT THEY'RE

19    NON-EXEMPT; RIGHT?

20    A    I'M NOT SURE.  I DON'T KNOW THAT.

21    Q    YOU HAVE NEVER READ THE EMPLOYEE HANDBOOK?

22    A    REPHRASE YOUR QUESTION.

23    Q    YOU'RE AWARE THAT THEY TELL THE DRIVERS AND THE

24    YARD HOSTLERS, ALL THE DRIVERS, ALL THE YARD HOSTLERS,

25    THAT THEY'RE NON-EXEMPT?
```

1 A  YES.

2 Q  AND YOU KNOW WHAT "NON-EXEMPT" MEANS, DON'T YOU?

3 A  YES.

4 Q  WHAT DOES "NON-EXEMPT" MEAN?

5 A  "NON-EXEMPT" MEANS THAT THEY CAN EARN OVERTIME.

6 Q  THEY WHAT?

7 A  THEY CAN EARN OVERTIME.

8 Q  THEY'RE ENTITLED TO OVERTIME; RIGHT?

9 A  YES.

10 Q  AND IT MEANS A FEW OTHER THINGS TOO, DOESN'T IT?

11   MR. SMEDSTAD:  OBJECTION TO THE FORM.

12   THE COURT:  SUSTAINED.  THAT'S REALLY --

13 THAT'S NOT HELPFUL.

14   WE'LL TAKE A 15-MINUTE BREAK.

15    **(RECESS)**

16   THE COURT:  YOU MAY BE SEATED.

17   MR. PARRIS, YOU MAY CONTINUE.

18 BY MR. PARRIS:

19 Q  I WANT TO MOVE ON TO SOMETHING ELSE.

20   YOU PREPARED A DECLARATION IN THIS CASE;

21 RIGHT?

22 A  YES.

23 Q  AND DO YOU REMEMBER SAYING THAT ESTENSON'S

24 CUSTOMERS OWN AND CONTROL THE TRANSPORTATION OF THE

25 FREIGHT COMING INTO AND OUT OF THEIR DISTRIBUTION

1    CENTERS, TRACK THEIR FREIGHT USING THEIR OWN FREIGHT

2    TRACKING SYSTEMS AND PAY US TO TRANSPORT THE FREIGHT?

3          THAT'S AN ACCURATE STATEMENT; RIGHT?

4    A    YES.

5    Q    IN THE WAY TRACKING FREIGHT IS DEFINED IN THE

6    INDUSTRY, ESTENSON HAS NO OBLIGATION TO TRACK THE

7    FREIGHT.  THEY JUST TRACK THE TRUCKS; RIGHT?

8    A    NO.

9          SO WITH HOME DEPOT, WE ARE REQUIRED TO SEND

10   STATUS MESSAGES FROM OUR ON-BOARD COMPUTER ON OUR

11   TRUCKS.  THOSE STATUS MESSAGES SENT FROM OUR SYSTEM TO

12   THEIR SYSTEM ARE WHAT UPDATE THEIR TRACKING.  SO WE'RE

13   MEASURED ON COMPLIANCE ON HOW TIMELY THOSE MESSAGES ARE

14   SENT AND RECEIVED.  SO IT'S SOMETHING THAT WE HAVE TO

15   HANDLE.

16   Q    IT TRACKS THE TRUCK, DOESN'T IT?

17   A    YES.  AND THE SHIPMENT THAT THE TRUCK IS --

18   Q    IT'S INSIDE THE TRUCK.  YOU DON'T KNOW WHAT'S

19   INSIDE THAT TRUCK, DO YOU?

20   A    IF WE HAVE A BILL OF LADING FROM A SHIPPER OR A

21   BILL OF LADING FROM A DISTRIBUTION CENTER TO A STORE,

22   THAT IDENTIFIES THE PRODUCT.

23          WE MIGHT NOT KNOW, AS A DRIVER OR A

24   DISPATCHER, WHAT THAT EXACT PRODUCT MIX IS; BUT THERE'S

25   DOCUMENTS THAT INDICATE THAT.

1   Q    AND THEY WOULD BE TWO SEPARATE BILL OF LADINGS,

2   WOULDN'T THEY?

3   A    ONE.

4         IF YOU'RE TALKING DIFFERENT SHIPPERS, YES.

5   Q    ONE SHIPPER GOES TO THE RELOCATION CENTER -- OR THE

6   DISTRIBUTION CENTER, AND THEN THE OTHER -- HOME DEPOT

7   BECOMES THE SHIPPER TO THE STORE; ISN'T THAT CORRECT?

8   A    YES.

9   Q    OKAY.  THANK YOU.

10        NOW, YOU TESTIFIED ABOUT THE LOGS THAT ARE

11  INPUTTED INTO THE COMPUTER IN THE TRUCK; RIGHT?

12  A    YEAH.

13  Q    YOU'RE REQUIRED TO KEEP THAT INFORMATION, AREN'T

14  YOU?

15  A    YES.

16  Q    D.O.T. CAN COME IN AND AUDIT YOU JUST TO MAKE

17  CERTAIN NOBODY IS BEING SLEEP DEPRIVED; RIGHT?

18  A    YES.

19  Q    OKAY.  AND THAT INFORMATION IS THE MOST ACCURATE

20  INFORMATION ABOUT WHERE ANY GIVEN DRIVER WAS ON ANY

21  GIVEN ROAD AT ANY GIVEN DAY; ISN'T THAT RIGHT?

22  A    YES.

23  Q    BECAUSE HE CAN'T MAKE A MISTAKE.  IT'S -- THAT

24  COMPUTER KNOWS WHERE THE TRUCK WAS AND WHO THE DRIVER

25  WAS AT ALL TIMES; RIGHT?

