Christopher C. McNatt, Jr. (SBN 174559)
cmcnatt@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, LLP
2 North Lake Avenue, Suite 560
Pasadena, CA 91101
Tel: (626) 795-4700
Fax: (626) 795-4790

James H. Hanson
jhanson@scopelitis.com
R. Jay Taylor, Jr.
jtaylor@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
Tel: (317) 637-1777
Fax: (317) 687-2414

Adam C. Smedstad (SBN 303591)
asmedstad@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
30 West Monroe Street, Suite 600
Chicago, IL 60603
Tel: (312) 255-7200
Fax: (312) 422-1224

Attorneys for Defendant,
Estenson Logistics, LLC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLODOALDO ANTEMATE, an individual, for himself and all members of the putative class,<br><br>      Plaintiff,<br><br>  vs.<br><br>ESTENSON LOGISTICS, LLC, a Nevada limited liability corporation; and DOES 1 through 100, inclusive,<br><br>      Defendants.<br>– | Case No. 2:14-cv-05255-DSF-RAO<br>The Honorable Dale S. Fischer<br><br>**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Trial Date: May 9 and 10, 2017<br>Time:   8:00 a.m.<br>Courtroom: 7D |

Defendant, Estenson Logistics, LLC ("Estenson"), respectfully submits the following Proposed Findings of Fact and Conclusions of Law pursuant to the Court's Order Sustaining Plaintiff's Objection to Trial Exhibit 586 and Overruling Plaintiff's Objections to Trial Exhibit 587 (ECF No. 234).

## PROPOSED FINDINGS OF FACT

### I.  Estenson is an Interstate Motor Carrier

1.     Estenson is a for-hire motor carrier operating in interstate commerce under the authority of the Federal Motor Carrier Safety Administration (the "FMCSA"), an agency under the jurisdiction of the Secretary of the U.S. Department of Transportation ("DOT").

2.     In California, Estenson provides dedicated contract carrier services, which consists of picking up products for its customers (such as The Home Depot), delivering the products to its customers (such as The Home Depot's rapid distribution center ("RDC") in Tracy, California), and then transporting the products from a customer's location to a final destination (like a Home Depot retail location). Tr., 94:1-5; 196:20-197:7.

3.     Estenson transports its customers' property for compensation. Tr., 94:1-5; 209:19-21.

4.     Estenson operates approximately 1200 trucks throughout the country. Tr., 204:2-6.

5.     Estenson owns most of those trucks. Tr., 204:7-11.

6.     Some of Estenson's drivers primarily transport freight from a customer's facility to a final destination on public highways in commercial motor vehicles (or "CMVs") with gross vehicle weight ratings ("GVWR") in excess of 26,000 pounds (these employees are known as "route drivers"). Tr. 94:18-22; 260:23-24.

7.     Some of Estenson's drivers mainly shuttle empty and loaded trailers

within the confines of or in the proximity of a distribution center. These employees are known as "yard hostlers." Tr. 18:15-17; 94:23-95:1; 197:3-7.

8.      The class certified by the Court includes 103 yard hostlers employed by Estenson in California since May 30, 2010.

9.      On February 4 and 5, 2016, pursuant to the Court's authorization, an administrator mailed notice of the case to the 103 yard hostlers identified as class members.  ECF No. 147.

10.      Plaintiff worked for Estenson at the Home Depot's Rapid Distribution Center ("RDC") in Tracy, California. Tr., 241:2-13.

11.      Plaintiff worked for Estenson from November 27, 2009 through May 31, 2013. Tr., 235:18-23.

## II.   Class Members Could be Called Upon to Drive Trucks Over the Road When Necessary

### A.   Estenson required yard hostlers to be qualified to operate CMVs in interstate commerce because they were called upon to do route driving work when needed.

12.      Estenson required all of its drivers, both route drivers and yard hostlers, to be qualified to operate CMVs under rules established by the U.S. Department of Transportation (the "DOT") and have a valid commercial driver's license ("CDL") so they could haul freight on the public highways when needed. Tr., 18:22-20:16; 94:11-95:1; 95:17-104:14; 204:17-23; Tr. 240:17-23; 260:6-8; Exhibit 590 p. 19; Exhibit 591.

13.      Estenson does not distinguish between route drivers and yard hostlers for purposes of compliance with DOT regulations applicable to interstate truck drivers. Tr., 95:25-96:4; 97:10-23; Exhibit 590.

14.      When Plaintiff applied to become a yard hostler in 2009, he presented Estenson with his CDL. Tr. 237:12-15; Exhibit 551 at EST000021. He maintained

his CDL throughout his employment with Estenson. Exhibit 551 at EST000020-21.

