UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLODOALDO ANTEMATE, an individual, for himself and all members of the putative class, and on behalf of aggrieved employees pursuant to the Private Attorneys General Act ("PAGA"),<br><br>    Plaintiff,<br><br>  v.<br><br>ESTENSON LOGISTICS, LLC, a Nevada limited liability; and DOES 1 through 100, inclusive,<br><br>    Defendants. | Case No. CV 14-5255 DSF (RAOx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

    Defendant's affirmative defense to its alleged failure to pay weekly overtime compensation to the class of employees came on for trial before the Court sitting without a jury on May 9-10, 2017. The Court, having heard live testimony and having duly considered the evidence, the credibility of the witnesses, and the contentions and

arguments of counsel, makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.[1]

## FINDINGS OF FACT

1. Estenson Logistics, LLC (Estenson) provides logistic transportation services for its customers (such as Home Depot), transporting merchandize from vendors to customers' distribution centers, and from the distribution centers on to customers' retail stores. Tr. 94:1-5, 196:20-197:2.

2. Estenson employs both "route drivers" and "yard hostlers." Tr. 18:5-17, 94:18-95:1, 197:3-7.

3. Route drivers primarily transport freight from a customer's facility to a final destination. Tr. 94:18-22. During the relevant time period, route drivers were paid based on activity. Tr. 108:10-13.

4. Yard hostlers primarily shuttle empty and loaded trailers within the confines of a distribution center. Tr. 18:15-17, 94:23-95:1, 197:3-7. Yard hostlers are paid by the hour. Tr. 106:8-11.

5. The certified class includes 103 yard hostlers employed by Estenson in California from May 30, 2010 through the present. See June 15, 2015 Order (Dkt. 72).

6. Plaintiff Clodoaldo Antemate worked as a yard hostler for Estenson from November 27, 2009 through May 31, 2013, primarily at Estenson's Home Depot Rapid Deployment Center (RDC) in Tracy, California (the Tracy RDC). Tr. 235:18-23, 241:6-15.

---

[1] The Court has adopted certain findings of fact and conclusions of law from the proposed findings and conclusions of both parties. Any different or additional proposed findings or conclusions were either unsupported or unnecessary to the Court's determination. The Court declines to consider the unauthorized responses or the unauthorized exhibits.

## I. The Nature of Estenson's Business

7. The merchandise that customers ship to Estenson's California distribution centers comes from all over the world, arriving through California's seaports, rail lines, and highways. Tr. 10:23-11:3; 12:15-13:17, 201:10-202:1, 255:6-256:14; 257:9-259:21.

8. Shipping containers arriving at the Tracy RDC from a seaport primarily contain products coming from China. Tr. 257:12-258:12. Shipping containers arriving at the Tracy RDC by rail mostly contain merchandise from the east coast of the United States. Tr. 258:6-16. Estenson also transports freight from Nevada to the Tracy RDC. Tr. 10:23-11:3.

9. Estenson's customers ship their merchandise to Estenson's distribution centers with the understanding that the merchandise will be transported to a final destination outside the distribution center, such as a customer's retail location. Tr. 125:24-126:6, 217:19-218:3, 218:21-219:25.

10. When a trailer full of products is brought to a distribution center, Estenson's customers unload the products and consolidate them with products from other incoming shipments for distribution to retail locations.[2] Tr. 13:18-17:8, 201:21-202:1, 202:17-203:2. Items shipped to a distribution center on a single trailer will be transported to many different stores on many different trailers. Tr. 16:10-17:2.

11. Merchandise remains in the Tracy RDC for processing for approximately three days before being sent to its final destination. Tr. 17:20-22.

---

[2] Freight shipped to Estenson's distribution centers is unloaded from one trailer and consolidated with other items on another trailer, but is not modified in any way. Tr. 68:8-12, 170:7-171:3, 208:8-209:1.

## II. Estenson Represents to Yard Hostlers That They Are Classified as Non-exempt Employees Entitled to Overtime Pay

12. The offer letter Estenson issues to each yard hostler at the time of hiring states that "[t]his position is classified as a non-exempt position; therefore, it is eligible for overtime." Tr. 268:14-269:4; Ex. 9.