```
 1    A    YES.
 2           BUT IF THERE IS A MALFUNCTION ON A COMPUTER,
 3    THEN THE DRIVER WOULD BE REQUIRED TO REVERT TO PAPER
 4    LOGS.  SO THERE WOULDN'T BE A COMPUTER RECORD
 5    INDICATING LOCATION.  IT WOULD BE WRITTEN HOURS OF
 6    SERVICE LOG.
 7    Q    OKAY.  IF I WERE TO ASK YOU HOW I.T. PULLED THE
 8    LOGS FOR ALL THE DRIVERS FROM THIS PERIOD OF TIME "A"
 9    TO "B," YOU COULD JUST SEND THAT ORDER IN AND GET IT;
10    RIGHT?
11           MR. SMEDSTAD:  FOUNDATION.
12           THE COURT:  DO YOU KNOW?
13           THE WITNESS:  WELL, THERE'S A RETENTION PERIOD
14    ON THE LOGS.  SO I DON'T -- I DON'T BELIEVE IT WOULD GO
15    BACK FURTHER THAN 12 MONTHS.
16    BY MR. PARRIS:
17    Q    WELL, LET ME ASK YOU THIS:  ONCE THIS LAWSUIT WAS
18    FILED, DO YOU KNOW IF THERE WAS ANY ATTEMPT TO RETAIN
19    THAT INFORMATION?
20    A    YES.
21    Q    TELL ME ABOUT THAT.
22    A    LIMITED MEMORY.  SEVERAL YEARS AGO, BUT I KNOW
23    THERE WAS AN ORDER TO MAKE SURE WE RETAIN INFORMATION.
24    Q    FROM THE LOGS?
25    A    I CAN'T RECALL IF IT WAS LOGS OR TRIP SHEETS.
```