15.     Plaintiff had to keep his CDL with him at all times while employed as an Estenson yard hostler. Tr., 238:6-7.

16.     Plaintiff did not need his CDL to drive yard tractors within the Tracy RDC. Those vehicles are not licensed for highway use. Plaintiff only needed his CDL to drive commercial motor vehicles over public roads. Tr., 41:17-42:2; 236:16-19; 260:6-8.

17.     If a yard hostler or a route driver loses his or her CDL for any reason, the driver may not work until the driver's CDL is renewed or reinstated. If the CDL is not renewed or reinstated, the driver's employment will be terminated. Tr., 103:25-104:14.

18.     All Estenson drivers, including Yard Hostlers, are required to maintain medical authorization to drive pursuant to 49 C.F.R. § 391.43, including taking and passing a DOT physical examination, and possessing a valid DOT medical card. Tr., 100:10-101:15; Tr. 235:6-8; 235:18-223; Tr., 237:4-238:5; Exhibit 551 at EST000017, EST000019; Exhibit 590 p. 21; Exhibit 591.

19.     All Estenson drivers, including yard hostlers, must pass DOT-required alcohol and drug testing for purposes of compliance with 49 C.F.R. Parts 40 and 382, including pre-employment controlled substance testing and random tests once employed. Tr., 98:14-99:22; 237:16-19; Exhibit 591.

20.     Yard hostlers sometimes recorded drug tests on the trip sheets they prepared to record the work they performed. For example, Tracy RDC class member Rudy Salazar recorded that he underwent a "drug screen" between 1:35 p.m. and 3:00 p.m. on September 16, 2011 while working as a yard hostler (later that day, he was assigned to haul a load of freight from the Tracy RDC to a location in San Rafael, California). Exhibit 587 at EST043583, EST043584 (Defendant's Exhibit Volume 6).

21.   As part of the process of qualifying route drivers and yard hostlers, Estenson examines a prospective employee's background and driving records, known as an "MVR," or "motor vehicle record," as required by DOT regulations. Tr., 97:24-98:1; Tr., 103:16-24; Tr., 240:15-22; Exhibit 551, at EST000003-EST000016; Exhibit 590 p. 20; Exhibit 591.

22.   Estenson tracks the hours of service of route drivers and yard hostlers as required by the DOT's hours of service rules through Estenson's People Net timekeeping system. When yard hostlers are performing yard work, their hours are recorded when they swipe their employee card at a kiosk. When they drive trucks on public roads, their hours of service are recorded through the same on-board units used to track the hours of service of route drivers. Tr., 20:21-21:2; 42:7-44:20; 68:13-69:5; 214:10-242:2; Tr., 261:3-15; 265:11-266:4; Exhibit 591 ¶8.

23.   The People Net system will not let yard hostlers clock in for a work shift unless they have been off duty for at least 10 hours because the FMCSA requires drivers to have ten hours of off-duty time between work shifts. Tr., 241:18-242:2.

24.   Plaintiff understood that his hours of service were governed by the DOT's hours of service regulations when he worked as a yard hostler for Estenson. Tr., 239:9-12; Exhibit 554 at EST000120 (Driver Data Sheet form signed by Plaintiff specifying the number of hours he worked in the seven days prior to his date of hire to "ensure duty hours are available as required by FMCSA Hours of Service."); Exhibit 554 at EST000123 ("People Net Training and Installation Acknowledgment" form signed by Plaintiff stating: "During pre-trip, ensure your truck has a copy of the E-Logs manual and blank DOT log. If the truck does not have a People Net unit or the People Net unit is not functioning, then you must complete a DOT paper log and turn into dispatch."); Exhibit 554 at EST000124 ("Driver Safety Bonus Performance Program" form specifying the terms of the driver safety

bonus program Estenson offers to route drivers and yard hostlers. The form states that "[s]afety performance is measured in numerous ways," including "hours of service.").

**B.     Estenson advises yard hostlers that they may be called upon to transport freight over the road in CMVs.**

25.     The job description for the "Yard Jockey / Spotter Position" states that the "Duties and Responsibilities" of yard hostlers include "[o]ccasional local delivery." Ex. 556; Tr., 116:3-22; 146:13-147:1; 166:14-23.

26.     Estenson informs yard hostlers that they may be called upon to perform local deliveries. Tr., 56:6-15.

27.     Local deliveries are deliveries that can be made in a work shift so the driver does not have to be away from home over night. Tr., 56:16-17.

28.     Plaintiff understood that yard hostlers would be pulled from their yard hostling work to deliver freight. Tr., 261:16-22.