13. Estenson tells yard hostlers that they are non-exempt. Tr. 66:21-22.

14. Estenson's employee manual states: "The non-exempt status of our drivers is intended to be an additional benefit to the total rewards package offered through employment with [Estenson]." Tr. 135:2-7; Ex. 590 at 31. It further states that "[n]on-exempt employees . . . are paid an overtime rate based on the state location." Tr. 136:2-7; Ex. 590 at 23.

15. Estenson pays its yard hostlers <u>daily</u> overtime for hours they work over eight hours each day. Tr. 106:16-21.

16. Estenson does <u>not</u> pay its yard hostlers <u>weekly</u> overtime for hours they work over forty hours each week. Tr. 144:7-145:2.

17. Plaintiff understood the yard hostler position to be non-exempt and that he would be entitled to overtime compensation. Tr. at 266:14-23, 267:20-21; Ex. 9.

## III. Estenson Advises Yard Hostlers They May be Asked to Drive on the Road

18. The job description for the "Yard Jockey / Spotter Position" states that the "Duties and Responsibilities" of yard hostlers include "[o]ccasional local delivery." Tr. 116:3-22, 146:13-147:1, 166:14-23; Ex. 556.

19. Estenson informs yard hostlers that they may be called on to perform local deliveries, which include driving on highways. Tr. 56:6-15, Tr. 58:4-18.

20. Local deliveries are deliveries that can be completed in one work shift so that the driver does not have to be away from home overnight. Tr. 56:16-17.

21. Plaintiff understood that yard hostlers could be pulled from their yard hostling work to perform local deliveries. Tr. 261:16-22. Plaintiff also signed several form documents during his employment that reference route driving work. See Ex. 554.

22. When Estenson hired Plaintiff, Estenson gave him a fuel card to fill up the truck he was using to bring trailers into the Tracy yard facility. Tr. 242:3-16. Estenson told Plaintiff to keep the fuel card because there were instances when yard hostlers needed to do "emergency runs." Tr. 244:3-7.

**IV. Estenson Requires Yard Hostlers to have Valid Commercial Driving Licenses and be Qualified Under DOT Rules to Drive on Public Roads**

23. The trucks that Estenson's yard hostlers use in the distribution center, called "yard goats," are not licensed for highway use. Tr. 41:20-23.

24. Nevertheless, Estenson requires that its yard hostlers hold a valid commercial driver's license (CDL) because yard hostlers may in certain circumstances be asked to take tractor-trailers on the highway, and CDLs are required for that activity. Tr. 18:18-21, 19:6-11 20:10-11.

25. For example, yard hostlers may be asked to take tractor-trailers on the highway for a "backhaul," which involves driving an empty trailer from the distribution center to a vendor, exchanging the empty trailer for a loaded trailer, and driving the loaded trailer back to the distribution center. Tr. 19:10-20:3. Yard hostlers also may be asked to step in for route drivers if, for example, a route driver is ill, and yard hostlers may be asked to drive a route if Home Depot requests a "hot shipment to a store." Tr. 20:3-9.

26. If a yard hostler or a route driver loses his or her CDL for any reason, the employee may not work at Estenson until the CDL is renewed or replaced; if the yard hostler or route driver is unable to renew or replace his or her CDL, the employee will no longer have a job with Estenson. Tr. 104:3-14; Ex. 590.

27. Estenson also requires both route drivers and yard hostlers to be qualified—meaning that they have passed background checks, drug tests, and physical and medical examinations—under rules established by the Department of Transportation (DOT). Tr. 94:11-13, 97:10-103:121, 204:17-23, 260:6-8. Estenson does not distinguish between route drivers and yard hostlers for purposes of compliance with DOT regulations. Tr. 95:25-96:4; 97:10-23; Ex. 590.

**V. Yard Hostlers May Only Drive on Highways if, Under the DOT's Rules, Their Hours of Service Allow**

28. Route drivers are required to take ten hours off between road driving shifts, pursuant to rules promulgated by the DOT. Tr. at 42:11-22. Yard hostlers are not required to take ten hours off in between yard goat driving shifts within the distribution center; however, if a yard hostler drives a tractor-trailer on the road, the yard hostler is required to have taken ten hours off before doing so. Tr. 75:15-17, 76:5-8.

29. Estenson tracks its drivers' service hours through the company's People Net timekeeping system, a log-in computer installed in Estenson's tractor-trailers. Tr. 69:3-5. When yard hostlers are performing yard work, their hours are recorded by swiping their employee cards at a kiosk. Tr. 42:7-44:20. When yard hostlers drive on public roads, they must log into the tractor-trailers' People Net system, which imports the yard hostlers' hours from their employee card kiosk swipes. Tr. 68:13-69:5, 261:3-15; 265:11-266:4.