```
 1    Q    OKAY.  DID YOU MAKE ANY EFFORT TO RETAIN THE DATA

 2    THAT WAS IN THE TRIP LOGS THAT WAS BEING STORED?

 3              MR. SMEDSTAD:  OBJECT TO THE FORM, "TRIP LOG."

 4              MR. PARRIS:  I'M SORRY, YOU'RE RIGHT.

 5    BY MR. PARRIS:

 6    Q    THE LOGS -- THEY'RE CALLED "TRIP LOGS," AREN'T

 7    THEY?

 8              WHAT ARE THEY CALLED?

 9    A    WHAT ARE YOU REFERRING TO?

10    Q    THE LOG THAT THE DRIVER PUTS IN FOR D.O.T. ON THE

11    COMPUTER.

12    A    THE HOURS OF SERVICE LOG?

13    Q    OKAY.  THE HOURS OF SERVICE LOGS.

14    A    THAT PROCESS WOULDN'T FUNNEL THROUGH ME.  SO I

15    CAN'T SAY THAT THAT WAS DONE.

16    Q    OKAY.  GOOD.  THANK YOU.

17              MR. PARRIS:  I THINK THAT'S ALL I HAVE.

18              THE COURT:  MR. SMEDSTAD?

19                       REDIRECT EXAMINATION

20    BY MR. SMEDSTAD:

21    Q    I JUST WANT TO COVER A COUPLE OF TOPICS WITH YOU.

22              MR. PARRIS TALKED TO YOU ABOUT WATER HEATERS

23    COMING IN FROM MEXICO AND ARRIVING AT THE DC.

24              ARE YOU FAMILIAR WITH THE CROSS-DOCK

25    OPERATIONS AT THE RDC'S?
```

1  A   YES.

2  Q   CAN YOU DESCRIBE FOR ME THE PROCESS OF CROSS-DOCK

3  IN TERMS OF HOW IT WORKS WITH FREIGHT THAT'S COMING IN

4  AND THEN GOING OUT?

5  A   A LOADED INBOUND TRAILER ARRIVES AT THE YARD FROM A

6  ROUTE DRIVER.  IT'S PARKED IN A PARKING SPOT WITHIN THE

7  YARD.  WHEN THE DC ASSOCIATES ARE READY TO UNLOAD THAT

8  PRODUCT --

9        MR. PARRIS:  YOUR HONOR, WHAT'S THE "DC

10  ASSOCIATES"?

11        THE WITNESS:  A DISTRIBUTION CENTER WORKER

12  INFORMS THE YARD HOSTLER THAT THEY WANT THAT TRAILER IN

13  A PARTICULAR DISTRIBUTION CENTER DOOR.  THE YARD

14  HOSTLER MAKES THAT MOVE.  THE HOME DEPOT DISTRIBUTION

15  CENTER WORKERS WILL UNLOAD THAT PRODUCT AND THEN PUT IT

16  WHERE IT NEEDS TO BE TO BE RELOADED ONTO AN OUTBOUND

17  TRAILER.

18  BY MR. SMEDSTAD:

19  Q   DO YOU HAPPEN TO KNOW WHY THEY CALL IT A "RAPID

20  DEPLOYMENT CENTER"?

21  A   TO TURN INVENTORY QUICKLY.

22  Q   WHEN YOU SAY "TURN INVENTORY QUICKLY," WHAT YOU DO

23  MEAN?

24  A   THEY DON'T WANT TO SIT ON THE INVENTORY.  THEY WANT

25  TO BRING IT TO THE DISTRIBUTION, HANDLE IT AND THEN GET

```
1    IT BACK OUT TO THEIR STORES AS QUICKLY AS POSSIBLE.