29.     Plaintiff signed several form documents during his employment that specifically referenced his expected performance of route driving work. Exhibit 554 at EST000124 ("Driver Safety Bonus Performance Program," stated that "[s]afety performance is measured in numerous ways," including "[c]itations for moving and non-moving violations."); Exhibit 554 at EST000127 ("Safe Following Distance Policy," advising drivers that it is there "responsibility to 'protect' other motorists on our highways."); Exhibit 554 at EST000129 ("Citation Policy and Acknowledgment Form," which warned drivers to "obey all traffic laws and regulations" when driving over the road because "you may be issued a citation for either equipment violations or not obeying traffic laws and regulations."); Exhibit 554 at EST000128 ("Notice Regarding Federal Ban on Use of Hand-Held Mobile Telephones," which explained that "'driving' means operating a CMV on a highway.").

30.     When Estenson hired Plaintiff, Estenson gave him a fuel card and told him to use it to fuel his truck when delivering freight over public highways, which Estenson told him yard hostlers were expected to do. Tr., 242:3-16; 244:3-7.

31.     Other yard hostlers sometimes used fuel cards of regular route drivers to fuel their trucks when driving over the road. For example, Tracy RDC class member Rudy Bernal noted on his trip sheet for October 26, 2013 that he "used the fuel card of Driver RODLE for fueling truck #2732" in connection with a trip that took him from the Tracy RDC to a Home Depot retail location in Bakersfield, California and back to the Tracy RDC. Exhibit 587, EST008377.

**C.     All yard hostlers are subject to receiving route driving assignments.**

32.     Estenson sometimes requires yard hostlers to perform route driving work and will pull them from their yard hostling work to deliver loads over public highways. Tr., 151:3-11; 244:10-16; 262:9-16; 278:17-279:10.

33.     When Estenson needs a yard hostler to perform route driving work, Estenson determines which yard hostlers may perform the work within the parameters of the DOT's hours of service limits and assigns road driving work to yard hostlers with sufficient hours of service to do the work. Tr., 20:17-21:5; 58:14-59:9; 71:3-22; Tr., 72:2-14; 262:9-263:1.

34.     Which yard hostlers may have sufficient hours of service to perform route driving varies day to day. Tr., 71:17-22.

35.     No yard hostlers are exempt from receiving road driving assignments. Tr., 20:17-21:5; 72:2-10; 206:25-207:3.

36.     Yard hostlers do not have discretion to decline route driving assignments. Tr., 58:19-59:2.

III.   **Yard Hostlers Transport Freight in Interstate Commerce Just Like Estenson's Route Drivers**

    A.   **Yard hostlers transport freight over public highways in the same CMVs used by Estenson's route drivers.**

    37.   When yard hostlers perform route driving work, they drive tractor-trailer units with gross vehicle weight ratings of 80,000 pounds, the same trucks regular route drivers operate. Tr., 260:9-19.

    38.   At some locations, yard hostlers drive CMVs over public roads not just when delivering freight to stores but to move loaded trailers to and from off-site staging areas as part of their daily yard hostling duties. 94:23-95:23.

    39.   Estenson is the registered owner or lessee of these vehicles. 204:9-11.

    B.   **Yard hostlers transport the same interstate freight as route drivers.**

    40.   When yard hostlers transport freight on public highways, they transport the same freight as regular route drivers. Tr., 209:14-18.

    41.   Freight shipped by Estenson's customers to their distribution centers in California comes from all over the world, including products coming through California's seaports, over rail lines, and on trucks. Tr., 10:23-11:3; 12:15-13:17; 201:10-202:1; 255:6-256:14; 257:9-259:21.

    42.   For example, Estenson picks up water heaters manufactured in Mexico and transports them to distribution centers in California to be delivered to retail locations around the state and sometimes in Nevada. Tr., 201:10-202:1; 210:22-211:6.

    43.   Other freight is shipped to Estenson's customers' locations in shipping containers. For example, Estenson's Home Depot locations receive shipping containers from locations overseas and throughout the United States full of a wide variety of items found in Home Depot stores. Tr., 13:12-17; 255:21-268:16.

    44.   Shipping containers arriving at the Tracy RDC through a seaport

primarily contained products coming from China. Tr., 237:12-14.

45.   Shipping containers arriving at the Tracy RDC that had been shipped to California by rail mostly came from the east coast. Tr., 258:6-16.

46.   Estenson also brings freight to the Tracy RDC from Nevada. Tr. 10:23-11:3.

47.   The Home Depot facility in Lathrop, California, where Plaintiff was assigned before working at the Tracy RDC, received the same kinds of freight. Tr., 259:13-21.

48.   Freight shipped to the Lathrop location comes from the Port of Oakland seaport. Tr., 6:9-11.

49.   Estenson's customers ship their freight to distribution centers with the understanding that the freight will be promptly transported to a final destination outside the distribution center such as a customer's retail location. Tr., 125:24-126:6; 211:12-15; 217:19-218:3; 218:21-219:25.