30. When Estenson needs a yard hostler to perform route driving work, Estenson can assign the drive to a yard hostler whose service hours on that particular day allow the yard hostler to drive on the highway, i.e., if there has been at least ten hours since the yard hostler's last shift ended. Tr. 20:17-21:5, 58:14-59:9; 71:3-22.

31. The People Net system will not let a yard hostler, or any driver, clock in for a road driving shift unless the employee has been off duty for at least ten hours. Tr. 241:18-242:2.

6

32. Which yard hostlers have sufficient hours of service to perform route driving varies day to day. Tr. 71:17-22. No yard hostlers who have sufficient hours are exempt from receiving road driving assignments, and yard hostlers do not have discretion to decline route driving assignments. Tr. 20:17-21:5, 58:19-59:2, 206:25-207:3.

33. Plaintiff understands that his hours of service are governed by the DOT's hours of service regulations. Tr. 239:9-12; Ex. 554 at EST000120 (Driver Data Sheet form signed by Plaintiff specifying the number of hours he worked in the seven days prior to his date of hire to "ensure duty hours are available as required by FMCSA Hours of Service."); id. at EST000123 ("People Net Training and Installation Acknowledgment" form signed by Plaintiff stating: "During pre-trip, ensure your truck has a copy of the E-Logs manual and blank DOT log. If the truck does not have a People Net unit or the People Net unit is not functioning, then you must complete a DOT paper log and turn into dispatch.").

**VI. Yard Hostlers May be Required to and Have Performed Route Driving Assignments During the Class Period**

34. Estenson sometimes requires yard hostlers to perform route driving work, and will pull them from their yard hostling work to deliver freight over public highways. Tr. 151:3-11, 58:4-11, 244:3-16, 262:9-16, 278:17-279:10.

35. When yard hostlers perform route driving work, they drive tractor-trailer units, called day cabs, with up to gross vehicle maximum weight ratings of 80,000 pounds. Tr. 260:9-19.

36. When yard hostlers are called on to transport freight, they transport the same freight as route drivers. Tr. 209:14-18.

37. Plaintiff made road trips seven or eight times in four years. Tr. 278:17-20.

38. At least 49 other class members completed route driving trips between 2011 and 2015. Dkt. 235-1; Ex. 587.[3]

---

[3] Defendant submitted, along with its Proposed Findings of Fact and Conclusions of Law, a summary of some of the 6,693 "trip sheets" (the trip sheets were submitted as Exhibit 587).

**CONCLUSIONS OF LAW**

California law requires employers to pay both daily and weekly overtime to employees for "[a]ny work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek at the rate of no less than one and one-half times the regular rate of pay for an employee." Cal. Lab. Code § 510(a). California's overtime laws do not apply, however, to employees who are subject to DOT regulations governing the hours of service of drivers, 49 C.F.R. § 395.1 to § 395.13 (the "motor carrier exemption"). Cal. Code Regs. tit. 8 § 11070(3)(K); Collins v. Overnite Transp. Co., 105 Cal. App. 4th 171, 180 (2003), as modified (Feb. 3, 2003) (affirming validity of motor carrier exemption under California statutes). The Federal Labor Standards Act (FLSA) has a similar exemption from its overtime provisions. See 29 U.S.C. § 213(b)(1). Federal decisions provide reliable authority for interpretation of California wage laws where there are parallels in federal law. See Monzon v. Schaefer Ambulance Serv., Inc., 224 Cal. App. 3d 16, 31 (1990).

Ensuring the safety of public highways lies at the heart of the DOT's jurisdiction over a motor carrier's employees. See Levinson v. Spector Motor Serv., Inc., 330 U.S. 649, 685 (1947) ("[U]nder the Motor Carrier Act, the Interstate Commerce Commission has power to establish qualifications and maximum hours of service for those employees whose service affects the safety of transportation of common carriers, contract carriers or private carriers of property in interstate and foreign commerce . . . .").[4]

---

Trip sheets are forms that all route drivers and yard hostlers complete daily to record their work shift activity. Tr. 21:12-14. The summary lists the names of fifty class members (including Plaintiff) who, according to Defendant, have completed road trips during the class period.