2    Q    AND THE "THEY" IN THAT SENTENCE IS WHOM?

3    A    HOME DEPOT.

4    Q    LET'S TALK ABOUT HOME DEPOT.

5         MR. PARRIS ASKED YOU ABOUT THE BILLS OF LADING

6    AND WHO WOULD BE THE SHIPPER.

7         DO YOU REMEMBER HIM ASKING YOU QUESTIONS ABOUT

8    THAT?

9    A    YES.

10   Q    AND DO YOU HAVE AN UNDERSTANDING OF WHO OWNS THE

11   FREIGHT FROM THE TIME THAT IT LEAVES EITHER THE VENDOR

12   OR THE MANUFACTURER?

13   A    YES.

14   Q    AND WHO IS THAT?

15   A    IT VARIES.  SOMETIMES HOME DEPOT ALREADY OWNS THE

16   PRODUCT.  SOMETIMES THE VENDOR OWNS THE PRODUCT.

17        MR. PARRIS:  I'M GOING TO OBJECT.  LACKS

18   FOUNDATION.

19        THE COURT:  YOU CAN CROSS-EXAMINE, MR. PARRIS.

20   BY MR. SMEDSTAD:

21   Q    AND IN THE INSTANCES IN WHICH HOME DEPOT OWNS THE

22   PRODUCT FROM THE -- HAS ALREADY PURCHASED IT FROM THE

23   VENDOR; RIGHT?

24        AND IT'S COMING INTO THE DISTRIBUTION CENTER

25   TO BE DISTRIBUTED OUT TO THE STORES; CORRECT?
```

```
 1              IS THAT, "YES"?
 2   A     YES.
 3   Q     ALL RIGHT.  SO HOME DEPOT HAS REQUESTED THAT THE
 4   VENDOR SHIP THAT PRODUCT FROM THE PLACE OF ORIGIN;
 5   ISN'T THAT RIGHT?
 6   A     CORRECT.
 7   Q     OKAY.  SO HOME DEPOT IS, IN EFFECT, ACTUALLY THE
 8   SHIPPER FROM THE TIME IT LEAVES THE MANUFACTURER OR
 9   VENDOR?
10             MR. PARRIS:  ARGUMENTATIVE.  THE WAY IT'S
11   PHRASED, IT'S ACTUALLY A LEGAL CONCLUSION.
12             THE COURT:  OVERRULED.
13             THE WITNESS:  I DON'T KNOW FOR CERTAIN.
14   BY MR. SMEDSTAD:
15   Q     OKAY.  WHETHER THEY'RE CALLED "STOCKING
16   DISTRIBUTION CENTERS" OR "RAPID DISTRIBUTION CENTERS,"
17   THEY'RE ALL DISTRIBUTION CENTERS; CORRECT?
18   A     THAT'S CORRECT.
19   Q     AND WHAT IS YOUR UNDERSTANDING OF WHAT THAT MEANS
20   IN TERMS OF WHERE THE STOCK IS -- WHAT IS SUPPOSED TO
21   HAPPEN TO THE INVENTORY THAT GETS TO THAT DISTRIBUTION
22   CENTER?
23   A     THAT IT IS DISTRIBUTED TO THEIR RETAIL STORES.
24   Q     AND THAT'S WHERE IT WAS INTENDED TO BE DONE?
25   A     YES.
```

```
 1              MR. SMEDSTAD:  ALL RIGHT.  THAT'S ALL I HAVE.
 2   THANK YOU.
 3              THE COURT:  MR. PARRIS?
 4              MR. PARRIS:  I WAS INFORMED I ASKED A QUESTION
 5   BADLY.  GO FIGURE.
 6              THE COURT:  ONLY ONE?
 7              MR. PARRIS:  ONLY IN FORM ONCE.  SO I WANT TO
 8   CLEAR IT UP.  I DID A DOUBLE NEGATIVE.
 9                         REDIRECT EXAMINATION
10   BY MR. PARRIS:
11   Q    ONCE IT GETS TO THE CENTER AND IT IS UNLOADED FROM
12   THE SHIPPING CONTAINER AND PUT INTO THE WAREHOUSE --
13   THAT IS, HOME DEPOT, THE INDIVIDUAL STORES OR THE MAIN
14   OFFICE -- YOU DON'T KNOW WHO, BUT SOMEBODY IN HOME
15   DEPOT PLACES AN ORDER FOR IT TO GO TO THE LOCAL STORE;
16   RIGHT?
17              MR. SMEDSTAD:  FOUNDATION.  COMPOUND.
18   BY MR. PARRIS:
19   Q    YOU MAY JUST NOT KNOW HOW IT'S DONE?
20              THE COURT:  DO YOU KNOW?
21              THE WITNESS:  WELL, YOU SAID THE "CENTER" AND
22   THE "WAREHOUSE," AND I'M NOT FAMILIAR WITH THESE TWO
23   TERMS.
24              MR. PARRIS:  THE DISTRIBUTION.
25              THE WITNESS:  THE DISTRIBUTION CENTER?
```

1          CAN YOU PHRASE IT ONE MORE TIME FOR ME?

2     BY MR. PARRIS:

3     Q    LET'S JUST USE TRACY AS AN EXAMPLE.

4          IT GOES TO THE TRACY FACILITY, RIGHT, THE

5     PRODUCT, WHATEVER THAT PRODUCT MIGHT BE.  IT'S

6     OFF-LOADED.  AND IT'S -- AT SOME POINT, IT'S DECIDED AS

7     TO WHAT STORE THAT PRODUCT SHOULD GO TO.  WHAT STORES,

8     MEANING IT'S DIVIDED UP AND PUT IN DIFFERENT TRUCKS.

9          ISN'T THAT RIGHT?

10    A    YES.

11    Q    AND THAT IS A DECISION THAT IS MADE BY THE ORDERING

12    PROCESS OF THE INDIVIDUAL STORES TO THE DISTRIBUTION

13    CENTER?

14         MR. SMEDSTAD:  FOUNDATION.

15         THE COURT:  DO YOU KNOW?

16         THE WITNESS:  I DON'T KNOW THAT THAT IS THE

17    PROCESS EXACTLY.  I DON'T KNOW WHEN THE ORDERS ARE

18    PLACED AT THE STORE, WHO DETERMINES WHEN OR WHAT.

19    BY MR. PARRIS:

20    Q    OKAY.  THAT'S GREAT.  THANK YOU.

21         THE COURT:  ANYTHING ELSE?

22         MR. SMEDSTAD:  NOTHING, YOUR HONOR.

23         THE COURT:  THANK YOU, SIR.  YOU ARE EXCUSED.

24         DO YOU HAVE ANOTHER WITNESS?

25         MR. HANSON:  ALL WE HAVE IS MR. ANTEMATE, AND

```
 1    WHICH THEY SAID HE WOULD BE HERE TOMORROW.