50.   Freight is shipped through a distribution center with the expectation that it will remain in the distribution center only long enough to be unloaded and then repackaged for rapid distribution to retail locations. Tr. 217:19-218:3.

51.   When a trailer full of products is brought to a distribution center, Estenson's customers unload the products and consolidate them with products from numerous other incoming shipments for prompt distribution to retail locations. Tr., 13:18-17:8; 201:21-202:1; 202:17-203:2; 245:25-249:10; 254:1-255:5.

52.   Given the way products are unloaded from one trailer and consolidated with other incoming products, it is expected that items shipped to a distribution center on a single trailer will be transported to many different stores on many different trailers. Tr., 16:10-17:2.

53.   Freight is typically processed through a distribution center and on to its final destination within three days. Tr., 17:20-22.

54.     Aside from being unloaded from one trailer and being consolidated on another trailer with other items, freight shipped to a distribution center is not modified in any way at the distribution center. Tr., 68:8-12; 170:16-171:3 207:21-208:2; 208:8-209:1.

55.     Estenson's customers track the movement of their freight. Tr., 209:2-11; 212:23-213:17.

56.     Estenson's customers direct Estenson where to transport the freight from the distribution center to the final destination. Tr., 209:12-13; 212:23-213:4.

57.     Estenson's customers pay for the cost of transporting their freight. Tr., 208:19-21; 212:23-213:4.

**C.     The trip sheets in Exhibit 587 show that class members performed route driving work as expected.**

58.     Trip sheets are forms that all route drivers and yard hostlers fill out to show their activity during a work shift. Tr., 21:12-14; 22:5-7; 73:19-22; 205:4-6.

59.     Exhibit 587 consists of seven three-ring binders (Volumes 2-9 of Defendant's Trial Exhibits) containing a total of 6693 trip sheets, each of which was prepared by a class member identified on Trial Exhibit 1.

60.     The trip sheets in Exhibit 587 show work performed by class members between January 3, 2011, the date of the oldest trip sheet in Exhibit 587, through October 25, 2015, the date of the most recent trip sheet in Exhibit 587.

61.     The trip sheets in Exhibit 587 are arranged alphabetically by the location of the customer the class member serviced. The trip sheets of class members are distributed within Exhibit 587 as follows (Defendant's Binder 1 contained all of Estenson's Exhibits except 587):

| Defendant's Exhibit Volume No. | Class Member Location(s) |
|---|---|
| 2 | Clorox Fairfield, Clorox Los Angeles, Dreyers Southern California; The Home Depot La Mirada |
| 3 | The Home Depot La Mirada; The Home Depot Lathrop; The Home Depot Mira Loma; The Home Depot Ontario |
| 4 | The Home Depot Ontario; The Home Depot Redlands; The Home Depot Tracy |
| 5 | The Home Depot Tracy |
| 6 | The Home Depot Tracy |
| 7 | The Home Depot Tracy |
| 8 | The Home Depot Tracy; Weyerhauser Long Beach |

62.    Exhibit 587 contains trip sheets prepared by class members showing route driving work. Examples of trip sheets from Exhibit 587 showing road driving by class members are attached as Exhibit A. The trip sheets contained in Exhibit A are identified in tables attached to the front of the exhibit showing the name of the class member who prepared the trip sheets, the location where the class member worked, and the Bates No. listed on the trip sheet.

63.    If a trip sheet shows an origin or destination outside of the location at which a route driver or yard hostler works, that means the route driver or yard hostler performed road driving work transporting freight between the origin and destination shown on the trip sheet. Tr., 22:8-15; 30:19-36:25.

64.    Sometimes, a yard hostler will fill out more than one trip sheet on days the yard hostler performs both yard hostling work and route driving work. Tr., 77:19-81:5

65.    For example, the first trip sheet in Exhibit 587, Bates No. EST009446,

is a trip sheet prepared by Clorox Fairfield class member Cary Pellerin on August 7, 2017. That trip sheet states "yard" at the top and contains a single location in the "Origin/Destination" section. However, as the check mark in the trip sheet's "Multiple Sheets This Day" section indicates, Mr. Pellerin prepared more than one trip sheet on that date. The other trip sheet Mr. Pellerin prepared for August 7, 2014 is the seventh trip sheet in Exhibit 587, Bates No. EST056239, and shows several different locations in the "Origin/Destination" section, showing Mr. Pellerin performed both yard work and road driving that day.