[4] See 29 C.F.R. § 782.2 ("The U.S. Supreme Court has accepted the Agency determination, that activities of this character are included in the kinds of work which has been defined as the work of drivers, driver's helpers, loaders, and mechanics . . . employed by such carriers, and that no other classes of employees employed by such carriers perform duties directly affecting such 'safety of operation.'").

The motor carrier exemption applies where trips in interstate commerce are part of the company's normal business operations, are distributed throughout the year, and are shared indiscriminately by the employees in question, even though they are mingled with other services not in interstate commerce. Morris v. McComb, 332 U.S. 422, 433 (1947). The trips need not be evenly distributed and need not have been made by each employee. See id. (noting two newer employees had not driven in interstate commerce); see also Reich v. Am. Driver Serv., Inc., 33 F.3d 1153, 1156 (9th Cir. 1994) (explaining those who have not driven in interstate commerce may still be subject to the exemption if they could "reasonably have been expected" to make interstate trips and other drivers actually did) (citing Application of the Federal Motor Carrier Safety Regulations, 46 Fed. Reg. 37902-02 (July 23, 1981) (the "DOT Notice of Interpretation").[5]

"'An employer who claims an exemption from [overtime requirements] has the burden of showing that the exemption applies . . . .'" Reich, 33 F.3d at 1156 (quoting Donovan v. Nekton, Inc., 703 F.2d 1148, 1151 (9th Cir.1983)). Exemptions from

---

[5] Plaintiff contends that Defendant was required to show that each class member in fact drove in interstate commerce, but the cases on which Plaintiff relies do not stand for that proposition. See, e.g., Goldberg v. Faber Indus., Inc., 291 F.2d 232, 235 (7th Cir. 1961) (district court erred in finding that the employer's operation, rather than activities of the employees, was controlling because, among other things, unlike in Morris, none of the employees claiming overtime was subject to interstate trip assignments); Pritchett v. Werner Enters., Inc., No. CIV.A. 12-0182-WS-C, 2013 WL 6909892, at *7 (S.D. Ala. Dec. 31, 2013) (employer did not meet burden at summary judgment where the raw materials transported on employee's trips between facilities or to a gas station were "not finished products beginning an interstate journey"); Verdi v. Domino Logistics Co., No. 1:10-CV-1888, 2011 WL 2457503, at *3 (N.D. Ohio June 16, 2011) (employer did not meet burden on summary judgment where there was no evidence that employees drove on public highways); Billingslea v. S. Freight, Inc., 699 F. Supp. 2d 1369, 1377 (N.D. Ga. 2010) ("Based on the record, the only vehicle that Plaintiff drove or was authorized to drive as part of his employment with Defendant was a hostler tractor that he could not, and did not, take on to any public roads or interstate highways.") (emphasis added); Dole v. Circle "A" Const., Inc., 738 F. Supp. 1313, 1323 (D. Idaho 1990) ("If Circle A had demonstrated that between 1983 and 1986 all of its drivers were subject to the indiscriminate distribution of interstate hauls, DOT would certainly have had jurisdiction over all of those drivers.").

overtime laws must "'be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress.'" Id.

I. **When Yard Hostlers Perform Route Work, They Fall Under the DOT's Definition of "Drivers"**

The DOT has jurisdiction to govern the hours of (a) "drivers" of "commercial motor vehicles," for (b) "motor carriers," (c) in interstate commerce. 49 C.F.R. §§ 390.5, 395.1[6]; see Wells v. A.D. Transport Express, Inc., No. 15-cv-11324, 2016 WL 3213396, *3 (E.D. Mich. June 10, 2016) ("Neither the name given to an employee's position nor that given to the work he does is controlling; instead, it is the character of the activities involved in the performance of the job that controls.") (citing 29 C.F.R. § 782.2(b)(2).

A. **Drivers of Commercial Motor Vehicles**

A "driver" is "any person who operates any commercial motor vehicle." 49 C.F.R. § 390.5. A commercial motor vehicle (CMV) is "any self-propelled or towed motor vehicle used on a highway in interstate commerce to transport passengers or property" that has a "gross vehicle weight rating or gross vehicle weight or gross combination weight" of 10,001 pounds or more. Id. Although the record is not entirely clear, the parties do not appear to dispute that when yard hostlers perform route driving assignments, they drive CMVs.[7] Such route driving work requires yard hostlers to drive

---

[6] The definitions in the DOT regulations have greater weight than those contained in the Department of Labor's FLSA regulations. See 29 C.F.R. § 782.1 ("The Fair Labor Standards Act confers no authority on the Secretary of Labor or the Administrator to extend or restrict the scope of this exemption."); Reich, 33 F.3d at 1156 (Farris, J., dissenting) (citing 46 Fed. Reg. 37902-02 and noting that the "Federal Highway Administration's interpretation of its own jurisdiction is entitled to deference").