 2              THE COURT:  IS THAT ALL WE CAN GET DONE TODAY?

 3              MR. HANSON:  I SHOULD INFORM THE COURT THAT WE

 4    WILL READ IN PART OF MR. SOTO'S DEPOSITION CAUSE THERE

 5    WAS A QUESTION OF WHETHER HE WAS A ROAD DRIVER OR DID

 6    HOSTLER WORK.

 7              THE COURT:  WHY DON'T WE DO THAT OR JUST

 8    DESIGNATE IT.

 9              MR. HANSON:  WE DON'T HAVE IT DONE YET BECAUSE

10    IT JUST CAME UP TODAY.  SO WE WERE GOING TO DO -- TO

11    FIND THE SPECIFIC TESTIMONY AND DO IT QUICKLY TOMORROW.

12              THE COURT:  OKAY.

13              MR. PARRIS:  I WANT TO MOVE, IN CASE I

14    HAVEN'T, PLAINTIFF'S 12, PAGE 12.

15              THE COURT:  GOT THAT.

16              MR. PARRIS:  THAT'S IT.

17               ARE WE READY TO PLAY THE DEPOS?

18               WE HAVE SOME CLIPS WE WANTED TO PLAY FOR

19    YOU IN OUR CASE.

20              THE COURT:  I DON'T MIND.  THAT'S FINE.

21               INSTEAD OF HAVING OUR REPORTER TO REPORT

22    THEM, YOU NEED TO SUBMIT THEM TO US AS WELL.

23              MR. PARRIS:  YES, YOUR HONOR.

24              THE COURT:  OKAY.

25              MR. PARRIS:  THANK YOU.
```

1          MR. HANSON:  YOUR HONOR, IF THESE ARE CLIPS

2     FROM PEOPLE WHO HAVE JUST TESTIFIED, WE'LL OBJECT TO

3     THAT.  THEY COULD HAVE CROSS-EXAMINED THEM ON IT AND --

4          THE COURT:  THESE ARE ESTENSON PEOPLE, AREN'T

5     THEY?

6          MR. HANSON:  THEY ARE, BUT THEY AREN'T

7     NECESSARILY ADMISSIONS BY A PARTY OPPONENT.

8          MR. PARRIS:  THEY'RE A DEPO BY A PARTY

9     OPPONENT.

10          THE COURT:  ARE THEY 30(B)(6) DEPOS?

11          MR. PARRIS:  YES.

12          THE COURT:  PLAY THAT ONE THEN, AND THEN WE'LL

13     ARGUE ABOUT IT.

14          MS. SZETO:  YOUR HONOR, THERE'S A 30(B)(6)

15     THAT'S NOT VIDEO.  THAT WOULD BE A READING.

16               THERE'S ONE WITNESS WHO WAS ON THE

17     WITNESS LIST.  HE'S UNAVAILABLE, NOT WITHIN THE MILE

18     RESTRICTIONS.  SO WE WOULD LIKE TO PLAY THAT VIDEO,

19     MARK CONNACHER.

20          MR. HANSON:  HE WAS ON THE LIST.  THAT'S

21     CORRECT, YOUR HONOR.

22          THE COURT:  OKAY.  HE WAS ON WHAT LIST?

23          MR. HANSON:  HE WAS ON THE PLAINTIFF'S --

24          THE COURT:  YOU DON'T HAVE ANY OBJECTION TO

25     THEM PLAYING IT?

1        MR. HANSON:  NO OBJECTION, YOUR HONOR.

2        MR. PARRIS:  LET'S PLAY IT.

3        **(VIDEO PLAYED IN OPEN COURT)**

4        MR. HANSON:  YOUR HONOR, THEY HAD GIVEN US

5   DESIGNATED TESTIMONY; BUT THIS ISN'T FOLLOWING THEIR

6   DESIGNATED TESTIMONY.  IT'S KIND OF HIT OR MISS.  AND

7   THERE'S STUFF IN THERE THAT IS NOT DESIGNATED AS FAR AS

8   I CAN TELL IN TRYING TO FOLLOW THE TRANSCRIPT THAT THEY

9   GAVE US.

10        MS. SZETO:  EVERYTHING WAS DESIGNATED, YOUR

11   HONOR.  AND WE CAN DOUBLE CHECK.  I CAN GRAB THE

12   DEPOSITION TRANSCRIPTS.

13        THE COURT:  WELL, IS THERE SOME REASON THAT I

14   HAVE TO WATCH THE VIDEO, WHICH TAKES MUCH LONGER THAN

15   IF I JUST READ IT?

16        YOU CAN GET TOGETHER AND FIGURE OUT WHAT

17   REALLY IT IS THAT I'M SUPPOSED TO RELY ON.

18        MS. SZETO:  WE CAN, YOUR HONOR.  IT'S ACTUALLY

19   ALREADY IN WRITTEN FORMAT.  SO WE CAN JUST SUBMIT IT.

20   IT DOES HAVE PAGE AND LINE AND IN THE ORDER THAT WE'RE

21   TRYING TO PRESENT IT.

22        MR. HANSON:  THAT WOULD BE HELPFUL.

23        THE COURT:  WHY WE DON'T DO THAT THEN.

24        MS. SZETO:  CAN WE DO THAT FOR ALL OF

25   THE DEPOSITIONS THAT WE INTEND TO OFFER?