66.   Some trip sheets have a section titled "Page #" instead of "Multiple Sheets This Day" to indicate that a class member prepared more than one trip sheet during a work shift. For example, Tracy RDC class member Jesse Domier prepared two trip sheets on April 6, 2015, identified by Bates Nos. EST028185 and EST028186 in Exhibit 587. The first trip sheet, EST028185, shows yard hostler work by Mr. Domier on April 6, 2015. On the second trip sheet, EST028186, Mr. Domier stated that he drove a CMV over public roads on the same day.

## PROPOSED CONCLUSIONS OF LAW

For the reasons set out in greater detail below, the Court concludes that Plaintiff and class members were exempt from California's overtime requirements. California law does not require overtime for employees whose hours of service are regulated by the DOT's hours of service rules. *IWC Wage Order No. 9-2001* ("Wage Order No. 9"), § 3(L). As the Court has noted, the exempt status of class members does not turn on the volume or frequency of interstate driving, but on whether class members "could 'reasonably have been expected' to" haul freight over the road in interstate commerce. *See Order Denying Defendant Estenson Logistics' Motion to Decertify Classes* (ECF No. 155) (citing *Morris v. McComb*, 332 U.S. 422, 433 (1947) and quoting *Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1157 (9th Cir. 1994)).

The uncontradicted evidence at trial established that Estenson expected Plaintiff and class members to take interstate driving assignments when needed. Estenson explicitly advised class members that they could be called on to drive trucks on public highways when necessary. This is why all class members were required to be qualified to drive commercial motor vehicles on public roads under DOT regulations just like regular route drivers. Because yard hostlers were expected to take interstate driving assignments when needed, they were subject to the DOT's hours of service rules and exempt from the payment of overtime under California law.

## I.   CMV Drivers Are Exempt From California's Overtime Requirements

1.   California law does not require overtime for employees whose hours of service are regulated by (1) federal DOT regulations governing the hours of service of drivers, 49 C.F.R. §§ 395.1 to 395.13 (the "federal hours of service regulations"); or (2) California regulations governing the hours of drivers, Cal. Code Regs. tit. 13 § 1200 et seq. (the "California intrastate hours of service regulations") (the federal

and California hours of service regulations are collectively referred to herein as the "Hours of Service Regulations"). *IWC Wage Order No. 9-2001* ("Wage Order No. 9"), § 3(L).

## II.   The DOT Hours of Service Regulations Applied to Yard Hostler Class Members Engaged (or Reasonably Expected to be Engaged) in Interstate Commerce

2.     Whether drivers engaged (or reasonably expected to be engaged) in interstate commerce are exempt from the payment of overtime under California law is determined under the same standards that govern application of the motor carrier overtime exemption under the Fair Labor Standards Act ("FLSA"). *See Collins v. Overnite Transp.*, 129 Cal. Rptr. 2d 254, 256 (Cal. Ct. App. 2003) (describing California motor carrier exemption as being "based on" federal motor carrier regulations and "parallel" California regulations); *Monzon v. Schafer Ambulance Serv., Inc.*, 273 Cal.Rptr. 615, 623 (Cal. Ct. App. 1990) ("Federal decisions have provided reliable authority to California courts in the interpretation of state labor law provisions which have language that differs from, but parallels that of the federal statutes.").

3.     "Those motor carrier employees, whose hours of service are regulated by [the federal] safety standards, have always been exempted from the coverage of the federal" FLSA. *Collins*, 129 Cal. Rptr. 2d at 256.

4.     The federal hours of service regulations "form part of the Federal Motor Vehicle Safety Standards (49 C.F.R. § 371 et seq. (2001)) and establish a unique regulatory scheme . . . designed to balance safety considerations against the demands of the trucking industry." *Id.*

5.     The federal hours of service regulations apply to all "drivers" of "commercial motor vehicles" (or CMVs) for "motor carriers" in interstate commerce, including "drivers" who *primarily* perform duties as yard hostlers. 49

C.F.R. §§ 390.5, 395.1.

### A. Class members were "drivers" of "commercial motor vehicles."

6. A "driver" is "any person who operates any commercial motor vehicle." 49 C.F.R. § 395.1.

7. A "[CMV]" is "any self-propelled or towed motor vehicle [including a semitrailer] used on a highway in interstate commerce to transport passengers or property" and that has a "gross vehicle weight rating or gross vehicle weight or gross combination weight" of 10,001 pounds or more. 49 C.F.R. § 390.5.

8. Plaintiff and class members are "drivers" within the meaning of 49 C.F.R. § 395.1 because they operate CMVs with gross vehicle weight ratings or gross vehicle weights of 10,001 pounds or more on highways in interstate commerce to transport property.

9. The fact class members were referred to as "yard hostlers" does not mean they were not "drivers" within the meaning of the relevant statutes. "Neither the name given to an employee's position nor that given to the work he does is controlling; instead, it is the character of the activities involved in the performance of the job that controls." *Wells v. A.D. Transport Express, Inc.*, No. 15-cv-11324, 2016 WL 3213396, *3 (E.D. Mich. June 10, 2016); *see also* 29 C.F.R. § 782.2(b)(2).