[7] The parties agree that the tractor-trailers that route drivers use to make deliveries qualify as CMVs. See Dkt. 242 (Plaintiff's Response) at 19. Plaintiff testified at trial that the only difference between a "day cab" yard hostlers use when they perform local delivery route work and a "sleeper cab" (which allows route drivers making longhaul trips to sleep and reset their DOT 10-hour service clock) is that the day cab doesn't have a place for the driver to sleep. Tr. 243:10-13.

on highways, Tr. 58:4-18, and transport the same freight that route drivers typically transport. Tr. 209:14-18.

### B. Motor Carrier

A "motor carrier" is "a for-hire motor carrier or a private motor carrier." 49 C.F.R. § 390.5. A "for-hire motor carrier" is "a person [including "any individual, partnership, association, corporation, business trust, or any other organized group of individuals"] engaged in the transportation of goods or passengers for compensation." Id. Defendant is a "motor carrier" within the meaning of the DOT regulations because it is "engaged in the transportation of goods . . . for compensation." Id.; see Tr. 94:1-5, 196:20-197:2.

### C. Interstate Commerce

Interstate commerce means transportation "(1) [b]etween a place in a State and a place outside of such State (including a place outside of the United States); (2) [b]etween two places in a State through another State or a place outside of the United States; or (3) [b]etween two places in a State as part of trade, traffic, or transportation originating or terminating outside the State or the United States." 49 C.F.R. § 390.5. The employer's involvement in interstate commerce must be established by concrete evidence. Reich, 33 F.3d at 1157.

Defendant presented testimony that it operates in interstate commerce because its route drivers transport items from another state into California and transport items between two places in California that originated outside California or the United States. 49 C.F.R. § 390.5; see Tr. 10:23-11:3 (Defendants' drivers transport freight from Nevada to the Tracy RDC); 257:12-258:12 (products arriving at the Tracy RDC via seaport primarily are from China); 258:6-16 (products arriving at the Tracy RDC via rail primarily are from the east coast).

That products may be held in a distribution center for a short period does not take them out of interstate commerce:

> [W]hen a shipper transports his product across state lines for sale by him to customers in the destination state, and the product undergoes no alteration during its journey to the shipper's customer, and interruptions in the journey that occur in the destination state are no more than the normal stops or stages that are common in interstate sales, such as temporary warehousing, the entire journey should be regarded as having taken place in interstate commerce within the meaning of the Motor Carrier Act's exemption . . . .

Collins v. Heritage Wine Cellars, Ltd., 589 F.3d 895, 898 (7th Cir. 2009) (emphasis added).[8]

---

[8] Plaintiff urges the Court to apply the interstate commerce test set out in Baird v. Wagoner Transp. Co., 425 F.2d 407 (6th Cir. 1970) instead of the Collins test. See Baird, 425 F.2d at 411 (finding that products had come to rest in storage facility and drivers transporting products only from the storage facility to other locations in the state were not engaged in interstate commerce). The Court finds Collins more persuasive. See California Trucking Ass'n v. I.C.C., 900 F.2d 208, 213 (9th Cir. 1990) (stating that "it appears that use of that standard [i.e., the standard used in Baird for determining whether goods remain in interstate commerce] has been refined, if not phased out."); see also Kennedy v. Equity Transp. Co., Inc., 663 F. App'x 38, 40 (2d Cir. 2016) (noting that Baird was based on an "outdated test."); Roberts v. Levine, 921 F.2d 804, 811 (8th Cir. 1990) (stating the Baird test is "outmoded."). Plaintiff also contends that Watkins v. Ameripride Servs., 375 F.3d 821 (9th Cir. 2004) is fatal to Defendant's claim because here, Home Depot sometimes placed orders for delivery to a warehouse without identifying the vendors to which the goods ultimately would be delivered. See Watkins, 375 F.3d at 825 (when "a company places orders with an out-of-state vendor, with delivery to the company's intrastate warehouse for future delivery to customers yet to be identified, the transportation chain culminating in delivery to the customer is considered intrastate in nature."). Defendant presented evidence sufficient to demonstrate that the products did not rest in Defendants' warehouses, as they did in Watkins, but rather went through Defendants' distribution centers. Tr. 126:6 (products come into a distribution center for unloading reloading, and prompt distribution "as a continual [process]."); see Klitzke v. Steiner Corp., 110 F.3d 1465, 1470 (9th Cir. 1997) ("[E]ven though the shippers did not know the goods' ultimate destinations, the orders were placed and the goods were shipped to satisfy contracts between Steiner and its customers that specified a final place of delivery within Oregon other than the Steiner warehouse. The goods were therefore in 'continuous transportation' until delivered to Steiner's customers."); see also Reich, 33 F.3d at 1155 n.3 ("If the wholly intrastate commerce is merely part of a 'continuing transportation' in interstate or foreign commerce, [] the motor carrier is subject to the Secretary of Transportation's jurisdiction.") (citation omitted).