```
 1           THE COURT:  IT'S FINE WITH ME.  I DON'T WANT
 2   TO SIT HERE AND WATCH.
 3           OKAY.  THAT RESOLVES THAT.
 4           ANYTHING ELSE WE CAN ACCOMPLISH TODAY?
 5           MR. HANSON:  I DON'T BELIEVE FROM OUR END,
 6   YOUR HONOR.
 7           MR. PARRIS:  I WAS WONDERING WHAT YOUR PLANS
 8   WERE FOR TOMORROW AFTER THE LAST WITNESS TESTIFIES?
 9           ARE WE GOING TO ARGUE OR WOULD YOU LIKE
10   SUBMITTED WRITTEN ARGUMENT?
11           THE COURT:  WHAT I'M GOING TO DO IS, HAVE YOU
12   GET THE TRANSCRIPT TO MAKE WHATEVER OBJECTIONS YOU WANT
13   TO MAKE ABOUT THE ADMISSIBILITY OF THE EXHIBIT THAT WAS
14   AT ISSUE, TO TELL ME IF THERE'S SOMETHING ELSE YOU
15   WANTED TO DO.  I MADE A STATEMENT EARLIER ABOUT HAVING
16   TIME TO DO WHATEVER IT WAS YOU WANTED TO DO TO FIGURE
17   OUT SOMETHING ABOUT THIS EXHIBIT.
18           AND THEN I WANT YOU TO -- YOU CAN PROVIDE
19   IT BY WAY OF WRITTEN CLOSING ARGUMENT.  BUT I WANT YOU
20   BOTH TO DO PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
21   LAW IN GOOD FAITH WITH CITATIONS TO THE RECORD, SO THAT
22   I DON'T GET TWO SETS THAT HAVE EVERYTHING ON THE OTHER
23   SIDE CROSSED OUT, WHICH WAS LESS THAN USELESS.  SO
24   THAT'S MY THOUGHT.
25           SO, NO, I'M NOT EXPECTING YOU TO MAKE
```

1    CLOSING ARGUMENTS TOMORROW AFTERNOON.

2                MR. PARRIS:  THANK YOU.

3                THE COURT:  SO OTHER THAN MR. ANTEMATE, WHO --

4                MR. PARRIS:  I'M NOT PLANNING TO CALL ANYONE

5    ELSE.

6                THE COURT:  OKAY.  SOUNDS FINE.  WE'LL SEE YOU

7    AT 8:30.

8                MR. PARRIS:  YES.

9                MR. HANSON:  YES.  THANK YOU, YOUR HONOR.

10                    **(END OF PROCEEDINGS)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES          )
                               )
STATE OF CALIFORNIA            )

                I, ALEXANDER T. JOKO, FEDERAL OFFICIAL

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT

COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT

TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS

HELD IN THE ABOVE-ENTITLED MATTER, AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED

STATES.

DATE:  MAY 24, 2017


                       /S/ ALEXANDER T. JOKO
                     _____
                     ALEXANDER T. JOKO, CSR NO. 12272
                     FEDERAL OFFICIAL COURT REPORTER