10. The critical inquiry is the nature of class members' job duties, not their job title. If an employee could be called on to drive a CMV in interstate commerce, the employee falls within the scope of the exemption, regardless of job description. *See*, *e.g.*, *Badgett v. Rent-Way, Inc.*, 350 F. Supp. 2d 642, 656-57 (W.D. Pa. 2004) (account representatives exempt where duties involved delivering merchandise); *J.H. Rose Truck Line, Inc. v. Ross*, 442 S.W.2d 483, 486-87 (Tex. Civ. App. 1969) (welder exempt); *Walling v. Silver Fleet Motor Exp.*, 67 F. Supp. 846, 853 (W.D. Ky. 1946).

11. The United States Department of Labor (the federal agency tasked with

interpreting the scope of the exemption under the FLSA) has acknowledged and agrees that a yard hostler who drives trucks in and about the premises of a terminal or other private property *may* qualify for the exemption if there is a reasonable expectation that the hostler may *also* perform other safety-affecting activities (e.g., driving in interstate commerce). *See* 29 C.F.R. § 782.3(b) ("It has been held that so-called 'hostlers' who 'spot' trucks and trailers at a terminal dock for loading and unloading are not exempt as drivers merely because as an incident of such duties they drive the trucks and tractors in and about the premises of the trucking terminal").

12.     The exemption applies to employees cast with the title of yard "hostler" or "jockey" when there is a reasonable expectation that the employee may also perform other safety-affecting activities like driving on public highways. *See Order Denying Defendant's Motion for Summary Judgment* (Sept. 23, 2015) (ECF No. 83) (the "Order on Summary Judgment"), *slip op.* at *4 (noting the court deemed hostlers "exempt because a substantial part of their activity affected the safety of goods in interstate commerce" in *Wilson v. Notheis, Inc.*, No. 1:98CV2495CAM, 1999 WL 1142531, at *3 (N.D. Ga. Nov. 16, 1999) (finding the exemption applied to individuals who primarily performed activities on private property as yard hostlers when (1) the yard hostlers sometimes drove the hostler tractors on public roads for a short distance, and (2) the motor carrier at issue also employed over-the-road drivers)); *see also, e.g.*, *Roberts v. Cowan Distr. Sys., LLC*, 58 F. Supp. 3d 593, 599 (E.D. Va. 2014) (finding exemption applies to yard jockeys when they have a "reasonable expectation to be called upon to drive in interstate commerce"); *cf. Walling*, 67 F. Supp. at 853 (finding yard drivers "perform work which directly affects the safety of operation and are exempt from the provisions of the Wage and Hour Law").

**B.      Class members drove CMVs for a "motor carrier."**

13.     A motor carrier is "a for-hire motor carrier or a private motor carrier." 49 C.F.R. § 390.5.

14.     A "for-hire motor carrier" is "a person [including "any individual, partnership, association, corporation, business trust, or any other organized group of individuals"] engaged in the transportation of goods or passengers for compensation." *Id.*

15.     Estenson is a "motor carrier" within the meaning of 49 C.F.R. § 395.1 because it is "a person [including "any individual, partnership, association, corporation, business trust, or any other organized group of individuals"] engaged in the transportation of goods or passengers for compensation."

**C.      Route driving is interstate commerce.**

16.     Interstate commerce consists of transportation "(1) between a place in a State and a place outside of such State (including a place outside of the United States); (2) between two places in a State through another State or a place outside of the United States; or (3) between two places in a State as part of trade, traffic, or transportation originating or terminating outside the State or the United States." 49 C.F.R. § 390.5; *see also* 49 U.S.C. § 13501(1).

17.     Route drivers and yard hostlers therefore drove in interstate commerce whenever they transported freight from California to another state, from another state to California, between two points in California on a route that went through another state, or between two points in California where the freight had been shipped to California from outside the state to be delivered to a final destination in California or in another state.

18.     Drivers are therefore "exempt if they reasonably expect to drive across state lines, or if they move goods that are in the stream of interstate commerce, regardless of whether they personally drive across state lines." *Order on Summary*

*Judgment* at \*4 (citing *Watkins v. Ameripride Servs.*, 375 F.3d 821 (9th Cir. 2004) (tacitly acknowledging the importance of considering the totality of the facts and circumstances surrounding a shipment for purposes of determining its interstate nature, as well as the applicability of the exemption to *in*-state moves when the freight is in the stream of interstate commerce) and *Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1156 (9th Cir. 1994)); *see also Deherrera v. Decker Truck Line, Inc.*, 830 F.3d 1147, 1160 (10th Cir. 2016); *Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895, 898 (7th Cir. 2009); *Bell v. Superior Court*, 158 Cal. App. 4th 147, 69 Cal. Rptr. 3d 328, 334 (2007) ("[I]f goods originate out of state and their intrastate transport is simply part of a lengthier interstate journey, the intrastate delivery is considered part of interstate commerce").