**II. Yard Hostlers Did or Reasonably Could Have Been Expected to Move Goods That Are in the Stream of Interstate Commerce**

The Supreme Court has instructed that in considering whether an employee is subject to the DOT's jurisdiction, "it is 'the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the [Interstate Commerce] Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment." Morris, 332 U.S. at 431-32 (citing Levinson, 330 U.S. at 674-75; see also Reich, 33 F.3d at 1155 ("Under Morris, even a minor involvement in interstate commerce as a regular part of an employee's duties can subject that employee to the Secretary of Transportation's jurisdiction.") (citing Morris, 332 U.S. at 432-35); Alexander v. Tutle & Tutle Trucking, Inc., 834 F.3d 866, 870-71 (8th Cir. 2016) (drivers exempt from overtime even though, as a group, they drove in interstate commerce on fewer than 1% of the days in question); Starrett v. Bruce, 391 F.2d 320, 323 (10th Cir. 1968) ("As a practical matter it is not the amount of time an employee spends in work affecting safety, rather it is what he may do in the time thus spent, whether it be large or small, that determines the effect on safety.").[9]

---

[9] Although the Supreme Court has recognized a de minimis exception to DOT jurisdiction when the employee's interstate activities "form so trivial, casual or occasional a part of an employee's [duties]" that they cannot be said to affect safety, Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695, 708 (1947), as the DOT Notice of Interpretation recognizes, "courts that have applied this principle find that it should seldom, if ever, be applied to drivers because of the direct effect of driving on the safety of motor vehicle operations." 46 Fed. Reg. at 37903; Shoemaker v. United Parcel Serv., Inc., No. 1:10-CV-185-EJL-CWD, 2011 WL 836998, at *9 (D. Idaho Feb. 10, 2011), report and recommendation adopted, No. 1:10-CV-00185-EJL, 2011 WL 863015 (D. Idaho Mar. 9, 2011); see also Levinson, 330 U.S. at 678 ("[A] driver's work more obviously and dramatically affects the safety of operation of the carrier during every moment that he is driving than does the work of the loader who loaded the freight which the driver is transporting."). Courts that have found the de minimis exception to apply generally have done so only after concluding that the employees did not have a reasonable expectation of being assigned interstate commerce work. See, e.g., Veliz v. Cintas Corp., No. C 03-1180(RS), 2009 WL 1107702, at *7 (N.D. Cal. Apr. 23, 2009).

In 1981, the DOT, through the Federal Highway Administration, promulgated a Notice of Interpretation, in which it stated that according to case law, if there is no evidence that individual employees actually engaged in interstate commerce, the DOT still would have jurisdiction if the <u>employer</u> has engaged in interstate commerce and the individual employee "could reasonably have been expected to make one of the carrier's interstate runs" in the "regular course of [his or her] employment." DOT Notice of Interpretation, 46 Fed. Reg. at 37902, 37903.[10] The Ninth Circuit has emphasized that the DOT's "reasonable expectation" language applies only to employees for whom there is no evidence of actual interstate driving:

> The interpretation's only reference to "reasonable expectations" concerns claims of jurisdiction over a motor carrier's drivers who have not driven in interstate commerce when there is evidence that other drivers employed by the motor carrier have driven in interstate commerce. In such a case, those drivers would be subject to the Secretary of Transportation's jurisdiction if they could "reasonably have been expected to make one of the carrier's interstate runs." The interpretation does not indicate that a driver's or motor carrier's reasonable expectations are otherwise relevant.