19.    When a shipper transports products across state lines for sale to customers in the destination state, the products undergo no alteration during the journey, and interruptions in the journey that occur in the destination state are no more than the normal stops or stages that are common in interstate sales, such as temporary warehousing, the entire journey should be regarded as having taken place in interstate commerce. *Heritage Wine*, 589 F.3d at 898.

20.    "The fact that in the course of its journey," freight shipped from another state is "unloaded from one carrier and loaded onto another would be as inconsequential as the fact that en route to the store the truck had stopped for a red light." *Id.* at 897.

21.    That an in-state shipment is part of a continuous movement of interstate freight may also be established by "the practical realities of the business at hand and the character of the materials" being shipped. *Deherrera*, 820 F.3d at 1159.

22.    The shipment of products for which there is no existing order does not terminate in a warehouse but continues to a final destination where the shipper intended the product to remain in the warehouse only as long as it took to find a

customer. *Heritage Wine*, 589 F.3d at 899; *see also Deherrera*, 830 F.3d at 159-60.

23.    In-state shipments of freight by yard hostlers from distribution centers to final destinations were part of a continuous movement of interstate freight because Estenson's customers transport that freight into California for sale to customers in the state, and the freight is not altered during the journey but merely pauses briefly in a distribution center for more efficient delivery to the ultimate destination.

**D.**    **Because class members had a reasonable expectation that they would be called upon to transport freight, class members were exempt from overtime even if they did not engage in interstate commerce every day, or even at all.**

24.    As this Court has explained, "the exemption can apply even when an employee has only 'minor involvement in interstate commerce as a regular part of [his] duties,'" so long as "trips in interstate commerce were part of the company's normal business operations, were distributed throughout the year, were shared indiscriminately by drivers, and were mingled with other services in interstate commerce." *Order Denying Defendant Estenson Logistics' Motion to Decertify Classes* (April 4, 2016) (ECF No. 155) (the "Order on Decertification"), *slip op.* at *2 (quoting *Reich*, 33 F.3d at 1155 and citing *Morris v. McComb*, 332 U.S. 422, 433 (1947) (finding the exemption applied when interstate trips constituted 4% of employee drivers' duties)); *see also Alexander v. Tutle & Tutle Trucking, Inc.*, 834 F.3d 866, 871 (8th Cir. 2016) (drivers exempt from overtime even though, as a group, they drove in interstate commerce on fewer than 1% of the days in question); *Resch v. Krapf's Coaches, Inc.*, 785 F.3d 869, 875 (3d Cir. 2015) (interstate operations accounting for 1% to 9.7% of revenue sufficient).

25.    Any class member who "could 'reasonably have been expected' to make interstate trips" as a result of their membership in a pertinent pool of drivers was exempt, even "those who have not driven in interstate commerce" at all. *Order*

*on Decertification*, *slip op.* at *2 (citing *Morris*, 332 U.S. at 433 and quoting *Reich*, 33 F.3d at 1157); *see also Resch*, 785 F.3d at 873-74 (indicating the "DOT has jurisdiction 'even if the driver has not personally driven in interstate commerce if, because of company policy and activity, the driver could reasonably be expected to do interstate driving'" (quoting *Application of the Federal Motor Carrier Safety Regulations* ("1981 DOT Guidance"), 46 FR 37902-02, 37903, 1981 WL 115508 (Jul. 23, 1981) ("If jurisdiction is claimed over a driver who has not driven in interstate commerce, evidence must be submitted that the carrier has engaged in interstate commerce and that the driver could reasonably have been expected to make one of the carrier's interstate runs.")).

26.    A driver's membership in a pertinent pool of drivers subject to interstate driving assignments does not require proof that driving assignments were evenly or proportionally distributed to drivers within the *pertinent* pool to be deemed "indiscriminately assigned." *See Order on Decertification*, *slip op.* at *2 (acknowledging interstate "trips need not be evenly distributed or . . . made by everyone" for the exemption to apply (citing *Morris*, 332 U.S. at 433-34 (concluding drivers were exempt from overtime even though the interstate trips "were not distributed equally to each driver"))); *see also Brennan*, 540 F.2d at 1204-05 (applying the exemption despite the small number of interstate loads and the unequal distribution of the interstate loads); *Griffin v. Consolidated Foods Corp.*, 771 F.2d 826, 829 (4th Cir. 1985) (employee was exempt even though she never received one of the available out of state trips); 29 C.F.R. § 782.2(c)(1) (providing that a class of employees may be "exempt even though the interstate driving of particular employees was sporadic and occasional, and in practice some drivers would not be called upon for long periods to perform any such work").