<u>Reich</u>, 33 F.3d at 1157; <u>see also</u> <u>Alexander</u>, 834 F.3d at 870 ("The Motor Carrier Act exemption applies to a driver who performs no interstate driving if the driver is 'subject to be[ing] assigned an interstate trip' and there is a reasonable expectation of such an assignment.") (citing <u>Starrett</u>, 391 F.2d at 323-24; DOT Notice of Interpretation, 46 Fed. Reg. 37902-02).

Determination of whether a driver had a reasonable expectation of interstate driving assignments does not require proof that driving assignments were evenly or proportionally distributed, but the driving assignments must be "indiscriminately assigned." <u>See</u> <u>Morris</u>, 332 U.S. at 433-34 (concluding drivers were exempt from overtime even though the interstate trips "were not distributed equally to each driver");

---

[10] <u>See</u> <u>Reich</u>, 33 F.3d at 1158 (Farris, J., dissenting) (Federal Highway Administration's interpretation entitled to deference).

see also Griffin v. Consol. Foods Corp., 771 F.2d 826, 829 (4th Cir. 1985) (employee was exempt even though she never received one of the available out of state trips).

Defendant therefore had the burden to demonstrate either that each yard hostler in the class actually made "interstate runs" during the relevant time period, or, for any class members for whom there is no such evidence, that those class members nevertheless reasonably could have expected to receive interstate run assignments. Reich, 33 F.3d at 1157. "[S]tatements from drivers and carriers, and any employment agreements" constitute evidence of drivers' reasonable expectations. Id. at 1156 (citing DOT Notice of Interpretation). Defendant also was required to prove that its assignment of route driving to yard hostlers was indiscriminate. Morris, 332 U.S. at 433.

### A. Estenson Presented Evidence that at Least Fifty Class Members Actually Performed Route Driving Assignments

As noted above, the Court finds that Defendant operates in interstate commerce because its route drivers transport items from outside of California and also transport items within California that originated from outside California. When yard hostlers perform route driving work, they perform the same work as route drivers. Defendant submitted evidence in the form of a summary of certain trip sheets, setting out the route driving work of fifty yard hostlers, including Plaintiff, between 2011 and 2015.[11] Both Scott Halterman, Estenson's Tracy RDC site manager, and Michelle Alexander,

---

[11] Plaintiff objects on various grounds to the trip sheets contained in Exhibit 587. The Court, already having found the trip sheets to be admissible, see July 25, 2017 Order, Dkt. 234, at 5, notes only that their probative value is limited due to the lack of detail in Defendant's summary (e.g., dates) and the inability of counsel to stipulate to a more comprehensive summary. Plaintiff does not appear to dispute the accuracy of Defendant's submitted summary, and given that even class members who have taken no road driving assignments may be subject to DOT jurisdiction if they reasonably could have expected an assignment, the Court need not determine whether each trip sheet in Exhibit 587 accurately reflects a class member performing road driving work. Unlike in Coast Van Lines, Inc. v. Armstrong, 167 F.2d 705, 707 (9th Cir. 1948), in which the defendant produced evidence showing road trips for one month only, here, Defendant has submitted evidence of actual trips taken by some yard hostlers (nearly half the class) over six years, and, as discussed below, also has demonstrated that yard hostlers who may not have taken road trips nevertheless could have been assigned such work.

1  Estenson's VP of Corporate Services, testified that yard hostlers in fact made route
2  deliveries. Tr. 58:19-59:2, 166:14-23. Plaintiff testified that he personally performed
3  route driving work seven or eight times over the course of his employment, and further
4  testified that other yard hostlers would on occasion be pulled from their yard hostling
5  duties to do such work. Tr. 261:16-22, 262:14-23, 278:17-20.

### B. Estenson Proved Other Drivers Had a Reasonable Expectation of Being Called on to Perform Route Driving Assignments

Whether an employee has a reasonable expectation of being assigned to perform work in interstate commerce is an objective determination. See, e.g., Lucas v. NOYPI, Inc., No. CIV.A. H-11-1940, 2012 WL 4754729, at *8 (S.D. Tex. Oct. 3, 2012), aff'd, 536 F. App'x 416 (5th Cir. 2013) ("The issue, therefore, is whether objectively there can be said to be a 'reasonable expectation' that an interstate trip could be assigned to members of a group, not whether a particular employee subjectively thought he was likely to receive an interstate assignment.").