27.    To the contrary, "[i]ndiscriminate assignment simply requires that at any time," the carrier "could have assigned an interstate route to" a driver in the

pertinent pool. *See Roberts*, 58 F. Supp. 3d at 611; *see also Order on Decertification, slip op.* at *2.

28.     When a motor carrier has the "ability to change a driver's assignment at any time," it demonstrates, "at a minimum" that the carrier "could have assigned [the driver] an interstate route at any point." *Roberts*, 58 F. Supp. 3d at 613.

29.     "[E]ven if only a few of the drivers actually have interstate trips assigned, the possibility that any one driver could get an interstate trip controls." *Roberts*, 58 F. Supp. 3d at 611–12; *see also*, *Order on Decertification, slip op.* at *2.

30.     Estensen indiscriminately assigned interstate driving activities to class members because Estenson could have assigned an interstate route to any member of the pool of yard hostlers at any time. *Roberts*, 58 F.Supp.3d at 610-613. As Plaintiff explained, yard hostlers as a group could be called upon at random at any time to make deliveries to stores, Tr., 261:19-22; 262:14-23.

31.     The Court concludes that all class members were reasonably expected to be called upon to transport freight on public roads in CMVs because, among other things:

        a.     Estenson indiscriminately assigned interstate driving activities to class members;

        b.     Estenson treated class members the same as road drivers with respect to federal regulations applicable to over-the-road truck drivers;

        c.     Estenson informed class members that they might be called upon to drive over the road; and

        d.     Class members were in fact called upon to transport freight over the road in CMVs.

32.     Thus, all class members were covered by the federal DOT hours of service rules and were therefore exempt from the payment of overtime under

California law.

## III.   Even if the DOT Hours of Service Rules Did Not Apply, Class Members Would Still Be Exempt Because California's Hours of Service Regulations Apply to Intrastate Driving

33.   California regulates the hours of service of "all intrastate motor carriers and drivers." Cal. Code Regs. tit. 13 § 1212(a).

34.   Cal. Code Regs. tit. 13, § 1212.5 states that "no motor carrier shall permit or require any driver used by it to drive nor shall any driver drive" in excess of the hours specified in the regulation.

35.   A "motor carrier" is "the registered owner, lessee, . . . of any vehicle who operates or directs the operation of any such vehicle on either a for-hire or not-for-hire basis." Cal. Code Regs. tit. 13 § 1201(r).

36.   Estenson is a motor carrier within the meaning of Cal. Code Regs. tit. 13, § 1212.5 because it is the registered owner or lessee, of vehicle and operates and directs the operation of those vehicles on a for-hire basis.

37.   A "driver" is "any person . . . who drives any motor vehicle subject to" the California intrastate hours of service regulations "and any person, whether driving for compensation or not, who is under the direct control of and drives for a motor carrier." Cal. Code Regs. tit. 13 § 1201(i).

38.   The California intrastate hours of service regulations apply to drivers operating vehicles listed in Cal. Vehicle Code § 34500, including (in relevant part): (a) motortrucks of three or more axles with a GVWR of more than 10,000 pounds; (b) truck tractors; (c) trailers and semitrailers when used in combination with other qualifying vehicles; (d) a combination of a motortruck and a qualifying vehicle if the combination exceeds 40 feet; (e) a CMV with a GVWR of 26,001 or more pounds; or (f) a CMV of any GVWR towing a qualifying vehicle with a GVWR of more than 10,000 pounds.

39.     Plaintiff and class members were drivers under Cal. Code Regs. tit. 13 § 1201(i) because they drove motor vehicles subject to the California intrastate hours of service regulations.

40.     California's intrastate hours of service rules do not apply to "[m]otor carriers and drivers engaged in interstate commerce," who must "comply with the federal" hours of service regulation. Cal. Code Regs. tit. 13 § 1212.5(b).

41.     Class members were subject to the federal DOT hours of service regulations for the reasons discussed above.

42.     Even if they were not, they would still be exempt from overtime because they would have been subject to the California intrastate hours of service regulations when they drove over the road in intrastate commerce.

43.     All class members were either subject to the federal hours of service regulations or the California intrastate hours of service regulations, and were therefore exempt from the payment of overtime under California law.


Dated:  August 28, 2017                              Respectfully submitted,


                                                     _/s/ James H. Hanson_____
                                                     James H. Hanson

                                                     Attorney for Defendant,
                                                     Estenson Logistics, LLC


4839-3023-8028, v. 9