The evidence shows that Defendant hired only yard hostlers who held valid CDLs and who otherwise were qualified (including passing physical, medical, and drug tests, as well as background checks) to drive on public roads under the DOT rules, even though the yard goats hostlers used for yard hostling work were not licensed for road use.[12] Tr. 19:6-11, 41:20-23, 94:11-13, 97:10-103:121, 204:17-23, 260:6-8. The yard hostler job description includes "occasional local deliveries," and Defendant informed yard hostlers that they may be asked to make local deliveries. Tr. 56:6-15 (yard hostlers could be asked to make only local, i.e., not overnight, deliveries), Tr. 116:3-22, 146:13-147:1 (yard hostler job description includes occasional local deliveries), 166:14-23 (same), Tr. 261:16-22 (Plaintiff understood that yard hostlers would be pulled from hostling to make deliveries), Ex. 556. There is nothing in the record to indicate that yard hostlers'

---

[12] DOT compliance alone is not dispositive of a motor carrier's involvement in interstate commerce, but it is relevant evidence—and the carrier's involvement in interstate commerce is relevant to the employees' reasonable expectations. Sturm v. CB Transp., Inc., 943 F. Supp. 2d 1102, 1117 (D. Idaho 2013).

route work was limited to certain times of the year. This evidence is sufficient to demonstrate that yard hostlers were aware they could be assigned occasional route driving in the regular course of their employment. See Reich, 33 F.3d at 1156; Alexander, 834 F.3d at 870.[13]

### C. Estenson Assigned Road Driving Work to Yard Hostlers Indiscriminately

Defendant also presented evidence sufficient to demonstrate that when it assigned route driving work to yard hostlers, the assignment was indiscriminate.[14] See Reich, 33 F.3d at 1156 (citing DOT Notice of Interpretation stating that for purposes of showing indiscriminate assignment, "[s]atisfactory evidence would be statements from drivers and carriers, and any employment agreements."). Mr. Halterman testified that "[a]s long as that hostler had the hours of service available [pursuant to the DOT rules] to take that run, we would ask that driver." Tr. 20:17-20; see also Tr. 59:3-9. He further testified that no hostlers were exempt from being assigned route work, and he described a situation in which a yard hostler did not want to take on route work and Mr. Halterman "had to tell a driver, yes, you have to take that route." Tr. 21:3-5, 58:24-59:2. Plaintiff testified that the selection of which yard hostler might be assigned to perform local deliveries was a "random selection" of "[a]ny of the yard hostlers." Tr. 262:17-23.

---

[13] Defendant somewhat confusingly classifies yard hostlers as non-exempt and eligible for overtime compensation (and Defendant represents the same to yard hostlers and pays the yard hostlers daily, but not weekly, overtime compensation). Tr. 66:21-22, 144:7-145:2, 268:14-269:4. Defendant's employee manual explains, however, that "[t]he non-exempt status of our drivers is intended to be an additional benefit to the total rewards package offered through employment with [Estenson]." Tr. 135:2-7; Ex. 590 at 31 (emphasis added); see also Tr. 136:8-20 ("Estenson does not have to pay that overtime. And we pay it as an overall benefit to the drivers."). While it may be an unusual way to describe a benefit, using the word "non-exempt" does not create a legal obligation where one otherwise does not exist, and does not, contrary to Plaintiff's assertion, constitute waiver or implicate the doctrine of estoppel.

[14] Defendant was required to show indiscriminate assignment of route driving work among the employees in question, i.e., the yard hostler class members, and not, as Plaintiff contends, among yard hostlers and route drivers. See Morris, 332 U.S. at 423 (the question is whether interstate assignments are "shared indiscriminately among such employees") (emphasis added).

## CONCLUSION

Estenson has met its burden of establishing that, during the class period, the class members were subject to the jurisdiction of the DOT under the motor carrier exemption, Cal. Code Regs. tit. 8 § 11070(3)(K), and Defendant therefore was not required by Section 510(a) of the California Labor Code to pay overtime to the class members.

IT IS SO ORDERED.

Date: 11/7/17

_____
Honorable Dale S. Fischer
United States District Judge